## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
Laboratory Partners, Inc., et al.,[1]  :      Case No. 13-12769 (      )
                                       :
                   Debtors.            :      (Joint Administration Pending)
-------------------------------------------------------x
```

## DECLARATION OF WILLIAM A. BRANDT, JR.
## IN SUPPORT OF FIRST DAY RELIEF

I, William A. Brandt, Jr., being duly sworn, deposes, and says:

1.    I am the Chief Executive Officer, President and Secretary of each of Laboratory Partners, Inc. ("Laboratory Partners"), Terre Haute Medical Laboratory, Inc. ("THML"), Pathology Associates of Terre Haute, Inc. ("PATH"), Kilbourne Medical Laboratories, Inc. ("Kilbourne"), MedLAB Ohio, Inc. ("MedLAB"), Suburban Medical Laboratory, Inc. ("Suburban") and Biological Technology Laboratory, Inc. ("BTL" and, together with THML, PATH, Kilbourne, MedLAB and Suburban, the "Subsidiaries"). Laboratory Partners and the Subsidiaries are each referred to herein as a "Debtor" and, collectively, as the "Debtors". The Debtors are requesting various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the Debtors' chapter 11 cases (the "Chapter 11 Cases"). I submit this declaration (this "Declaration") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485). Certain of the Debtors do business as MEDLAB. The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

(the "Bankruptcy Code") and (b) the First Day Pleadings.  I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

2.    I have held my current position with Laboratory Partners since August 20, 2013.  I have held my current positions with the Subsidiaries since October 15, 2013.  As a result of my work for the Debtors, review of relevant documents and discussions with other members of the Debtors' management teams, I am familiar with the operations, business affairs, and books and records of the Debtors.  I have knowledge of the matters set forth herein and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of Debtors' management teams, my review of relevant documents, or my opinion based on my knowledge of the Debtors' operations and financial conditions, except as otherwise noted.  In making this Declaration, I have relied a great deal on information and materials that the Debtors' employees and advisors have gathered, prepared, verified, and provided to me under my ultimate supervision, at my direction, or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3.    The Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, corporate and capital structures, restructuring efforts, and events leading up to the filing of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

# PART I

# BACKGROUND

## A.    The Debtors' Business

4.    Laboratory Partners, through its Subsidiaries, provides clinical laboratory and anatomic pathology services to (i) skilled nursing facilities in Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Virginia and Washington, D.C. (the "Long-Term Care Division"), (ii) physicians, physician offices and medical groups (the "PO Division") in Indiana and Illinois, and (iii) Union Hospital, Inc. in Terre Haute and Clinton, Indiana (the "UH Division").

5.    Laboratory Partners is headquartered in Cincinnati, Ohio, and, through its Subsidiaries, operates approximately 11 laboratory facilities and has approximately 27 offices in 7 states.  The Debtors do not have any operations outside of the United States.

## B.    The Debtors' Workforce

6.    The Debtors currently employ approximately 1,034 employees collectively, all of which are located in the United States (the "Employees"), of which 147 are paid on a salaried basis and 887 are paid on an hourly basis.  794 Employees work in Debtors' Long-Term Care Division and 221 Employees work in Debtors' PO Division or UH Division.

7.    The Employees provide a variety of services to support the Debtors' operations.  Approximately 70% of the Debtors' salaried Employees are engaged in laboratory services functions, with the balance of the salaried Employees engaged in sales, service, marketing, billing and administration.  The hourly Employees are engaged in laboratory services and administrative functions.

8.     To supplement its workforce, Debtors utilize approximately 16 individuals who provide services on a temporary basis through three temporary staffing agencies (collectively, the "Temporary Employees") and retain five independent contract workers (the "Contract Workers" and, together with the Employees and the Temporary Employees, the "Workforce") to provide a range of services including, but not limited to (a) laboratory services, (b) sales and marketing services, and (c) information technology consulting services.

C.     **The Debtors' Corporate and Capital Structure**

9.     Laboratory Partners, a Delaware corporation organized in 2004, is the parent corporation of five direct domestic Subsidiaries and one indirect domestic Subsidiary.  An organizational chart of Debtors is attached as **Exhibit A** hereto.  Each Subsidiary is a Debtor in these Chapter 11 Cases.

10.     The principal amount of the Debtors' prepetition funded indebtedness can be summarized as follows:

|  | **Debt as of the Petition Date: (in US Dollars)** |
| --- | --- |
| The Marathon Facility (as defined below) | $21,595,465.62 |
| The Notes (as defined below) | $18,424,917.67 |
| Capital Lease Obligations | $2,654,139.47 |
| **Total Debt** | **$42,324,522.76** |

11.     The Marathon Facility.  The Subsidiaries, as borrowers, and Laboratory Partners, as the guarantor, are parties to an amended and restated credit agreement dated as of August 5, 2008 with various financial institutions party thereto as lenders (the "Prepetition Lenders"), The Bank of New York Mellon ("BNY Mellon"), as administrative and collateral

agent, and Marathon Special Opportunity Fund, L.P. ("Marathon"), as lead arranger, which amended and restated in its entirety a prior credit agreement that had been entered into on March 28, 2007 (such credit agreement and additional documents and ancillary agreements, as amended, are referred to herein collectively as the "Marathon Facility").

12. The indebtedness under the Marathon Facility matured by its terms on March 28, 2013. The loans under the Marathon Facility currently bear interest at a base rate, which is equal to the greater of (i) the prime interest rate, (ii) the federal funds rate plus 3.25% or (iii) adjusted one-month LIBOR rate plus 1.5%, plus the relevant applicable margin as set forth in the Marathon Facility, plus 3% default interest. As of the Petition Date, the interest rate on the Term Loans A-1 and A-2 and the Revolving Loans under the Marathon Facility was approximately 10.8%, and the interest rate on Term Loan B was approximately 16.8%.

13. The obligations of the Debtors under the Marathon Facility are secured by a first-priority lien on substantially all of the assets of the Debtors; however, THML owns a real property parcel located in Vigo County, Indiana that may not be covered by the lien. Current searches of real property records do not indicate a filing in favor of the Prepetition Lenders.

14. On May 1, 2013, Debtors entered into a Forbearance Agreement with the Prepetition Lenders, Marathon and BNY Mellon (as amended, the "Forbearance Agreement") whereby the Debtors, Prepetition Lenders, Marathon and BNY Mellon acknowledged that certain Defaults and Events of Default (as defined in the Marathon Facility) have occurred and are continuing, including the failure to pay all loans and obligations due under the Marathon Facility on March 28, 2013. (All of such Defaults and Events of Default, as listed in the Forbearance Agreement, are herein referred to as the "Designated Defaults".) Under the terms of the Forbearance Agreement, the Prepetition Lenders, Marathon and BNY Mellon agreed to

forbear, during the Forbearance Period (as defined below), from exercising or enforcing any right or remedy available to them under the Marathon Facility and/or applicable law arising as a result of the Designated Defaults.   The forbearance period (the "Forbearance Period") commenced on March 29, 2013 (one day after the maturity date of the loans under the Marathon Facility) and, including all extensions, expired on October 7, 2013.

15.   The Seller Notes.   On March 28, 2007, Laboratory Partners issued two subordinated unsecured promissory notes to individual sellers, M. Bashar Kashlan, M.D. and Gerald Longa, M.D., in connection the acquisition by Laboratory Partners of THML and PATH pursuant to the Stock Purchase Agreement dated as of June 29, 2006 (such subordinated promissory notes, as amended from time to time, the "THML Notes").   Each THML Note was originally issued in the principal amount of $4,030,000. On June 29, 2007, Laboratory Partners issued two subordinated promissory notes to individual sellers, Paul Kilbourne, Sr. and Jay Braun, in connection the acquisition by Laboratory Partners of Kilbourne pursuant to the Stock Purchase Agreement dated as of June 29, 2007 (such subordinated promissory notes, as amended from time to time, the "Kilbourne Notes" and, together with the THML Notes, the "Seller Notes").

16.   The Kilbourne Notes were originally issued in the principal amounts of $2,897,000 and $2,183,000.   The Seller Notes have an interest rate of 12% per annum.   The Kilbourne Notes have a default rate of 12% per annum, and the THML Notes have a default rate of 15% per annum.   Interest on the Seller Notes is payable in cash quarterly in arrears.

17.   The Seller Notes are subordinated to the indebtedness under the Marathon Facility.   The THML Notes matured on May 1, 2013, and the Kilbourne Notes mature on November 1, 2013.   Laboratory Partners is currently in default with respect to the Seller Notes.

Consequently, on October 18, 2013, Gerald J. Longa and M. Bashar Kashlan each filed a complaint in the United States District Court for the Southern District of Indiana against Laboratory Partners seeking payment on an accelerated basis of principal, interest and related amounts allegedly due under the THML Notes (together, the "Seller Note Actions").[2]  As of the Petition Date, the Seller Notes had a remaining principal balance of $10.4 million outstanding, plus accrued and unpaid interest of approximately $72,000.

18.    The Investor Notes.   On March 8, 2011, the Debtors issued unsecured subordinated promissory notes to nine purchasers in the aggregate original principal amount of $3,225,806 (as amended from time to time, the "March 2011 Notes") which bear interest at a rate of 12% per annum payable quarterly.   The March 2011 Notes matured on May 1, 2013.   On March 28, 2012, the Debtors issued unsecured convertible subordinated promissory notes to eight purchasers in the aggregate original principal amount of $1,200,000 (as amended from time to time, the "March 2012 Notes").   On June 26, 2012, the Debtors issued unsecured convertible subordinated promissory notes to the same eight purchasers of the March 2012 Notes in the aggregate original principal amount of $1,000,000 (as amended from time to time, the "June 2012 Notes").   On December 28, 2012, the Debtors issued unsecured convertible subordinated promissory notes to the same eight purchasers in the aggregate original principal amount of $1,000,000 (as amended from time to time, the "December 2012 Notes").   On February 13, 2013, the Debtors issued unsecured convertible subordinated promissory notes to the same eight purchasers in the aggregate original principal amount of $491,716.34 (as amended from time to time, the "February 2013 Notes" and, together with the March 2011 Notes, March 2012 Notes,

---

[2]        This action as stayed upon the filing of the Debtors Chapter 11 Cases.

June 2012 Notes and December 2012 Notes, the "Investor Notes" and, together with the Seller Notes, the "Notes").

19.    The March 2012 Notes, June 2012 Notes, December 2012 Notes and February 2013 Notes mature on November 1, 2013 and bear interest at a rate of 10% per annum payable quarterly.  Such Notes are convertible, at the option of the holder, into Laboratory Partners' Series F Preferred Stock, par value $0.001 per share, at a conversion price of $8.75 per share, on November 1, 2013 or into shares of Laboratory Partners equity securities upon certain equity financings at a conversion price equal to the price per share paid by investors in such equity financing.  The Investor Notes have a default rate of 15% per annum.

20.    The indebtedness under the Investor Notes is subordinate in right of payment to the indebtedness under the Marathon Facility.  The indebtedness under the March 2012 Notes is subordinate in right of payment to all the indebtedness under the Marathon Facility and the March 2011 Notes, June 2012 Notes, December 2012 Notes and February 2013 Notes. The Investor Notes include a provision which allow the Debtors to pay interest in kind (in some cases, 50% of such interest, and in some cases, 100% of such interest).

21.    As of the Petition Date, the Investor Notes had a remaining principal balance of $8.0 million outstanding, plus accrued and unpaid interest of approximately $60,000. The Debtors are currently in default with respect to the Investor Notes.  The net proceeds of the Investor Notes were used to fund general corporate expenses and working capital requirements of the Debtors.

