## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re                                :    Chapter 11
                                     :
Laboratory Partners, Inc. et al.,¹   :    Case No. 13-12769 (      )
                                     :
                    Debtors.         :    (Joint Administration Pending)
-------------------------------------------------------x
```

## MOTION OF DEBTORS FOR ORDERS (A) AUTHORIZING DEBTORS (I) TO OBTAIN POSTPETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364; (II) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) TO PROVIDE ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 361; AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS

The above-captioned debtors and debtors in possession (the "Borrowers" or the

"Debtors") in the above-captioned cases hereby move (the "DIP Motion"), pursuant to sections

105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), for entry of an interim order (proposed form

attached hereto as **Exhibit A**, the "Interim Order") and a final order, inter alia,

---

[1]     The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485). Certain of the Debtors do business as MEDLAB. The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

(i) authorizing the Debtors to obtain secured, superpriority postpetition financing (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time and substantially in the form attached hereto as **Exhibit B**, the "DIP Agreement") by and among the DIP Borrowers, The Bank of New York Mellon as administrative and collateral agent (in such capacity, together with it successors in such capacity, the "DIP Agent"), for and on behalf of Marathon Special Opportunity Fund, L.P. (the "DIP Lender");

(ii) authorizing the Debtors to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the "DIP Documents") [2] and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) granting to the DIP Agent and the DIP Lender allowed superpriority administrative expense claims in each of the Cases and any Successor Cases for the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations");

(iv) granting to the DIP Agent, for the benefit of the DIP Lender, automatically perfected security interests in and liens on all of the DIP Collateral, including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral");

(v) authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, closing fees, extension fees, servicing fees, appraisal fees, administrative agent's fees, continuing commitment fees, fees associated with establishing and perfecting liens created under the DIP Documents, the fees and disbursements of each of DIP Agent and DIP Lender's attorneys, advisers, accountants, and other consultants, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

---

[2] Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Interim Order or the DIP Agreement. To the extent that there is any conflict between the definitions contained in either the Interim Order or the DIP Agreement, the definitions in the DIP Agreement shall control.

> (vi) authorizing the Debtors' use of the Cash Collateral of the Prepetition Agent and Prepetition Lenders (each as defined herein) and management and operation of their businesses and properties to the extent not prohibited by the DIP Documents;
>
> (vii) providing adequate protection to the Prepetition Agent and Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding) for any Diminution in Value of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral;
>
> (viii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order, and the final order approving this DIP Motion;
>
> (ix) permitting the refinancing of $350,000 of prepetition bridge financing as loans under the DIP Facility; and
>
> (x) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Debtors rely upon and incorporate by reference the *Declaration of William A Brandt, Jr. In Support of First Day Relief* (the "Brandt Declaration"), which was filed with the Court concurrently herewith. In further support of the DIP Motion, the Debtors, by and through their undersigned proposed co-counsel, respectfully state as follows:

## JURISDICTION

1.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

3

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases. The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      The Debtors, headquartered in Cincinnati, Ohio and doing business primarily as MEDLAB, provide clinical diagnostic laboratory services to long-term care facilities, hospitals and physician offices through a network of clinical laboratories.

5.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Brandt Declaration.

## SUMMARY OF THE DEBTORS' PREPETITION SECURED INDEBTEDNESS AND CERTAIN NOTES

### *Loan and Security Agreement*

6.      The Debtors are party to that certain Amended and Restated Credit and Guaranty Agreement dated as of August 5, 2008, as amended or otherwise modified to date (the "Prepetition Credit Agreement"), by and among the Terre Haute Medical Laboratory, Inc. ("THML"), Pathology Associates of Terre Haute, Inc. ("PATH"),    Kilbourne Medical Laboratories, Inc. ("Kilbourne"), MedLab Ohio, Inc., Suburban Medical Laboratory, Inc., and Biological Technology Laboratory, Inc. (collectively, the "Prepetition Borrowers"), Laboratory Partners, Inc. (the "Prepetition Guarantor"), The Bank of New York Mellon, as administrative and collateral agent (the "Prepetition Agent"), and Marathon CLO I, LTD., Marathon CLO II, LTD., Marathon Financing I, B.V., and solely with respect to the Additional Term Loan,

4

Marathon Special Opportunity Fund, L.P. as lenders (collectively, the "Prepetition Lenders"), and together with all other loan and security documents executed in connection therewith (the "Prepetition Credit Documents"), among the Prepetition Borrowers, Prepetition Guarantor, Prepetition Agent, and the Prepetition Lenders, the Prepetition Lenders provided credit to the Prepetition Borrowers and provided other financial accommodations to or for the benefit of the Prepetition Borrowers and the Prepetition Guarantor (collectively, the "Prepetition Facility"). Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders made available to the Debtors a revolving line of credit (the "Revolver") to be used for business operations and certain term loan facilities (collectively, the "Term Loans").

7.    As of the Petition Date, the aggregate outstanding principal and accrued interest under the Prepetition Credit Agreement is approximately $21,595,465.62 with regard to the Term Loans. There are no outstanding amounts under the Revolver.

