**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
Laboratory Partners, Inc., et al.,¹      :    Case No. 13-12769 (PJW)
                                         :
                 Debtors.                :    (Joint Administered)
                                         :    Hearing Date: Nov. 15, 2013 at 1:30 p.m. (ET)
                                         :    (REQUESTED)
                                         :    Obj. Due: Nov. 8, 2013 at 4:00 p.m. (ET)
-------------------------------------------------------x    (REQUESTED)
```

**DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BIDDING
PROCEDURES IN CONNECTION WITH SALE(S) OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING HEARINGS TO
CONSIDER SALES; (III) APPROVING FORM AND MANNER OF NOTICE
THEREOF; AND (IV) AUTHORIZING ENTRY INTO STALKING HORSE
AGREEMENTS SUBJECT TO FURTHER HEARING; (B)(I) AUTHORIZING
AND APPROVING SALES OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors"), through their undersigned proposed co-counsel, hereby move (the "Motion"),

pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), for entry of orders approving, among other things, the

---

¹ The Debtors and the last four digits of their taxpayer identification numbers are as
follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849),
MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological
Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and
Pathology Associates of Terre Haute, Inc. (6485). Certain of the Debtors do business as
Medlab. The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite
K, Cincinnati, OH 45245.

sale or sales (the "Sales") of the Purchased Assets (as defined below), related bidding procedures and procedures for the assumption and assignment of executory contracts and unexpired leases, and certain protections for a potential purchaser or purchasers of such assets.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of William A. Brandt, Jr. In Support of First Day Relief* (the "Brandt Declaration")[2] which was filed with the Court on the Petition Date.  In further support of the Motion, the Debtors, by and through their undersigned proposed co-counsel, respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rule 6004-1.

## GENERAL BACKGROUND

2.      On October 25, 2013 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Brandt Declaration.

---

[2]      Undefined capitalized terms used herein shall have the meanings ascribed to such terms in the Brandt Declaration.

## DESCRIPTION OF THE DEBTORS' BUSINESSES

4.      Laboratory Partners, Inc. ("Laboratory Partners") through its subsidiaries, provides clinical laboratory and anatomic pathology services to (i) skilled nursing facilities in Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Virginia and Washington DC (the "Long-Term Care Division"), (ii) physicians, physician offices and medical groups (the "PO Division"), in Indiana and Illinois, and (iii) Union Hospital, Inc. in Terre Haute and Clinton, Indiana (the "UH Division").

5.      Laboratory Partners is headquartered in Cincinnati, Ohio, and, through its subsidiaries, operates approximately eleven laboratory facilities and has approximately twenty-seven offices in seven states.  The Debtors do not have any operations outside of the United States.

6.      The Long-Term Care Division is losing money on an operating basis. Presently, the Debtors have multiple interested buyers for the Long-Term Care Division; however, none have yet agreed to be a stalking horse bidder.  Notwithstanding the loss of cash on an operational basis and the lack of a stalking horse bidder, the Debtors have been able to secure sufficient postpetition financing to operate the Long-Term Care Division for approximately sixty (60) days while seeking a sale.  To maximize the value of the Long-Term Care Division for the benefit of all estate constituents, the Debtors believe the Long-Term Care Division must be sold as a going-concern.  Given the understandable limitations in the Debtors' post-petition financing, a prompt sale of the Long-Term Care Division is a matter of urgency. The PO Division is also proposed to be sold pursuant this Motion, although on a slightly longer timetable.  The Debtors are still exploring strategic options for the UH Division.

**DEBTORS' DECISION TO SELL THE ASSETS
AND THE NEED FOR AN IMMEDIATE SALE**

7.      The Debtors sought the protection of chapter 11 of the Bankruptcy Code to provide breathing room to pursue a sale process and maximize the value of their estates, for the benefit of all estate constituencies.

**A.      Prepetition Liquidity Events and Sales Efforts**

8.      Substantially all of the Debtors' debt was scheduled to mature in 2012. The Debtors began to examine their strategic alternatives and sought to improve efficiency and reduce corporate costs, and in August 2011, Laboratory Partners engaged MTS Health Partners, L.P. ("MTS") as its financial advisor/investment banker to assist Laboratory Partners in evaluating, formulating and implementing its financial and strategic plan and provide it with a range of strategic alternatives.  Following the MTS engagement, from August 2011 through March 2012, Laboratory Partners, with the assistance of MTS, engaged in a detailed examination of its operating performance and reviewed a range of strategic corporate alternatives.

9.      In March 2012, Debtors, the Prepetition Lenders and The Bank of New York Mellon ("BNY Mellon"), as administrative agent and collateral agent, extended the maturity of the indebtedness under the Marathon Facility until March 2013 and the Debtors reached agreements with holders of the Notes to extend maturities under the Notes to May 2013 in some cases and November 2013 in others.

10.      Beginning in March 2012, Laboratory Partners, with the assistance of MTS, began to explore the possible sale of some of its operations, a partial or complete refinancing of its debt and a complete recapitalization.  Numerous selected financial and strategic buyers were contacted regarding a potential sale.  In addition, numerous selected parties were

contacted regarding refinancing alternatives. Laboratory Partners also considered other strategic alternatives.

11.     In April 2012, Laboratory Partners began to explore the sale of a portion of its operating assets to a group of prospective purchasers and concurrently invested in expanding its Long-Term Care Division. From May 2012 through May 2013, representatives of Laboratory Partners and MTS engaged in significant discussions with numerous potential purchasers concerning the sale of a portion of its then-existing PO Division on a stand-alone basis or together with other operations of the Debtors.

12.     In May 2013, certain of the Debtors signed a definitive asset purchase agreement to sell a portion of the then-existing PO Division to Laboratory Corporation of America Holdings ("Lab Corp"). In June 2013, such Debtors consummated the sale of selected operating assets of the then-existing PO Division to Lab Corp for an aggregate purchase price of $10,676,000, plus an earn-out payment not to exceed $1,200,000 (the "POB Sale"). In connection with the POB Sale, Laboratory Partners received approximately $9,157,481 in net proceeds (including $1,114,740 of the earn-out), after deducting transaction fees and expenses of approximately $1,457,260. In addition, $1,000,000 of the purchase price related to the POB Sale is currently held in escrow until December 2014 as security against indemnification claims that may be made by Lab Corp. To date, no indemnification claims have been asserted. In connection with the POB Sale, the Lenders received $7,392,741 of Debtors' net proceeds and allowed the Debtors to retain $1,764,740 to fund operations.

**B.     Negative Legislative Events**

13.     Like many healthcare sector participants, Laboratory Partners has experienced declining revenues resulting from government-imposed permanent reductions in rates of reimbursement. The Affordable Care Act of 2010 imposed multi-year cuts to the

Medicare Clinical Laboratory Fee Schedule ("MCLFS") from calendar years 2011 through 2015.[3]  Beginning January 1, 2011, the MCLFS for clinical laboratories was cut by 1.75%.  In each calendar year thereafter, an additional 1.75% cut was made to the MCLFS with additional cuts scheduled for 2014 and 2015.  Compounding these MCLFS cuts was an additional 2.0% reduction under the Middle Class Tax Relief and Job Creation Act of 2012[4] and sequestration cuts of 2.0% were implemented for all Medicare claims beginning April 1, 2013.[5]  The cumulative effect of these reimbursement reductions had a negative impact on the Debtors' clinical laboratory revenues.  Cuts to the Medicare Physician Fee Schedule also negatively impacted providers of pathology services.  On November 16, 2012, the Centers for Medicare & Medicaid Services ("CMS") issued the 2013 Medicare Physician Fee Schedule Final Rule which included cuts to pathology payments totaling 6.0% overall, with certain high volume pathology codes receiving significant reimbursement cuts, up to 52.0%,[6] which caused negative pricing pressure on the Debtors' businesses and additional uncertainty for potential buyers of clinical laboratories.  In addition to the above reductions, government agencies are urging CMS to make further cuts to laboratory reimbursements in the coming years.