22.    Capital Leases.    As of the Petition Date, the Debtors also have approximately $2.7 million in secured debt consisting of capital leases for certain property and equipment.  These capital leases are for various assets, including vehicles, laboratory testing

equipment, office equipment, information technology equipment and software.  These capital leases are financed by specialty lease financing companies or by the related vendor.

23.     <u>General Unsecured Debt</u>.  As of the Petition Date, the Debtors also have approximately $11 million in general unsecured debt primarily consisting of outstanding payments under various contracts and other arrangements for goods and services supporting their operations.

24.     <u>Laboratory Partners' Common and Preferred Stock</u>.  Laboratory Partners is a private company.  As of the Petition Date, Laboratory Partners had approximately 266,938 shares of common stock issued and outstanding, which are held by 3 holders.  In addition, as of the Petition Date, Laboratory Partners had 403,500 shares of Series A Preferred Stock, 2,212,000 shares of Series B Preferred Stock, 1,288,000 shares of Series D Preferred Stock, 561,545 shares of Series D-1 Preferred Stock, 640,000 shares of Series E Preferred Stock and 400,000 shares of Series F Preferred Stock issued and outstanding, for a total of 5,505,045 shares of Preferred Stock.  The issued and outstanding shares of Preferred Stock are held by 14 holders.

25.     All of the shares of capital stock of the Subsidiaries are held directly by Laboratory Partners, except the shares of capital stock of PATH, all of which are held directly by THML. Laboratory Partners also has outstanding warrants convertible into 44,000 shares of Series A Preferred Stock and options outstanding for 302,975 shares of common stock.

**D.      Events Leading to Debtors' Chapter 11 Filing**

26.     In recent years, a number of factors have contributed to a decline in the Debtors' earnings and liquidity, ultimately making this Chapter 11 filing a necessary step for the Debtors.

27.   <u>Reimbursement Rate Pressures.</u>  Like many healthcare sector participants, Laboratory Partners has experienced declining revenues resulting from government-imposed permanent reductions in rates of reimbursement. The Affordable Care Act of 2010 imposed multi-year cuts to the Medicare Clinical Laboratory Fee Schedule ("<u>MCLFS</u>") from calendar years 2011 through 2015.[3]  Beginning January 1, 2011, the MCLFS for clinical laboratories was cut by 1.75%.  In each calendar year thereafter, an additional 1.75% cut was made to the MCLFS with additional cuts scheduled for 2014 and 2015.  Compounding these MCLFS cuts was an additional 2.0% reduction under the Middle Class Tax Relief and Job Creation Act of 2012[4] and sequestration cuts of 2.0% were implemented for all Medicare claims beginning April 1, 2013.[5]  The cumulative effect of these reimbursement reductions had a negative impact on the Debtors' clinical laboratory revenues.  Cuts to the Medicare Physician Fee Schedule also negatively impacted providers of pathology services.  On November 16, 2012, the Centers for Medicare & Medicaid Services ("<u>CMS</u>") issued the 2013 Medicare Physician Fee Schedule Final Rule which included cuts to pathology payments totaling 6.0% overall, with certain high volume pathology codes receiving significant reimbursement cuts, up to 52.0%,[6] which caused negative pricing

---

[3]   Patient Protection and Affordable Care Act, Pub. Law 111-148, § 3401(l) (Mar. 23, 2010).

[4]   Amending Section 1833(h)(2)(A) of the Social Security Act to require the rebasing of the Medicare clinical laboratory fee schedule by 2% beginning in 2013 and extending to subsequent years.  *See*, Middle Class Tax Relief and Job Creation Act of 2012; Pub. L. 112-96, Subtitle C, § 3202 (Feb. 22, 2012)

[5]   *See* CMS Medicare FFS Provider e-News "Mandatory Payment Reductions in the Medicare Fee-for-Service (FFS) Program – Sequestration" (Mar. 8, 2013) available at http://www.cms.gov/Outreach-and-Education/Outreach/FFSProvPartProg/Downloads/2013-03-08-standalone.pdf.          (*last visited October 8, 2013*)

[6]   *See* 77 Fed. Reg. 68891 (Nov. 16, 2012).

pressure on the Debtors' businesses and additional uncertainty for potential buyers of clinical laboratories.  In addition to the above reductions, government agencies are urging CMS to make further cuts to laboratory reimbursements in the coming years.  On June 11, 2013, the Office of the Inspector General released a report stating that Medicare could save approximately $910 million on laboratory tests if it paid providers at the lowest established rate in each geographic area.[7]  Similarly, the Medicare Payment Advisory Commission recommended to legislators in its March 2013 report that laboratory reimbursements be cut an additional 10% over the next 10 years, totaling $21 billion in reductions[8].  Additionally, the Medicare Physician Fee Schedule Proposed Rule released in July 2013 proposes additional laboratory reimbursement cuts of 25% for clinical laboratory services and approximately 50% for pathology laboratories after taking into account reductions in physician service reimbursements.[9]  In response to these Medicare reductions to laboratory reimbursements, commercial payors have likewise begun to cut reimbursements.  Blue Cross Blue Shield of Mississippi announced a 25% reimbursement cut to pathology services on May 15, 2013, and Aetna announced a significant reduction in pathology

---

[7]   *See* OIG Report OEI-07-11-00010 (June 11, 2013) recommending "that the Centers for Medicare & Medicaid Services (CMS) seek legislation that would allow it to establish lower payment rates for lab tests and consider seeking legislation to institute copayments and deductibles for lab tests."

[8]   *See* MedPAC Report to the Congress: Medicare Payment Policy (Mar. 2013).

[9]   *See* American Clinical Laboratory Association Statement on CMS Proposed Physician Fee Schedule Rule (July 9, 2013) available at http://www.acla.com/sites/default/files/Statement%20on%20PFS%20Proposed%20Rule%20July%202013.pdf (*last visited October 8, 2013*); *See* College of American Pathology Letter to CMS Administrator Marilynn Tavenner titled CMS-1600-P: Medicare Program; Revisions to Payment Policies under the Physician Fee Schedule, Clinical Laboratory Fee Schedule & Other Revisions to Part B for CY 2014 (Sept. 6, 2013) available at http://www.cap.org/apps/docs/advocacy/letters/cms_1600P_2014_proposed_rules.pdf (*last visited October 8, 2013*).

reimbursement to 45-50% of Medicare on July 1, 2013.  These announcements create additional uncertainty in the clinical laboratory market.

28.    The Debtors Explore the Strategic Options.    Substantially all of the Debtors' debt was scheduled to mature in 2012.  The Debtors began to examine their strategic alternatives and sought to improve efficiency and reduce corporate costs, and in August 2011, Laboratory Partners engaged MTS Health Partners, L.P. ("MTS") as its exclusive financial advisor/investment banker to assist Laboratory Partners in evaluating, formulating and implementing its financial and strategic plan and provide it with a range of strategic alternatives. Following the MTS engagement, from August 2011 through March 2012, Laboratory Partners, with the assistance of MTS, engaged in a detailed examination of its operating performance and reviewed a range of strategic corporate alternatives.  In March 2012, the Debtors, the Prepetition Lenders and BNY Mellon extended the maturity of the indebtedness under the Marathon Facility until March 2013 and the Debtors reached agreements with holders of the Notes to extend maturities under the Notes to May 2013 in some cases and November 2013 in others.

29.    Beginning in March 2012, Laboratory Partners, with the assistance of MTS, began to explore the possible sale of some of its operations, a partial or complete refinancing of its debt and a complete recapitalization.  Numerous selected financial and strategic buyers were contacted regarding a potential sale.  In addition, numerous selected parties were contacted regarding refinancing alternatives.  Laboratory Partners also considered other strategic alternatives.

30.    In April 2012, Laboratory Partners began to explore the sale of a portion of its operating assets to a group of prospective purchasers.  From May 2012 through May 2013, representatives of Laboratory Partners and MTS engaged in significant discussions with

numerous potential purchasers concerning the sale of a portion of its PO Division in Ohio, Indiana, Kentucky, Missouri and Illinois on a stand-alone basis or together with other operations of the Debtors.

31.     In May 2013, certain Debtors signed a definitive asset purchase agreement to sell such portion of the PO Division to Laboratory Corporation of America Holdings ("Lab Corp").  In June 2013, such Debtors consummated the sale of selected operating assets of the PO Division to Lab Corp for an aggregate purchase price of $10,676,000, plus an earn-out payment not to exceed $1,200,000 (the "POB Sale").  In connection with the POB Sale, Laboratory Partners received approximately $9,157,481 in net proceeds (including $1,114,740 of the earn-out), after deducting transaction fees and expenses of approximately $1,457,260.  In addition, $1,000,000 of the purchase price related to the POB Sale is currently held in escrow until December 2014 as security against indemnification claims that might be made by Lab Corp.  To date, no indemnification claims have been asserted.  In connection with the POB Sale, the Prepetition Lenders received $7,392,741 of the Debtors' net proceeds and allowed the Debtors to retain $1,764,740 to fund operations.

32.     In August 2013, the Debtors retained Development Specialists, Inc. ("DSI") to provide financial restructuring advice.  In connection with DSI's engagement, Laboratory Partners appointed me as chief executive officer.  Laboratory Partners, with the assistance of DSI, is currently engaged in substantive discussions with various parties regarding possible sales of other assets and divisions.

33.     On September 5, 2013, the Debtors engaged Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") to provide legal advice to the Debtors in connection with a restructuring.

34.     On or about October 22, 2013, the Debtors engaged Duff & Phelps Corporation as investment bankers to assist Debtors in connection with potential asset sales.

35.     <u>Expiration of the Forbearance Agreement; Near-Term Expiration of the Standstill Agreements</u>.  The Forbearance Period expired on October 7, 2013.  In addition, the Debtors are in default under the terms of the Notes, and the holders of the Notes are subject to contractual standstills and cannot exercise remedies prior to, among other things, a date that is 180 or 270 days, as the case may be, after written notice by the holder of such Notes of the occurrence and continuance of a Note Event of Default (as defined in such Notes).

36.     On April 16, 2013, Laboratory Partners received notices from two holders of Seller Notes (Drs. Kashlan and Longa) that a Note Event of Default (as defined in their Seller Notes) has occurred and such holders intend to commence an Enforcement Action (as defined in their Seller Notes) against Laboratory Partners on or about October 13, 2013.  On October 18, 2013, Drs. Kashlan and Longa filed complaints thereby initiating the Seller Note Actions.

37.     On April 23, 2013, Debtors received notices from Chrysalis Ventures II, L.P., a holder of Investor Notes, stating that a Note Event of Default (as defined in the Investor Notes) had occurred.

38.     On May 1, 2013 and May 9, 2013, Laboratory Partners received a notice from Paul Kilbourne, Sr. and Jay Braun, respectively, that a Note Event of Default (as defined in their Seller Notes) had occurred and, upon expiration of the 180 day standstill provision included in the Seller Note held by them, such holders intend to commence an Enforcement Action unless Laboratory Partners cures the Note Event of Default.

39.    On July 10, 2013, Debtors received notices from Primus Capital Fund IV, L.P., a holder of Investor Notes, indicating that a Note Event of Default (as defined in the Investor Notes) had occurred.

40.    In September 2013, representatives of Laboratory Partners and DSI had numerous conversations with representatives of Marathon and the holders of the Seller Notes. As a result of such conversations, and after considering all available options and the results of the Debtors' prior efforts to restructure their liabilities out of court, the Debtors determined that the consummation of an out-of-court restructuring in the near-term was very unlikely.  This determination was reinforced by the October 18, 2013 filing of the Seller Note Actions.

41.    DIP Financing.  Beginning in September 2013, representatives of the Debtors and DSI had numerous discussions with the Prepetition Lenders under the Marathon Facility regarding the possibility of debtor-in-possession financing ("DIP Financing").