### *Forbearance*

8.    The Revolver and Term Loans matured on March 28, 2013. On May 1, 2013, Debtors entered into a Forbearance Agreement with the Prepetition Lenders and the Prepetition Agent (as amended, the "Forbearance Agreement") whereby the Debtors, Prepetition Lenders, and the Prepetition Agent acknowledged that certain Defaults and Events of Default (as defined in the Prepetition Credit Agreement) have occurred and are continuing, including the failure to pay all loans and obligations due under the Prepetition Credit Agreement on March 28, 2013. (All of such Defaults and Events of Default, as listed in the Forbearance Agreement, are herein referred to as the "Designated Defaults".) Under the terms of the Forbearance Agreement, the Prepetition Lenders and the Prepetition Agent agreed to forbear, during the Forbearance Period (as defined below), from exercising or enforcing any right or remedy available to them

under the Prepetition Credit Agreement and/or applicable law arising as a result of the Designated Defaults. The forbearance period (the "Forbearance Period") commenced on March 29, 2013 (one day after the maturity date of the loans under the Prepetition Credit Agreement) and, including all extensions, terminated on October 7, 2013.

***Prepetition Subordinated Unsecured Notes***

9. The Seller Notes. On March 28, 2007, Laboratory Partners issued two subordinated unsecured promissory notes to individual sellers, M. Bashar Kashlan, M.D. and Gerald Longa, M.D., in connection the acquisition by Laboratory Partners of THML and PATH pursuant to a certain Stock Purchase Agreement dated as of June 29, 2006 (such subordinated promissory notes, as amended from time to time, the "THML Notes"). Each THML Note was originally issued in the principal amount of $4,030,000.

10. On June 29, 2007, Laboratory Partners issued two subordinated promissory notes to individual sellers, Paul Kilbourne, Sr. and Jay Braun, in connection with the acquisition by Laboratory Partners of Kilbourne pursuant to the Stock Purchase Agreement dated as of June 29, 2007 (such subordinated promissory notes, as amended from time to time, the "Kilbourne Notes" and, together with the THML Notes, the "Seller Notes"). The Kilbourne Notes were originally issued in the principal amounts of $2,897,000 and $2,183,000. The Seller Notes have an interest rate of 12% per annum. The Kilbourne Notes have a default rate of 12% per annum, and the THML Notes have a default rate of 15% per annum. Interest on the Seller Notes is payable in cash quarterly in arrears.

11. As of the Petition Date, the Seller Notes had a remaining principal balance of $10.4 million outstanding, plus accrued and unpaid interest of approximately $72,000. The Seller Notes are subordinated to the indebtedness under the Prepetition Credit Agreement. The

6

THML Notes matured on May 1, 2013, and the Kilbourne Notes mature on November 1, 2013. Laboratory Partners is currently in default with respect to the Seller Notes.

12. The Investor Notes. On March 8, 2011, Debtors issued unsecured subordinated promissory notes to nine purchasers in the aggregate original principal amount of $3,225,806 (as amended from time to time, the "March 2011 Notes") which bear interest at a rate of 12% per annum payable quarterly. The March 2011 Notes matured on May 1, 2013.

13. On March 28, 2012, Debtors issued convertible subordinated promissory notes to eight purchasers in the aggregate original principal amount of $1,200,000 (as amended from time to time, the "March 2012 Notes"). On June 26, 2012, Debtors issued convertible subordinated promissory notes to the same eight purchasers of the March 2012 Notes in the aggregate original principal amount of $1,000,000 (as amended from time to time, the "June 2012 Notes"). On December 28, 2012, Debtors issued convertible subordinated promissory notes to the same eight purchasers in the aggregate original principal amount of $1,000,000 (as amended from time to time, the "December 2012 Notes"). On February 13, 2013, Debtors issued convertible subordinated promissory notes to the same eight purchasers in the aggregate original principal amount of $491,716.34 (as amended from time to time, the "February 2013 Notes" and, together with the March 2011 Notes, March 2012 Notes, June 2012 Notes and December 2012 Notes, the "Investor Notes" and, together with the Seller Notes, the "Notes").

14. The March 2012 Notes, June 2012 Notes, December 2012 Notes and February 2013 Notes mature on November 1, 2013 and bear interest at a rate of 10% per annum payable quarterly. Such Notes are convertible, at the option of the holder, into Laboratory Partners' Series F Preferred Stock, par value $0.001 per share, at a conversion price of $8.75 per share, on November 1, 2013 or into shares of Laboratory Partners equity securities upon certain

7

equity financings at a conversion price equal to the price per share paid by investors in such equity financing.

15. The Investor Notes have a default rate of 15% per annum. The indebtedness under the Investor Notes is subordinate in right of payment to the indebtedness under the Prepetition Credit Agreement. The indebtedness under the March 2012 Notes is subordinate in right of payment to all the indebtedness under the Prepetition Credit Agreement and the March 2011 Notes, June 2012 Notes, December 2012 Notes and February 2013 Notes. The Investor Notes include a provision which allow Debtors to pay interest in kind (in some cases, 50% of such interest, and in some cases, 100% of such interest). As of the Petition Date, the Investor Notes had a remaining principal balance of $8 million outstanding, plus accrued and unpaid interest of approximately $60,000. Debtors are currently in default with respect to the Investor Notes.

16. Capital Leases. As of the Petition Date, the Debtors also have approximately $2.7 million in secured debt consisting of capital leases for certain property and equipment. These capital leases are for various assets, including vehicles, laboratory testing equipment, office equipment, information technology equipment and software. These capital leases are financed by specialty lease financing companies or by the related vendor.

## THE DEBTORS' URGENT NEED FOR POSTPETITION FINANCING

17. As a consequence of the factors described herein and in the Brandt Declaration, the Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.