---

[3]    Patient Protection and Affordable Care Act, Pub. Law 111-148, § Section 3401(l) (Mar. 23, 2010).

[4]    Amending Section 1833(h)(2)(A) of the Social Security Act to require the rebasing of the Medicare clinical laboratory fee schedule by 2% beginning in 2013 and extending to subsequent years.  *See*, Middle Class Tax Relief and Job Creation Act of 2012; Pub. L. 112-96, Subtitle C, §3202 (Feb. 22, 2012)

[5]    *See* CMS Medicare FFS Provider e-News "Mandatory Payment Reductions in the Medicare Fee-for-Service (FFS) Program – Sequestration" (Mar. 8, 2013) available at http://www.cms.gov/Outreach-and-Education/Outreach/FFSProvPartProg/Downloads/2013-03-08-standalone.pdf.    (*last visited October 8, 2013*)

[6]    *See* 77 Fed. Reg. 68891 (Nov. 16, 2012).

14.     On June 11, 2013, the Office of the Inspector General released a report stating that Medicare could save approximately $910 million on laboratory tests if it paid providers at the lowest established rate in each geographic area.[7]  Similarly, the Medicare Payment Advisory Commission recommended to legislators in its March 2013 report that laboratory reimbursements be cut an additional 10% over the next 10 years, totaling $21 billion in reductions.[8]  Additionally, the Medicare Physician Fee Schedule Proposed Rule released in July 2013 proposes additional laboratory reimbursement cuts of 25% for clinical laboratory services and approximately 50% for pathology laboratories after taking into account reductions in physician service reimbursements.[9]  In response to these Medicare reductions to laboratory reimbursements, commercial payors have likewise begun to cut reimbursements.  Blue Cross Blue Shield of Mississippi announced a 25% reimbursement cut to pathology services on May 15, 2013, and Aetna announced a significant reduction in pathology reimbursement to 45-50% of Medicare on July 1, 2013.  These announcements create additional uncertainty in the clinical laboratory market.

---

[7]     *See* OIG Report OEI-07-11-00010 (June 11, 2013) recommending "that the Centers for Medicare & Medicaid Services (CMS) seek legislation that would allow it to establish lower payment rates for lab tests and consider seeking legislation to institute copayments and deductibles for lab tests."

[8]     *See* MedPAC Report to the Congress: Medicare Payment Policy (Mar. 2013).

[9]     *See* American Clinical Laboratory Association Statement on CMS Proposed Physician Fee Schedule Rule (July 9, 2013) available at http://www.acla.com/sites/default/files/Statement%20on%20PFS%20Proposed%20Rule%20July%202013.pdf (*last visited October 8, 2013*).

*See* College of American Pathology Letter to CMS Administrator Marilynn Tavenner titled CMS-1600-P: Medicare Program; Revisions to Payment Policies under the Physician Fee Schedule, Clinical Laboratory Fee Schedule & Other Revisions to Part B for CY 2014 (Sept. 6, 2013) available at http://www.cap.org/apps/docs/advocacy/letters/cms_1600P_2014_proposed_rules.pdf (*last visited October 8, 2013*).

15.     Further, in June 2013, the Office of the Inspector General released a report about the discrepancy in the Medicare versus commercial fee schedules for laboratory services, creating additional uncertainty in the clinical laboratory market.

**C.     Present Restructuring and Sale Efforts**

16.     Laboratory Partners is currently engaged in substantive discussions with various parties regarding possible sales of other assets and divisions.

17.     In August 2013, Debtors retained Development Specialists, Inc. ("DSI") to provide financial restructuring advice.   In connection with DSI's engagement, Laboratory Partners appointed DSI's William A. Brandt, Jr. as chief executive officer.   In addition, on September 5, 2013, the Debtors engaged Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") to provide legal advice to the Debtors in connection with a restructuring.    The Debtors have also engaged Duff & Phelps Securities, LLC ("Duff & Phelps") as their investment banker to assist with postpetition marketing and sale efforts.

18.     The Debtors believe that expeditious sales of the Long-Term Care Division and the PO Division are essential to maximize value in these cases.  For many reasons, the Debtors' business is not one that can endure a prolonged stay in chapter 11 without significant risk of deterioration to the value of their assets, especially in light of funding limitations.

19.     Funding for these cases is also contingent upon the Debtors' pursuit of an expeditious sale process.  On the Petition Date, the Debtors filed a motion seeking interim and final orders (the "DIP Orders") authorizing the Debtors to enter into a debtor in possession credit

agreement (the "DIP Agreement") and use cash collateral, among other relief.[10]   The DIP

Agreement and DIP Orders enable Debtors to meet current financial needs to continue to pursue

a sale process and maximize the value of their assets.  The DIP Agreement and DIP Orders only

provide Debtors enough fully committed financing to operate the Long-Term Care Division for

approximately sixty (60) days postpetition.[11]  To obtain additional advances, the DIP Agreement

requires, among other things, that (i) the Long-Term Care Division be sold or shut down by

December 23, 2013 and (ii) an order be entered by December 20, 2013, scheduling an auction for

the PO Division by January 28, 2014.  Other financing is unlikely to be readily available to the

Debtors on favorable terms, if at all.

20.     In furtherance of their value maximizing objectives, the Debtors propose

to subject the sales of the Long-Term Care Division and the PO Division to the Bidding

Procedures described below.  At this time, the Debtors believe that the sale of substantially all of

the Purchased Assets (as defined below) to will maximize the value of their estates for the

benefit of their constituencies.

### ASSETS TO BE SOLD

21.     Attached hereto as **Exhibit B** is a proposed form of Asset Purchase

Agreement for the Long-Term Care Division and the Debtors intend to file a proposed form of

---

[10]   *See Motion Of Debtors For Order (A) Authorizing Debtors (I) To Obtain Post-Petition Financing And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. § 364; (II) To Use Cash Collateral Pursuant To 11 U.S.C. § 363; (III) To Provide Adequate Protection Pursuant To 11 U.S.C. § 361; And (B) Scheduling A Final Hearing And Establishing Related Notice Requirements.*

[11]   Any summary or discussion of the terms of the DIP Orders or the DIP Agreement contained in this Motion is provided for the convenience of the Court and parties-in-interest.  To the extent that any summary or discussion of the terms of the DIP Orders or the DIP Agreement differs in any way from the terms of the DIP Orders or the DIP Agreement, the terms of the DIP Orders and the DIP Agreement, as applicable, shall control.

asset purchase agreement for the PO Division in the near term (collectively with all applicable ancillary documents and agreements, the "Purchase Agreements") to serve as the baseline for potential bids with respect to the Long-Term Care Division and the PO Division (collectively, the "Purchased Assets," and each, a "Purchased Asset").