42.    During this period and to assist the Debtors in their continuing marketing process, on October 16, 2013, the DIP Lender, in its capacity as an additional Prepetition Lender advanced the Debtors $350,000 in funds to permit the Debtors to pay operational and payroll expenses.  The purpose of this was to enable the Debtors to delay filing chapter 11 while they negotiated with a potential stalking horse bidder for the Long-Term Care Division.  The negotiations, although productive, did not result in a stalking horse bid on a timely basis; however, the potential counterparty remains actively interested.  The DIP Motion seeks authority to roll-up this limited amount of bridge financing in the DIP Financing.  Such advance was critical for the Debtors' operations and marketing process and the Debtors believe it is appropriate for this amount to be rolled-up in the DIP Financing.

43. Based upon the Debtors' prior experience and in light of their current financial condition, the Debtors did not believe that they would be able to obtain financing from any other sources. The DIP Financing will enhance the Debtors' liquidity with approximately $5,000,00 in new capital to assist in the restructuring. The Debtors project an initial DIP Financing draw of $2,850,000 upon interim approval of the DIP Financing and a second DIP Financing draw of approximately $2,150,000 upon satisfaction of the Second Draw Loan Milestones.

44. Therefore, after securing a fully-committed $5,000,000 in DIP Financing, the Debtors determined it was time to enter into Chapter 11 and implement a structured sales process with the goal of generating the most value for their constituencies.

E. **Health Care Businesses**

45. It is my understanding and belief that the Debtors are not "health care businesses" under the Bankruptcy Code because the Debtors are not "primarily engaged in offering to the general public facilities and services for (i) the diagnosis or treatment of injury, deformity, or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care". While the Debtors do provide facilities or services for the diagnosis or treatment of injury, deformity, or disease and take limited walk-in business in the patient service centers in Terre Haute, Indiana, the Debtors do not provide diagnosis or treatment. Rather, the Debtors test the samples and deliver results to the physician, who then makes the diagnosis and prescribes a course of treatment for the patient. Furthermore, the Debtors are not any of the specific types of health care business listed in the definition of "health care business" in the Bankruptcy Code, as the Debtors are not hospitals, treatment facilities, hospice or similar health care institutions or long-term care facilities, nor do the Debtors offer "room, board, laundry, or personal assistance with

activities of daily living".  Because the Debtors are not "health care businesses", section 333 of the Bankruptcy Code, requiring that an ombudsman be appointed to "monitor the quality of patient care" if the debtor in a case is a "health care business", is not applicable to these Chapter 11 Cases.

## PART II

## FIRST DAY PLEADINGS

46.    An important element to the success of the Debtors' Chapter 11 Cases is approval of the Debtors' requests for First Day Pleadings submitted concurrently herewith. Generally, the first day relief has been designed to facilitate: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of employees, customers, vendors, suppliers and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases.  I have reviewed the first day relief, including the exhibits thereto, and I believe that the relief sought therein is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their estates for their creditors and other stakeholders.

**I.    ADMINISTRATIVE PLEADINGS**

**A.    Debtors' Motion For Joint Administration Of Chapter 11 Cases Pursuant To Rule 1015(B) Of The Federal Rules Of Bankruptcy Procedure And Local Bankruptcy Rule 1015-1**

47.    By this Motion,[10] the Debtors are seeking the entry of an order directing joint administration of the Debtors' related Chapter 11 Cases and related relief.

---

[10]    Capitalized terms used, but not otherwise defined herein, shall have those meanings ascribed to them in the relevant Motion.

17

48.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will arise in the Chapter 11 Cases will affect each and every Debtor.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow this Court, the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the Chapter 11 Cases with greater ease.

49.     Further, joint administration will not adversely affect the Debtors' respective constituencies because this Motion requests only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.

50.     I believe that joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest.

**B.      Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 341 And 28 U.S.C. § 156(c) Authorizing The Debtors To File (A) Consolidated List Of Creditors And (B) Consolidated List Of Debtors' Top Thirty Creditors**

51.     By this Motion, the Debtors are requesting authority to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtors' thirty (30) largest unsecured creditors.

52.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the notices and other documents in these cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested

parties with the notices and other similar documents. The Debtors also submit that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.

## C. Debtors' Application For Entry Of An Order Pursuant To 28 U.S.C. §156(C) Authorizing The Employment And Retention Of BMC Group, Inc. As Claims And Noticing Agent, Effective Nunc Pro Tunc To The Petition Date

53. By this Application, the Debtors respectfully request the entry of an order authorizing them to retain and employ BMC Group, Inc. ("BMC") as Claims and Noticing Agent in these Chapter 11 Cases as of the Petition Date, to, among other things: (a) serve as the Court's noticing agent to mail notices to the estate's creditors and parties in interest; (b) preparing and serving required notices in these cases; (c) maintaining an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs; (d) maintaining a list of all potential creditors and other mailings lists; (e) maintaining a post office box or address for the purpose of receiving claims and returned mail, and process all mail received; (f) processing all proofs of claim received; (g) maintaining official claims register; (h) recording all transfers of claims and providing required notices of the same; and (i) other matters as set forth in the Application. The Debtors propose to retain BMC on the terms and conditions set forth in an agreement substantially in the form attached to the Motion as an exhibit and incorporated therein by reference (the "Services Agreement").

54. Pursuant to Bankruptcy Code section 156(c),[11] this Court is authorized to use facilities other than the Clerk's Office for the administration of bankruptcy cases, including

---

[11]   28 U.S.C. § 156(c) provides, in relevant part, that "[a]ny court may utilize facilities or services, either on or off the court's premises, which pertain to the provision of notices, dockets, calendars and other administrative information to parties in cases filed under the
*(footnote continued on next page)*

such matters as giving notice of hearings and orders filed in these Chapter 11 Cases, the meeting of creditors pursuant to section 341 of the Bankruptcy Code and claims bar dates, and providing record keeping and claims docketing assistance.

55.    In addition, under Bankruptcy Rule 2002(f), the Court may direct that a person other than the Clerk of the Court give notice of the various matters described therein. Moreover, Local Rule 2002-1(f) requires a debtor to file an application to retain a notice and/or claims clerk within seven (7) days of the Petition Date in all cases with more than 200 creditors. The Debtors believe that the number of creditors in these cases will greatly exceed that number. Thus, pursuant to Local Rule 2002-1(f) and for the reasons set forth below, the Debtors believe it is necessary and in the best interests of their creditors and estates to engage BMC to act as an outside agent to the Clerk's Office in order to assume full responsibility for, among other things, distribution of notices and proof of claim forms and the maintenance, secondary processing and docketing of all proofs of claim filed in the Debtors' Chapter 11 Cases.

56.    The Debtors anticipate that there will be hundreds of entities that the Debtors will be required to serve with the various notices, pleadings, and other documents filed in these Chapter 11 Cases.  In consideration of the number of anticipated claimants and other parties-in-interest, the Debtors respectfully submit that the appointment of BMC will expedite the distribution of notices and relieve the Clerk's Office of the administrative burden of processing such notices.

57.    Consistent with the Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of

---

provisions of title 11, United States Code, where the cost of such facilities or services are paid for out of the assets of the estate and are not charged to the United States"

District of Delaware, the Debtors obtained and reviewed engagement proposals from three (3) other Court-approved claims and noticing agents to ensure selection through a competitive process.

58.     For all of the foregoing reasons, I believe that the appointment of BMC as the Claims and Noticing Agent is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors determined that BMC's bid was most economical and overall superior to the other bids.

## II.    OPERATIONAL PLEADINGS

**A.     Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 345(b) And 503(b)(1) And Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use Of Existing (A) Bank Accounts, (B) Cash Management System And (C) Business Forms, Books And Records; (II) Authorizing Continued Intercompany Transactions And Providing Administrative Priority Status To Postpetition Intercompany Claims; And (III) Waiving On An Interim Basis Debtors' Compliance With Investment Guidelines**

59.     By this Motion, the Debtors respectfully request the entry of an order: (i) authorizing the  Debtors' maintenance of existing bank accounts; (ii) authorizing the Debtors' continued use of their existing cash management system; (iii) authorizing the Debtors' continued use of their existing business forms; (iv) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis, (v) authorizing the continuation of intercompany transactions postpetition and according administrative expense status to claims for postpetition intercompany transactions; and (vi) grating related relief.

### (i)    The Cash Management System

60.     The basic structure of the cash management system (the "Cash Management System") described herein constitutes the Debtors' ordinary, usual, and essential business practices.  The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

Flowcharts generally outlining the Debtors' Cash Management System are attached to the Motion as Exhibit B.

61.     Prior to the commencement of these Chapter 11 Cases, the Debtors maintained, in the ordinary course of business, seventeen operational bank accounts (collectively, the "Bank Accounts") at six banking institutions (collectively, the "Cash Management Banks").  In particular, the Debtors maintain one Bank Account with JPMorgan Chase Bank, N.A. ("Chase National"), one Bank Account with The PNC Financial Services Group, Inc. ("PNC"), six Bank Accounts with U.S. Bank, National Association ("U.S. Bank"), six Bank Accounts with Old National Bancorp ("Old National Bank"), and three Bank Accounts with First Financial Corporation ("First Financial").  A list of the Bank Accounts and redacted account numbers is attached as Exhibit A to the Motion.  The Debtors do not maintain any investment accounts.

62.     Under the Cash Management System, the Debtors collect and concentrate the funds generated by the Debtors' operations to fund disbursements to their vendors, suppliers, employees and other creditors incurred in the operation of the Debtors' businesses.  The Cash Management Systems uses Microsoft Dynamics and MAS 200, which are general ledger systems that track account balances and transfers.  In particular, the Debtors' finance and accounting employees use the Microsoft Dynamics and MAS 200 platforms to accurately maintain and track the Debtors' cash and ensure payment of their obligations.  In addition, DSI, which employs personnel trained in chapter 11 cash management systems, is working closely with the Debtors' finance and accounting employees to ensure that the Debtors will continue to maintain these detailed accounting records postpetition.

63.     The operation of the Debtors' business requires that the existing Cash Management System continue during the pendency of the Chapter 11 Cases.  If the Debtors are not permitted to continue to utilize their Cash Management System in their current form, their operations would be severely impaired.

64.     The movement of funds through the Cash Management System is described in detail below.

(a)     **Cash Management System of the Debtors' Long-Term Care Division**

65.     The Debtors conduct the business of their Long-Term Care Division through Debtors Kilbourne, MedLAB, Suburban and BTL (collectively, the "LTC Subsidiaries").   The LTC Subsidiaries each maintain a Bank Account with U.S. Bank (collectively, the "LTC Receipt Accounts") for the daily collection of receipts from their customers and third-party payors, such as Medicare and Medicaid.  The LTC Receipt Accounts are zero-balance accounts ("ZBAs"), meaning that they do not carry a balance and are swept of all funds on a daily basis.  The funds in the LTC Receipt Accounts are automatically swept into a Bank Account maintained by Debtor Laboratory Partners with U.S. Bank (the "LTC Concentration Account").   In addition, any funds transferred from the Debtors' PO and UH Divisions to the Debtors' Long-Term Care Division are funded into the LTC Concentration Account.  The LTC Concentration Account is not a ZBA.

66.     Disbursements made by the Debtors related to their Long-Term Care Division fall into four general categories: (i) payments made to vendors, suppliers and service providers, (ii) payments made to Long-Term Care and corporate-level employees, (iii) refunds to customers and third-party payors, and (iv) payments in connection with the Debtors' flexible

spending account program.   All four types of disbursements are subject to the Debtors'
institutional controls.