18. Other than the DIP Agreement, there are no viable financing alternatives available to the Debtors under the circumstances. The Debtors have been exploring financial

alternatives for at least two years and are intimately familiar with the lack of financing available to them. In fact, the Debtors previously retained an investment banker to seek alternatives and it was unable to obtain any on terms as favorable as those contained in the proposed. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Prepetition Lenders, the Debtors are convinced that they are unable to obtain better financing to address the their urgent liquidity needs.

19.     Indeed, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Lenders.[3]   Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases. Absent immediate availability of new credit, the Debtors' will be forced to cease operations and the going-concern value of their business will be lost.

20.     Accordingly, the Debtors require the availability of working capital from the DIP Agreement and the use of cash collateral. The DIP Agreement will provide more than just the ability for the Debtors to operate their businesses; the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders.

---

[3]     The obligations of the Debtors under the Prepetition Facility are secured by a first-priority lien on substantially all of the assets of the Debtors; however, THML owns a real property parcel located in Vigo County, Indiana that may not be covered by the lien. Current searches of real property records do not indicate a filing in favor of the Prepetition Lenders.

9

The Debtors' critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

21.     In sum, without the immediate access to postpetition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on this DIP Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lender. The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the DIP Motion.

## SUMMARY OF THE DEBTORS' PROPOSED DIP FINANCING[4]

22.     The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require a postpetition credit facility in substantially the form described herein. Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Agreement with the DIP Agent.

23.     The terms of the DIP financing are more specifically set forth in the DIP Agreement attached hereto **Exhibit B**. The key provisions of the DIP Agreement are as follows:

---

[4]     The summaries and descriptions of the terms and conditions of the DIP Documents and the proposed Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Documents and the Interim Order. In the event there is a conflict between this Motion and the DIP Documents or the Interim Order, the DIP Documents or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Borrowers:** | Laboratory Partners, Inc., Kilbourne Medical Laboratories, Inc., MedLab Ohio, Inc., Suburban Medical Laboratory, Inc., Biological Technology Laboratory, Inc., Terre Haute Medical Laboratory, Inc., and Pathology Associates of Terre Haute, Inc.<br><br>*See* DIP Agreement, Preamble. |
| **Lender:** | Marathon Special Opportunity Fund, L.P. ("Marathon" or the "DIP Lender").<br><br>*See* DIP Agreement, Preamble. |
| **Administrative and Collateral Agent:** | The Bank of New York Mellon (in such capacity, the "DIP Agent").<br><br>*See* DIP Agreement, Preamble. |
| **Loan Facility:**<br><br>Facility Amount:<br><br>Budget: | Five Million Dollars ($5,000,000).<br>*See* DIP Agreement, Recitals, Appendix A.<br><br>A copy of the Budget is attached to the Interim Order as Exhibit 1. |
| **Interest Rates:** | If a Base Rate Loan, at the Base Rate plus 6.50%.<br>If a LIBOR Rate Loan, at the Adjusted LIBOR Rate plus 8.00%.<br><br>*See* DIP Agreement § 2.7. |
| **Default Interest:** | The default rate of interest shall equal the then applicable rate plus 2%.<br><br>*See* DIP Agreement § 2.9. |
| **Term:** | The earliest earliest of (a) the date that is 5 months after the Petition Date, (b) the date that is 35 days after entry of the Interim Order, if the Final Order has not been entered prior to the expiration of such 35-day period, (c) the effective date with respect to a confirmed Plan of Reorganization for any Borrower or Borrowers, (d) the date a sale of all or substantially all of the Borrowers' assets is consummated under Section 363 of the Bankruptcy Code (for the avoidance of doubt such date will not be deemed to have occurred until a sale or liquidation of both the LTC Business and the Talon Business have occurred), (e) the date at which any of the Chapter 11 Cases converts to a case under Chapter 7 of the Bankruptcy Code, (f) the date of dismissal of any of the Chapter 11 Cases, and (g) the date of acceleration of the Loans pursuant to Section 8.<br><br>*See* DIP Agreement § 1.1. |
| **Fees:** | The Borrowers shall pay to the Administrative Agent (i) an annual administrative fee (the "Administrative Fee") in respect of the Loans under the DIP Agreement of $35,000 per annum, such Administrative Fee (which shall not be subject to pro ration) to be due, earned and payable in full on each of the Effective Date and each anniversary of the Effective Date until the payment in full of all of the Obligations and the termination of all Commitments thereunder and (ii) a one-time transaction acceptance fee of $5,000, to be due, earned and payable in full on the Effective Date.<br><br>The Borrower shall pay to the DIP Lender a closing fee of $25,000 (the "Closing Fee") in respect of the Commitments under the DIP Agreement, which Closing Fee represents 0.50% of the Commitments on the Effective Date, such Closing Fee to be due, earned and payable in full on the Effective Date.<br><br>*See* DIP Agreement § 2.10; *See* Fee Letter at pp. 1-2. |

| | |
|---|---|
| **Expenses:** | Whether or not the transactions contemplated hereby shall be consummated, the Borrowers agree to pay promptly, and in any event within thirty (30) days after written demand therefore, (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrowers and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to the Agents or the Lenders in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrowers; (d) all the actual and reasonable costs and expenses incurred in obtaining approval by the Bankruptcy Court of the Credit Documents; (e) all the actual and reasonable costs and expenses incurred in the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; (f) all the actual costs and expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties pursuant hereto, including filing and recording fees, expenses and amounts owed pursuant to Section 2.19(c) and (d), search fees, title insurance premiums and fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (g) all the actual costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (h) all the actual costs and expenses (including the reasonable fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (i) all other actual and reasonable costs and expenses incurred by each Agent in connection with the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (j) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including attorneys' fees and costs of settlement, incurred by any Agent and the Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder, under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings. <br><br> *See* DIP Agreement § 10.4; Interim Order ¶ 3. |