## SUMMARY OF RELIEF REQUESTED

22.    The Debtors seek entry of three orders:

(I)    An order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"):

(A)    Approving procedures (the "Bidding Procedures," the form of which is attached as Schedule 1 to the Bidding Procedures Order)[12] for the solicitation and consideration of competing offers for the Sales of the Purchased Assets including (i) procedures for submitting bids for any or all of the Purchased Assets, and (ii) conducting auctions (the "Auctions") with respect to any Purchased Assets on which the Debtors receive more than one bid;

(B)    Authorizing the Debtors to enter, with the reasonable consent of the DIP Lender and Prepetition Lenders and any official committee appointed in these cases (the "Committee"), on or before the Participation Deadline (as defined below), into purchase agreements (each, a "Stalking Horse Agreement") with one or more Stalking Horse Bidders (as defined below), subject to higher and better offers and containing certain terms and conditions, including, but not limited to, reasonable expense reimbursement, overbid protections, break-up fees or other bid protections (the "Bid Protections"), as approved by the Court on notice and a hearing;

(C)    Scheduling a hearing to approve the sale of the Purchased Assets constituting the Long-Term Care Division (the "LTC Sale Hearing") approximately fifty (50) days from the date hereof (between December 16, 2013 and December 20, 2013), subject to the Court's availability, with any objections to the Sale to be filed on or before 4:00 p.m. at least seven (7) days before the LTC Sale Hearing;

(D)    Scheduling a hearing to approve the sale of the Purchased Assets constituting the PO Division (the "PO Sale Hearing" and together with the "LTC

---

[12]    The Debtors reserve the right to submit modified Bidding Procedures before the hearing on this Motion following entry into one or more Stalking Horse Agreements as described below.

Sale Hearing", the "Sale Hearings" and each a "Sale Hearing") approximately ninety (90) days from the date hereof (between January 27, 2014 and January 31, 2014), subject to the Court's availability, with any objections to the Sale to be filed on or before 4:00 p.m. at least seven (7) days before the PO Sale Hearing;

(E)      Approving procedures, as set forth below, for the assumption, assignment and/or transfer of certain executory contracts and unexpired leases (collectively, the "Executory Contracts and Unexpired Leases") to any purchaser(s) of the Purchased Assets and/or to resolve any objections thereto; and

(F)      Approving (i) the form of notice of the Bidding Procedures, Auctions and Sale Hearings (the "Notice of Auctions and Sale Hearings"), substantially in the form attached as Schedule 2 to the Bidding Procedures Order, to be served on the Bidding Procedures Notice Parties; and (ii) the notice of the Debtors' intent to assume, assign and/or transfer the Executory Contracts and Unexpired Leases, and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer (the "Notice of Assumption and Assignment"), substantially in the form attached as Schedule 3 to the Bidding Procedures Order.

(II)      At each Sale Hearing, following an Auction (if any), the Debtors will request entry of an order with respect to the sale of each Purchased Asset (each, a "Sale Order"), pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006 and 9014:

(A)      Authorizing and approving the Sale of the Purchased Assets to the highest and best bidder for such Purchased Assets free and clear of all liens, interests, claims and encumbrances;

(B)      Approving the assumption and assignment of the Executory Contracts and Unexpired Leases to such bidder; and

(C)      Waiving the requirements of Bankruptcy Rules 6004(h) and 6006(d).

23.      The Debtors expressly reserve the right to modify the relief requested in this Motion, including the proposed Bidding Procedures, prior to or at the applicable hearing, or as set forth herein.

## BIDDING PROCEDURES AND RELEVANT NOTICES

### A.      Proposed Bidding Procedures

24.      The Debtors believe the proposed Bidding Procedures, which are annexed as Schedule 1 to the proposed Bidding Procedures Order, will maximize the realizable value of

the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties. The Bidding Procedures contemplate an auction process pursuant to which any bids for the Purchased Assets will be subject to higher or otherwise better offers.  The Debtors seek to implement an open and competitive bidding process designed to maximize recovery for the benefit of their estates.  As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auctions.  Specifically, the Bidding Procedures provide, in relevant part, as follows:[13]

    (I)    <u>Provisions Governing Qualification of Bidders</u>

To participate in the Bidding Process, each interested person or entity must deliver the following documents to the parties set forth below (the "<u>Participation Materials</u>"):

(a)    An executed confidentiality agreement in form and substance satisfactory to the Debtors;

(b)    A statement demonstrating to the Debtors' satisfaction, in consultation with the DIP Lender, Prepetition Lenders and the Committee, a *bona fide* interest in purchasing some or all the Purchased Assets from the Debtors;

(c)    Current audited financial statements of (i) the Potential Bidder, or (ii) if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Asset, current audited financial statements of the equity holder(s) of the Potential Bidder who shall guarantee the obligations of the Potential Bidder; or such other form of financial disclosure and credit-quality support information or enhancement acceptable to the Debtors, in consultation with the DIP Lender, Prepetition Lenders and the Committee; and

(d)    Information representing that the Potential Bidder has the financial wherewithal to satisfy cure and adequate assurance requirements with respect to the Assumed Contracts and Assumed Leases under the

---

[13]    The following description is a summary of the terms set forth in the Bidding Procedures annexed to the proposed Bidding Procedures Order as <u>Schedule 1</u>.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures.  To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

Bankruptcy Code, which information may be required to be supplemented at the request of the Debtors or other parties in interest.

The Participation Materials must be transmitted so as to be received no later than 5:00 pm (ET) on the date that is three (3) business days before the Bid Deadline (the "Participation Deadline") by each of the following parties (collectively, the "Notice Parties"): (i) the Debtors, 671 Ohio Pike, Suite K, Cincinnati, OH 45245; (ii) co-counsel to the Debtors, (a) Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036 (Attn: Leo T. Crowley, Jonathan Russo and Margot Erlich) and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P. O. Box 1347, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney and Derek C. Abbott); (iii) investment bankers to the Debtors, Duff & Phelps Securities, LLC, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067 (Attn: Mark Catania); (iv) Development Specialists, Inc., Three First National Plaza, 70 West Madison Street, Suite 2300, Chicago, IL 60602-4250 (Attn: William A. Brandt, Jr.); (v) counsel to DIP Lender and Prepetition Lenders, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn: Mark Deveno and Erin K. Mautner) and Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801 (Attn: Mark Collins); and (vi) counsel to the Committee.

Any party that delivers the Participation Materials shall be a "Potential Bidder," and by delivering the Participation Material each Potential Bidder acknowledges that its identity may be made public, including in court filings. If the Debtors determine that a Potential Bidder has a *bona fide* interest in some or all of a Purchased Asset, then no later than two (2) business days after such determination, the Debtors will deliver to the Potential Bidder: (a) an electronic copy (in Word format) of the Purchase Agreement relating to such Purchased Asset; and (b) access to information for confidential electronic access concerning such Purchased Asset (the "Data Room").

The DIP Lender and the Prepetition Lenders (each a "Credit Bidding Party") shall be deemed to be a Potential Bidder and a Qualified Bidder for all purposes in connection with the Bidding Procedures and as a Credit Bidding Party shall, pursuant to 11 U.S.C. § 363(k), be permitted, but not compelled, to credit bid ("Credit Bid") up to the full amount of its prepetition secured claims and/or claims related to postpetition debtor in possession financing against the Debtors at the Auctions.

(II)    Provisions Governing Qualified Bids

Bid Deadline. A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to the Notice Parties so as to be received no later than 12 noon (ET) on the following dates: (i) as to the Long-Term Care Division, December 3, 2013; and (ii) as to the PO Division the date that is seven (7) business days before the scheduled Auction (as applicable, the "Bid Deadline"). The Debtors reserve the right to extend each Bid Deadline by filing a notice of

such extension with the Court and serving such notice upon the parties that received this Motion.