67.     With respect to disbursements to vendors, suppliers and service providers,
the Debtors' have instituted a multi-step review and approval process to ensure that expenditures
of the Debtors' funds are appropriately authorized.   In particular, invoices from vendors,
suppliers and service providers are received by the Debtors at the lab locations where the goods
and services were ordered.   Once received, the lab's operations management is responsible for
reviewing all invoices.   Invoices that are approved by a lab's operations manager are sent to the
Debtors' finance department for a second round review.   After an invoice is received by the
Debtors' finance department, it is entered into the Debtors' Microsoft Dynamics platform.   On a
weekly basis, the Debtors' generate a check report of all scheduled payments.   This report is
reviewed by the Debtors' accounting manager.   Only after this report is approved do the Debtors
cut checks or issue ACH transfers.

68.     These checks or ACH transfers are issued from two Bank Accounts
maintained by Laboratory Partners at U.S. Bank and Chase National (together, the "LTC
Disbursement Accounts").   With respect to the LTC Disbursement Account maintained at U.S.
Bank, the Debtors use this account to make payments to vendors, suppliers, service providers,
employee expense reimbursements and refunds to the Debtors' Long-Term Care customers.   The
LTC Disbursement Account maintained at U.S. Bank is a ZBA.   As such, when the Debtors issue
a check or initiate an ACH transfer from this LTC Disbursement Account, a negative balance in
the amount of the transfer or check is recorded in the LTC Disbursement Account.   Once the
check clears or the ACH transfer is completed, the negative balance is immediately funded from

the LTC Concentration Account and, thus, the balance of the LTC Disbursement Account is returned to zero.

69.     The Debtors use the LTC Disbursement Account at Chase National to fund payroll and other employment-related expenses for Laboratory Partners, which employs the Debtors' corporate-level employees.   The Debtors use a third-party payment administrator, Paycor, Inc. ("Paycor"), to administer all of the Debtors' payroll and employment-related expenses.  With respect to the Debtors' corporate-level payroll, prior to the scheduled pay date, the Debtors transfer funds from the LTC Concentration Account to the LTC Disbursement Account maintained at Chase National in an amount approximately equal to the anticipated amount of disbursements for the Debtors' corporate-level payroll.  Thereafter, Paycor issues a "reverse-wire" to the LTC Disbursement Account in an amount equal to the scheduled corporate-level payroll expense.  Once the reverse wire is processed, the Debtors' funds are transmitted from the LTC Disbursement Account to Paycor and Paycor disburses such funds from its own accounts to the Debtors' employees, taxing authorities and other applicable third parties.

70.     With respect to the LTC Subsidiaries' employees, the Debtors fund payroll and other employment-related expenses from the LTC Receipt Accounts.  In particular, prior to the scheduled pay date, Paycor issues a reverse-wire to each LTC Receipt Account in an amount equal to the scheduled payroll expense for each LTC Subsidiary.  As the LTC Receipt Accounts are ZBAs, the reverse-wire creates a negative balance in the LTC Receipt Accounts. This negative balance is automatically funded from the LTC Concentration Account.  Thereafter, the reverse wire is completed and Paycor disburses the funds from its own accounts to each LTC Subsidiary's employees, taxing authorities and other applicable third parties.

71.     As described in more detail below, the Debtors offer the Flexible Spending Plan for their employees.  The Flexible Spending Plan permits participating employees to pay for qualifying medical expenses with pre-tax dollars.  The Debtors utilize a third-party administrator, Chard Snyder, to manage the Flexible Spending Plan, and this third-party administrator is responsible for tracking each employee's savings account and issuing payments to vendors as employees purchase qualifying goods or services.   Under the Flexible Spending Plan and the Debtors' agreement with Chard Snyder, the Debtors' are required to maintain a bank account from which Chard Snyder can draw funds as employees make qualifying medical expenses.  For this purpose Suburban maintains a Bank Account with PNC Bank (the "FSA Account").  The Debtors maintain a $10,000 balance in the FSA Account, which is historically enough to fund two weeks of the Debtors' obligations under the Flexible Spending Plan.

### (b)     Cash Management System of the Debtors' PO Division and UH Division

72.     The Debtors conduct the business of their PO and UH Divisions through Debtors THML and PATH.  THML maintains two Bank Accounts with Old National Bank for the daily collection of receipts from THML customers and third-party payors, such as Medicare and Medicaid.  One of these Bank Accounts is a ZBA and the other is an operating account (the "THML Operating Account").  On a daily basis, the funds in the ZBA are automatically swept into the THML Operating Account.

73.     Disbursements made by THML fall into four general categories: (i) payments made to THML's vendors, suppliers and service providers, (ii) payments made to THML's employees, (iii) refunds to THML's customers and third-party payors, and (iv) payments made to the Debtors' Long-Term Care Division.  All four types of disbursements are subject to the Debtors' institutional controls.

26

74.    With respect to THML's vendors, suppliers and service providers, THML instituted a multi-step review and approval process to ensure that expenditures of THML's funds are appropriately authorized.  This system is substantially similar to that maintained by the Debtors' Long-Term Care Division.  THML utilizes the MAS 200 general ledger and transfer tracking software platform.

75.    THML utilizes the THML Operating Account to make payments to vendors, suppliers and service providers.  THML issues checks and ACH transfers as they are needed to pay invoices approved through its internal review and approval process.

76.    THML also uses the THML Operating Account to fund payroll and other employment-related expenses for THML employees.  Paycor is also the third-party payroll administrator for THML employees.  Amounts are drawn from the THML Operating Account and remitted to Paycor in the same manner as discussed above regarding the employees of the Debtors' Long-Term Care Division.

77.    In the ordinary course of THML's operations, THML issues refunds to customers and third-party payors.  THML issues these refunds by check out of a Bank Account maintained by THML at Old National Bank (the "THML Refund Account").  THML issues refunds approximately once per month.  After THML calculates the amount of monthly refunds, THML transfers an amount sufficient to cover all refunds from the THML Operating Account to the THML Refund Account.  Thereafter, THML issues refund checks.

78.    Occasionally, THML also transfers funds to the LTC Concentration Account to fund certain general operating expenses of the Debtors' Long-Term Care Division.  These funds are transferred from a Bank Account maintained by THML with Old National (the

"THML Transfer Account").   THML funds the THML Transfer Account from the THML Operating Account.[12]

79.   PATH maintains two Bank Accounts for the receipt of funds from PATH customers and third-party payors, such as Medicare and Medicaid.   To the extent a PATH customer chooses to pay PATH by credit card or check mailed to a lockbox account, PATH receives those deposits in a Bank Account maintained by PATH at Old National Bank (the "PATH Old National Account").   For all other customer deposits, PATH maintains a Bank Account with First Financial (the "PATH Operating Account").

80.   Disbursements made by PATH fall into four general categories: (i) payments made to PATH's vendors, suppliers and service providers, (ii) payments made to PATH's employees, (iii) refunds to PATH's customers and third-party payors, and (iv) payments made to THML PathLab LLC, the Debtors' captive pathology provider.   All four types of disbursements are subject to the Debtors' institutional controls.

81.   With respect to PATH's vendors, suppliers and service providers, PATH has instituted a multi-step review and approval process to ensure that expenditures of PATH's funds are appropriately authorized.   This system is substantially similar to that maintained by the Debtors' Long-Term Care Division.   PATH utilizes the MAS 200 general ledger and transfer tracking software platform.

82.   PATH utilizes the PATH Operating Account to make payments to vendors, suppliers and service providers.   PATH issues checks and ACH transfers as they are needed to pay invoices approved through its internal review and approval process.

---

[12]    To the extent THML transfers funds to PATH, the funds are transferred through an account maintained by THML at Old National Bank.

83.     PATH also uses the PATH Operating Account to fund payroll and other employment-related expenses for PATH employees.  Paycor is the also the Debtors' third-party payroll administrator for PATH's employees.  Amounts are drawn from the PATH Operating Account and remitted to Paycor in the same manner as discussed above regarding the Debtors' Long-Term Care and THML employees.

84.     In the ordinary course of PATH's operations, PATH issues refunds to customers and third-party payors.  PATH issues these refunds by check out of a Bank Account maintained by PATH at First Financial (the "PATH Refund Account").  PATH issues refunds approximately once per month.  After PATH calculates the amount of monthly refunds, PATH transfers an amount sufficient to cover all refunds from the PATH Operating Account to the PATH Refund Account.  Thereafter, PATH issues refund checks.

85.     Occasionally, PATH also transfers funds to the LTC Concentration Account to fund certain general operating expenses of the Debtors' Long-Term Care Division. These transfers are funded from a Bank Account maintained by PATH with First Financial (the "PATH Transfer Account").  PATH funds the PATH Transfer Account from the PATH Operating Account.

86.     As discussed in greater detail herein, PATH provides pathology testing services to hospitals and doctors.  In order to conduct this business, PATH relies on medical doctors who specialize in pathology.  While these doctors are necessary for the operation of PATH's business and the services PATH provides to its customers, PATH cannot employ these doctors directly due to certain laws in the state of Indiana.  Therefore, PATH entered into that certain Professional Services Agreement with THML PathLab LLC, dated July 19, 2010 (the "PATH Agreement").  THML PathLab LLC employs four medical doctors who specialize in

pathology and provide services exclusively to PATH.  PATH funds its payment obligations under the PATH Agreement from the PATH Old National Account.

      **(ii)**    **Cash Management Fees**

      87.    In the ordinary course of business, the Debtors incur fees charged by the Cash Management Banks for administering the Bank Accounts and certain credit card processing fees (collectively, the "Cash Management Fees").  The administration of the Bank Accounts is a critical aspect of the Cash Management System, and any cessation of these services due to the Debtors' inability to pay the Cash Management Fees would be extremely disruptive to the Cash Management System and the Debtors' businesses overall.  As the Cash Management Fees are automatically debited from the Bank Accounts by the Cash Management Banks, if there were any outstanding Cash Management Fees on the Petition Date, the amount of such outstanding fees would be *de minimis*.

      88.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System will prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of their estates.

      **(iii)**    **Existing Business Forms and Records**

      89.    In the ordinary course of the Debtors' business, the Debtors use a variety of checks, business letterhead, purchase orders, invoices, envelopes and other business forms and correspondence (collectively, the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as a debtor in possession.  To minimize expense to the estates, the Debtors request authority to continue to use all existing Business Forms without reference to their debtor in possession status.  By virtue of the nature

and scope of the Debtors' business operations, it is vital that the Debtors be permitted to continue to use the existing Business Forms without alterations or change.  If new Business Forms are ordered, such Business Forms will include the legend "debtor in possession" with the corresponding bankruptcy case number.  As with the existing Cash Management System, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

90.    In the ordinary course of their businesses, the Debtors maintain certain books and records in connection with the operations of their businesses (collectively, the "Books and Records").  Continuing to use the Books and Records subsequent to the Petition Date rather than closing those and opening new books will enable the Debtors to avoid unnecessary cost and burden.

### (iv)    Intercompany Transactions

91.    From time to time, in connection with the ordinary course of the Debtors' businesses, the Debtors engage in transactions with each other that form an integral part of such entities' operations (collectively, the "Intercompany Transactions").    Such Intercompany Transactions create intercompany balances, which are accounted for through book entries on the Books and Records.    The Cash Management System, in conjunction with the Debtors' accounting systems, allows for accurate tracking and tracing of such Intercompany Transactions.