| **Collateral:** | All of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents and/or the DIP Orders as security for the Obligations, including, without limitation, all bankruptcy avoidance actions and claims arising under Sections 544, 547 and 548 of the Bankruptcy Code. <br><br> *See* DIP Agreement § 1.1. <br><br> For the avoidance of doubt, the DIP Collateral shall include all amounts received by any Debtor pursuant to the asset purchase agreement entered into by certain Debtors in May, 2013, to sell selected operating assets of the PO Division to Laboratory Corporation of America Holdings, including amounts held in escrow pursuant to such asset purchase agreement until December, 2014 as security against indemnification claims that may be made by Laboratory Corporation of America Holdings. <br><br> *See* Interim Order ¶ 6. |
| **Use of Proceeds:** | The proceeds of the Loans shall be used by the Borrowers only to (i) repay in full all outstanding Roll-Up Obligations; (ii) pay all fees and expenses due to Administrative Agent, Collateral Agent and the Lenders as provided herein, including, without limitation, all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Administrative Agent, Collateral Agent or any Lender in connection with the preparation, negotiation, documentation and court approval of this Agreement and the other Credit Documents (whether incurred before or after the Petition Date); (iii) finance ongoing debtor-in-possession working capital needs, general corporate purposes relating to post-Petition Date |

| | |
|---|---|
| | operations and related costs, fees and expenses of the Chapter 11 Cases (including, subject to the limitations of the Carve-Out, and to the extent set forth in the Budget, professional fees and expenses of legal counsel and financial advisors to the Borrowers and any statutory committee of unsecured creditors, respectively); (iv) pay the costs of administration of the Chapter 11 Cases; in each case, in accordance with the Budget and to the extent paid in compliance with Section 6.7, and subject to the terms and conditions described in this Agreement and (v) with respect to the Carve-Out Amount (which shall be funded with proceeds of the Second Draw Loan), make the payments contemplated by Section 2.23(iii)(a)(i). <br><br> *See* DIP Agreement § 2.5; Interim Order ¶ 10. |
| **Loan Documentation:** | Definitive loan documentation set forth in the DIP Documents including, without limitation, the DIP Agreement. <br><br> Interim Order ¶ 3. |
| **Covenants:**[5] | (a)     Compliance with DIP Orders. Notwithstanding anything in the Credit Documents to the contrary, the Credit Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders. <br><br> (b)     Chapter 11 Cases. In connection with the Chapter 11 Cases, the Credit Parties shall give the proper notice for (v) the motions seeking approval of the Credit Documents and the Interim Order and Final Order, (w) the hearings for the approval of the Interim Order, (x) the hearings for the approval of the Final Order, (y) the motions seeking approval of the sale of all or substantially all of the assets or the Capital Stock of the Credit Parties and (z) the hearings for the approval of the sale of all or substantially all of the assets or the Capital Stock of the Credit Parties. The Credit Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable. <br><br> (c)     Milestones.    The Credit Parties shall comply with each of the Milestones on or before the corresponding dates set forth on Exhibit H to the DIP Agreement. <br><br> (d)     Consultant. If a consultant is retained by or on behalf of the Lenders, the Borrowers shall (i) pay the fees and expenses of such consultant in connection with such retention in an amount not to exceed $200,000 in the aggregate, (ii) provide such consultant with all assistance and cooperation necessary to fully perform its duties on behalf of the Lenders, and (iii) meet with the Lenders and such consultant at such reasonable times as the Lenders or such consultant may reasonably request, and (iv) furnish, by email or otherwise, to the Lenders and such consultant, promptly after request therefor, any reports or other information reasonably requested by the Lenders or such consultant with respect thereto. <br><br> (e)     Potential Purchasers. Borrowers shall use their best efforts to find Potential Purchasers and to cause the Borrowers' chief executive officer or investment banker, as the case may be, to (i) provide to the Lenders, on a weekly basis, written reports (which may be by email) as to the status of Borrowers' efforts to find Potential Purchasers and such other matters as the Lenders may reasonably identify, in form and substance reasonably satisfactory to the Lenders and (ii) attend, on a weekly basis, if requested, a call with the Lenders, in each case, discussing the progress of (x) marketing and sales efforts with respect to any sale, including any verbal or written offers from, and the identification of Potential Purchasers and (y) operational procedures and cost-saving initiatives of the Borrowers. <br><br> *See* DIP Agreement § 5.18. |

---

[5]     In addition to the above-referenced bankruptcy covenants, sections 5 and 6 of the DIP Agreement contain numerous other covenants.

| | |
|---|---|
| **Events of Default**: | Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, and subject to Section 8.2, the occurrence of any one or more of the following conditions or events shall constitute an Event of Default under the DIP Agreement:

(a)      <u>Failure to Make Payments When Due</u>. Failure by Borrowers to pay (i) when due the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) when due, any interest on any Loan or any fee due pursuant to the Fee Letter or Sections 2.10, or (iv) any other fee or amount due hereunder, if such fee or amount is not paid within (5) days after receipt by the Borrowers of written notice from Administrative Agent or any Lender of the Borrowers' failure to make such payment.