With respect to each of the Long-Term Care Division and the PO Division, to participate in an Auction, if any, for such Purchased Assets, a bidder must deliver to the Notice Parties a written offer, which must provide or otherwise comply with, at a minimum, each of the items noted below to be deemed a "Qualified Bid":

(a)     Potential Bidder submits an executed original of the applicable Purchase Agreement and ancillary documents by which the Potential Bidder offers to purchase some or all of such Purchased Asset from the Debtors at the purchase price and upon the terms and conditions set forth therein, together with a marked copy showing any proposed changes to the form of Purchase Agreement (the "Marked Agreement").

(b)     The bid is not subject to any due diligence or financing contingency, is not conditioned on bid protections, and is not subject to any future corporate or governmental consent or approval.

(c)     The proposed purchase price and the Purchased Asset that is the subject of the bid are specified.

(d)     The bid is received by the Debtors by the Bid Deadline.

(e)     The bid does not entitle a bidder to any break-up fee, termination fee or similar type of payment or reimbursement and, by submitting a bid, the bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures.

(f)     A cash deposit (the "Deposit") in immediately available funds equal to $250,000 is delivered in the form of a certified check or wire transfer to counsel for the Debtors, or as otherwise requested by the Debtors, by the Bid Deadline.  The Deposit shall be held by in a noninterest bearing escrow and will be refunded on the terms set forth below.

(g)     The bid also contains a list of the Debtors' executory contracts and unexpired leases that the Potential Bidder proposes to be assumed and assigned to it.

(h)     The bid contains an acknowledgement that it is an irrevocable offer that is binding on the Potential Bidder in accordance with the terms of the Bidding Procedures.

(i)     The bid demonstrates the Qualified Bidder's commitment to pay all Cure Costs and ability to provide adequate assurance of future

performance under any executory contracts or unexpired leases to be assumed and/or assigned pursuant to such bid.

A Potential Bidder shall accompany its bid with: (a) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder and such other evidence of ability to consummate the sale as the Debtors, in consultation with the DIP Lender, Prepetition Lenders, and the Committee, may reasonably request; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to the bid.

A bid received from a Potential Bidder will be considered a "Qualified Bid" only if it meets the above requirements unless the Debtors in their business judgment decide to waive any of such requirements. Each Potential Bidder that submits a Qualified Bid for a Purchased Asset will be considered a "Qualified Bidder" with respect to such Purchased Asset. Subject to the limitations described above, the Credit Bidding Party shall constitute a Qualified Bidder and if the Credit Bidding Party enters a Credit Bid will be deemed a Qualified Bid. The Credit Bidding Party shall not be required to furnish a cash deposit in connection with a Credit Bid. The Debtors shall determine, in the exercise of their reasonable business judgment, that a bid is a Qualified Bid in consultation with the DIP Lender, Prepetition Lenders, and the Committee. A Qualified Bid will be valued based upon factors such as: (a) the consideration set forth in the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the Debtors' and Qualified Bidder's ability to close the proposed sale without delay and within the timeframes contemplated by the Purchase Agreement; (c) the ability to obtain all necessary regulatory approvals for the proposed transaction, if necessary; and (d) any other factors the Debtors may deem relevant.

The Debtors, in consultation with DIP Lender, Prepetition Lenders, and the Committee, may reject any bid if, among other things, such bid:

      (a)    is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement; or

      (b)    includes a non-cash instrument or similar consideration that is not freely marketable.

Any bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

IRREVOCABLE AND BINDING BIDS.     EACH QUALIFIED BID SUBMITTED (INCLUDING ANY STALKING HORSE AGREEMENT (AS DEFINED BELOW)) SHALL CONSTITUTE AN IRREVOCABLE OFFER

AND BE BINDING ON THE APPLICABLE QUALIFIED BIDDER FROM THE TIME THE BID IS SUBMITTED UNTIL THE ENTRY OF THE SALE ORDER; PROVIDED, HOWEVER, THAT THE SUCCESSFUL BID SHALL REMAIN IRREVOCABLE AND BINDING IN ACCORDANCE WITH THE TERMS OF THE PURCHASE AGREEMENT EXECUTED BY THE SUCCESSFUL BIDDER(S); PROVIDED FURTHER THAT THE BACK-UP BID SHALL BE IRREVOCABLE AND BINDING ON THE BIDDER UNTIL TWO (2) BUSINESS DAYS AFTER THE CLOSING OF THE SALE OF THE PURCHASED ASSETS.

Return of Deposits. A Deposit submitted by the Back-Up Bidder will be held by the Debtors until forty eight (48) hours after the Back-Up Bid has been terminated in accordance with the Bidding Procedures. As to all other bidders (except the Successful Bidder(s)), Deposits will be returned promptly after conclusion of the Sale Hearing. If the Successful Bidder(s) or the Back-Up Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of the Successful Bidder(s) or the Back-Up Bidder, the Debtors shall be entitled to retain the Deposit in partial satisfaction of any damages resulting from the breach or failure to perform by the Successful Bidder(s) or the Back-Up Bidder, without prejudice to any other rights the Debtors may have. The Debtors may, in consultation with the DIP Lender, Prepetition Lenders, and the Committee, credit the Deposit of the Successful Bidder(s) or the Back-Up Bidder towards the purchase price on the closing of the sale of the Purchased Assets.

(III)    Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder

At any time on or prior to the Participation Deadline, the Debtors, with the reasonable consent of the DIP Lender, Prepetition Lenders and the Committee, may, with respect to each Purchased Asset for which a Stalking Horse Bidder has not been approved by the Court, enter into a purchase agreement, subject to higher and better offers at the Auction, with a bidder that submits a Qualified Bid with respect to such Purchased Asset (each, a "Stalking Horse Bidder") to establish a minimum Qualified Bid for such Purchased Asset at the Auction. The Stalking Horse Agreement may, with the reasonable consent of the DIP Lender, Prepetition Lenders, and the Committee, contain customary terms and conditions providing the Stalking Horse Bidder with reasonable Bid Protections.

If the Debtors enter into any such Stalking Horse Agreement(s), (a) on or before the Participation Deadline, the agreement(s) shall be placed on the Court's docket and notice thereof shall be given to all parties who received notice of the Bidding Procedures Motion, all parties on the Debtors' 2002 notice list and all Potential Bidders; and (b) the Court shall conduct a hearing on a date that is two (2) or more business days thereafter, subject to the Court's availability, to consider approval of the proposed Bid Protections. The Bid Protections hearing may be adjourned or rescheduled without notice other than as stated on the record in court or in an appropriate agenda letter.

(IV)   <u>Due Diligence</u>

Until the Bid Deadline (as defined below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. All due diligence requests shall be directed to Duff & Phelps at Mark Catania, Duff & Phelps Securities, LLC, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067, phone: 424-249-1650, fax: 424-270-9141, email: Mark.Catania@DuffandPhelps.com. The Debtors with Duff & Phelps shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders for the relevant Purchased Asset, as well as to the Notice Parties.

Unless otherwise determined by the Debtors, in consultation with the DIP Lender, Prepetition Lenders and the Committee, the availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

(V)   <u>The Auctions and Auction Rules</u>

An Auction for the Long-Term Care Division or the PO Division shall be held only if there are two or more Qualified Bids for such Purchased Assets. The Debtors will hold the Auctions for the Long-Term Care Division and the PO Division on the dates that are, respectively, three (3) and four (4) business days before the applicable Sale Hearing, beginning at 10:00 a.m. (ET) at the offices of Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036-4039 or at such other place, date and time as may be designated to the Auction Notice Parties (as defined below) in writing by the Debtors, for consideration of the Qualified Bids, each as may be increased at such Auction.

The Auctions may be adjourned as to any or all of the Purchased Assets as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to the Auction Notice Parties.