92.    The Debtors propose to continue and maintain their intercompany procedures and practices, in accordance with their ordinary course prepetition practice.  As with prepetition accounts generally, all prepetition intercompany balances will be "frozen" as of the Petition Date, except for any prepetition intercompany obligations that the Debtors may be authorized to pay pursuant to an Order of this Court.  Therefore, to the extent there was a

prepetition Intercompany Transaction in the ordinary course of a Debtor's business for which an affiliate is owed money, such affiliate would have a prepetition intercompany claim against the applicable Debtor. To the extent an affiliate makes a payment on one of the Debtors' behalf with respect to a postpetition obligation, or there is an Intercompany Transaction in the ordinary course of the Debtor's business for which an affiliate is owed money, such affiliate would be afforded an administrative claim against such Debtor(s), pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code (collectively, "Postpetition Intercompany Claims").

93.    If Postpetition Intercompany Claims are accorded such priority status, each entity utilizing funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for such borrowings. Maintaining the Debtors' current procedures for accounting for Intercompany Transactions is warranted in the Chapter 11 Cases.

**B.    Debtors' Motion For Entry Of An Interim And Final Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services On Account Of Prepetition Invoices, (II) Deeming Utilities Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Adequate Assurance Of Payment**

94.    By this Motion, the Debtors are requesting the entry of an order: (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion; and (v) setting a final hearing (the "Final Hearing") on the Debtors' proposed adequate assurance and consideration of entry of the Final Order.

95.     In the ordinary course of business, the Debtors regularly incur utility expenses for telephone, electric, gas, water, sewer, waste management, internet access, and other services (the "Utility Services").   The Debtors' aggregate average monthly cost for utility services is approximately $150,774.  The utility services are provided by approximately fifty-two (52) utility companies (the "Utility Providers").  A list of these Utility Providers is attached as Exhibit A to the Motion (the "Utility Provider List").

96.     As of the Petition Date and as qualified in the Motion, the Debtors are generally current on payments to the Utility Providers for utility services other than with respect to amounts asserted by Verizon Wireless and any payment interruptions that may be caused by the commencement of the Debtors' Chapter 11 Cases.  Overall and as qualified in the Motion, the Debtors have a long and established payment history with most of the Utility Providers indicating consistent payment for utility services with few to no material defaults or arrearages with respect to undisputed Utility Services invoices.  As of the Petition Date, however, the Debtors may have (a) prepetition accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for prepetition utility services for which the Debtors had not yet been billed.

97.     As adequate assurance of future payment to the Utility Providers, the Debtors propose to deposit cash in an amount equal to the approximate aggregate cost of one half of one month of utility service from the Utility Providers calculated as an historical average for 2013 or $75,387 (the "Adequate Assurance Deposits") into an interest-bearing, newly-created, segregated account (the "Utility Account") within ten (10) business days after the date of entry of the Interim Order approving the Motion; provided, however, that, the Debtors, in their sole

discretion and without further application to or order of the Court, may reduce the Utility Account upon termination of utility services from a particular Utility Provider in an amount equal to the approximate cost of one half of one month of utility service from such Utility Provider.[13]  Further, the Debtors do not propose to deposit Adequate Assurance Deposits into the Utility Account for Utilities that already hold a deposit on account of the Debtors.

          98.    Access to utility services is critical to the Debtors' ongoing operations while they are exploring their strategic options.   Should any Utility Provider refuse or discontinue a utility service even for a brief period of time, the Debtors' operations and administrative functions would be severely disrupted.  Any interruption of utility service to the Debtors' businesses would be severely disruptive and diminish the Debtors' value while they are exploring their strategic options. Certain Utility Providers provide the Debtors with services necessary to run their day-to-day office operations.  Further, the Debtors are dependent upon internet and telephone service to maintain their ability to send and receive electronic communications and records.  In this regard, I believe it is in the best interest of the Debtors, their estates and their creditors to maintain continuous and uninterrupted utility services during these Chapter 11 Cases.

---

[13]     In the event that the Debtors have multiple utility services accounts with a particular Utility Provider, the Debtors' reduction of the Utility Deposit upon termination of utility services from a particular Utility Provider will be based on those utility services accounts actually terminated.

**C. Debtors' Motion Pursuant To Sections 105(A), 363(B), 363(C) And 1107(A) Of The Bankruptcy Code And Bankruptcy Rules 6003 And 6004(H): For An Order (I) Authorizing Debtors To (A) Continue Insurance Policies, Premium Financing Agreement, And Agreements Relating Thereto, And (B) Honor Certain Prepetition Obligations In Respect Thereof; And (II) Granting Related Relief**

99.     By this Motion, the Debtors seek the entry of an Order (i) authorizing the Debtors to (a) pay certain prepetition obligations in order to continue insurance coverage entered into prepetition and enter into new insurance policies, and (b) pay certain prepetition expenses related to their insurance policies; and (ii) authorizing and directing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto.

**(i)     Insurance Policies**

100.     In the ordinary course of business, the Debtors maintain a number of other insurance policies that provide coverage for, among other things, property coverage, general liability, business automobile liability, commercial umbrella liability, crime liability, and directors' and officers' liability (collectively, the "Insurance Policies").[14]  Under the Insurance Policies, the Debtors have various deductibles and self-retained amounts as set forth in further detail in the Motion that may become due in the ordinary course of business after the Petition Date.

---

[14]     The Insurance Policies are summarized in the Motion and on Exhibit A thereto.  In addition to the relief requested in the Motion, the Debtors have requested authority to continue their workers' compensation and stop-loss employee health benefits policies, including satisfying any prepetition obligations thereunder, in the *Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A), 363(B), 363(C), 541(B)(7), 541(D), 1107(A), And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing, But Not Directing The Debtors To Pay And Continue Certain Prepetition (A) Wages, Salaries And Other Compensation And (B) Employee Medical And Similar Benefits; (II) Authorizing And Directing Banks And Other Financial Institutions To Honor All Related Checks And Electronic Payment Requests; And (III) Granting Related Relief*, which was filed concurrently herewith.

101.    The Insurance Policies are essential for preserving the value of the Debtors' business, property and assets.  In many cases, the insurance coverage provided by the Insurance Policies is required by various state and federal regulations that govern the Debtors' commercial activities.  Additionally, failure to maintain adequate insurance may pose a risk to the estates or the public, which constitutes "cause" under section 1112 of the Bankruptcy Code for purposes of converting or dismissing a chapter 11 case.  11 U.S.C. § 1112(b)(4).

102.    For the applicable coverage periods, the annual premiums for the Insurance Policies which the Debtors maintain through several different insurance carriers total approximately $635,706.  The Insurance Policies are managed by Willis of Wisconsin, Inc.  and Forrest Sherer.  As of the Petition Date, premiums for thirteen (13) of the Debtors' Insurance Policies were fully paid in the amount of $293,484.

(a)    **Premium Financing Agreement**

103.    For the current policy period (which, subject to certain exceptions, runs from September 1, 2013 through September 1, 2014), approximately $273,778 of the premiums due under the Insurance Policies were financed by AFCO Credit Financing Corporation ("AFCO") pursuant to a premium finance agreement (the "Premium Financing Agreement") between certain Debtors and AFCO.  Under the Premium Financing Agreement, the Debtors are obligated to make, in addition to a down payment, a total of nine monthly installment payments of $30,850.76 to AFCO on the 1st of each month.  Premiums under the following Insurance Policies are financed through the Premium Financing Agreement: (a) the Debtors' general liability policy with Columbia Casualty Company; (b) the Debtors' umbrella liability insurance policy with Columbia Casualty Company; (c) the Debtors' property insurance policy with Valley Forge Insurance Company; and (d) the Debtors' automobile liability insurance policies with Valley Forge Insurance Company.  The Debtors currently owe AFCO approximately

36

$246,806.08 on account of the Premium Financing Agreement, and by the Motion request authority to pay such amount and any other amounts that come due postpetition under the Premium Financing Agreement, in order to ensure the continuing coverage under the Insurance Policies.

104.    If the Debtors are unable to make payments on the Insurance Plans and the Premium Financing Agreement, the Debtors' insurance providers may be able to cancel the relevant Policies as a result of nonpayment.  Cancellation of the Policies would then force the Debtors to obtain replacement insurance on an expedited basis.  Replacement insurance would likely require the Debtors to pay a lump sum premium for the policy in advance, and would likely be greater than what the Debtors currently pay.  Even if the insurance providers were not permitted to terminate the Insurance Policies, any interruption of payment could have a severe, adverse effect on the Debtors' ability to qualify for insurance coverage at affordable rates.

105.    In light of the importance of maintaining the insurance coverage with respect to the Debtors' business activities, I believe it is in the best interests of the Debtors' estates to honor their monthly insurance obligations under the Insurance Policies, including payments under the Premium Financing Agreement.

**D.    Debtors' Motion Under Sections 105(a), 363(b), 507(a), and 541 of the Bankruptcy Code And Bankruptcy Rules 6003 And 6004 Authorizing Payment Of Certain Pre-Petition Use Taxes**

106.    By this Motion, the Debtors seek the entry of an Order (i) authorizing, but not directing, the Debtors to pay all prepetition use taxes (the "Taxes") that the Debtors, in their discretion, deem necessary to various federal, state, county and city taxing authorities (collectively, the "Taxing Authorities"); (ii) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing; and (iii) granting related relief.

107.    In the ordinary course of their business, the Debtors pay Taxes to various Taxing Authorities throughout the United States on a periodic basis.  While the Debtors believe that they are substantially current with respect to their payment of Taxes, the Debtors seek to make such payments where (a) Taxes accrued or incurred prepetition were not paid prepetition or were paid in an amount less than actually owed, (b) payments made prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities, or (c) Taxes incurred for prepetition periods become due after the commencement of these Chapter 11 Cases.  As of the Petition Date, the Debtors' outstanding obligations in respect of Taxes, including amounts incurred for prepetition periods that will come due after the Petition Date, totaled approximately $8,000.

108.    Payment of the Taxes is necessary for the Debtors to remain in good standing and operate in the various jurisdictions in which they do business.  Certain Taxing Authorities either have not been paid due to the time during the month, quarter or year at which such Taxes are normally remitted, or may have been sent checks for Taxes that may or may not have been presented or cleared as of the Petition Date.  In addition, prior to the Petition Date, the Debtors made payments to certain Taxing Authorities, yet the Taxing Authorities are currently reviewing those payments and may determine that the Debtors owe additional amounts.  In other cases, obligations may have accrued or are accruing, or are subject to audit or review, but may have not yet become due and payable.  Accordingly, the Debtors seek authorization for their banks to honor prepetition wire transfer requests and checks issued by the Debtors to the Taxing Authorities in payment of prepetition Taxes as described herein that, as of the Petition Date, have not cleared or been transferred.  In addition, to the extent that the Debtors have not yet remitted payment to the Taxing Authorities with respect to certain prepetition Taxes, the Debtors seek

authorization to issue checks or provide for other means of payment to the Taxing Authorities to the extent necessary to pay such Taxes.

109.    Many federal, state and local Taxing Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain taxes to the extent that such taxes are not remitted.  Thus, if certain of the Taxes remain unpaid, the Debtors' directors and responsible officers may be subject to lawsuits or even criminal prosecution on account of such nonpayment during the pendency of these Chapter 11 Cases.  Such lawsuits or proceedings would create a significant distraction for the Debtors' directors and responsible officers at a time when they should be focused on exploring the Debtors' strategic options to maximize the value of the Debtors' business and assets.   Moreover, by paying legitimate tax claims now, the Debtors will avoid any unnecessary fees, interest or penalties that might otherwise accrue.  For these reasons, I believe it is in the Debtors' best interests to be permitted to pay the Taxes as deemed necessary in the Debtors' discretion.