(b)      <u>Default in Other Agreements</u>. Except for (A) any default or event of default arising or existing on or prior to the Effective Date in respect of any Contractual Obligation of the Borrowers (other than this Agreement), including, without limitation, any default or event of default existing under the Pre-Petition Credit Documents, (B) defaults occasioned by the filing of the Chapter 11 Cases, and (C) defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, a default or breach that occurs under any other agreement, document or instrument entered into either (x) prior to the Petition Date and which is affirmed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) on or after the Petition Date, as a result of (i) the failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of such Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $50,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any, provided therefore; or (ii) a breach or default by any Credit Party or any of their respective Subsidiaries with respect to any other material term of (1) one or more items of such Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in an individual principal amount of $50,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any, provided therefore, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) or to require the prepayment, redemption, repurchase or defeasance of, or to cause Borrowers or any of its Subsidiaries to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be.

(c)      <u>Or Breach of Certain Covenants</u>. Failure of any Credit Party to perform or comply with (i) any term or condition contained in Section 2.5, Section 5.15 or Section 5.18 or Section 6, or (ii) any term or condition contained in Section 5.1(d), (f), (g), (l), (r) or (s), Section 5.2 or Section 5.7 if, in the case of clause (ii) only, such failure to perform is not remedied or waived within two (2) days after receipt by the Borrowers of written notice from Administrative Agent or any Lender of such failure to perform.

(d)      <u>Breach of Representations, etc</u>. Any representation, warranty, certification or statement made by any Credit Party in any Credit Document or given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made.

(e)      <u>Other Defaults Under Credit Documents</u>. Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within fifteen (15) days after the earlier of (i) an officer of such Credit Party having actual knowledge of such default, or (ii) receipt by Borrowers of notice from Administrative Agent or any Lender of such default.

(f)-(g)    Intentionally Omitted. |

(h)    Judgments and Attachments.  At any time after the Petition Date, any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $25,000 or (ii) in the aggregate at any time an amount in excess of $50,000 (in either case to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Holdings or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder).

(i)    Dissolution.  Other than any DIP Order, any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days.

(j)    Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or may reasonably be expected to result in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $50,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 401(a)(29) or 412(n) of the Internal Revenue Code or under ERISA.

(k)    Change of Control.  A Change of Control shall occur.

(l)    Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (A) (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Borrower shall repudiate its obligations thereunder, (ii) this Agreement or any Credit Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, other than expressly permitted under the terms of this Agreement, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party, or (B) (i) any Borrower shall attempt to contest the validity, perfection, priority or enforceability of or otherwise invalidate, reduce or otherwise impair the Liens or security interests of Agents or any Lender, Agent's or any Lender's claims or rights against the Borrowers or attempt to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by the Interim Order or the Final Order shall, for any reason, cease to be valid, senior, perfected and enforceable, (iii) any action is commenced by any Person (other than the statutory committee of unsecured creditors with respect to the Chapter 11 Cases to the extent permitted under this Agreement) which contests the validity, perfection, priority or enforceability of any of the claims, Liens and security interests of Agents and the Lenders created by this Agreement, the other Credit Documents or the DIP Orders unless (a) such action is subject to a protest by the applicable Borrower, which protest is instituted and diligently prosecuted by such Borrower in good faith and (b) Agents and the Lenders are satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agents' Liens in and to the Collateral.

(m)    Material Contracts.  (i) The Borrowers or any counterparty shall be in default under any Material Contract and the other party has taken any material remedial action permitted under such Material Contract as a result of such default, or (ii) any Material Contract shall cease to be in full force and effect and binding against the Borrowers and each other party thereto, other than in accordance with the terms of such Material Contract.

(n)    The occurrence of any of the following in any Chapter 11 Case: (i) The conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, the dismissal of any of the Chapter 11 Cases, or the filing of a motion or other pleading by any Credit Party seeking the dismissal of any Chapter 11 Case; (ii) The appointment in any of the Chapter 11 Cases of a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Borrowers' business (beyond those set forth under Sections 1106(a)(3)

and (4) of the Bankruptcy Code) pursuant to Section 1104 of the Bankruptcy Code; (iii) Except with respect to the Carve-Out and the Specified Permitted Liens, the grant to any Person other than Agents of any super-priority administrative expense claim or any Lien that is pari passu with or senior to those of the Agents and the Lenders or the authorization to use cash collateral without the consent of the Agents and the Lenders; (iv) The grant to any Person other than the Agents of relief from the automatic stay provided for in the Chapter 11 Cases or the modification of such automatic stay to permit enforcement of rights by such Person with respect to any assets of any of the Borrowers or any of their Subsidiaries in excess of $25,000 in the aggregate; (v) The authorization by any Borrower's board of directors or managers or members, as the case may be, of the sale or liquidation of such Borrower's business pursuant to one or more Section 363 sales or otherwise, or the filing of any motion under Section 363 of the Bankruptcy Code, other than, with respect to any such sale that will not result in indefeasible payment in full in cash of the Obligations and termination of the Commitments, as consented to by the Agents and the Lenders and, with respect to any such sale that will not result in the indefeasible payment in full in cash of the Pre-Petition Obligations, as consented to by the Pre-Petition Agent and the Pre-Petition Lenders; (vi) Except as expressly ordered by the Bankruptcy Court and consented to by Administrative Agent and the Lenders in the Budget, the payment by any of the Credit Parties or any of their Subsidiaries on account of Pre-Petition Indebtedness; (vii) The failure to have the Final Order entered in the Chapter 11 Cases within 35 days after the Petition Date approving this Agreement on a final basis and in form and substance acceptable to Agents and the Lenders; (viii) The amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplementing of the Interim Order, the Final Order, or any other order of the Bankruptcy Court affecting this Agreement or any other Credit Document or the transactions contemplated hereby or thereby, in each case, in any manner not acceptable to Agents and the Lenders; or (ix) The circulation or distribution by or on behalf of the Borrowers of any plan of reorganization and/or disclosure statement, or draft thereof (or term sheet or similar indicative statements of terms thereof) that does not provide for repayment in full, in cash, of all the Obligations under this Agreement before or at the effective date of such plan of reorganization, unless approved by the Lenders.