The Auctions shall run in accordance with the following procedures:

(a)   Only the Debtors, the Notice Parties, proper representatives of the Committee, the Debtors' creditors or parties in interest who have notified

the Debtors in advance of their interest in attending the Auction or other constituents permitted in advance by the Debtors, and any Qualified Bidder that has timely submitted a Qualified Bid with respect to the assets subject to the Auction (collectively, the "Auction Notice Parties"), and the respective counsel, financial advisors and other representatives, of any of the foregoing, shall attend the Auction in person.

(b)      Only the Qualified Bidders will be entitled to make any subsequent bids at the Auction of their respective Purchased Asset.

(c)      Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets.

(d)      At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder as required by these Bidding Procedures.  At least one (1) Business Day prior to each Auction, the Debtors will provide notice of the Qualified Bid which the Debtors believe, in their reasonable business judgment, is the highest or otherwise best offer (the "Starting Bid") to the Notice Parties, and all other Qualified Bidders that have informed the Debtors of their intent to participate in the Auction.

(e)      All Qualified Bidders who have timely submitted Qualified Bids for a Purchased Asset will be entitled to be present for all Subsequent Bids (as defined below) at the Auction for such Purchased Asset with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.  All proceedings at the Auction shall be conducted before and transcribed by a court stenographer or videotaped.

(f)      Bidding at each Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Debtors determine, in consultation with the DIP Lender, Prepetition Lenders and the Committee, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the

Auction shall provide net value to the estate of at least the Minimum Bid Increment (as defined with respect to each Purchased Asset below) over the Starting Bid or the Leading Bid, as the case may be; provided, however, that if the Starting Bid is the Qualified Bid of a Stalking Horse Bidder which has been provided with an overbid protection, such Minimum Bid Increment over the Starting Bid shall be at least equal to the amount required by such Stalking Horse Bidder's overbid protection. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth in the Bidding Procedures, for the purpose of evaluating the value of the consideration provided by Starting Bid or Subsequent Bids (including any Subsequent Bid by any Stalking Horse Bidder), the Debtors will, at each round of bidding, give effect to (a) any Bid Protections that may be payable to a Stalking Horse Bidder, (b) any additional liabilities to be assumed by a Qualified Bidder and (c) any additional costs which may be imposed on the Debtors by such Qualified Bid.

(g)     The "Minimum Bid Increment" shall mean $50,000.

(VI)     Modification of Bidding and Auction Procedures

The Debtors may employ and announce at each Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court or any other applicable court entered in connection with the Bidding Procedures, and (ii) disclosed to each Qualified Bidder at the Auction.

The Debtors may combine the Auction of the Purchased Assets (a "Combined Auction"), in their business judgment, in consultation with the DIP Lender, Prepetition Lenders, and the Committee. The rules set forth in these bid protections for an Auction shall apply to any such Combined Auction. For the purposes of conducting rounds of bidding in such Combined Auction (but not for the purposes of consummating Sales as bids submitted by multiple bidders shall remain separate and independent), the Debtors, in consultation with the DIP Lender, Prepetition Lenders, and the Committee, shall consider multiple Qualified Bids for separate Purchased Assets such that, if taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid with respect to the relevant Purchased Assets. At or before the Auction, the Debtors will provide notice (including oral notice) of whether a Combined Auction shall be conducted with respect to more than one Purchased Asset to the Qualified Bidders for such Purchased Assets.

<u>Reservation of Rights</u>.  Except as otherwise provided in the Bidding Procedures Order, the Debtors (in consultation with the DIP Lender, Prepetition Lenders, and the Committee as further set forth in the Bidding Procedures) reserve the right as they may determine in the reasonable exercise of their business judgment to be in the best interests of their estates, to:  (i) determine which bidders are Potential Bidders or Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (v) remove some of the Purchased Assets from the Auctions; (vi) waive terms and conditions set forth in the Bidding Procedures with respect to all Potential Bidders; (vii) impose additional terms and conditions with respect to all Potential Bidders; (viii) extend the deadlines set forth in the Bidding Procedures; (ix) adjourn or cancel the Auctions and/or Sale Hearings in open court without further notice; and (x) modify the Bidding Procedures as the Debtors may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

(VII)   <u>Closing with Alternative Backup Bidders</u>

Promptly after the conclusion of each Auction, the Debtors shall, in consultation with the DIP Lender, Prepetition Lenders, and the Committee (a) determine, consistent with the Bidding Procedures, which bid constitutes highest or best bid (such bid, the "<u>Successful Bid</u>") for each of the Purchased Assets, and (b) communicate to the Purchasers and the other Qualified Bidders the identity of the bidder making the Successful Bid (the "<u>Successful Bidder</u>") and the details of the Successful Bid.  At such time, the Debtors shall, in consultation with the DIP Lender, Prepetition Lenders, and the Committee, also determine which bid constitutes the second highest or best bid (such bid, the "<u>Back-Up Bid</u>") and communicate to the other Qualified Bidders the identity of the bidder making the Back-Up Bid (the "<u>Back-Up Bidder</u>") and the details of the Back-Up Bid.  If only one Qualified Bid is received with respect to a Purchased Asset, there shall be no Auction for such Purchased Asset, and such Qualified Bid shall be designated as the Successful Bid.  The determination of the Successful Bid and the Back-Up Bid by the Debtors, in consultation with the DIP Lender, Prepetition Lenders, and the Committee, shall be final subject to approval by the Court.  The Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid; (ii) definitive documentation has been executed in respect thereof; and (iii) the Court has entered an order approving such Successful Bid.

Following entry of the Sale Order, if the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

25.    The Debtors believe that the Bidding Procedures are fair and reasonable, designed to maximize the proceeds of the Sales, and are not likely to dissuade any serious potential purchaser from bidding for the Purchased Assets.

**B.    Notice of Auctions and Sale Hearings**

26.    Subject to the Court's availability, the Debtors' request that the LTC Sale Hearing be scheduled for a date approximately fifty (50) days from the date hereof and that the PO Sale Hearing be scheduled for a date approximately ninety (90) days from the date hereof.

27.    By this Motion, the Debtors also request that the objection deadline with respect to the Sales of the Purchased Assets or related relief requested in the to be filed Sale Order[14] be 4:00 p.m. (ET) on a date that is at least seven (7) days prior to the applicable Sale Hearing, or such later date as the Debtors may agree, and that such objections: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the United States Bankruptcy Court for the District of Delaware; (d) be served so as to be received no later than 4:00 p.m. (ET) on objection deadline upon: (i) the Notice Parties; and (ii) the United States Trustee for the District of Delaware (the "U.S. Trustee," and collectively, all of the foregoing, the "Objection Notice Parties"); and (e) state with specificity the nature of such objection and will be heard by the Court at the Sale Hearing.

28.    As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the Notice of Auctions and Sale Hearings and the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (a) the U.S. Trustee; (b) counsel for any Committee; (c) counsel to the DIP Lender; (d) counsel to the Prepetition Lenders; (e) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim,

---

[14]    Objections to the assumption, assignment and/or transfer of Executory Contracts and Unexpired Leases are addressed below.

encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (f) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (g) all Persons known or reasonably believed to have expressed a *bona fide* interest in acquiring some or all of any of the Purchased Assets within the last six months; (i) federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (j) the Internal Revenue Service; (k) the Attorneys General in the states where the Purchased Assets are located ; and (l) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002 (the "Bidding Procedures Notice Parties").[15]

29.    In addition to the foregoing, electronic notification of this Motion, the Bidding Procedures Order and the Notice of Auctions and Sale Hearings also will be posted on the case website maintained by the Debtors' proposed claims and noticing agent, BMC Group, Inc., www.bmcgroup.com/laboratorypartners.  Also, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will publish the Notice of Auctions and Sale Hearings in one (1) national publication the Debtors deem appropriate.