**E.**     **Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A), 363(B), 363(C), 541(B)(7), 541(D), 1107(A), And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing, But Not Directing The Debtors To Pay And Continue Certain Prepetition (A) Wages, Salaries And Other Compensation And (B) Employee Medical And Similar Benefits; (II) Authorizing And Directing Banks And Other Financial Institutions To Honor All Related Checks And Electronic Payment Requests; And (III) Granting Related Relief**

110.    By this Motion, the Debtors are requesting that the Court enter an Order (i) authorizing, but not directing, the Debtors to pay all prepetition (a) wages, salaries, commissions, vacation, paid time off, ordinary course incentive payments, and other accrued compensation, as well as all withholdings and deductions related thereto and (b) contributions to and benefits under employee medical and similar benefit plans; (ii) authorizing, but not directing, the Debtors to continue postpetition the maintenance of any and all employee benefit, policies, and procedures in the ordinary course in accordance with prepetition practices; (iii) authorizing

and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing; and (iv) granting related relief.

111.    A description of these prepetition employee related obligations or programs is provided below.

### (i)    The Debtors' Employees

112.    As of the Petition Date, the Debtors employed approximately 1,034 active Employees for the performance of services in connection with their operations, the majority of whom are hourly Employees of entities other than Laboratory Partners Inc. and paid on a bi-weekly basis (the "Non-LPI Hourly Employees").  Hourly Employees of Laboratory Partners Inc. ("LPI Hourly Employees" and together with the Non-LPI Hourly Employees, the "Hourly Employees") are paid on a semi-monthly basis.  The other Employees consist of two types of salaried employees – those employed by Debtors other than Laboratory Partners, Inc. and paid on a bi-weekly basis (the "Non-LPI Salaried Employees") and those employed by Laboratory Partners, Inc. and paid on a semi-monthly basis (the "LPI Salaried Employees" and together with the Non-LPI Salaried Employees, the "Salaried Employees"), and Contract Workers typically paid on a monthly basis.

113.    As of the Petition Date, the Debtors' Employees consist of: (i) approximately 887 Hourly Employees; (ii) approximately 147 Salaried Employees; and (iii) approximately five (5) Contract Workers.  None of the Employees are covered by collective bargaining agreements.  In addition to the Salaried and Hourly Employees and the Contract Workers, the Debtors also utilize several temporary staffing agencies to provide additional support on an as-needed basis by the Temporary Employees.  The Debtors are currently utilizing

approximately sixteen (16) Temporary Employees, provided to the Debtors through three employment agencies.

114.    Debtor Laboratory Partners operates in Cincinnati, Ohio and has approximately sixteen (16) Employees.

115.    Debtor Kilbourne operates in Cincinnati, Ohio, Centerville, Ohio, Greenwood, Indiana, Louisville, Kentucky, and Lexington, Kentucky and has approximately 440 Employees.

116.    Debtor MedLab operates throughout Ohio and has approximately 198 Employees.

117.    Debtor Suburban operates in Cleveland, Ohio, Beltsville, Maryland, and Farmington Hills, Michigan and has approximately fifty-six (56) Employees.

118.    Debtor BTL operates in St. Louis, Missouri, and southern Illinois and has approximately 100 Employees.

119.    Debtors THML and PATH (the "Terre Haute Debtors") operate in Terre Haute, Indiana and throughout Indiana and have approximately 221 Employees.

120.    The Debtors' monthly gross payroll is approximately $3.4 million.

**(ii)    Prepetition Employee Claims**

121.    As described more fully below, the Debtors owe certain of the Employees monies on account of wages, salaries, vacation, commissions, ordinary course incentive payments, and other accrued compensation that were earned during or related to a period prior to the Petition Date, but that are scheduled to be paid postpetition.  Attendant to these payments, the Debtors owe employer taxes and withholding taxes to local, state and federal authorities.  In addition, the Debtors withhold certain amounts from some of the Employees' paychecks for contributions to various programs and funds, including, without limitation, the 401(k) plan,

medical and dental plans, child support and garnishments.   All of the foregoing prepetition employee claims are collectively referred to hereinafter as the "Prepetition Employee Claims."

122.   Failure to pay the Prepetition Employee Claims would severely undermine the Employees' morale and result in significant hardship to the Employees.   To retain the services of the Employees and maintain their morale and loyalty during these Chapter 11 Cases, the Debtors seek authority to satisfy the Prepetition Employee Claims to the extent such payments are provided for in the Debtors' budget.   As of the Petition Date, the Debtors estimate that the aggregate amount of the Prepetition Employee Claims is approximately $2,492,150.   It is the Debtors' belief that no Employee's unpaid prepetition salary or wages exceeds the $12,475 threshold provided in Section 507(a)(4) of the Bankruptcy Code.

123.   A description of the Prepetition Employee Claims follows below.

(a)   **Prepetition Wages and Salaries**

124.   Non-LPI Hourly and Non-LPI Salaried Employees.   Non-LPI Hourly and Salaried Employees are paid in arrears on a bi-weekly basis (every other Friday), covering the hours worked during the two weeks ending on the Saturday prior to the Friday on which they are paid.[15]   Non-LPI Hourly and Salaried Employees were last paid on October 18, 2013 for the period ending October 12, 2013.   Non-LPI Hourly and Salaried Employees will be paid next on November 1, 2013.   In the ordinary course of business, the Debtors pre-funded the October 18, 2013 payroll to their payroll administrator, Paycor on October 17, 2013 in the amount of

---

[15]   For Non-LPI Hourly and Salaried Employees, the payroll period starts Sunday at 12:01 a.m. and ends on Saturday at 12:00 a.m. (Midnight) two weeks later.   Each new payroll period begins Sunday of the week the Non-LPI Hourly and Salaried Employees are paid for the prior two weeks.

$1,303,842.  As of the Petition Date, the Debtors estimate that the outstanding payroll amounts owed to Non-LPI Hourly and Salaried Employees is approximately $1,325,000.

125.   <u>LPI Hourly Employees and LPI Salaried Employees</u>.  LPI Hourly and Salaried Employees are paid in arrears on a semi-monthly basis, covering the half month in which they are paid.[16]  LPI Hourly and Salaried Employees were last paid on October 15, 2013, for the period ending October 15, 2013.  The total gross amount paid to LPI Hourly and Salaried Employees on October 15, 2013 was approximately $69,358.  As of the Petition Date, the Debtors estimate that the outstanding payroll amounts owed to LPI Hourly and Salaried Employees is approximately $39,000.

126.   <u>Contract Workers</u>.  Contract Workers, who are not employees of the Debtors, are typically paid on a monthly basis covering various periods.  The total gross amount paid to Contract Workers from September 16, 2013 through October 16, 2013 was approximately $8,725. The amount of outstanding fees and expenses owed to Contract Workers (the "<u>Prepetition Contract Worker Obligation</u>") is approximately $8,000 as of the Petition Date.

127.   <u>Temporary Employees</u>.  The average monthly cost for all Temporary Employees is approximately $72,500 (the "<u>Temporary Employee Costs</u>").  The Debtors estimate the outstanding prepetition amounts owed for Temporary Employees Costs (the "<u>Prepetition Temporary Employee Obligation</u>") are approximately $68,000 as of the Petition Date.

128.   <u>Prepetition Wages and Salaries</u>.  Based on the Debtors' ordinary course payroll schedule, the aggregate amount of current earned, but unpaid, prepetition wages and

---

[16]   For LPI Hourly and Salaried Employees, the semi-monthly payroll periods start on the first day of the month and the 16th day of the month at 12:01 a.m., respectively, and end on the 15th day of the month and the last day of the month, respectively, at 12:00 a.m. (Midnight).

salaries inclusive of withholding for payroll taxes (including the Prepetition Contract Worker Obligation and the Prepetition Temporary Employee Obligation, the "Prepetition Wages and Salaries") is approximately $1,440,000 as of the Petition Date.

129.    Commissions.    In addition to fixed compensation, in the ordinary course of their business, the Debtors pay various commissions ("Commissions") to certain Employees to motivate them to develop and foster customer relationships, which are crucial to the Debtors' businesses.    The Commissions represent a percentage of the value of sales made by the applicable Employee and are paid once a month on the 15th for the prior month.    In the ordinary course of business, the Debtors funded Commissions through September 30, 2013 in the amount of $30,409 on October 11, 2013 for the October 15, 2013 payroll.

130.    Based on historical Commissions earned for the last calendar year, the Debtors estimate that Commissions due for October will be approximately $35,800 with approximately $27,750 unpaid prior to the Petition Date.    The Commissions are an important part of the applicable Employees' compensation and provide substantial value to the Debtors' estates because Commissions encourage Employees to achieve performance targets.

131.    Ordinary Course Non-Insider Compensation Programs.    In the ordinary course of their business, the Debtors maintain several additional programs for certain of their non-insider Employees (collectively, the "Non-Insider Compensation Programs").    The Non-Insider Compensation Programs are consistent with industry practice and use a variety of benchmarks to determine eligibility, including performance, attendance, sales, and revenue collection.    The Non-Insider Compensation Programs provide monthly, quarterly, semi-annual, or annual incentive payments to 500 of the Debtors' non-insider Employees.    As of the Petition Date, approximately $10,000 is owed on account of Non-Insider Compensation Programs.

132.   The Non-Insider Compensation Programs include the following: (a) semi-annual discretionary performance bonuses up to 15% of salary for account managers based on performance, (b) monthly bonuses up to $150 for chart auditors based on revenue collection; (c) annual bonuses up to $5000 for lab managers based on performance; (d) quarterly bonuses up to 2% of base salary for phlebotomy supervisors based on performance; (e) monthly bonuses up to $60 for phlebotomists based on attendance and performance; and (f) monthly, quarterly, and annual bonuses up to $100, $250, and $1000, respectively, to eligible employees under a star employee program.   For the last calendar year, payments under all of the Non-Insider Compensation Programs have been approximately $22,000 per month.

133.   Payments under the Non-Insider Compensation Programs amount to a small percentage of the Debtors' payments to Employees.   Nevertheless, the Non-Insider Compensation Programs are important to the Debtors' Employees and provide substantial benefit to the Debtors' estates because they encourage Employees to achieve performance goals. Further, none of the proposed payments will be made to insiders, but rather to rank and file Employees.   Accordingly, the Debtors seek authority, but not direction, to pay any and all outstanding prepetition amounts under the Non-Insider Compensation Programs and to continue such programs postpetition.

**(b)**   **Prepetition Payroll Taxes**

134.   Attendant to the payment of Employee wages and salaries is the Debtors' obligation to pay local, state and federal withholding taxes and employer taxes.   The Debtors, through their payroll administrator, Paycor, withhold the withholding taxes and Social Security and Medicare contributions from payroll and pay these amounts to the appropriate authorities on a weekly, quarterly or annual basis, as applicable.   The aggregate amount of prepetition withholding taxes, tax deposits and processing fees inclusive of both the Debtors' portion and the

employee portion, shall be referred to as the "Prepetition Payroll Taxes."  Weekly payroll taxes payments are approximately $209,500. Although there are no amounts presently due for Prepetition Payroll Taxes, the Debtors estimate that as of the Petition Date, the Prepetition Payroll Taxes not yet due, but related to the prepetition period are $200,000.

135.    The Debtors also pay, through Paycor, federal, state, and local unemployment taxes and contributions ("Unemployment Taxes" together with the Prepetition Payroll Taxes, the "Prepetition Tax Claims").  Unemployment Taxes due for the fourth quarter of 2013 are scheduled to be paid January 15, 2014 and are estimated to be approximately $36,400.

### (c)    Vacation and Personal Time

136.    Employees of the Terre Haute Debtors with more than six (6) months continuous employment are entitled to vacation days ("Vacation") based on years of service and hours worked.  Employees of all other Debtors are entitled to paid time off ("PTO") based on years of service and hours worked.  Vacation and PTO accrue each pay period based on the number of hours worked in a pay period.