*See* DIP Agreement § 8.1.

## REQUEST FOR APPROVAL OF PROPOSED DIP FINANCING

24.     As described above, it is essential to the success of these cases that the Debtors immediately obtain access to sufficient postpetition financing, without which the Debtors will be unable to operate or generate income. The Debtors' continuing viability, ability to maximize the value of their estates for the benefit of their creditors, and their ability to pursue the sales of their assets as going concerns depends heavily upon the expeditious approval of the DIP Agreement and the related actions requested herein.

25.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to

Section 364(c) of the Bankruptcy Code,[6] a court may authorize a debtor in possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. Pursuant to section 364(d) of the Bankruptcy Code,[7] a court may authorize a debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

---

[6]    Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

> (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[7]    Section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

26.   As a condition to entering into the DIP Agreement and obtaining the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, (a) to grant the DIP Agent, for the benefit of itself and the DIP Lender, automatically perfected security interests in and liens upon all of the DIP Collateral and (b) grant the DIP Obligations allowed superpriority administrative expense claim status in each of the Cases and any successor Cases.

*__Approval Under Section 364(c) of the Bankruptcy Code__*

27.   The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

*__The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis under 11 U.S.C. § 364(a) or (b)__*

28.   As set forth in the Brandt Declaration, and as the evidence at hearings on this DIP Motion will show, the Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

29.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.     Other than the proposed DIP financing, there are no viable financing alternatives available to the Debtors under the circumstances. The Debtors have been exploring financial alternatives for at least two years and are intimately familiar with the lack of financing available to them. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Prepetition Lenders on the Prepetition Collateral, the Debtors are convinced that other than the proposed DIP financing they would be entirely unable to obtain financing to address the their urgent liquidity needs.

31.     Moreover, as noted above, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Prepetition Lenders. Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and

could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their chapter 11 cases at the outset.

### *Approval of Priming Liens*

32.     If a debtor in possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor in possession may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

33.     As discussed above, the Debtors have explored financial alternatives and are aware of the lack of financing available to them. In light of that, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the DIP Lender under the DIP Facility is currently unobtainable without the priming of the prepetition liens of the Prepetition Lenders. *See In re Utah 7000, L.L.C.*, 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding debtor unable to obtain financing without priming of prepetition liens); *In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495*

*Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

34.     Thus, the Debtors are unable to obtain alternative postpetition financing through credit allowable as an unsecured basis and without granting priming liens. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

## *The Loans Under the DIP Facility are Necessary to Preserve Assets of the Debtors' Estates*

35.     It cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility. As with most businesses of the Debtors' size, the Debtors have significant cash needs. Access to substantial credit to purchase inventory, pay employees and to keep their businesses running is critical to the Debtors' survival. In the absence of immediate access to cash and credit, the Debtors' suppliers and employees may refuse to supply the inventory and services required to maintain operations.

36.     The DIP Facility is also essential so that the Debtors can immediately instill their employees, suppliers and customers with confidence in the Debtors' ability to meet their obligations to these important stakeholders. Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their value as a going concern.

37.     The success of these cases thus depends on the confidence of the Debtors' employees, vendors, and customers. If this Motion is denied or delayed, that confidence may be

destroyed, and the success of these chapter 11 cases might be irreparably damaged. In contrast, once the DIP Facility is approved, the Debtors' ability to provide their employees, vendors, customers, and other important stakeholders with the necessary confidence will be assured. The Debtors' need for access to the DIP Facility loans is, therefore, immediate.

### *Application of the Business Judgment Standard*

38.     After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtors, the Prepetition Agent, the Prepetition Lenders, the DIP Lender, and the DIP Agent, the Debtors' management concluded that the proposed DIP financing and the use of cash collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD*, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14

(Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     The terms of the proposed DIP Facility are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Agreement and obtain funds from the DIP Lender on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### *Highlighted Provisions Under Rule 4001-2*

40.     Local Rule 4001-2(a) states in pertinent part that:

(i) All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five

(75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out;

(G) Provisions that prime any secured lien without the consent of that lienor; and

(H) Provisions that seek to effect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).

Del. Bankr. Local Rule 4001-2(a)(i).

41.    Pursuant to Local Rule 4001-2(a)(i)(C), paragraph 33 of the Interim Order provides that "[s]ubject to entry of a final order, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases at any time shall be charged against any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender or any of their respective claims or the DIP Collateral or Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the applicable DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender and no such consent shall be

implied from any other action, inaction, or acquiescence by any such agents or lenders." Interim Order at ¶ 33 (emphasis added).

42.     Pursuant to Local Rule 4001-2(a)(i)(D), paragraph 6 of the Interim Order provides that, the DIP Agent is granted, for the benefit of itself and the DIP Lender, among continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on, among other things, (i) unencumbered assets, including proceeds of any and all lawsuits or causes of action including those under Section 549 of the Bankruptcy Code, and (ii) subject to entry of the Final Order, any causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code.