30.    In addition, to facilitate the Sales of the Purchased Assets and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, the Debtors propose to serve the Notice of Assumption and Assignment on all non-Debtor parties to

---

[15]    The proposed Notice of Auctions and Sale Hearings will direct parties to contact Duff & Phelps, the Debtors' proposed investment banker, for more information and will provide that any party in interest that wishes to obtain a copy of any related document, subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auctions and Sale Hearings.

the Executory Contracts and Unexpired Leases, as soon as practicable after entry of the Bidding

Procedures Order by first-class mail or hand delivery.  If the Debtors identify additional

executory contracts or unexpired leases that may be assumed by the Debtors and assigned to

Purchasers not set forth in the original Notice of Assumption and Assignment, pursuant to the

proposed procedures, the Debtors will promptly send a supplemental notice (a "Supplemental

Notice of Assumption and Assignment") to the applicable counterparties to such additional

executory contracts and unexpired leases.

31.     In the proposed Notice of Assumption and Assignment or Supplemental

Notice of Assumption and Assignment, the Debtors will identify whether an Executory Contract

or Unexpired Lease is potentially to be assumed and assigned, and the amount that the Debtors

believe must be paid to cure all defaults required to be cured pursuant to section 365(b) of the

Bankruptcy Code with respect to such Executory Contract and Unexpired Lease (the "Cure

Amounts").  If no amount (or $0.00) is listed on the Notice of Assumption and Assignment or

Supplemental Notice of Assumption and Assignment, the Debtors believe that there is no Cure

Amount.

32.     The Debtors request that unless the non-Debtor party to an Executory

Contract or Unexpired Lease files an objection (the "Cure/Assignment Objection") to (a) its

scheduled Cure Amount, and/or (b) to the proposed assumption, assignment and/or transfer of

such Executory Contract or Unexpired Lease, by 4:00 p.m. (ET) on the date that is fourteen (14)

days after service of the Notice of Assumption and Assignment (or, for any Executory Contract

or Unexpired Lease for which a Supplemental Notice of Assumption and Assignment was

served, 4:00 p.m. (ET) on the date that is ten (10) days after service of the applicable

Supplemental Notice of Assumption and Assignment) (the "Cure/Assignment Objection

Deadline") and serves a copy of the Cure/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline on the same day to the Objection Notice Parties; then such non-Debtor party will (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount, and (ii) if the Executory Contract or Unexpired Lease was identified as to be assumed, assigned and/or transferred by the Successful Bidder(s), be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional prepetition amounts are due or prepetition defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease.

33.    The Debtors also request that if an objection challenges a Cure Amount, such objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof.  Upon receipt of an objection to a Cure Amount, pursuant to the proposed procedures, and subject to the applicable Purchase Agreement, the Debtors or the Successful Bidder for the objecting party's Executory Contract or Unexpired Lease, as the case may be, may, in their sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between the Debtors, the Successful Bidder, and the objecting party.  So long as the Debtors hold the Claimed Cure Amount (or such other amount as the Court may order) in reserve, the Debtors

seek authority to assume, assign and/or transfer the Executory Contract or Unexpired Lease that is the subject of an objection without further delay.

34.     Upon assumption and assignment of such Executory Contract or Unexpired Lease, the objecting party's recourse with respect to the prepetition Cure Amounts will be limited to the funds held in reserve.  The Debtors or the Successful Bidder, as the case may be, may determine to exclude any Executory Contract or Unexpired Lease (an "Excluded Contract") from the list of Purchased Assets no later than one (1) business day after the Sale Order is entered.  The non-Debtor party or parties to any such Excluded Contract will be notified of such exclusion by written notice mailed within one (1) business day of such determination.

## AUTHORITY FOR REQUESTED RELIEF

**A.     The Sale of the Purchased Assets is Within the Sound
          Business Judgment of the Debtors and Should be Approved**

35.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

36.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).    In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with Sales of the Purchased Assets and the Bidding Procedures is based upon sound business judgment and should be approved.    A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."    *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).    Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.    *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

37.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."    11 U.S.C. § 105(a).    Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is

proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

38.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Successful Bidder(s) pursuant to the Bidding Procedures.  The prompt Sales of the Purchased Assets present the best opportunity to maximize the value for the estates.  In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the most value for their assets and provide interested parties with accurate and reasonable notice of the Sale.  The Bidding Procedures will allow the Debtors to conduct the diligence process for potential bidders and the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction on the requisite timetable, thereby increasing the likelihood that the Debtors will receive the best possible consideration for their assets by helping to ensure a competitive and fair bidding process.

39.     The Debtors believe the sale of their businesses and assets must occur quickly in order to maximize the value of their estates, and that significant time spent in chapter

11 increases the real and palpable risk that the Debtors will be forced into a "fire sale" liquidation. *In re Lehman Brothers Holdings, Inc.*, 445 B.R. 143, 180 (Bankr. S.D.N.Y. 2011) ("[A] sale should be approved when the court is faced with the situation of a so-called "melting ice cube," a sale that would prevent further, unnecessary losses, the failure of other potential buyers to appear despite well-publicized efforts, and where the only alternative is an immediate liquidation that would yield far less for the estate and creditors.") (internal quotations and citations omitted); *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y.2010) ("[I]f the Debtors were to abandon the Sale Transaction ... there [would be] a material risk that, although the Debtors may not 'die,' their condition would significantly deteriorate.").

40.    Cash and liquidity for the Debtors' business are very limited.   There simply is not enough liquidity available to the Debtors for a more protracted sale process than proposed.   Accordingly, any delay in proceeding with the Sales on the proposed timeline may negatively impact the Debtors' ability to finance the sale process and, ultimately, consummate the Sale.

41.    As described above, the Debtors have very specific milestones they must meet pursuant to the DIP Agreement and proposed DIP Orders, and the financing provided pursuant thereto, absent additional advances thereunder, will only suffice to fund the Debtors' operations for approximately sixty (60) days.   Given the Debtors' liquidity issues, compliance with the terms of the DIP Documents is absolutely critical to ensure access to the financing necessary to manage these chapter 11 cases in an orderly and expeditious manner.   The expeditious sale of the Purchased Assets will alleviate further strain on the Debtors' estates by unburdening them with ongoing costs associated with maintaining such assets.

42.     The Debtors further believe that a targeted sale process, which the Bidding Procedures establish, is most likely to achieve the highest and best price for their assets and will do so in an efficient and timely manner.  The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders, and that a sound business justification exists to pursue the proposed Sales utilizing the expedited process of a section 363 sale rather than through a plan of reorganization.

43.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including both creditors of the Debtors' estates and also those parties who have previously expressed an interest in purchasing the Purchased Assets in the past six months.  Accordingly, the proposed sale satisfies the second prong of the *Abbotts Dairies* standard.

44.     The Bidding Procedures are also designed to maximize the value received for the Purchased Assets, therefore satisfying the requirement that the Debtors are adhering to their fiduciary duties owed to all creditors and interest holders.  The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid.  The Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of their assets to market testing and permitting prospective purchasers to bid on the assets in a competitive environment, thereby subjecting the proposed Sale to a market check through the solicitation of competing bids in a court-supervised auction process.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for their

assets will be fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is

satisfied.  As discussed below, the "good faith" prong of *Abbotts Dairies* is also satisfied here.

**B.     The Proposed Sale is Proposed in "Good Faith"**
**Under Section 363(m) of the Bankruptcy Code**

45.     The Debtors request that the Court find that any Successful Bidder is

entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in

connection with the sale of the Purchased Assets.