137.    Typical full-time Employees of all Debtors other than the Terre Haute Debtors accrue PTO as follows:

| Years of Service | Annual Leave |
|---|---|
| 0-1 year | 8 days |
| 1 year + 1 day – 5 years | 13 days |
| 5 years + 1 day – 6 years | 14 days |
| 6 years + 1 day – 7 years | 15 days |
| 7 years + 1 day – 8 years | 16 days |
| 8 years + 1 day – 9 years | 17 days |
| 9 years + 1 day – 10 years | 18 days |
| more than 10 years | 21 days |

138.    Typical full-time Employees of the Terre Haute Debtors accrue Vacation as follows:

| Years of Service | Annual Leave |
|---|---|
| 6 months – 5 years | 80 hours |
| 5 years + 1 day | 88 hours |
| 6 years + 1 day | 96 hours |
| 8 years + 1 day | 104 hours |
| 9 years + 1 day | 112 hours |
| 10 years + 1 day | 120 hours |
| 11 years + 1 day | 128 hours |
| 12 years + 1 day | 136 hours |
| 13 years + 1 day | 144 hours |
| 14 years + 1 day | 152 hours |
| 15 years + 1 day or more | 160 hours |

139.    For all Employees, the vacation year begins on their initial hire date and ends the day immediately preceding their initial hire date.  For all Employees unused Vacation and PTO carries over into the next year, subject to a cap of 200 Vacation hours and 168 PTO hours.

140.    Sick Time and Personal Days.  Full-time Employees of the Terre Haute Debtors with six (6) months of continuous service are also eligible for paid sick time ("Sick Time") and paid personal days ("Personal Days").  Such Employees accrue Sick Time per pay period based on hours worked, up to 80 hours of paid Sick Time per year.  Sick Time carries over into the next year, subject to a cap of 480 hours.  Unused accrued Sick Time is not paid upon termination of employment.  Such Employees also accrue one Personal Day after six (6) months of service, two Personal Days on the first January 15th after becoming eligible, and three Personal Days every January 15th thereafter.  Personal Days cannot be carried forward and are not paid out upon termination of employment.

141.    The Debtors estimate that as of the Petition Date the value of all Vacation, PTO, Sick Time, and Personal Days accrued by Employees, but not yet used by the Employees (the "Prepetition Time Off Amount") is approximately $685,000.

142.    Holidays.  Employees are scheduled for six (6) paid holidays ("Holidays") per year.

143.    Overtime.  Any non-exempt Employee that works over forty (40) hours a week is eligible for overtime pay ("Overtime").  The value of all prepetition Overtime is included in the outstanding amount of the Prepetition Wages and Salaries owed.

144.    I believe that honoring obligations to Employees with respect to Overtime and permitting Employees to take Vacation, PTO, Sick Days, Personal Days, and Holidays in accordance with the Debtors' policies and procedures is imperative to maintaining the morale and loyalty of the Employees during these Chapter 11 Cases.

### (d)    Designated Withholdings

145.    The Debtors withhold money from the Employee payroll pursuant to certain Employees' instructions or orders by judicial or administrative authorities (collectively, the "Designated Withholdings") for contributions or remittance to various programs and funds including, without limitation, certain supplemental insurance programs, savings plans, fitness memberships, donations, child support, garnishments, and for other purposes.  Failure to remit these funds to the appropriate programs or funds will be regarded by the Employees as a misappropriation of their wages or salaries and the cessation of certain benefits to which they reasonably believe they are entitled as a result of the deductions.

### (e)    Reimbursable Employee Business Expenses

146.    Before the Petition Date, certain of the Employees regularly incurred business expenses, which, consistent with ordinary practice, are reimbursable by the Debtors (the

"Reimbursable Expenses"). The Reimbursable Expenses include, without limitation, expenses for work-related travel, lodging, mileage,[17] auto expenses, telephone charges and meals. When an Employee has incurred a Reimbursable Expense, it is the Debtors' policy to require the Employee to submit an expense report within thirty (30) days of incurring the expense. The Debtors generally reimburse an Employee within seven (7) business days of the receipt of a properly submitted expense report. It would be inequitable to require the Employees to bear these expenses, all of which were incurred on behalf of the Debtors with the expectation that they would be reimbursed promptly. As of the Petition Date, Reimbursable Expenses in the system, but not paid, total approximately $93,000, however, given the nature and timing of the process the Debtors cannot accurately quantify the actual unpaid prepetition Reimbursable Expenses. Over the last three (3) full calendar months preceding the Petition Date, Reimbursable Expenses have averaged approximately $233,850 per month (the "Prepetition Reimbursable Expenses").

**(iii)** **Employee Benefits**

147. Before the Petition Date, the Debtors offered their full-time Employees standard employee benefits funded by either the Debtors, the Employees or both, including, among others: a variety of employee benefit plans and policies, including medical and health insurance, group life insurance, long-term and short-term disability, accidental death and dismemberment insurance, supplemental life, dental, vision, flexible spending plan, COBRA, relocation expenses, 401(k) plans, workers' compensation programs, and other similar such benefits (collectively, the "Employee Benefits"). Failure to continue these Employee Benefits

---

[17]     The Debtors reimburse mileage at varying rates depending on the average price of gas in a region. Mileage reimbursement makes up a large percentage of reimbursable expenses.

would severely undermine the Employees' morale and result in significant hardship to the Employees.

148.    As of the Petition Date, the Debtors were obligated to pay certain contributions to and benefits under the plans related to such Employee Benefits (collectively, the "Benefit Contributions").  Those Benefit Contributions either (a) were due and unpaid by the Debtors as of the Petition Date or (b) remained unpaid as of the Petition Date because certain Benefit Contributions accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not become payable in the ordinary course of the Debtors' business until a later date.  The Debtors estimate that the total of such Benefit Contributions as of the Petition Date is approximately $710,210 (the "Benefit Contribution Obligation"). The Debtors also seek authority to continue the Employee Benefits in the ordinary course of business during the postpetition period.

149.    Medical and Health Insurance.  Through a third-party administrator, the Debtors provide self-insured medical insurance plans (the "Medical Plans") to their Employees. The Debtors accrue approximately $314,000 each month for the Medical Plans and withhold approximately $146,000 per month from participating employees.  Year to date claims and associated fees have been approximately $460,000 per month, including administrative fees and premiums under the Stop-Loss Policies (as defined below).  As of the Petition Date, the Debtors estimate they have approximately $700,000 of incurred, but not reported, liabilities related to the Medical Plans.

150.    The Debtors carry two stop-loss insurance policies ("Stop-Loss Policies") in connection with the Medical Plans through Community Insurance Company d.b.a. Anthem Blue Cross and Blue Shield.  Monthly premiums under the Stop-Loss Policies are typically paid

on the Tuesday following the second Thursday of each month covering the month in which the payment is made. The Stop-Loss Policies are scheduled to expire on December 31, 2013 and March 31, 2014. As of the Petition Date, the Debtors do not have any prepetition premiums outstanding under the Stop-Loss Policies. By this Motion, the Debtors request authority to continue the Stop-Loss Policies and to continue to make payments thereunder regardless of whether such payments relate to a prepetition period.

151.    <u>Group Life Insurance</u>. The Debtors provide a group life insurance plan ("<u>Group Life</u>") to their Employees. Group Life costs the Debtors approximately $2,500 per month. As of the Petition Date, the Debtors owe approximately $1,250 for Group Life.

152.    <u>Short-Term and Long-Term Disability</u>. The Debtors provide or offer their employees short-term and long-term disability plans (the "<u>Disability Plans</u>"). Laboratory Partners, Inc. offers its Employees long-term disability. Employees of all other Debtors are offered long-term disability at their cost. Similarly, all Employees of all Debtors are offered short-term disability at their own cost. Employee contributions for the Disability Plans is approximately $10,400 per month. The net monthly cost to the Debtors of the Disability Plans is approximately $1,130. The Debtors' payments under the Disability Plans are current through August 31, 2013. As of the Petition Date, the Debtors owe approximately $2,260 for the Disability Plans.

153.    <u>Supplemental Life Insurance, Dental, Vision, Accident and Critical Injury Insurance</u>:    The Debtors maintain supplemental life, dental, vision, accidental death and dismemberment insurance (collectively the "<u>Additional Benefit Plans</u>"), each self-funded by the Employees, with the exception that the Terre Haute Debtors make minor contributions to dental for their Employees. The monthly withholdings for these benefits are approximately $33,500.

Specifically, the average monthly withholding for the supplemental life/accidental death and dismemberment insurance is $8,610, $20,000 for the dental insurance, and $4,800 for the vision insurance.   The net monthly cost of the Terre Haute Debtors' dental contributions is approximately $3,000. The payments under the Additional Benefit Plans are current through October 4, 2013.   As of the Petition Date, the Debtors owe approximately $1,500 for the Additional Benefits Plans.

154.   <u>Flexible Spending Plan.</u>  The Debtors offer Employees the option to sign up for a flexible spending account (the "<u>Flexible Spending Plan</u>").   The Flexible Spending Plan allows Employees to set aside pre-tax wages to use on eligible expenses.   The estimated amount outstanding under the Flexible Spending Plan of the Petition Date is $5,200.

155.   <u>COBRA.</u>  The Debtors pay in the ordinary course of business certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former employees and their dependents (the "<u>COBRA Coverage</u>").   Under the COBRA Program, a former Employee may elect to receive COBRA Coverage for the continuance of the Medical Plans, Additional Benefit Plans, and Flexible Spending Plan. As of the Petition Date, there are approximately three former Employees using the COBRA Program.

156.   Prepetition unpaid costs associated with this obligation (the "<u>Prepetition COBRA Obligations</u>") are estimated by the Debtors to be *de minimis*.

157.   <u>Relocation Expenses.</u>  The Debtors also maintain a program to provide relocation expenses to employees who qualify (the "<u>Relocation Expense Program</u>").   As of the Petition Date, there are no outstanding amounts due under the Relocation Expense Program.

158.   <u>401(k) Contributions.</u>  The Debtors maintain 401(k) retirement plans for the benefit of their Employees, but do not make contributions on their Employees' behalves.

The 401(k) contributions are made by Employees per pay period and the approximate net monthly maintenance and ancillary costs to the Debtors related to the 401(k) plans are *de minimus.*

159.  Workers' Compensation.  The Debtors are required under the laws of the states in which they operate to maintain workers' compensation insurance that provides their Employees with coverage for injuries arising from or related to their employment with the Debtors.  The Debtors: (a) either maintain workers' compensation liability insurance or participate in state-administered workers' compensation programs in each of the states in which they do business; and (b) provide Employees with workers' compensation coverage for any eligible claims arising in any jurisdiction (collectively, (a) and (b) the "Workers' Compensation Program").

160.  To implement the Workers' Compensation Program, in addition to participating in a certain state workers' compensation program (as described below), the Debtors maintain fully-insured workers' compensation policies (the "Workers' Compensation Policies") with Liberty Mutual Insurance Company, Berkeley, Kentucky Employers Mutual Insurance, IWIF, and Travelers Commercial Casualty Company, which collectively cover workers' compensation claims of the Debtors' Employees in six (6) states.  The Workers' Compensation Policies provide full insurance coverage for workers' compensation claims. The Debtors pay annual premiums of approximately $341,000 (in the aggregate) on account of the Workers' Compensation Policies.  The next payments totaling approximately $135,000 on the Worker's Compensation Policies are due on or around October 31, 2013.  Each of the Workers' Compensation Policies expires on January 22, 2014.