43.     Pursuant to Local Rule 4001-2(a)(i)(E), section 2.5(a) of the DIP Agreement and paragraphs F(iv) and 10 of the Interim Order permit the limited amount of $350,000 of funds advanced by the DIP Lender in its role as Additional Term Loan Lender in the week prior to the Petition Date to be refinanced as loans under the DIP Facility (the "Refinancing"). The Refinancing shall be subject to the reservation of rights of parties in interest set forth in paragraph 31 of the Interim Order, and upon expiration of the Challenge Period (as defined in paragraph 31 of the Interim Order), the Debtor's refinancing of the Roll-Up Obligations shall be deemed to be indefeasible, final and not subject to challenge.  The amount proposed to be refinanced was provided to the Debtors as prepetition bridge financing to permit the Debtors to pay critical operational and payroll expenses. The advance permitted the Debtors to advance their marketing process and thoroughly prepare for entering chapter 11 in the best possible position to maximize value. As a result, the Debtors believe the refinancing is appropriate under the circumstances.

44. Pursuant to Local Rule 4001-2(a)(i)(G), paragraph 7 of the Interim Order provides that the DIP Liens securing the DIP Obligations shall be junior to the (a) Carve Out, and (b) Specified Permitted Liens (as defined in the DIP Documents), and shall otherwise be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral. Furthermore, paragraph 8 of the Interim Order provides that the DIP Superpriority Claims shall be subordinate only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a final order), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. Paragraph 12(b) of the Interim Order provides that the Credit Facility Adequate Protection Liens shall be junior only to the: (A) Carve Out; (B) DIP Liens; and (C) Specified Permitted Liens (as defined in the DIP Documents). The Credit Facility Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. Paragraph 13 of the Interim Order provides that the Credit Facility Superpriority Claims shall be junior only to the Carve Out and DIP Superpriority Claims.

45. Pursuant to Local Rule 4001-2(a)(i)(H), paragraph 35 of the Interim Order provides that "[s]ubject to entry of a final order, the Debtors, DIP Agent, DIP Lenders,

Prepetition Agent and Prepetition Lenders, agree that they shall not assert the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral." Interim Order ¶ 35.

      46.    In addition, the DIP Agreement provides that the following is an event of default:

> The authorization by any Borrower's board of directors or managers or members, as the case may be, of the sale or liquidation of such Borrower's business pursuant to one or more Section 363 sales or otherwise, or the filing of any motion under Section 363 of the Bankruptcy Code, other than, with respect to any such sale that will not result in indefeasible payment in full in cash of the Obligations and termination of the Commitments, as consented to by the Agents and the Lenders and, with respect to any such sale that will not result in the indefeasible payment in full in cash of the Pre-Petition Obligations, as consented to by the Pre-Petition Agent and the Pre-Petition Lenders.

DIP Agreement, § 8.1(n)(v).

      47.    The justification for the provisions of the DIP Agreement for which disclosure is required pursuant to Local Rule 4001-2 is the immediate and critical need for this financing. As discussed above, the Debtors were unable to secure postpetition financing on terms more favorable than that obtained from the DIP Lender and such financing is critical to the maximization of recoveries for the Debtors' creditors. Indeed, without this financing, the Debtors will be forced to immediately shut down and liquidate, and any significant returns for unsecured creditors will almost certainly be eliminated. Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under Local Rule 4001-2, and these terms of the DIP Agreement should be approved.

## REQUEST FOR USE OF CASH COLLATERAL

48.    The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns. These essential items, however, constitute part of the Prepetition Lenders' Cash Collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

49.    Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

50.    In the instant cases, the Prepetition Lenders have consented to the Debtors' use of Cash Collateral. Because such use is essential to the preservation of the Debtors' estates and the Prepetition Lenders have consented, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

## APPROVAL OF ADEQUATE PROTECTION

51.    In exchange for the Debtors' use of the Prepetition Collateral, including Cash Collateral, and the priming of the prepetition liens of the Prepetition Lenders (the "Prepetition Liens"), the Prepetition Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Liens on the Prepetition Collateral, and the

28

subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

### *Prepetition Lenders' Adequate Protection*

52.    The Debtors propose to provide the Prepetition Agent, for the benefit of itself and the Prepetition Lenders for the benefit of themselves, with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code. To that end, the Debtors, the Prepetition Agent, and the Prepetition Lenders have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Prepetition Agent's and the Prepetition Lenders' interest in the Prepetition Collateral from any Diminution in Value of each of their respective interests in the Prepetition Collateral. Such adequate protection, as described more fully in the Interim Order, is summarized below.

(a)    Credit Facility Adequate Protection Liens. As adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent the Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors shall grant to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, continuing valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "Credit Facility Adequate Protection Liens"). The Credit Facility Adequate Protection Liens shall be junior only to the: (A) Carve Out; (B) DIP Liens; and (C) Specified Permitted Liens (as defined in the DIP Documents). The Credit Facility Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. Upon entry of the Interim Order, the Credit Facility Adequate Protection

Liens shall be valid, perfected and enforceable against the Collateral without further filing or recording of any document or instrument or the taking of any further actions.

(b)     Adequate Protection, Super-Priority Claim.  As further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent and Prepetition Lenders shall be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Credit Facility Superpriority Claims"), that shall be junior only to the Carve Out and DIP Superpriority Claims, and shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

(c)     Payment of Fees, Costs and Expenses.  As further adequate protection, to the extent the Prepetition Obligations remain outstanding, the Debtors shall provide adequate protection to the Prepetition Agent and Prepetition Lenders, in the form of ongoing payment of the Prepetition Agent's and Prepetition Lenders' reasonable fees, costs and expenses, including, without limitation, legal fees and expenses (together, the "Credit Facility Adequate Protection Payments").  All parties reserve all rights to assert that any such Credit Facility Adequate Protection Payments may be reallocated or recharacterized as repayments of

principal of the Prepetition Obligations pending determination of the value of the Prepetition Collateral.