46.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

47.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of

assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its

interest in the purchased assets if the order allowing the Sale is reversed on appeal.  By its terms,

section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.

Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has

indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's

interest in executory contracts under section 365 of the Bankruptcy Code.  *See Krebs Chrysler-*

*Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3d Cir. 1998).  In *Krebs*, the Court

considered "whether assignments of [certain automobile dealership] franchises under section 365

are also sales of estate property subject to section 363(m)."  *Id.* at 497.  Despite the absence of an

explicit reference to assignments of executory contracts under section 365 of the Bankruptcy

Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an

assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Executory Contracts and Unexpired Leases are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. Therefore, the Debtors respectfully submit that section 363(m) applies to protect any Successful Bidder with respect to the purchase of the Purchased Assets and the assumption of Executory Contracts and Unexpired Leases.

48.    As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchasers to act in good faith in negotiating the Sale(s) of the Purchased Assets and the assignment of the Executory Contracts and Unexpired Leases related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

49.    Here, the sale of the Purchased Assets and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which will be designated by any Successful

Bidder, will be in good faith. The Debtors marketed the Purchased Assets prior to the commencement of these cases and will continue to do so. As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of an extensive, arm's length solicitation and negotiation process in which all parties will be represented by counsel. All negotiations have been and will continue to be conducted on an arm's length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed Sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Lastly, the Bidding Procedures require any Qualified Bidder to confirm that it has not engaged in any collusion with respect to the bidding on the Purchased Assets. Under the circumstances, any Successful Bidder for the Purchased Assets should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

50.    All parties in interest as described herein will receive notice of the Sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided notice of assumption, assignment, and/or transfer and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**C.    The Proposed Sale Satisfies the Requirements**
**of Section 363(f) of the Bankruptcy Code**

51.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

52.     All entities known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets have been notified of the proposed Sales as provided herein, and the Debtors are unaware of any objections thereto.  See 11 U.S.C. § 363(f)(2).  In addition, to the extent that any party with a lien, claim, or interest in, or encumbrance on, the Purchased Assets has not consented to such sale, the Debtors assert that such party could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interests, if any, in the relevant assets.  See 11 U.S.C. § 363(f)(5).  Accordingly, the Debtors believe that one or more of the other requirements of section 363(f) of the Bankruptcy Code are satisfied with respect to the proposed sale of the Purchased Assets.  Thus, subject to the limitations described above, the Debtors seek authority to sell the Purchased Assets free and clear of all liens, claims, interests and encumbrances, with

such liens, claims, interests and encumbrances, if any, to attach to the proceeds of such sale, subject to any rights and defenses that the Debtors may have with respect thereto.

**D.    Assumption and Assignment of Executory Contracts
and Unexpired Leases Should be Approved**

53.    To facilitate and effectuate the Sale of the Purchased Assets, the Debtors seek authority to assume, assign, and/or transfer various Executory Contracts and Unexpired Leases to any Successful Bidder to the extent required by any such Successful Bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume, assign and/or transfer its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment*); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc*., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

54.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future

performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

55.    The Successful Bidder(s) will desire to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets.    To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment, and/or transfer, the Debtors intend to demonstrate that all requirements for assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearings.    As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets.    Moreover, potential bidders must provide a statement demonstrating to the Debtors' satisfaction, in consultation with the DIP Lender, Prepetition Lenders and the Committee, a *bona fide* interest in purchasing some or all of a Purchased Asset from the Debtors, and provide information that can be publicly filed and/or disseminated representing that the potential bidder has the financial wherewithal to satisfy adequate assurance requirements with respect to the Assumed Contracts and Assumed Leases under the Bankruptcy Code.    Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling their assets and assuming, assigning, and/or transferring to any Successful Bidder the Executory Contracts and Unexpired Leases would be in the best interests of their estates. Moreover, the Debtors will provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard.    Thus, the Debtors request that the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases should be approved.

56.     Specifically, the Debtors will serve the Notice of Assumption and Assignment as soon as practicable after entry of the Bidding Procedures Order on the non-Debtor parties to the Executory Contracts and Unexpired Leases.  The Successful Bidder's Qualified Bid will identify the Executory Contracts and Unexpired Leases that the Successful Bidder wishes to assume, and the respective Cure Amounts, if any.  The Debtors request that unless the non-Debtor party to an Executory Contract and Unexpired Lease files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment, and/or transfer to the Successful Bidder on or before the Cure/Assignment Objection Deadline, such non-Debtor party will (i) be forever barred from objecting to assumption, assignment and/or transfer to the Successful Bidder of such Executory Contact and Unexpired Lease, including, any objection to the Cure Amount, and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease, and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) be deemed to have consented to the assumption, assignment, and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant Executory Contract and Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, under such Executory Contract.

57.     Within one (1) business day after the conclusion of the applicable Auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidder(s) and Back-Up Bidder to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in the Successful Bid for such Purchased Asset.  The Debtors request that objections by a non-Debtor party to the Executory Contracts and Unexpired Leases to the

assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code be filed and served on or before 12:00 noon (ET) on the date that is one (1) business day prior to the Sale Hearing.  The Debtors request that replies to any objections to the sale portion of this Motion that are filed on or before 5:00 p.m. (ET) on the date that is one (1) business day prior to the applicable Sale Hearing be deemed timely.

**E.      Ability to Enter in Stalking Horse Agreements
         with Reasonable Bid Protections**

58.      The Debtors have determined at this time, in the exercise of their business judgment, to undertake a sales process without a lead or "stalking horse" bidder, although several parties have expressed an interest in pursuing a sales transaction with the Debtors, have commenced the due diligence process, and in certain circumstances have submitted non-binding letters of intent.

59.      However, to incentivize potential bidders and thereby maximize the potential value of the Purchased Assets for the benefit of the estates and various stakeholders, the Debtors request that, upon their receipt of any bid(s) that the Debtors deem, in the exercise of their sound business judgment, to be acceptable, they be authorized, with the reasonable consent of the DIP Lender, Prepetition Lenders and the Committee, and subject to further Court approval, to designate a bid (or more than one bid, for different Purchased Assets) as a stalking horse bid and to execute a Stalking Horse Agreement with such Stalking Horse Bidder in connection with the proposed sale of a Purchased Asset.

60.      Subject to further Court approval, the Debtors propose to offer (with the reasonable consent of the DIP Lender, Prepetition Lenders and the Committee) Potential Bidders

that serve as "staking horse" bidders customary bidding protections in the form of reasonable Bid Protections; provided, that any fee or expense reimbursement shall be expressly conditioned on the consummation of a Sale of the Purchased Assets to another party, and shall be subject to approval by separate order of the Court after not less than two (2) business days' notice and a hearing.

61.    Promptly after entering into a Stalking Horse Agreement, the Debtors will distribute such agreement to the parties submitting other Qualified Bids for the respective Purchased Asset.  If the Debtors enter into any such Stalking Horse Agreement(s), (a) on or before the Participation Deadline, the agreement(s) shall be placed on the Court's docket and notice thereof shall be given to all parties who received notice of the Bidding Procedures Motion, all parties on the Debtors' 2002 notice list and all Potential Bidders; and (b) such Bid Protections shall be subject to approval by the Court at a hearing on a date that is at least two (2) business days thereafter, subject to the Court's availability, to consider approval of the proposed Bid Protections.  The Bid Protections hearing may be adjourned or rescheduled without notice other than as stated on the record in Court or in an appropriate agenda letter.