161.  The Debtors located in Ohio participate in a fully-insured workers' compensation program administered by the Ohio Bureau of Workers' Compensation (the "State Program").  The Debtors pay annual premiums of approximately $564,000 on account of the State Program.  As of the Petition Date, the Debtors are current in premiums under the State Program and owe approximately $423,000 on account of future premiums under the State Program.  The remaining payments for 2013 coverage under the State Program, each in the approximate amount of $141,000, are due in December 2013, March 2014, and June 2014.

162.  The Debtors also utilize two third-party claims administrators to process and pay the workers' compensation claims, including Careworks Inc. and CCI.  On average, administrative and other fees payable to the administrators of the relevant programs are of *de minimus* cost to the Debtors.

163.  By the Motion, the Debtors seek authority to maintain the Workers' Compensation Program, including paying, in their discretion, any amounts owed on account of the Workers' Compensation Policies, the State Program, or administrative costs in the ordinary course of their businesses, regardless of when such obligations accrued.

**(iv)**    **Authority to Honor or Reissue Prepetition Checks and Drafts**

164.    The Debtors pay all payroll and other obligations due to their Employees by check, pre-funded debit cards, or by direct deposit at the election of the Employee.  The vast majority of Employees are paid by direct deposit.  As a result of the timing of these Chapter 11 Cases, checks previously issued by the Debtors to their Employees may not yet have been presented for payment or may not yet have cleared the banking system and, accordingly, may be dishonored unless the Court authorizes and directs the banks in which the Debtors maintain their payrolls and other disbursements to honor these checks.

165.    The Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn or draft requests made on the Debtors' accounts related to Prepetition Employee Claims, whether presented prior to or after the Petition Date, upon the receipt by each such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtors have, or will have, on deposit sufficient funds in their bank accounts to satisfy the Prepetition Employee Claims for which they seek immediate payment so that their financial institutions will not be prejudiced by an order directing them to honor the Debtors' checks or fund transfer requests with respect to such amounts.

(v)    **Authority to Pay Incidental Costs**

166.    In addition, the Motion requests that the Debtors be permitted, but not directed, to pay all costs incident to the payment of the Prepetition Employee Claims and Employee Benefits, such as processing costs.  Amounts for incidental costs are included in the other cost estimates herein.

167.    The Debtors' maintenance of their positive relationships with the Employees is critical to the continued reliability and efficiency of their ongoing operations while the Debtors explore their strategic options.  Paying the Employee Claims and Benefits will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, the Debtors believe that without the requested relief, their Employees may seek alternative employment opportunities.  Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and, likely, reduce the value of the Debtors.  The loss of valuable Employees and the subsequent recruiting of necessary replacement employees would be distracting at this critical time when the

Debtors are stabilizing operations and preparing for the sale of some or all of the Debtors' business and assets.  Further, if the Debtors lose valuable Employees, they will incur recruiting expenses in locating replacement workers.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee Wages and Benefits that accrued prepetition.

168.    For the reasons set forth above, I believe that the relief requested in this Motion is in the best interests of the Debtors and will enable the Debtors to operate their businesses without interruption so as to avoid immediate and irreparable harm to the Debtors' estates.

F.    **Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A), 363(B), 363(C), 1107(A) And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing The Debtors To Honor Certain Obligations To Customers; (II) To Continue Prepetition Customer Practices In The Ordinary Course Of Business; And (III) Granting Related Relief**

169.    By this Motion, the Debtors seek the entry of an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (i) authorizing the Debtors to honor certain prepetition obligations to customers and payors and to otherwise continue their prepetition customer programs and practices in the ordinary course of business; and (ii) granting related relief.

170.    In the ordinary course of business, the Debtors bill insurance companies of customers that receive services from their clinical laboratories and also individual customers.  In certain instances, after a customer pays the Debtors for a service, the customer's insurance company remits payment for the same underlying service to the Debtors.  The Debtors then reconcile the payments and, in the ordinary course of business, remit refunds to the individual

customers (the "Individual Refunds").  As of the Petition Date, the Debtors estimate that there are approximately $150,000 of Individual Refunds related to prepetition services outstanding.

171.    Additionally, a substantial portion of the Debtors' business involves individuals for whom services are paid for through government programs such as Medicare or by other third parties such as insurance companies (collectively, the "Third Party Payors").  In the ordinary course of their business, the Debtors routinely bill the Third Party Payors for services rendered to individuals who are covered by the Third Party Payors' programs.  In rendering payment on such bills, the Third Party Payors occasionally reimburse for services that are more appropriately payable by another payor.  In the ordinary course of business and pursuant to the applicable programs, these overpayments are then subsequently withheld from later payments by the Third Party Payors to the Debtors (the "Third Party Refunds").  Through this process, the Debtors are appropriately compensated for the services performed and the Third Party Payors are efficiently refunded overpayments.  The Debtors estimate that approximately $70,000 of Third Party Refunds are processed each month.  The Third Party Refunds can relate to payments made to the Debtors anywhere from approximately two weeks ago to two years ago.  As a result, it is not possible for the Debtors to estimate the amount of Third Party Refunds outstanding as of the Petition Date.

172.    The Debtors' relationships with their customers and the Third Party Payors are the backbone of their business.  The Debtors' ability to honor and perform their obligations with respect to their customers and the Third Party Payors is critical to the goodwill the Debtors have worked hard to establish.  Attendant to such goodwill is the Debtors' ability to charge customers and Third Party Payors correctly and issue refunds when appropriate.  These practices have allowed the Debtors to develop and sustain a positive reputation in the

marketplace for their services.   The Debtors' business and, ultimately, the success of the Debtors' proposed expedited sales process, depends largely on maintaining the loyalty of their customer base and the Third Party Payors.

173.    Further, the Debtors' reimbursements from the Third Party Payors must continue to flow seamlessly despite these cases.   Even a slight disruption in the flow of these reimbursements would have disastrous effects on the Debtors' operations.

174.    Unless the Debtors can take the measures requested by the Motion, the Debtors believe that the bankruptcy filing itself will have a negative impact on the Debtors' businesses.   In particular, if customers perceive that the Debtors are unable or unwilling to issue Individual Refunds and permit Third Party Refunds, the Debtors' goodwill and business relationships may erode.   To prevent any such occurrence, the Debtors desire to honor and perform their prepetition Individual and Third Party Refund obligations and to continue to issue Refunds and permit Third Party Refunds postpetition in the ordinary course.   Such relief is necessary to preserve the Debtors' critical customer relationships and goodwill, thereby maximizing the value of the Debtors' business and assets for the benefit of the estates.

175.    For these and for the other reasons set forth in the Motion, I believe the relief requested in the Motion is in the best interests of their estates, their creditors and other parties in interest in these cases.

**G.    Motion Of Debtors For Orders (A) Authorizing Debtors (I) To Obtain Postpetition Financing And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. § 364; (II) To Use Cash Collateral Pursuant To 11 U.S.C. § 363; (III) To Provide Adequate Protection Pursuant To 11 U.S.C. § 361; And (B) Scheduling A Final Hearing And Establishing Related Notice Requirements**

176.    By the DIP Motion, the Debtors seek the entry of interim and final orders, _inter alia_,

(i) authorizing the Debtors to obtain secured, superpriority postpetition financing (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time (the "DIP Agreement")) by and among the DIP Borrowers, The Bank of New York Mellon as administrative and collateral agent (in such capacity, together with it successors in such capacity, the "DIP Agent"), for and on behalf of Marathon Special Opportunity Fund, L.P. (the "DIP Lender"), substantially in the form of Exhibit 1 annexed to the proposed interim order (the "Interim Order"), a proposed form of which is attached to the DIP Motion as Exhibit B;

(ii) authorizing the Debtors to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) granting to the DIP Agent and the DIP Lender allowed superpriority administrative expense claims in each of the Cases and any Successor Cases for the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations");

(iv) granting to the DIP Agent, for the benefit of the DIP Lender, automatically perfected security interests in and liens on all of the DIP Collateral, including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral");

(v) authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, closing fees, extension fees, servicing fees, appraisal fees, administrative agent's fees, continuing commitment fees, fees associated with establishing and perfecting liens created under the DIP Documents, the fees and disbursements of each of DIP Agent and DIP Lender's attorneys, advisers, accountants, and other consultants, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(vi) authorizing the Debtors' use of the Cash Collateral of the Prepetition Agent and Prepetition Lenders and management and

operation of their businesses and properties to the extent not prohibited by the DIP Documents;

(vii) providing adequate protection to the Prepetition Agent and Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding) for any Diminution in Value of their respective interests in the Prepetition Collateral, including the Cash Collateral;

(viii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order, and the final order approving the DIP Motion;

(ix) permitting the roll-up of $350,000 of prepetition bridge financing; and

(x) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

177.    The Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.

178.    Other than the DIP Agreement, there are no viable financing alternatives available to the Debtors under the circumstances.  The Debtors have been exploring financial alternatives for at least two years and are intimately familiar with the lack of financing available to them.  In fact, the Debtors previously retained an investment banker to seek alternatives and it was unable to obtain any on terms as favorable as those contained in the proposed.  For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Prepetition Lenders, the Debtors are convinced that they are unable to obtain better financing to address the their urgent liquidity needs.

179.    Indeed, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Lenders.  Thus, even if alternative debtor-in-

possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases. Absent immediate availability of new credit, the Debtors' will be forced to cease operations and the going-concern value of their business will be lost.

180.    Accordingly, the Debtors require the availability of working capital from the DIP Agreement and the use of cash collateral. The DIP Agreement will provide more than just the ability for the Debtors to operate their businesses; the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders. The Debtors' critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

181.    The DIP Motion requests authority to roll-up $350,000 in funds advanced by the DIP Lender in its limited role as a Prepetition Lender to the Debtors in the week prior to the Petition Date. Such funds were advanced to permit the Debtors to pay operational and payroll expenses. The DIP Motion seeks authority to roll-up this limited amount of bridge financing in the DIP Financing. Such advances were critical for the Debtors' operations and marketing process. As a result, I believe it is appropriate for this amount to be rolled into the DIP Financing.

182.    In sum, without the immediate access to postpetition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses

necessary for the continued operation of their business before the Final Hearing on the DIP Motion can be held, and, therefore, it is essential that the Debtors obtain interim financing provided by the DIP Agreement. The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the DIP Motion.

**H.      "Second Day Relief" and Applications to Retain Professionals**

183.    On or soon after the Petition Date, in addition to the foregoing requests for relief, the Debtors intend to file:  (a) motions seeking authority to, among other things, (i) retain and employ ordinary course professionals, (ii) establish interim compensation procedures for professionals and official committee members, (iii) extend the time to file their schedules and statements; (iv) reject certain agreements; (v) and procedures for additional rejections; and (vi) set certain procedures related to bids, auctions and sales of substantially all of the Debtors' assets and scheduling related auctions and hearings; and (b) applications to retain (i) Pillsbury as Debtors' counsel, (ii) Morris Nichols as Debtors' counsel, (iii) William A. Brandt, Jr. as Chief Executive Officer to the Debtors and additional personnel provided by Development Specialists, Inc., and (iv) Duff & Phelps as investment bankers.

## II.      CONCLUSION

184.    The Debtors' ultimate goal in these Chapter 11 Cases is to maximize the value of their estates for the benefit of their creditors.  To minimize any loss of value of the Debtors' business during the Debtors' transition into chapter 11, the Debtors' immediate objective is to engage in business as usual with as little interruption or disruption to operations as the Debtors evaluate all of their strategic options.  I believe that, if the Court grants the First Day Relief, the Debtors' prospects for achieving their overriding goal of maximizing value will be substantially enhanced.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 24th day of October 2013, at *New York*, *New York*.

WILLIAM A. BRANDT JR.

*[Signature Page for First Day Declaration]*

7677949.2