(d)    Reservation of Rights. The Prepetition Agent and the Prepetition Lenders reserve the right to request additional or further adequate protection of their interests in the Prepetition Collateral.

(e)    Recognition of Prepetition Facility Liens and Prepetition Obligations. Subject to certain provisions of the Interim Order, upon entry of the Interim Order, (a) as of the Petition Date, the Prepetition Facility Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected in all material respects; (b) as of the Petition Date, the Prepetition Facility Liens are senior in priority over any and all other liens on the Prepetition Collateral except as my be permitted under the Prepetition Facility or created by operation of law; (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Obligations exist, and no portion of the Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law as of the date hereof; (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Agent, Prepetition Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees as of the date hereof; and (f) any payments made on account of the Prepetition Obligations to or for the benefit of the Prepetition Agent or the Prepetition Lenders prior to the Petition Date are on

account of amounts in respect of which the Prepetition Agent and the Prepetition Lenders are secured, were payments out of the Prepetition Collateral, and such payments do not diminish any property otherwise available for distribution to unsecured creditors.

53.    The Debtors believe that the proposed adequate protection is fair and reasonable. The Prepetition Agent and the Prepetition Lenders have agreed that the adequate protection summarized above and provided for in the Interim Order is sufficient to allow the Debtors to use their Cash Collateral. Furthermore, the priming of the Prepetition Liens will enable the Debtors to obtain the DIP Facility. As a result, the Prepetition Agent and the Prepetition Lenders consent to such priming liens and are entitled to receive adequate protection of their interest in their respective interests in the Prepetition Collateral.

54.    Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

## THE DEBTORS SHOULD BE PERMITTED TO MAKE INTERIM BORROWINGS UNDER THE DIP AGREEMENT

55.    This Court is empowered to conduct a preliminary expedited hearing on this DIP Motion and authorize the Interim Order. Specifically, Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

56.     Pending the Final Hearing, the Debtors require $2,850,000.00 under the DIP Facility for, inter alia, payment of vital services and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, postpetition operating expenses in order to preserve the value of the Debtors' estates for the benefit of all of the Debtors' creditors and equity holders.

57.     Absent immediate financing for their continuing business operations, the Debtors will be unable to pay operating expenses and, therefore, unable to continue to conduct their businesses pending the Final Hearing. Consequently, if interim relief is not obtained, the Debtors, their estates, their creditors and equity holders, their businesses, their employees, and their assets will suffer immediate and irreparable harm.

58.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). The Debtors' current financial distress and acute need for postpetition liquidity, provides ample evidence to support the conclusion that the Debtors will avoid immediate and irreparable harm only if the Court authorizes the relief provided for in the Interim Order.

59.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing under the DIP Agreement up to a maximum in the aggregate principal amount of $2,850,000.00 to sustain operations and comply with terms and conditions of the DIP Agreement.

## GOOD FAITH

60.    The Debtors submit that the terms and conditions of the DIP Agreement, and the fees paid and to be paid thereunder, are the best available to the Debtors under the circumstances. As stated above, the Debtors, the DIP Agent, the DIP Lender, the Prepetition Agent, and the Prepetition Lenders negotiated the terms and conditions of the DIP Agreement and the use of Cash Collateral in good faith and at arm's length. Moreover, the Debtors' decision to enter into the DIP Agreement was an exercise of the Debtors' prudent business judgment. Therefore, the DIP Agent, DIP Lender, the Prepetition Agent, and the Prepetition Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Agreement, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

61.    The Interim Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtors to grant the adequate protection set forth therein; (b) permit the Debtors to perform such acts as the DIP Agent, the DIP Lenders, Prepetition Agent or the Prepetition Lenders may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lender, the Prepetition Agent, and the Prepetition Lenders under the DIP Agreement and the Interim Order; and (d) authorize the Debtors to pay and the DIP Agent, the DIP Lender, the Prepetition Agent, and the Prepetition Lenders to retain and apply payments made in accordance with the terms of the Interim Order.

62.     Stay modification provisions of this type are customary features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

### REQUEST TO WAIVE BANKRUPTCY RULES 6003(B), 6004(A), AND 6004(H)

63.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the twenty-one day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h). The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

### REQUEST FOR FINAL HEARING

64.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing that is no later than 25 days from the Petition Date.

### NOTICE

65.     Notice of the interim hearing on this Motion has been given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; and (c) counsel for the DIP Lender and the Prepetition Lenders. As this DIP Motion is seeking first day relief, notice of this DIP Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). The Debtors respectfully submit that no further notice of the interim hearing on this DIP Motion is required.

## NO PRIOR REQUEST

66.    No prior request for the relief sought in the Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Order annexed hereto as **Exhibit A**; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Dated: October 25, 2013
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Erin R. Fay (No. 5268)
1201 N. Market St., 16th Flr.
PO Box 1347
Wilmington, DE 19899-1347
Telephone: 302-658-9200
Facsimile: 302-658-3989

-and-

PILLSBURY WINTHROP SHAW PITTMAN LLP
Leo T. Crowley
Margot Erlich
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500

*Proposed Counsel to Debtors
and Debtors in Possession*

7595092.6

36