62.    While such procedures are, admittedly, not always found in "naked" auctions, the Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid.  The ability of the Debtors to offer a Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors because it allows the Debtors to provide the incentive required to induce a Potential Bidder to submit or increase its bid prior to the Auctions.  To the extent bids can be improved prior to the Auctions, a higher floor is established for further bidding.  Thus, even if a Stalking Horse Bidder is offered the Bidding Protections and ultimately is not the Successful Bidder, the

Debtors and their estates will have benefited from the higher floor established by the improved bids.  The Debtors will exercise prudent business judgment before offering or agreeing to any of the Bidding Protections and will only do so if such protections, in the reasonable business judgment of the Debtors and with the reasonable consent of the Committee, will likely result in the realization of greater value for the Debtors and their estates.

63.     There is substantial justification for authorizing the Debtors to choose a stalking horse bidder after approval of the Bidding Procedures but before an Auction in situations where (a) the stalking horse bidder is not readily apparent or the stalking horse agreement was not readily available at the time the bidding procedures motion was filed; (b) any such later determination to enter into a stalking horse agreement will only be made with the consent of other constituents, such as the creditors committee; and (c) further court approval is sought.  *In re Leiner Health Products Inc.*, Case No. 08-10446 (KJC) (Bankr. D. Del. May 14, 2008) [D.I. 299] (authorizing Debtors, with the consent of, *inter alia*, the creditors' committee, to set a telephonic hearing with the court to approve a stalking horse agreement and break-up fee); *In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. May 9, 2012) (authorizing Debtors to provide bid protections in the form of (i) a topping fee, (ii) a requirement that other bidders be obligated to agree to a form of asset purchase agreement no less favorable to debtors than the stalking horse agreement, and (iii) minimum initial and overbid increments; provided, that the top-up fee is expressly conditioned on consummation of the sale to another party and subject to court approval on two (2) business days' notice); *see also In re Archway Cookies LLC*, Case No. 08-12323 (CSS) (Bankr. D. Del. May 9, 2012) (approving stalking horse bidder, where motion stated the Debtors' intent to entertain stalking horse offers and indicated that, if one was accepted, the Debtors would apply to the bankruptcy court for approval and prior

to hearing, a stalking horse was identified); *In re Verasun Energy Corp.*, Case No. 08-12606 (BLS) (Bankr. D. Del. Feb. 5, 2009) (transcript of hearing) (discussing with debtors' counsel their plans to seek a naked auction, Judge Shannon indicated reluctance to prospectively approve break-up fees, indicating that "we have dealt with that in a bunch of different ways.  If you get a stalking horse after the bid procedures are entered, we'll entertain… a hearing on short notice").

64.    In this case, the Debtors have not yet been presented with acceptable stalking horse bids but remain optimistic that such a bid will emerge for certain of the Purchased Assets.  Under these circumstances, authorization of the Debtors to offer Bidding Protections, subject to further Court approval, will be beneficial to the Debtors' efforts to maximize value for all constituents.

65.    Approval of the Bid Protections is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *In re O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, [the inquiry] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *In re O'Brien*, 181 F.3d at 535.  Here, the Bid Protections should be approved because it will provide a benefit to the Debtors' estates.

66.    In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award bidding protections:  (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the fee relative to the purchase

price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

67.    Whether evaluated under the "business judgment rule" applied by certain courts[16] or the Third Circuit's "administrative expense" standard, the Debtors' ability to agree to the Bid Protections should be approved.  Based on the Debtors' pre-filing discussions with potential purchasers, the Debtors have determined that the Bid Protections are necessary to attract and retain a Stalking Horse Bidder.  Moreover, the Stalking Horse Bid provides substantial value to the Debtors by providing a minimum floor for the Purchased Assets, which can be utilized to seek higher or better offers at the Auction.  Lastly, the Debtors intend to conduct all negotiations with a Stalking Horse Bidder in good faith, on an arm's-length basis, as demonstrated by the fact that it will only enter into an acceptable agreement after it has obtained the reasonable consent of the DIP Lender, Prepetition Lenders and the Committee.

68.    The Debtors submit that authorization of the Bid Protections will not chill the bidding for the Purchased Assets.  The Bid Protections will be negotiated with any Stalking

---

[16]    *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

Horse Bidder and the Debtors believe that the Bid Protections are appropriate under the circumstances because the Stalking Horse Purchase Agreement will provide a floor by which other bids may be judged.  Further, payment of the Bid Protections is not likely to diminish the Debtors' estates.  The Debtors will incur the obligation to pay the Bid Protections only if they receive from a third party a higher or better offer on the Purchased Assets, and that offer is subsequently approved by Court and closes.

69.    After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as being appropriate under the facts and circumstances of the case.  *In re Claim Jumper Restaurants, LLC*, Case No. 10-12819 (Bankr. D. Del. Oct. 1, 2010) ($750,000 expense reimbursement); *In re Universal Building Products, Inc.,* Case No. 10-12453 (Bankr. D. Del. Aug. 27, 2010) (approving $400,000 break-up fee and expense reimbursement up to $850,000 on purchase price of $25,000,000); *In re Nortel Networks Inc.,* Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee and expense reimbursement of $400,000 (i.e., 5.9% in the aggregate) on proposed purchase price of $17,650,000); *In re Gallery Corp.*, Case No. 07-11628 (Bankr. D. Del. Nov. 29, 2007) (approving 3% break-up fee and expense reimbursement up to $100,000 on a sale with a proposed purchase price of $7,100,000); *In re Radnor Holdings*, Case No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *In re Riverstone Networks,* Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); *In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW), (Bankr. D. Del. February 17, 1998) (fee of 4.0% upheld).

**F.    Relief from the Fourteen-Day Waiting Periods
       Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

70.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Orders be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

71.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

72.    Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**G.    Relief from Local Rule 6004-1**

73.     In addition, the Debtors request relief from Local Rule 6004-1 that requires a proposed form of sale order and asset purchase agreement to be filed with a sale or sale procedures motion.   The Debtors intend to file a form asset purchase agreement and proposed sale orders for each of the proposed sales in advance of the Sale Hearings so as to provide parties in interest sufficient notice of the proposed orders.   At this time, however, the Debtors are still soliciting interested parties and any form of order or PO Division purchase agreement filed now would change significantly by the Sale Hearings.   In an effort to be most cost-efficient, the Debtors propose to file and serve (i) a proposed form of PO Division purchase agreement not more than five (5) business days after entry of an order approving this Motion; and (ii) proposed sale orders not less than twenty (21) days prior to the applicable Sale Hearing.

## NOTICE

74.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the DIP Lender and the Prepetition Lenders; (d) the Internal Revenue Service; (e) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any portion of the Purchased Assets; and (f) all parties that have requested, prior to the date hereof, or that are required to receive notice pursuant to Bankruptcy Rule 2002.   In addition, notice of this Motion will be provided to counsel for the Committee once appointed.   The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (b) entry of the proposed Sale Orders; and (c) such other and further relief as the Court deems just and proper.

Dated: October 30, 2013  
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Erin R. Fay*  
Robert J. Dehney (No. 3578)  
Derek C. Abbott (No. 3376)  
Andrew R. Remming (No. 5120)  
Erin R. Fay (No. 5268)  
1201 N. Market St., 16th Flr.  
PO Box 1347  
Wilmington, DE  19899-1347  
Telephone:  302-658-9200  
Facsimile:  302-658-3989

-and-

PILLSBURY WINTHROP SHAW PITTMAN LLP  
Leo T. Crowley  
Margot Erlich  
1540 Broadway  
New York, New York 10036  
Telephone: (212) 858-1000  
Facsimile: (212) 858-1500

*Proposed Counsel to Debtors*  
*and Debtors in Possession*

7607977.5