**EXHIBIT A**

**Talon Stalking Horse Agreement**

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**LABORATORY PARTNERS, INC.**

**TERRE HAUTE MEDICAL LABORATORY, INC., AND**

**PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,**

**AS SELLERS**

**AND**

**LABORATORY CORPORATION OF AMERICA HOLDINGS,**

**AS PURCHASER**

**Dated as of January 27, 2014**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of Assets | 1 |
| 1.2 | Excluded Assets | 3 |
| 1.3 | Assumption of Liabilities | 4 |
| 1.4 | Excluded Liabilities | 4 |
| 1.5 | Contracts; Deferred Contracts; Cure Costs | 6 |
| 1.6 | "As Is" Transaction | 8 |
| 1.7 | Seller Representative | 8 |

## ARTICLE 2
## CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE PRICE

| | | |
|---|---|---|
| 2.1 | Consideration | 8 |
| 2.2 | Deposit | 8 |
| 2.3 | Withholding | 9 |
| 2.4 | Seller Representative | 9 |

## ARTICLE 3
## CLOSING AND TERMINATION

| | | |
|---|---|---|
| 3.1 | Closing | 9 |
| 3.2 | Closing Deliveries by Sellers | 9 |
| 3.3 | Closing Deliveries by Purchaser | 11 |
| 3.4 | Termination of Agreement | 12 |
| 3.5 | Procedure Upon Termination | 13 |
| 3.6 | Effect of Termination | 13 |

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

| | | |
|---|---|---|
| 4.1 | Corporate Organization | 14 |
| 4.2 | Authority Relative to This Agreement | 15 |
| 4.3 | Conflicts; Consents of Third Parties | 15 |
| 4.4 | Collections Statement | 16 |
| 4.5 | Taxes. | 16 |
| 4.6 | Litigation | 17 |
| 4.7 | Intellectual Property | 17 |
| 4.8 | Agreements, Contracts and Commitments; Certain Other Agreements | 17 |
| 4.9 | Permits | 18 |
| 4.10 | Brokers and Finders | 19 |
| 4.11 | Title to Assets | 19 |
| 4.12 | Tangible Personal Property; Equipment | 20 |

i

4.13    Real Property ........................................................................................20
4.14    Compliance with Laws ..........................................................................20
4.15    Employees; Employee Benefits .............................................................22
4.16    Employee Relations. ..............................................................................23
4.17    Insurance Policies .................................................................................23
4.18    Environmental Matters...........................................................................23
4.19    Significant Customers ...........................................................................24
4.20    NO OTHER REPRESENTATIONS OR WARRANTIES ..........................24

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1    Corporate Organization...........................................................................24
5.2    Due Authorization; No Conflict................................................................24
5.3    No Brokers .............................................................................................25
5.4    Sufficiency of Funds ..............................................................................25
5.5    "Covered Entity"....................................................................................25

### ARTICLE 6
### EMPLOYEES

6.1    Employee Claims. ..................................................................................25
6.2    Hired Employees.....................................................................................25
6.3    Release of Hired Employees. ..................................................................26
6.4    No Transfer of Employees. ......................................................................26
6.5    No Third Party Beneficiaries. ..................................................................26
6.6    Liability for Benefit Arrangements...........................................................26

### ARTICLE 7
### BANKRUPTCY COURT MATTERS

7.1    Certain Motions and Orders....................................................................26
7.2    Stalking Horse Protections......................................................................27

### ARTICLE 8
### COVENANTS AND AGREEMENTS

8.1    Conduct of Business Prior to Closing.......................................................27
8.2    Pre-Closing Access to Information ...........................................................28
8.3    Assignability of Certain Contracts, Etc ...................................................28
8.4    Rejected Contracts .................................................................................28
8.5    Consent and Approvals ...........................................................................29
8.6    Preservation of Records; Post-Closing Access to Information.....................29
8.7    Further Agreements ................................................................................30
8.8    Publicity .................................................................................................31
8.9    Notification of Certain Matters................................................................31
8.10   Accounts Receivable...............................................................................31
8.11   Further Assurances.................................................................................32

ARTICLE 9
CONDITIONS TO CLOSING

9.1     Conditions Precedent to the Obligations of Purchaser and the Sellers .......... 33
9.2     Conditions Precedent to the Obligations of the Sellers ................................. 34
9.3     Conditions Precedent to the Obligations of Purchaser ................................. 34

ARTICLE 10
DEFINITIONS

10.1    Certain Definitions ...................................................................................... 35
10.2    Additional Defined Terms ........................................................................... 42

ARTICLE 11
TAXES

11.1    Additional Tax Matters ................................................................................ 44

ARTICLE 12
MISCELLANEOUS

12.1    Payment of Expenses ................................................................................... 45
12.2    Survival of Representations and Warranties; Survival of Post-Closing
        Covenants .................................................................................................... 45
12.3    Entire Agreement; Amendments and Waivers ............................................. 45
12.4    Counterparts ................................................................................................ 46
12.5    Governing Law ............................................................................................ 46
12.6    Jurisdiction, Waiver of Jury Trial ................................................................ 46
12.7    Notices ......................................................................................................... 46
12.8    Binding Effect; Assignment ........................................................................ 47
12.9    Severability ................................................................................................. 48
12.10   Injunctive Relief .......................................................................................... 48
12.11   Time of the Essence ..................................................................................... 48
12.12   Third Party Beneficiaries ............................................................................ 48
12.13   Damages ...................................................................................................... 48
12.14   Certain Interpretations ................................................................................ 48

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of January 27, 2014 (the "Execution Date"), by and among Laboratory Partners, Inc., a Delaware corporation ("LP"), Terre Haute Medical Laboratory, Inc., an Indiana corporation, ("THML") and Pathology Associates of Terre Haute, Inc., an Indiana corporation and wholly-owned subsidiary of THML ("PATH" and, with LP, and THML, sometimes hereinafter referred to individually as "Seller" and collectively, the "Sellers"), each as a Chapter 11 debtor and debtor in possession, and Laboratory Corporation of America Holdings, a Delaware corporation ("Purchaser").  Article 10 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, the Sellers operate the Business and own certain assets related thereto and Purchaser desires to purchase certain assets primarily used in the operation of the Business free and clear of any interests, liens, or encumbrances in accordance with 11 U.S.C. § 363 and title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") and assume only those liabilities specified in this Agreement;

WHEREAS, the Sellers and certain of their Affiliates are debtors and debtors-in-possession (the "Debtors") in those certain jointly administered bankruptcy cases under chapter 11 of the Bankruptcy Code filed on October 25, 2013 (the "Filing Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and jointly administered under Case No. 13-12769 (PJW) (such bankruptcy case, the "Chapter 11 Case");

WHEREAS, Purchaser desires to purchase and assume from the Sellers, and the Sellers desire to sell, transfer and assign to Purchaser, the Purchased Assets and the Assumed Liabilities in accordance with this Agreement and in accordance with and subject to the Sale Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code; and

WHEREAS, all of the transactions contemplated by this Agreement will be subject to and conditioned upon approval by the Bankruptcy Court and will be consummated only pursuant to the Sale Order that is a Final Order entered in the Chapter 11 Case.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and the Sellers hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1     Purchase and Sale of Assets. Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date Purchaser shall purchase, acquire and accept from the

Sellers, and each Seller shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances) on the Closing Date, all of such Seller's right, title and interest in, to and under all of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, solely or primarily related to or used, or held for use, in connection with the Business, now existing or hereafter acquired on or prior to the Closing Date, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets, and in all cases as amended or modified by Section 1.5, (collectively, the "Purchased Assets"), including the following assets, properties, rights and interests:

(a)     the Contracts with customers of the Business (the "Acquired Customers") to which a Seller is a party set forth on Schedule 1.1(a), and all rights of such Seller pursuant thereto (the Contracts referred to in this Section 1.1(a), collectively, the "Assumed Customer Contracts");

(b)     the Existing Leases set forth on Schedule 1.1(b), including all rights of the Sellers pursuant thereto, to the extent assigned pursuant hereto (the "Assumed Real Property Leases");

(c)     all of the personal property that is used in the Business, including laboratory equipment, accessories, machinery, apparatus, furniture, fixtures, motor vehicles, computer hardware and office equipment, including those items identified on Schedule 1.1(c) attached hereto ("Equipment");

(d)     all inventory and supplies maintained by any Seller in connection with the Business;

(e)     all customer lists, machinery and equipment records, mailing lists, quality control records and procedures, employment and personnel records (to the extent related to Business Employees actually employed by Purchaser and permitted to be transferred by applicable Laws) and display materials, each to the extent used in the Business;

(f)     all claims of any Seller against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, except for Estate Causes of Action;

(g)     all rights of any Seller relating to deposits and prepaid expenses relating to the Business or the Assigned Contracts;

(h)     all warranties (express and implied) that continue in effect with respect to any Purchased Asset;

(i)     (i) all Seller Intellectual Property, (ii) all Contracts used in connection with the operation of the Business pursuant to which such Seller is granted a license to, or any rights under, any Intellectual Property of any other Person and all Contracts pursuant to which such Seller granted to any other Person a license to, or any rights under, the Seller Intellectual Property, in each case set forth on Schedule 1.1(i), to the extent assigned to Purchaser (the "Assumed IP Contracts"), (iii) all trade names and marks, together with the goodwill associated

2

with the names and marks, all websites and domain names of any Seller or its Affiliates set forth on Schedule 1.1(i) to the extent assigned to Purchaser and (iv) to the extent not included in Section 1.1(c) or Section 1.1(i), all IT Assets;

(j)       the Owned Real Property, but only if the Purchaser consummates the option to purchase such Owned Real Property pursuant to the Option to Purchase Agreement substantially in the form attached hereto as Exhibit 1.1(j) (the "Property Option"); and

(k)       all other Contracts set forth on Schedule 1.1(k) (such Contracts, together with the Assumed Customer Contracts, the Assumed Real Property Leases, Assumed IP Contracts and any other Contracts that are included in the definition of Purchased Assets pursuant to Section 1.5(a), the "Assigned Contracts").

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller or its Affiliates be deemed to sell, transfer, assign or convey, and such Seller and its Affiliates shall retain all of their right, title and interest to, in and under the following assets, properties, rights and interests (collectively, the "Excluded Assets"):

(a)       all cash and cash equivalents, bank deposits, and certificates of deposit of the Sellers or any Affiliates;

(b)       all accounts receivable and notes receivable (whether current or non-current) of any Seller or any Affiliates, including, with respect to the Business, all accounts receivable and notes receivable created or otherwise relating to any periods prior to the Closing Date;

(c)       each Seller's minute books, stock books and Tax records and such other corporate records having to do with the organization and capitalization of the Sellers;

(d)       each Seller's rights under any Contract set forth on Schedule 1.2(d) (which for the avoidance of doubt is not an Assigned Contract or a Deferred Contract);

(e)       all Non-Assumed Contracts;

(f)       all of the Sellers' rights under any Permits;

(g)       all of the intangible rights and property of any of the Sellers and any of their Affiliates not related to the Business (which shall not include, for the avoidance of doubt, any such rights or property set forth on Schedule 1.1(i)), all websites and domain names of any Seller or its Affiliates and all Intellectual Property listed on Schedule 1.2(g) attached hereto;

(h)       the assets, properties and businesses of any of the Sellers that are not Purchased Assets or that are not related to the Business and the Purchased Assets, including those that are specifically set forth on Schedule 1.2(h);

(i)       all records that any of the Sellers are required by applicable Laws to retain;

3

(j)      all rights with respect to deferred Tax assets and all refunds, credits or deposits of Taxes with respect to the taxable periods or portions thereof ending prior to the Closing Date, including any refunds, credits or deposits of Taxes arising as a result of any Seller's operation of the Business or ownership, operation, utilization or maintenance of the Purchased Assets prior to the Closing Date;

(k)      all of each Seller's rights under this Agreement and the Ancillary Agreements;

(l)      all Estate Causes of Action;

(m)      Sellers' Provider Agreements not assumed by Purchaser, and Sellers' provider numbers under any Programs;

(n)      all insurance policies and the rights and proceeds thereunder relating to any Seller or its Affiliates; and

(o)      all assets set aside in a trust for the payment of benefits under any funded Benefit Arrangement, as defined in Section 1.4(e).

1.3      Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume only the following Liabilities related to or arising out of the Purchased Assets or Business and no others (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities"):

(a)      all Liabilities under each Assigned Contract arising on or after the Closing Date and excluding any Liability arising out of or relating to a breach, violation, default or failure to perform by each Seller that occurred prior to the Closing Date pursuant to

(i)      an assignment and assumption agreement substantially in the form of Exhibit 1.3(a)(i) attached hereto (the "Assumption Agreement"); and

(ii)      with respect to the Assumed Real Property Leases, an assignment and assumption of leases substantially in the form of Exhibit 1.3(a)(ii) attached hereto (the "Lease Assignments");

(b)      all Liabilities for obligations under each Deferred Contract on and from the Closing Date and through and until either the date on which the Deferred Contract is rejected and such rejection is approved by the Bankruptcy Court or until the Deferred Contract is assumed and such assumption is approved by the Bankruptcy Court; and

(c)      all Liabilities for obligations to Acquired Customers (including without limitation refunds, credits and similar obligations) related to the Business and incurred in the Ordinary Course of Business on or after the Closing Date.

1.4      Excluded Liabilities.  Except for the Assumed Liabilities set forth in Section 1.3 (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller or any of its Affiliates of any

nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including the following Liabilities, all of which shall remain Liabilities of such Seller and its Affiliates:

(a)     all Liabilities of such Seller and its Affiliates relating solely to or otherwise arising, whether before, on or after the Closing Date, out of, or in connection with, any of the Excluded Assets (including the Non-Assumed Contracts);

(b)     all Liabilities of such Seller and its Affiliates to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Seller or its Affiliates;

(c)     any Liability for any laboratory or medical malpractice claims arising from the operation of the Business prior to the Closing Date;

(d)     any Liability related to a violation by any Seller or the Business of any Laws arising prior to the Closing Date;

(e)     any Liabilities, obligations and duties of such Seller and such Seller's Affiliates, whether or not related to the Business, that arise or arose out of any "employee benefit plan" within the meaning of Section 3(3) of ERISA or any other employee benefit arrangement, including bonus plan, employment, consulting or other compensation agreement, incentive, equity or equity-based compensation, or deferred compensation arrangement, change in control, termination or severance plan or arrangement, stock purchase, severance pay, sick leave, vacation pay, salary continuation for disability, hospitalization, medical insurance, life insurance and scholarship plan or program, in each case maintained by any Seller or its Affiliates for the benefit of the employees or directors of any Seller or to which any Seller is a party (each being, a "Benefit Arrangement");

(f)     any Liability of any Seller related to compliance with the WARN Act and similar state and local applicable Laws, whether or not such Liability arises before or after the Closing Date, except to the extent such Liability arises as a result of Purchaser's termination or layoff on or after the Closing of any Current Business Employees that Purchaser hires in connection with the Closing;

(g)     all Liabilities relating to the DIP Credit Agreement or any Indebtedness of any Seller and their Affiliates;

(h)     any Liability to pay any Taxes of any Seller or any of its Affiliates, regardless of whether arising in connection with the consummation of the transactions contemplated hereby or otherwise;

(i)     any Liability of any Seller or its Affiliates for performance under this Agreement or the Ancillary Agreements;

(j)     any Liability under any Assigned Contract (which includes any Assumed Real Property Lease) arising prior to the Closing Date or arising out of or relating to any breach, violation, default or failure to perform by any Seller that occurred prior to the Closing Date;

(k)  any Liability under any Non-Assumed Contract, whether arising from or relating to the operation of the Business on or prior to or after the Closing Date;

(l)  any Liability of any Seller with respect to any Proceeding;

(m)  any Liability for any Encumbrance created or existing prior to the Closing Date except any Permitted Encumbrance;

(n)  any Liability arising out of any Sellers' agreements with any Programs (including pursuant to any Provider Agreements not assumed by Purchaser);

(o)  any Liability and obligations in respect of or related to continuation coverage under Code Section 4980B ("COBRA") and any other Liability further specified in Section 6.1;

(p)  any Liability related to a violation by any Seller or the Business of any applicable Laws and/or Health Care Laws from or relating to the operation of the Business arising prior to the Closing Date; and

(q)  all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by such Seller or its Affiliates in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Case or otherwise.

Without limitation of the foregoing and notwithstanding anything to the contrary set forth herein, in no event shall Purchaser assume or be deemed to assume any of Sellers' provider numbers under any Programs, or any of Sellers' agreements with the federal Medicare program, any state Medicaid program, or any other payor of health care services that is a Governmental Body (each a "Governmental Payor"), and Purchaser shall not be liable in any manner for any Liability of the Sellers to any Governmental Payor or third party payor, whether known or unknown, including any Liability for past overpayments, civil monetary penalties or false claims, and any Liabilities arising out of any failure of Seller to comply with any Law, regulation, rule, manual provision or other requirement applicable to providers of services paid under any Programs.

1.5  Contracts; Deferred Contracts; Cure Costs.

(a)  Schedule 1.5(a) (the "Original Contract & Cure Schedule") contains a list of each Contract and the Sellers' good faith estimate of the amount of Cure Costs.  At the Closing, Seller shall pay all Cure Costs for the Assigned Contracts Purchaser has agreed to assume as of the Closing Date; provided, however, that with respect to any Cure Costs that are Undetermined Cure Costs as of the Closing Date, upon such Cure Costs becoming finally determined by court order or by agreement by the parties to such Contract, Seller shall promptly pay such finally determined Cure Costs.

(b)  Schedule 1.5(b) contains a list of all Contracts that Purchaser has not assumed as an Assigned Contract as of the Closing Date, but which Purchaser may decide to

assume prior to the Designation Deadline, which for the avoidance of doubt shall not include those Contracts listed on Schedule 1.2(d) (each a "Deferred Contract").  To the extent permitted by the Bid Procedures Order and the Sale Order, Purchaser may, at any time and from time to time through (and including) the Designation Deadline, include any Deferred Contract in the definition of Purchased Assets and exclude it from the definition of Excluded Assets; provided that no such change of the definitions of Purchased Assets and Excluded Assets shall reduce or increase the amount of the Purchase Price.  If Purchaser decides to assume a Deferred Contract, Purchaser shall deliver one or more written notices (each, an "Assumption Notice") to the Sellers prior to the Designation Deadline specifying the Deferred Contract(s) to be so included and specifying the requisite additions, deletions or other changes to any applicable Schedule to reflect such inclusion.  Purchaser and Sellers agree to make such changes to the Schedule to reflect the inclusion of the Deferred Contract in Purchased Assets.  If Purchaser decides to reject a Deferred Contract, Purchase shall deliver one or more written notices (each, a "Rejection Notice") to the Sellers prior to the Designation Deadline specifying the Deferred Contract(s) to be so rejected.  To the extent that Purchaser does not deliver an Assumption Notice or a Rejection Notice for a Deferred Contract to the Sellers by the Designation Deadline, such Deferred Contract shall automatically be deemed to be an Excluded Asset and Sellers shall be entitled to take all actions reasonably necessary to seek to reject such Deferred Contract pursuant to Section 365 of the Bankruptcy Code.

(c)    As soon as reasonably practical after receiving an Assumption Notice, Sellers shall, with respect to the Deferred Contracts included in the Assumption Notice, (i) take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code, (ii), if applicable, notify the non-debtor counterparty of the assignment, and (iii) pay all applicable Cure Costs; provided, however, that with respect to any Cure Costs that are Undetermined Cure Costs as of such date, upon such Cure Costs becoming finally determined by court order or by agreement of the parties to such Deferred Contract, Seller shall promptly pay such finally determined Cure Costs.  As soon as reasonably practical after receiving a Rejection Notice, Sellers shall, with respect to the Deferred Contracts included in the Rejection Notice, take all actions reasonably necessary to reject such Deferred Contracts pursuant to Section 365 of the Bankruptcy Code and diligently pursue approval of the Bankruptcy Court of such rejection.

(d)    The Sellers shall use commercially reasonable efforts to verify all Cure Costs and establish the proper Cure Costs, if any prior to the Closing Date.  The Purchaser shall use commercially reasonable efforts to minimize the number of Deferred Contracts.

(e)    Purchaser shall promptly pay when due to Sellers or as the Sellers direct in a signed writing all Liabilities associated with the continuation by Sellers of any Deferred Contract from the Closing Date and through and until either the date on which such Deferred Contract is rejected and such rejection is approved by the Bankruptcy Court or until such Deferred Contract is assumed and such assumption is approved by the Bankruptcy Court.

(f)    Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 1.5 shall survive the Closing. Notwithstanding anything in this Agreement to the contrary, on the date any Deferred Contract is assumed and assigned to Purchaser pursuant to

this Section 1.5, such Deferred Contract shall be deemed an Assigned Contract for all purposes under this Agreement.

1.6    <u>"As Is" Transaction</u>.    PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR THE BUSINESS. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN ARTICLE 4, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

1.7    <u>Seller Representative</u>.  From and after the date on which the Sale Order becomes a Final Order, each Seller, by their execution hereof, hereby irrevocably constitutes and appoints LP to act as its exclusive agent and attorney-in-fact to give and receive notices on behalf of such Seller, as the case may be, and in general to do all things and to perform all acts on behalf of such Seller as may be contemplated by this Agreement.  From and after the date on which the Sale Order becomes a Final Order, this power of attorney, and all authority hereby conferred, is irrevocable and will not be terminated by any act of any Seller, by operation of Laws or by the occurrence of any other event.

**ARTICLE 2**

**CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE PRICE**

2.1    <u>Consideration</u>. The aggregate purchase price for the purchase of the Purchased Assets shall be an amount equal to Ten Million Five Hundred Thousand Dollars ($10,500,000), (the "<u>Purchase Price</u>"), plus the assumption of the Assumed Liabilities. The Purchase Price shall be paid on the Closing Date in accordance with Section 3.3(a).

2.2    <u>Deposit</u>.

(a)    On or prior to the Execution Date, Purchaser and the Sellers have entered into an escrow agreement (as amended, supplemented or otherwise modified from time to time, the "<u>Escrow Agreement</u>") with Deutsche Bank Trust Company Americas (the "<u>Escrow Agent</u>"). Concurrently with the execution and delivery of the Escrow Agreement by the Sellers, Purchaser and the Escrow Agent, Purchaser deposited $300,000 (Three Hundred Thousand Dollars) (the

"Deposit") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, non-interest-bearing account (the "Escrow Account") pursuant to the terms and conditions of the Escrow Agreement and this Agreement. All interest or other earnings on amounts held in the Escrow Account pursuant to the Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

(b)     If this Agreement is terminated in accordance with the terms hereof prior to the Closing, the Deposit shall be released and distributed to Purchaser or the Sellers in accordance with Section 3.6(b), Section 3.6(c) and/or Section 3.6(d), as applicable.

2.3     Withholding. Purchaser shall be entitled to deduct and withhold from all amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to such payments under any provision of U.S. federal, state, local or foreign Tax Laws. Purchaser agrees that, if the Sellers deliver to Purchaser the certificates described in Section 3.2(e), Purchaser will not deduct or withhold from any amounts paid under this Agreement any Taxes under Section 1445 of the Code. The parties will reasonably cooperate with each other to minimize the amount of any other withholding Taxes that may be imposed on any amounts paid under this Agreement. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

2.4     Seller Representative. All obligations of any Seller pursuant to this Agreement shall be administered by LP pursuant to Section 1.7 hereof. The processing of all amounts owing to any Seller pursuant to this Agreement shall be administered through LP on behalf of such Seller pursuant to Section 1.7 hereof. Purchaser shall be entitled to deal with and rely on the authority of LP with respect to any such matters.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1     Closing. Subject to (i) the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party entitled to waive the applicable condition and (ii) the provisions of Section 3.4, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Pillsbury Winthrop Shaw Pittman LLP at 1540 Broadway, New York, New York 10036 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing). The date on which the Closing is held is referred to in this Agreement as the "Closing Date". The Closing shall be effective for economic and accounting purposes as of 12:01 a.m. on the Closing Date.

3.2     Closing Deliveries by Sellers. At the Closing, the Sellers shall deliver, or cause to be delivered, to Purchaser:

(a)    the General Assignment and Bill of Sale, substantially in the form of Exhibit 3.2(a) attached hereto, duly executed by Sellers;

(b)    the Assumption Agreement, duly executed by Sellers;

(c)    a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

(d)    the officer's certificate required to be delivered pursuant to Sections 9.3(a) and 9.3(b);

(e)    a certification of non-foreign status of each Seller in accordance with Section 1445 of the Code and the Treasury regulations thereunder, which certification shall be reasonably acceptable to Purchaser;

(f)    a duly executed Custodian Agreement, duly executed by Sellers;

(g)    a Transition Services Agreement, duly executed by the Sellers;

(h)    a duly executed Non-Competition Agreement, substantially in the form of Exhibit 3.2(h) attached hereto (the "Non-Competition Agreement"), duly executed by the Sellers;

(i)    a Lease Assignment for each Assumed Real Property Lease duly executed by Sellers ;

(j)    joint instructions releasing to Sellers the Deposit in the Deposit Escrow Agreement, duly executed by Sellers;

(k)    a certificate of the secretary of LP, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1)  the certificate of incorporation of LP, certified as of a recent date by the Secretary of State of the State of Delaware, and the bylaws of LP, (2) to the extent applicable, resolutions duly adopted by the board of directors of LP authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Seller Ancillary Agreements to which it is a party and (3) a certificate of existence or good standing as of the Closing Date of LP from the Secretary of State of the State of Delaware and a certificate of good standing as of the Closing Date of LP from each state in which it is qualified to conduct business (other than California, which shall be of a recent date) and (B) the resolutions referenced in subsection (A)(2) are still in effect;

(l)    a certificate of the secretary of THML, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1)  the articles or certificate of incorporation of THML, certified as of a recent date by the Secretary of State of the State of Indiana, and the bylaws of THML, (2) to the extent applicable, resolutions duly adopted by the board of directors and shareholders of THML authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Seller Ancillary Agreements to which it is a party and (3) a certificate of existence or good

standing as of the Closing Date of THML from the Secretary of State of the State of Indiana and a certificate of good standing as of the Closing Date of THML from each state in which it is qualified to conduct business and (B) the resolutions referenced in subsection (A)(2) are still in effect;

(m)    a certificate of the secretary of PATH, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1)  the articles or certificate of incorporation of PATH, certified as of a recent date by the Secretary of State of the State of Indiana, and the bylaws of PATH, (2) to the extent applicable, resolutions duly adopted by the board of directors and shareholders of PATH authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Seller Ancillary Agreements to which it is a party and (3) a certificate of existence or good standing as of the Closing Date of PATH from the Secretary of State of the State of Indiana and a certificate of good standing as of the Closing Date of PATH from each state in which it is qualified to conduct business and (B) the resolutions referenced in subsection (A)(2) are still in effect;

(n)    the Property Option, duly executed by Sellers;

(o)    the license agreements set forth on Schedule 3.2(o) (the "License Agreements"), in a form reasonably acceptable to the parties, duly executed by the applicable Seller; and

(p)    all other previously undelivered Seller Ancillary Agreements expressly required by this Agreement to be delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver, or cause to be delivered to the Sellers (or Seller Representative, as indicated):

(a)    to the Seller Representative an amount equal to the Purchase Price minus the Deposit, by wire transfer of immediately available funds to the account of the Sellers in accordance with written instructions delivered by the Seller Representative to Purchaser at least two (2) Business Days prior to the Closing Date;

(b)     joint instructions releasing to Sellers the Deposit in the Deposit Escrow Agreement, duly executed by Purchaser;

(c)    a duly executed Assumption Agreement by Purchaser;

(d)    the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(e)    the Custodian Agreement, duly executed by Purchaser;

(f)    the Transition Services Agreement, duly executed by Purchaser;

(g)    the Lease Assignments, duly executed by Purchaser;

(h)     the Non-Competition Agreement, duly executed by the Purchaser;

(i)     the Property Option, duly executed by Purchaser;

(j)     the License Agreements, in a form reasonably acceptable to the parties, duly executed by the Purchaser; and

(k)     all other previously undelivered Purchaser Ancillary Agreements expressly required by this Agreement to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4     <u>Termination of Agreement</u>. This Agreement may be terminated as follows:

(a)     by the mutual written consent of the Sellers and Purchaser at any time prior to the Closing;

(b)     by Purchaser or the Sellers, if the Closing shall not have been consummated on or prior to February 28, 2014 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to Purchaser or the Sellers, as applicable, if Purchaser is or the Sellers are, as applicable, in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement; and <u>provided</u> <u>however</u>, that if Purchaser is designated as a back-up bidder according to the terms of the Bid Procedures Order, then the right to terminate this Agreement under this Section 3.4(b) shall not be available to Purchaser until such time as provided in the Bid Procedures Order;

(c)     by Purchaser or the Sellers, if there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)     by Purchaser, if any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(e)     by Purchaser or the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on February 25, 2014, (ii) following entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days, or (D) have been modified or amended in any manner adverse to Purchaser without the prior written consent of Purchaser or (iii) if Sellers accept and consummate the purchase of all or part of the Purchased Assets with another bidder; <u>provided</u>, <u>however</u>, that if Purchaser is designated a back-up bidder according to the terms of the Bid Procedures Order, then the right to terminate this Agreement under this Section 3.4(e) shall not be available to Purchaser until such time as provided in the Bid Procedures Order;

(f)     by the Sellers, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Purchaser fails to deliver any portion of the Purchase Price at the Closing;

(g)     by Purchaser, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing;

(h)     by Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to the Sellers by Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(h) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(i)     by the Sellers, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers; provided, that the right of the Sellers to terminate this Agreement under this Section 3.4(i) shall not be available if any Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

(j)     by Purchaser in the event the Bankruptcy Court approves a third party as the Successful Bidder for the sale of the Business and either of the following events has occurred: (i) two Business Days after the transaction with such applicable Successful Bidder has been consummated or (ii) sixty (60) days after the applicable sale order approving the Successful Bidder has been entered by the Bankruptcy Court.

3.5     Procedure Upon Termination. In the event of a termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) subject to Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto; provided, however, that such termination shall not relieve any party from Liability for its intentional misconduct or material breach of this Agreement prior to such termination. Any termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto.

3.6     Effect of Termination.

(a)      In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Purchaser or the Sellers or any of their respective Affiliates, except as expressly set forth in Section 3.5 or this Section 3.6. The provisions of Section 3.4, Section 3.5, this Section 3.6 and Article 12 shall survive any termination of this Agreement and shall remain in full force and effect.

(b)      In the event this Agreement is terminated pursuant to Section 3.4 (other than pursuant to Section 3.4(f) or 3.4(i)) then Purchaser shall be entitled to disbursement of the Deposit from the Escrow Account.

(c)      If the Sellers terminate this Agreement pursuant to Section 3.4(f) or 3.4(i), then the Sellers shall be entitled to disbursement of the Deposit from the Escrow Account.

(d)      In the event that this Agreement is terminated pursuant to Section 3.4 and the Sellers or Purchaser is entitled to receive the Deposit, then the Sellers or Purchaser as applicable, shall be entitled to deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to the Sellers or Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

(e)      In the event this Agreement is terminated pursuant to Section 3.4(j), Purchaser shall be entitled to immediate return of its Deposit of $300,000 together with payment of the Break Up Fee as defined in Section 7.2(a) in the amount of $300,000 by Sellers, which Break Up Fee shall be paid upon the closing of the sale of the Business with the applicable Successful Bidder.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby, jointly and severally, make the representations and warranties in this Article 4 to Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date). Each Section of the Seller Disclosure Schedule, attached hereto as Schedule A, is numbered by reference to representations and warranties in a specific Section of this Article 4. Any event, item or matter disclosed in any Section or numbered part of the Seller Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article 4 to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.1    Corporate Organization. Each Seller is duly organized and validly existing under the Laws of the state of its incorporation. Each Seller has all requisite power and authority to own, lease and operate its properties used to operate the Business as it is now being operated, subject to the provisions of the Bankruptcy Code.

4.2     <u>Authority Relative to This Agreement</u>. Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite corporate power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver such Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Ancillary Agreements by Sellers, and the consummation of the transactions contemplated hereby and thereby by Sellers, have been duly authorized by all requisite action on the part of each Seller. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Bid Procedures Order and Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Laws or in equity) (the "<u>Bankruptcy Exceptions</u>").

4.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     Except as set forth in Section 4.3(a) of the <u>Seller Disclosure Schedule</u> or as permitted by the Sale Order, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation by Sellers of the transactions contemplated hereby or thereby, or compliance by such Seller with any of the provisions hereof or thereof will (i) conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (A) any of the organizational documents of such Seller; (B) subject to and assuming entry of the Sale Order, any Contract or Permit that is a Purchased Asset; or (C) subject to and assuming entry of the Sale Order, any applicable Laws, other than, in the case of clauses (B) and (C), such conflicts, violations, defaults, fees, payments, increases, charges, modifications, terminations, cancellations, accelerations or losses that would not have, individually or in the aggregate, a material adverse effect on the Purchased Assets taken as a whole or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any of the Purchased Assets.

(b)     Except as set forth in Section 4.3(b) of the <u>Seller Disclosure Schedule</u>, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of any Seller in connection with the execution and delivery of this Agreement or any of the Seller Ancillary Agreements by Sellers, the compliance by such Seller with any of the provisions hereof or thereof, the consummation by any Seller of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, have a material adverse effect on the Purchased Assets taken as a whole.

4.4    <u>Collections Statement</u>.  Set forth in Section 4.4 of the <u>Seller Disclosure Schedule</u> is a statement showing the amount of net cash collections and number of accessions received by THML and PATH each month for each Acquired Customer for the years ending December 31, 2012 and December 31, 2013 (the "<u>Collections Statement</u>").  The Collections Statement is based on the books, records and actual transactions of THML and PATH and presents fairly in all material respects, on a cash accounting basis, the cash collections received by the Business for the periods specified.  Sellers have not received any prepayments from any Acquired Customer that are outstanding as of the date hereof.

4.5    <u>Taxes.</u>

(a)    Sellers have timely filed with the appropriate Governmental Body all material Tax Returns relating to the operation of the Business which are required to be filed prior to the date of this Agreement, and all such Tax Returns are true, correct and complete in all material respects.  All material Taxes owed (or to be remitted) by Seller (whether or not shown or required to be shown on any Tax Return) relating to the operation of the Business have been paid or will be timely paid to the appropriate Governmental Body. To Seller's Knowledge, no event has occurred which would reasonably be expected to impose on Purchaser any successor or transferee liability for any Taxes in respect of any Seller relating to the operation of the Business or the Purchased Assets.  Sellers have not waived or been requested to waive any statute of limitations in respect of Taxes relating to the operation of the Business.  Since November 30, 2013, Sellers have not incurred any Liability for Taxes relating to the operation of the Business outside the Ordinary Course of Business.

(b)    With respect to the operation of the Business, Sellers have withheld and paid all material Taxes required to have been paid or withheld in connection with amounts paid or owing to its employees, customers, creditors, stockholders, independent contractors and other third parties, in compliance with all withholding and similar provisions of the Code and any and all other applicable United States, foreign, state or local laws, statutes, codes, ordinances, rules and regulations.

(c)    With respect to the operation of the Business, no examination or audit of any Tax Return of the Sellers is currently in progress and no Seller has received from any Governmental Body notice that such Governmental Body is asserting against any Seller any deficiency, proposed deficiency or claim for additional Taxes or any adjustment thereof with respect to any period for which a Tax Return has been filed, for which Tax Returns have not yet been filed or for which Taxes are not yet due and payable.  There are no Encumbrances on any of the Purchased Assets of Sellers that arose in connection with, or otherwise relate to, any failure (or alleged failure) to pay any Tax.

(d)    No Purchased Asset is an interest, directly or indirectly, in any joint venture, partnership, limited liability company or other entity that is treated as a partnership for income Tax purposes.  With respect to the operation of the Business, Sellers have no Liability for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of any other Legal Requirement), as a transferee or successor, by contract, or otherwise.

(e)     Section 4.5(e) of the <u>Seller Disclosure Schedule</u> lists each agreement, contract, plan or other arrangement (whether or not written and whether or not Benefit Arrangement) to which Sellers are a party that is a "nonqualified deferred compensation plan" within the meaning of Code Section 409A and the Treasury Regulations promulgated thereunder. Each such nonqualified deferred compensation plan (i) complies, in all material respects, and is operated and administered in accordance, with the material requirements of Code Section 409A, the Treasury Regulations promulgated thereunder and any other Internal Revenue Service guidance issued thereunder and (ii) has been operated and administered in good faith material compliance with Code Section 409A from the period beginning on January 1, 2013.

4.6     <u>Litigation</u>. Except as set forth in Section 4.6 of the <u>Seller Disclosure Schedule</u>, there is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (except as filed as part of the Bankruptcy Case) arising out of or related to the Purchased Assets, pending or, to the Knowledge of the Sellers, threatened that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions contemplated hereby.

4.7     <u>Intellectual Property</u>.

(a)     Section 4.7(a) of the <u>Seller Disclosure Schedule</u> sets forth a true, complete and correct list of all of the patents, registered trademarks, registered copyrights, Internet domain names, in each case that constitute the Seller Intellectual Property ("<u>Registered IP</u>"). To the Knowledge of Sellers, all Registered IP is valid and enforceable.

(b)     Except as set forth in Section 4.7(b) of the <u>Seller Disclosure Schedule</u>, (i) to the Knowledge of Sellers, the Sellers own the Seller Intellectual Property free from any Encumbrances (other than Permitted Encumbrances); and (ii) no Action is pending or, to the Knowledge of Sellers threatened, challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property.

4.8     <u>Agreements, Contracts and Commitments; Certain Other Agreements</u>.

(a)     Section 4.8(a) of the <u>Seller Disclosure Schedule</u> sets forth executory contracts of the following types that are unexpired as of the Execution Date primarily relating to the Business to which a Seller is a party or by which any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "<u>Material Contracts</u>"):

(i)     Contracts to which any Seller is a party requiring payments by or to a Seller in excess of $50,000 during any twelve (12)-month period;

(ii)     Contracts to which any Significant Customer is a party;

(iii)     each employment, consulting, sales, commissions, advertising or marketing Contract which provides for annual payments in excess of $50,000, excluding bonuses and commissions;

(iv)    a Benefit Arrangement providing for deferred or other compensation to employees or any other Benefit Arrangement or Contract with any labor union;

(v)    each Contract relating to loans to officers or directors;

(vi)    each Contract under which Sellers have made advances or loans to any Person other than advances in the Ordinary Course of Business for travel and other reimbursable expenses;

(vii)    Contracts with any Governmental Body;

(viii)    Contracts to which any current officer or director of a Seller is a party;

(ix)    Provider Agreements;

(x)    Contracts providing for "take or pay" or similar unconditional purchase or payment obligations

(xi)    Contracts entered into other than in the Ordinary Course of Business that to the Knowledge of the Sellers provides for an express undertaking by the Sellers to be responsible for consequential, incidental or punitive damages;

(xii)    each joint venture, partnership or Contract involving a sharing of profits, losses, costs or Liabilities with any other Person

(xiii)    each Contract containing covenants not to compete, non-solicitation clauses or other restrictive covenants (which for the avoidance of doubt shall not include customary confidentiality agreements) which materially limit where Seller may engage in any line of business or solicit or hire any Person in any geographical area or granting any "most favored nations" rights;

(b)    Except as set forth in Section 4.8(b) of the <u>Seller Disclosure Schedule</u>, there is not under any Material Contract any existing breach by any Seller (and, to the Sellers' Knowledge, no breach has been alleged to exist) and there exists no event or condition that, after notice or lapse of time or both, would constitute a breach of or default under the terms of any Material Contract on the part of any Seller, other than a breach or default resulting from the filing of the Chapter 11 Case that would, individually or in the aggregate, have a material adverse effect on the Purchased Assets taken as a whole.

4.9    <u>Permits</u>.

(a)    The Sellers own, hold or possess all material Permits which are necessary to entitle the Sellers to own or lease, operate, store, and use the Purchased Assets and to carry on and conduct the Business as currently conducted. Section 4.9(a)(i) of the <u>Seller Disclosure Schedule</u> sets forth a list of each of the Sellers' material Permits primarily relating to the Business (the "<u>Material Permits</u>"). Except as disclosed in Section 4.9(a)<u>(ii)</u> of the <u>Seller</u>

Disclosure Schedule, (A) each of the Material Permits set forth in Section 4.9(a)(i) of the <u>Seller Disclosure Schedule</u> is valid and in full force and effect and (B) the Sellers are not in breach or violation of, or default under, any such Material Permit.

(b)    Except as set forth in Section 4.9(b) of the <u>Seller Disclosure Schedule</u>, the Sellers are not in breach or violation of, and there is no pending, or to the Knowledge of the Sellers, threatened Proceeding with respect to any of the Permits listed or required to be listed in Section 4.9(a)(i) of the <u>Seller Disclosure Schedule</u>, except for such breaches or violations that would not have a material adverse effect on the Purchased Assets taken as a whole. Except as set forth in Section 4.9(b) of the <u>Seller Disclosure Schedule</u>, none of the Sellers nor any officer, director or employee of any of the Sellers, has received any written, or to the Knowledge of the Sellers, oral notice of any Proceeding primarily related to the Business, including any Proceeding initiated, pending or recommended by any Governmental Body having jurisdiction over the Permits listed or required to be listed in Section 4.9(a)(i) of the <u>Seller Disclosure Schedule</u> to revoke, withdraw or suspend any such Permit.

(c)    With respect to the Business, each Seller's laboratory locations are duly certified by and registered in accordance with CLIA or CAP to the extent required by applicable Laws. The certificates of registration issued by CLIA or CAP primarily relating to the operation of the Business, and copies of the CLIA, CAP and/or Medicare survey reports, within the last two (2) years, including a list of deficiencies, if any, corrective action plans and resolutions and proficiency test results have been provided to Purchaser. The Business is in compliance in all material respects with CLIA or CAP requirements, as applicable, and no suspension, revocation, termination, sanction, corrective action or limitation of any CLIA or CAP certification or accreditation relating to the operation of the Business is pending or, to the Knowledge of the Sellers, threatened.

4.10    <u>Brokers and Finders</u>. No Seller has employed and no other Person has made any arrangement by or on behalf of the Sellers with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would give rise to any valid claim against the Purchaser for any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11    <u>Title to Assets</u>.

(a)    At the Closing, pursuant to the Sale Order, the Sellers will convey to Purchaser good and valid title or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances) to the full extent allowed under Sections 363, 365 and 105(a) of the Bankruptcy Code.

(b)    The tangible assets included in the Purchased Assets, taken as a whole, are in good working order, condition and repair, reasonable wear and tear excepted, and are not in need of maintenance or repairs except for maintenance or repairs which are routine, ordinary or otherwise not material in costs or nature. Except as set forth in Section 4.11(b) of the <u>Seller Disclosure Schedule</u>, all of the Purchased Assets are located at the Leased Premises.

4.12   <u>Tangible Personal Property; Equipment</u>.   Section 4.12 of the <u>Seller Disclosure Schedule</u> sets forth all leases and subleases involving annual payments under such lease or sublease in excess of $100,000 relating to personal property, including Equipment, primarily used in operation of the Business.

4.13   <u>Real Property</u>.

(a)      Section 4.13(a) of the <u>Seller Disclosure Schedule</u> sets forth the address and the tax map/parcel identification number of each parcel of real property owned by any of the Sellers primarily used in connection with the operation of the Business (the "<u>Owned Real Property</u>"). With respect to each parcel of Owned Real Property: (i) if the parties consummate the transactions contemplated by the Property Option, pursuant to the Sale Order, the Sellers will convey to Purchaser good and marketable fee simple title, which shall be free and clear of all Encumbrances (other than Permitted Encumbrances); (ii) no Person other than the Sellers and, to the extent applicable, Purchaser, pursuant to the Property Option, have a leasehold interest or right to use or occupy such Owned Real Property or any portion thereof; (iii) other than the Property Option, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein; (iv) the Sellers are not in violation of any zoning, public health, building code or other similar laws applicable thereto or to the ownership, occupancy and/or operation thereof, nor does there exist any waivers or exemptions relating to such Owned Real Property with respect to any non-conforming use or other zoning or building code matters; (v) the Owned Real Property is subject to no conditions, restrictions or covenants other than Permitted Encumbrances; and (vi) no part of the Owned Real Property is subject to any pending or, to the Knowledge of Sellers, threatened condemnation proceedings.

(b)      Section 4.13(b)(i) of the <u>Seller Disclosure Schedule</u> sets forth a complete and correct list of all of the real property leased by each of the Sellers primarily used in connection with the operation of the Business, including facilities and patient service centers (collectively, the "<u>Leased Premises</u>"), and identifies each Contract under which a Seller leases such property (the "<u>Existing Leases</u>"). There are no subleases, licenses, concessions, occupancy agreements or other contracts granting to any other Person the right of use or occupancy of the Leased Premises and there is no Person (other than the Sellers) in possession of the Leased Premises. There is no pending or, to the Knowledge of the Sellers, threatened eminent domain taking affecting any portion of the Leased Premises which shall interfere with the conduct of the Business by the Sellers. The Sellers have delivered to Purchaser true, correct and complete copies of the Existing Leases, including all amendments related thereto. Each Seller's operation of the Leased Premises complies in all material respects with all applicable federal, state and local Laws. Except as provided in Section 4.13(b)(ii) of the <u>Seller Disclosure Schedule</u>, none of the Sellers lease from any Affiliate any real property used in connection with the Business.

4.14   <u>Compliance with Laws</u>.

(a)      None of the Sellers or the Business is in breach or violation of, or default under any applicable Laws (including under any Program) with respect to the operation of the Business, except for such breaches, violations or defaults which do not have a material adverse effect on the Purchased Assets taken as a whole.

(b)      With respect to the Business, no Seller and, to the Knowledge of Sellers, no directors, officers or employees of any Seller have directly or indirectly, overtly or covertly, in violation of any Health Care Laws in connection with the Business at any time within the applicable statute of limitations (i) made, or agreed to make, any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person (including, in the case of an individual, any family members of such Person and in the case of an entity, any Affiliates of such entity), regardless of form, whether in money, property or services, including (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, or (C) to obtain special concessions or pay for special concessions already obtained for or in respect of any Seller, or (ii) established or maintained any fund or asset that has not been recorded in the books and records of any Seller.

(c)      To the Knowledge of Sellers, none of the Sellers has engaged in any activity related to the operation of the Business which would reasonably be likely to lead to an investigation by the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG"), any Medicare or Medicaid Fraud Control Unit, or other federal or state prosecutor or enforcement agency or which would reasonably be likely to lead to an action or proceeding for recoupment by any third party insurer or government agency or for mandatory or permissive exclusion under 42 U.S.C. Sec. 1320a-7 or under any other applicable federal or state law or for civil monetary penalties under 42 U.S.C. Sec. 1320a-7a or for civil monetary penalties under 42 U.S.C. Sec. 1320a-7 or under any other applicable federal or state law.

(d)      Each of the Sellers is in compliance and in good standing in all material respects with all Programs for which the Business seeks or receives reimbursement for services. With respect to the operation of the Business, the billing practices of the Business with respect to all patients and Programs are in compliance in all material respects with all applicable Laws, and the Seller is not subject to, nor in the last three (3) years has been subject to, any recoupment, refund or set-off by any Program, in each case other than with respect to routine and immaterial refunds, offsets and adjustments made in the Ordinary Course of Business. There are no pending, or, to the Knowledge of the Sellers, threatened investigations, audits or other Proceedings, relating to any of the Seller's participation in any Program with respect to the operation of the Business.

(e)      None of the Sellers is, with respect to the operation of the Business, in violation in any material respect of the applicable Laws of the standards for Privacy or Security of Individually Identifiable Health Information, which were promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996, Title II, Subtitle F, Sections 261-264, Public Law 104-191, and the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160-164, the Standards for Security of Electronic Protected Health Information, 45 C.F.R. Parts 160, 162, and 164, and the implementing regulations thereunder, and the Health Information Technology for Economic and Clinical Health Act ("HITECH") (collectively, "HIPAA").

(f)      With respect to the Business:

(i)      All "financial relationships" (whether or not memorialized in writing), including any joint venture, partnership, co-ownership or other compensation

arrangement, that Sellers have had in the past three (3) years with any Person that is a physician or other healthcare provider or supplier of items or services payable under a governmental Program, or an immediate family member of a referring physician or other referring healthcare provider or supplier of items or services payable under a governmental Program have been made available to Purchaser in due diligence to the extent requested.  Except as disclosed to Purchaser, since January 1, 2010, no physician has made any "referrals" to Sellers, or any predecessor entities, for "designated health services," as those terms are defined in 42 U.S.C. Section 1395nn and the regulations promulgated pursuant thereto (the "<u>Stark Law</u>"), during such time as such physician, or an immediate family member of the physician, has had a "financial relationship" with Sellers, other than a "financial relationship" to which an exception under the Stark Law applies.  For purposes of this Section 4.14(f)(i), the term "financial relationship" has the meaning set forth in the Stark Law.

(ii)   No Seller nor, to the Knowledge of Sellers, any director, officer, or employee of Sellers:  (A) has been convicted of, charged with or investigated for any violation of any Health Care Laws related to any governmental Program; (B) has been convicted of any violation of Health Care Laws related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances; or (C) is excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any governmental Program or has committed any violation of Health Care Laws that would reasonably be expected to serve as the basis for any such exclusion, suspension, debarment or other ineligibility.

4.15   <u>Employees; Employee Benefits</u>.

(a)   Section 4.15(a) of the <u>Seller Disclosure Schedule</u> sets forth a true and complete list of Current Business Employees, including name, title, date of hire, current base salary, cash bonus opportunity, and whether such employee is out on disability or other permitted leaves of absence.

(b)   Each Seller has performed in all material respects its obligations under each Benefit Arrangement in accordance with the terms of such Benefit Arrangement, as applicable, and in compliance in all material respects with the applicable provisions of ERISA and the Code.

(c)   Except as set forth in Section 4.15(c) of the <u>Seller Disclosure Schedule</u>, (i) each Seller is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours as applicable to Business Employees, (ii) there is no material unfair labor practice complaint against such Seller or any of its Affiliates pending before the National Labor Relations Board in respect of any Business Employees, (iii) there is no material labor strike, dispute, slowdown or stoppage actually pending or threatened against or affecting the Business, iv) within the past year, such Seller has not experienced any strike, work stoppage in respect of the Business and (v) since January 1, 2011, no Seller has received any written complaint alleging that any Current Business Employee has engaged in inappropriate behavior in connection with the Business, including harassment or discrimination.

22

(d)    None of the Sellers nor any of their Affiliates is, or has been within the last six years, (i) the sponsor of a Benefit Arrangement that is subject to the provisions of Title IV of ERISA or Section 412 of the Code, or (ii) obligated to contribute to or participate in any "multiemployer plan", as defined in Section 3(37) of ERISA.

4.16    <u>Employee Relations.</u>  With respect to the operation of the Business, Sellers have complied in all material respects with all applicable Laws which relate to prices, wages, hours, discrimination in employment and collective bargaining and, to Seller's Knowledge, is not liable in any material respects for any arrears of wages, Taxes or penalties for failure to comply with any of the foregoing.  No Current Business Employee of Sellers is a party to a collective bargaining agreement or any similar contract or agreement with a union.  With respect to the operation of the Business, Sellers are not a party to or, to the Knowledge of the Sellers, threatened with any dispute with a union.  To Sellers' Knowledge, Sellers' Current Business Employees have not, while employed by Sellers, been engaged in any union organizing or election activities. Sellers have not received any correspondence from the Social Security Administration advising of a "no-match" between a Current Business Employee's name and social security number. Within the past year, with respect to the operation of the Business, Sellers have not incurred any Liability or obligation under WARN Act or any similar state or local Laws that remains unsatisfied, and no terminations by any Sellers prior to the date hereof shall result in unsatisfied Liability or obligation under the WARN Act or any similar state or local Laws to Purchaser.  To Seller's Knowledge, no Business Employee of Sellers has experienced an employment loss, as defined by the WARN Act or any similar applicable state or local Laws, requiring notice to employees in the event of a closing or layoff, within ninety (90) days prior to the date of this Agreement.

4.17    <u>Insurance Policies</u>.  Section 4.17 of the <u>Seller Disclosure Schedule</u> lists all current insurance policies covering the Purchased Assets or the Assumed Liabilities (the "<u>Insurance Policies</u>").  The description includes for each Insurance Policy the type of policy, policy number, name of insurer and expiration date. To the extent requested, Sellers have made available to Purchaser true and correct summaries or copies of all such Liability Policies, in each case, as amended or otherwise modified and in effect with respect to Sellers. Sellers are not in default in any material respect with respect to its obligations under any Insurance Policy and have not failed in any material respect to give any notice or present any claim thereunder in a due and timely manner.  Except as disclosed in Section 4.17 of the <u>Seller Disclosure Schedule</u>, Sellers do not have any self-insurance or co-insurance programs.

4.18    <u>Environmental Matters</u>.  With respect to the operation of the Business, except as set forth in Section 4.18 of the <u>Seller Disclosure Schedule,</u> to Seller's Knowledge: (a) Sellers have not at any time generated, used, treated or stored Hazardous Materials on, or transported Hazardous Materials to or from, the Leased Premises or any property adjoining or adjacent to the Leased Premises other than in compliance in all material respects with all Environmental Laws and no party has taken such actions on or with respect to the Leased Premises, other than such release or disposal as would not reasonably be expected to result in a material adverse effect on the Purchased Assets taken as a whole, (b) Sellers have not at any time, in violation in any material respect of any Environmental Laws, released or disposed of Hazardous Materials on the Leased Premises or any property adjoining or adjacent to the Leased Premises, and no party has taken any such actions on the Leased Premises in violation in any material respect of any

Environmental Laws, (c) Sellers have at all times been in compliance in all material respects with all Environmental Laws and requirements of any governmental authorizations issued under such Environmental Laws with respect to the Leased Premises, the Purchased Assets and the operation of the Business, (d) there are no pending or, to the Knowledge of Sellers, threatened environmental claims against the Leased Premises, any of the Purchased Assets or the Business, (e) there are no facts or circumstances, conditions or occurrences regarding Sellers, the Leased Premises, any of the Purchased Assets or the Business that would reasonably be expected to form the basis of an environmental claim against Sellers, any of the Purchased Assets or the Business or to cause the Leased Premises, the Purchased Assets or the Business to be subject to any restrictions on its ownership, occupancy, use or transferability under any Environmental Laws, other than as would not reasonably be expected to result in a material adverse effect on the Purchased Assets taken as a whole, (f) there are not now and, to the Knowledge of Sellers, there never have been, any underground storage tanks located on the Leased Premises, and (g) other than in compliance in all material respects with Environmental Laws, Sellers have not ever transported or arranged for the transportation of any Hazardous Materials to any site from the Leased Premises.

4.19    Significant Customers.  Section 4.19 of the Seller Disclosure Schedule sets forth a complete list of all Significant Customers. "Significant Customers" are (a) the ten (10) customers of the Sellers that have purchased the most, in terms of dollar value, clinical laboratory services from the Business during twelve (12)-month period ending December 31, 2012; and (b) the ten (10) customers of the Sellers that have purchased the most, in terms of dollar value, clinical laboratory services from the Business during the six (6) month period ending June 30, 2013.

4.20    NO OTHER REPRESENTATIONS OR WARRANTIES.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 4, NONE OF THE SELLERS NOR OR ANY OTHER PERSON ON BEHALF OF THE SELLERS MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO ANY OF THE SELLERS OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING AS TO THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS, AND THE PURCHASED ASSETS FOLLOWING THE CLOSING.

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties in this Article 5 to the Sellers as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

5.1    Corporate Organization.  Purchaser is a corporation, duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.

5.2    Due Authorization; No Conflict.

(a)    Purchaser has full corporate power and authority to execute, deliver and perform this Agreement and all other agreements, certificates, and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Purchaser of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary corporate action.    This Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, shall constitute, a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

(b)    The execution and delivery by Purchaser of this Agreement and the agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, and the performance by Purchaser of its obligations hereunder and thereunder, does not (i) contravene the organizational documents of Purchaser or (ii) require the consent, authorization or approval of, or notice to, or filing or registration with, any Governmental Body or any other Person other than the Bankruptcy Court.

5.3    No Brokers. Neither Purchaser nor any Person acting on behalf of Purchaser has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

5.4    Sufficiency of Funds. Purchaser has and shall have at the Closing immediately available funds that are sufficient to pay the Purchase Price, the Cure Costs and all related fees, expenses and obligations for which Purchaser shall be responsible hereunder and to consummate the transactions contemplated by this Agreement.

5.5    "Covered Entity".  Purchaser is a "covered entity" as defined by HIPAA.

## ARTICLE 6

## EMPLOYEES

6.1    Employee Claims.    Under no circumstances shall Purchaser assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of Sellers' employees, including but not limited to, any claims or Liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour Laws, any other state, federal or local labor and employment Laws, Liability under WARN, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension, profit sharing, retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the Liability, responsibility and obligations of Sellers, except pursuant to the Transition Services Agreement.

6.2    Hired Employees.  Purchaser shall have the right (in its sole and absolute discretion), but not the obligation, to offer employment, on an at will basis, effective on the Closing Date, to any or all employees of Sellers that are primarily related to the Business.  In no

event shall Purchaser be obligated to hire or retain any employee of Sellers for any period following the Closing.  The employees of Sellers who accept Purchaser's offer of employment pursuant hereto and who commence employment with Purchaser from and after the Closing Date shall be referred to herein as the "Hired Employees."  Under no circumstances shall any individual employed or formerly employed by Sellers become an employee of Purchaser unless such individual becomes a Hired Employee.  At least five (5) Business Days prior to the Closing Date, Purchaser shall provide to Sellers a list of the Sellers' employees to which it intends to make an offer pursuant hereto.

6.3    Release of Hired Employees.  With respect to each Hired Employee, effective as of the Closing, Sellers shall be deemed to have waived and released each such individual from any and all contractual or common law provisions related to the Business that are enforceable by Sellers which restricts the employment activities or other conduct of such individuals related to the Business after their termination of employment with Sellers; provided, however, that Sellers shall be deemed to have assigned (to the extent unilaterally assignable) to Purchaser, effective as of the Closing, the rights of Sellers to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

6.4    No Transfer of Employees.  Except as expressly provided in this Agreement, nothing herein shall be construed as transferring to Purchaser (i) any Contract with any current or former employee of any Seller or for the employment of any Person or engagement of any independent contractor by any Seller or (ii) any rights or obligations any Seller may owe to or be owed by any current or former employee, officer, consultant, independent contractor or agent of any Seller.

6.5    No Third Party Beneficiaries.  Nothing herein, express or implied, shall confer upon any employee or former employee of Sellers any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement.  Purchaser and Sellers agree that the provisions contained herein are not intended to be for the benefit of or otherwise enforceable by, any third party, including any employee or former employee of Sellers.

6.6    Liability for Benefit Arrangements.  Sellers shall retain all Liability and responsibility for its Benefit Arrangements except as provided otherwise under the Transition Services Agreement.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1    Certain Motions and Orders.

(a)    The Sellers shall use their commercially reasonable efforts to: (i) obtain entry by the Bankruptcy Court of the Sale Order no later than February 14, 2014, and (ii) subject to the satisfaction of the conditions precedent contained in this Agreement, consummate the

Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(b)     The Sale Order, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance reasonably satisfactory to Purchaser.  Such form is attached hereto as <u>Exhibit B</u>.

7.2     <u>Stalking Horse Protections</u>.  The Sellers shall file this Agreement with the Bankruptcy Court in accordance with the Bid Procedures Order which shall seek the approval of the Purchaser as the Stalking Horse Bidder, which approval shall include the following additional protections for the Purchaser in the event of a competing bid for the Purchased Assets (the "<u>Stalking Horse Protections</u>"):

(a)     a break up fee in the amount of Three Hundred Thousand Dollars ($300,000) (the "<u>Break Up Fee</u>")  payable to Purchaser and without further order of the Bankruptcy Court in immediately available funds directly from the proceeds received upon the consummation of a transaction relating to the Business with the applicable Successful Bidder;

(b)     a minimum initial overbid increment of  the Break Up Fee plus an additional One Hundred Thousand Dollars ($100,000) over the Purchase Price;

(c)     a minimum subsequent bid increments of Fifty Thousand Dollars ($50,000) which bid increment requirement may be waived by Purchaser at any time in its sole discretion;

(d)     a requirement that the Purchaser and its legal counsel promptly receive copies of any potential qualifying competing bids following the time the Sellers receive notice of such bids as required by the Bid Procedures Order; and

(e)     a requirement that any potential bidder agrees, as part of its bid submission, to be a back-up bidder according to the terms of the Bid Procedures Order approved by the Bankruptcy Court.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1     <u>Conduct of Business Prior to Closing</u>.  During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code or the DIP Credit Agreement, (2) as required by applicable Laws, the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement or as otherwise approved by the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement or as set forth in <u>Schedule 8.1</u> or (4) with the prior written consent of Purchaser (which consent shall not to be unreasonably withheld, conditioned or delayed), each Seller shall use commercially reasonable efforts to operate the Business in the ordinary course and maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers primarily related to the Business.

8.2     <u>Pre-Closing Access to Information</u>. Each Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser and the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors, lenders and other representatives (the "<u>Representatives</u>") of Purchaser, shall be entitled to have, and each Seller shall afford, such reasonable access to, and make such reasonable, non-disruptive investigation and examination of the Purchased Assets and the Assumed Liabilities as Purchaser or any of Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours and upon reasonable advance notice to such Seller.

8.3     <u>Assignability of Certain Contracts, Etc.</u>

(a)     To the extent that the assignment to Purchaser of any Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Laws and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with applicable Laws cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (such Purchased Assets, the "<u>Nonassignable Assets</u>"), then this Agreement shall not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with applicable Laws.

(b)     If any such consent, waiver, confirmation or other approval or such waiver is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Laws (including the Bankruptcy Code) or the terms of such Nonassignable Asset, Purchaser and the Sellers shall reasonably cooperate with each other, as of and after the Closing Date, in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of such Nonassignable Asset (an "<u>Interim Arrangement</u>").  Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date to the extent that if such Nonassignable Asset were purchased by Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.

(c)     All Interim Arrangements shall be at Purchaser's sole cost and expense.

(d)     Unless Purchaser elects that it does not desire assignment of a Nonassignable Asset, following the Closing, the Sellers and Purchaser shall cooperate using their respective commercially reasonable efforts (at Purchaser's sole cost and expense) to obtain as expeditiously as possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset and/or a waiver of any prohibition under applicable Laws necessary for the assignment thereof to Purchaser.

8.4     <u>Rejected Contracts</u>.  No Seller shall reject any Assigned Contract in the Chapter 11 Case or any other bankruptcy proceeding following the Execution Date without the prior written consent of Purchaser, except as provided in Section 1.5.

8.5    Consent and Approvals.

(a)    Prior to Closing, each Seller shall, at the Seller's sole cost and expense: (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices and other filings with, regulatory and other Governmental Bodies and all other Persons (including those set forth in Section 4.3(a) and 4.3(b) of the Seller Disclosure Schedule) that are necessary or required of the Sellers to consummate the transactions set forth herein; (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or such Governmental Bodies or other Persons may reasonably request; and (iii) provide reasonable cooperation to Purchaser in obtaining or making, as soon as practicable, all approvals, authorizations, clearances, consents, waivers, notices and filings of or with regulatory and other Governmental Bodies and all other Persons required of Purchaser to consummate the transactions set forth herein.

(b)    Prior to Closing, Purchaser shall, at Purchaser's sole cost and expense: (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices and other filings with, regulatory and other Governmental Bodies and all other Persons that are necessary or required of Purchaser to consummate the transactions contemplated hereby; (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or such Governmental Bodies or other Persons may reasonably request; and (iii) provide reasonable cooperation to the Sellers in obtaining or making, as soon as practicable, all approvals, authorizations, clearances, consents, waivers, notices and filings of or with regulatory and other Governmental Bodies and all other Persons required of the Sellers to consummate the transactions contemplated hereby.

8.6    Preservation of Records; Post-Closing Access to Information.

(a)    The Sellers and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the final decree closing the Chapter 11 Case and the liquidation and winding up of the Sellers' Estates (but in no event later than three (3) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or Purchaser or any of their respective Affiliates, administration of the Sellers' Chapter 11 Case, or in order to enable the Sellers or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby.  In the event any of the Sellers or Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' Estates shall permit.

(b)    Until the closing of the Chapter 11 Case, Purchaser shall give the Sellers and Sellers' Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of Purchaser or any of its subsidiaries, to Purchaser's offices, facilities, plants, properties, assets, employees and Documents that were included in the Purchased Assets pertaining to (A) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (B) the Excluded Assets and the Excluded Liabilities, to the extent necessary for, and solely in order for, the Sellers to effect the wind down of its Chapter 11 estates, including reconciling and objecting to claims in the Chapter 11 Case and compiling and filing tax returns. Subject to the terms of a mutually acceptable agreement providing for the reimbursement to Purchaser for its reasonable out-of-pocket costs and expenses and the payment to Purchaser of reasonable fees and expenses for services provided by Purchaser thereunder, Purchaser shall use commercially reasonable efforts to cause its Representatives to furnish to the Sellers such financial, technical, operating and other information pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and the Excluded Liabilities, in each case, as the Sellers' Representatives shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information) and to discuss such information with such Representatives to the extent necessary for, and solely in order for, the Sellers to effect the wind down of its Chapter 11 Estates. Notwithstanding the foregoing, Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of Purchaser, would (I) constitute a waiver of the attorney-client privilege or (II) violate any applicable Laws or (III) be materially detrimental to Purchaser or its assets, properties, condition or operations. The Sellers acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, Purchaser pursuant to this Section 8.6(b) shall be used solely as specified in any applicable written notice requesting such information.  In addition, the Sellers agree that only those Representatives who require the receipt of information for the purposes allowed hereunder and who have been informed by the Sellers of the confidential nature of such information shall be provided access to such information.

8.7    Further Agreements.  After the Closing, each Seller shall (i) promptly deliver to Purchaser any mail or other communication received by such Seller and primarily relating to the Business, the Purchased Assets or the Assumed Liabilities and (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credits or deposits received by such Seller but solely to the extent that such cash, electronic credits or deposits are or relate to Purchased Assets.  After the Closing, Purchaser shall (x) promptly deliver to such Seller any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to the Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets. From and after the Closing Date, the Sellers shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Sellers.

8.8    Publicity.  Prior to the Closing, the Sellers and Purchaser agree to communicate with each other and cooperate with each other prior to any public disclosure of this Agreement or the transactions contemplated hereby.  Prior to the Closing, each of the Sellers and Purchaser agrees that it shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed), except as such release or announcement may be required by applicable Laws or by the Bankruptcy Court (which shall include the filings to be made with the Bankruptcy Court in connection with this Agreement), in which case the party required to make the release or announcement shall use reasonable efforts to allow the other party reasonable time to comment on such release or announcement in advance of such issuance. Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without disclosure schedules.  Notwithstanding the foregoing, for purposes of this Section 8.8, each Seller may freely communicate with its employees regarding this Agreement and the sale of the Purchased Assets; provided, however, that prior to making any written communications to its employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, such Seller shall provide Purchaser with a copy of the intended communication, and Purchaser shall have a reasonable period of time to review and comment on the communication.

8.9    Notification of Certain Matters.

(a)    The Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to the Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or Action that challenges the transactions contemplated hereby or the entry of any Bankruptcy Court Order.

(b)    To the extent permitted by applicable Laws, the Sellers shall give prompt notice to Purchaser of any event or circumstance that would result in any representation or warranty of any Seller being untrue or any covenant or agreement of any Seller not being performed or complied with such that the conditions set forth in Section 9.3(a) or Section 9.3 would not be satisfied if such event or circumstance existed on the Closing Date.

(c)    To the extent permitted by applicable Laws, Purchaser shall give prompt notice to the Sellers of any event or circumstance that would result in any representation or warranty of Purchaser being untrue or any covenant or agreement of Purchaser not being performed or complied with such that the conditions set forth in Section 9.2(a) or Section 9.2 would not be satisfied if such event or circumstance existed on the Closing Date.

8.10    Accounts Receivable. Sellers and Purchaser covenant and agree that:

(a)    Following the Closing, Sellers may continue to collect accounts receivable related to the Business that arose from services provided by Sellers or any of their Affiliates for any periods prior to the Closing Date. Subject to the terms of this Section 8.10, Purchaser (i) shall not intentionally take, or fail to take, any action that could reasonably be expected to

interfere, or cause any other person to interfere with Sellers' billing and collection activities related to services provided by Sellers or any of their Affiliates for any periods prior to the Closing Date, and (ii) shall not intentionally take, or fail to take, any action that could reasonably be expected to cause any customer of Seller or any of their Affiliates to withhold payment of any invoice due from such customer to Sellers or any of their Affiliates, including demanding, suggesting or otherwise requiring such customer to pay post-Closing claims due to Purchaser prior to paying pre-Closing claims due to Sellers.

(b)     For a period of one hundred fifty (150) days following the Closing Date (or such shorter period of time as provided in the Transition Services Agreement), Purchaser shall provide the services described in the Transition Services Agreement to Sellers pursuant to the terms thereof.

(c)     Purchaser agrees that any payments for services received by the Purchaser from any payor or customer that are attributable to dates of service prior to the Closing Date shall be separated from any payments for services attributable to dates of service on or after the Closing Date and shall be promptly forwarded to Sellers at the notice address identified in Section 12.7 hereof.  In the event that reimbursements from any payor or customer cover time periods occurring both pre-Closing and post-Closing and Purchaser is unable to identify to which dates of service the reimbursement should be allocated, Purchaser shall promptly and in good faith query the payor or customer as to what period the payment relates and promptly send Sellers a copy of such query.  Should the payor or customer fail to designate the dates of service to which the payment relates, Purchaser shall promptly notify the Sellers and the parties shall promptly jointly determine an appropriate allocation.  In the event that Purchaser and Sellers are unable to mutually agree to an allocation, the payment shall be allocated between the Sellers and the Purchaser pro rata based upon the ratio of the unpaid billed amounts for services rendered to that payor or customer by the Sellers prior to the Closing Date and the unpaid billed amounts for services rendered by the Purchaser to the same payor or customer on or after the Closing Date. In the event of a pro rata determination, Purchaser agrees to promptly pay such amounts to the Sellers by check or wire transfer to accounts designated by the Sellers.

(d)     To the extent the Purchaser receives any proceeds from the accounts receivable of the Sellers, the Purchaser acknowledges that the payment belongs to the Sellers and the Purchaser shall hold the payment in trust for the benefit of the Sellers. Purchaser shall not have any right of offset with respect to such accounts receivable, and shall not have any right, title or interest whatsoever in the payment and shall remit the same to Sellers within five (5) Business Days of receipt.

8.11    Further Assurances.

(a)     Subject to the terms and conditions of this Agreement and applicable Laws, each Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other party's obligations hereunder set forth in this Agreement are satisfied and to consummate the transactions contemplated by this Agreement as soon as practicable.

(b)     Subject to the terms and conditions of this Agreement, neither the Sellers nor Purchaser shall take any action or refrain from taking any action the effect of which would materially delay or materially impede the ability of the Sellers or Purchaser to consummate the transactions contemplated by this Agreement unless taking such action is permitted or required by this Agreement or refraining from taking such action is required by applicable Laws, the Bankruptcy Court or the Bankruptcy Code.

(c)     Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby. Nothing in this Section 8.11 shall obligate any party hereto to waive any right or condition under this Agreement and nothing in this Section 8.11 shall (i) require the Sellers or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of Purchaser (unless funds in the full amount thereof are prepaid in advance to the Sellers in cash) or (ii) prohibit, delay or interfere with the ability of Sellers or any of their Affiliates from ceasing operations or winding up their affairs following the Closing.

(d)     The obligations of the Sellers pursuant to this Section 8.11 shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Case), and each Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Bid Procedures Order), and the Sellers' duty to the Estate and their creditors including the duty to seek and obtain the highest or otherwise best price for the Purchased Assets in compliance with, and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

## ARTICLE 9

## CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to the Obligations of Purchaser and the Sellers</u>.    The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers and Purchaser, in whole or in part, to the extent permitted by applicable Laws):

(a)     no temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Body or court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other applicable Laws promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body set forth on Schedule 9.1(b), shall have been filed, occurred or been obtained; and

(c)    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each such order shall be a Final Order; provided, however, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed.

9.2    Conditions Precedent to the Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Laws):

(a)    each of (i) the representations and warranties of Purchaser in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations and warranties of Purchaser in this Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (i) and (II), at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Sellers shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)    Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) all of the items set forth in Section 3.3.

9.3    Conditions Precedent to the Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Laws):

(a)    each of the representations and warranties of the Sellers shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein), except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, have a material adverse effect on the Purchased Assets taken as a whole, at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Purchaser shall have received a

certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)    each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by such Seller on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of such Seller, dated the Closing Date, to the foregoing effect; and

(c)    the Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2.

# ARTICLE 10
## DEFINITIONS

10.1    <u>Certain Definitions</u>. As used herein:

(a)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(b)    "<u>Ancillary Agreements</u>" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(c)    "<u>Auction Date</u>" has the meaning ascribed to such term in the Bid Procedures.

(d)    "<u>Bid Procedures</u>" has the meaning ascribed to such term in the Bid Procedures Order.

(e)    "<u>Bid Procedures Order</u>" means the Order: (I) Approving Bidding Procedures In Connection with Sale(s) Of Substantially All Of The Debtors' Assets; (II) Scheduling Hearing To Consider Sale; (III) Approving Form And Manner Of Notice Thereof; (IV) Authorizing Entry Into Stalking Horse Agreements Subject To Further Hearing; and (V) Granting Related Relief, entered by the Bankruptcy Court on November 15, 2013 [Docket No. 100.]

(f)    "<u>Business</u>" means the Sellers' business of providing clinical and anatomic laboratory and associated pathology-related services, which includes reference business to hospitals, clinics, surgery centers, physician offices, physicians and other applicable sources. For the avoidance of doubt, Business does not include the business of providing nuclear medicine services nor does it include clinical laboratory and anatomic pathology services to skilled nursing and long-term care facilities other than in the counties of Greene, Parke, Vermillion and Vigo in the State of Indiana and the counties of Clark, Edgar and Vermillion in the State of Illinois.

(g)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Laws to be closed.

(h)    "Business Employees" shall mean, collectively, Current Business Employees and Former Business Employees.

(i)    "CAP" means the College of American Pathologists.

(j)    "CLIA" means the Clinical Laboratories Improvement Act of 1967 and Amendments of 1988 and the regulations, rules and guidance promulgated thereunder.

(k)    "Code" means the Internal Revenue Code of 1986, as amended.

(l)    "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement of any Seller primarily related to the Business, all of which are listed in Schedule 1.5(a).

(m)    "Cure Costs" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Assigned Contract.

(n)    "Current Business Employees" shall mean all individuals employed by the Sellers primarily in connection with the operation of the Business immediately prior to the Closing as set forth on Schedule 10.1(n) (which Schedule shall be updated at the Closing), including in each case all such individuals on leave of absence, furlough, maternity or paternity leave, vacation, sick leave, short term disability, military leave, jury duty or bereavement leave.

(o)    "Custodian Agreement" means a Custodian of Records Agreement in the form attached hereto as Exhibit A, which shall appoint Purchaser as custodian of certain medical records retained by Sellers.

(p)    "Designation Deadline" means thirty (30) days after the Closing Date.

(q)    "Determined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is finally established by court order or by agreement by the parties to such Contract at the date or time in question.

(r)    "DIP Credit Agreement" means that certain $5,000,000 Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 30, 2013, by and among the Debtors, The Bank of New York Mellon, as the administrative and collateral agent, Marathon Special Opportunity Fund, as lead arranger, and the other lenders party thereto from time to time, as the same may be amended, supplemented or otherwise modified from time to time.

(s)    "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, supplier

lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form primarily related to or primarily used, or held for use, in connection with the Purchased Assets or operation of the Business.

(t)     "Encumbrance" means any security interest, lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(u)     "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), Safe Drinking Water Act (42 U.S.C. § 3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), Clean Air Act (42 U.S.C. § 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

(v)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(w)     "Estate" means the estate of each Seller created by section 541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition, and "Estates" means, collectively, the estates of all Sellers created by section 541 of the Bankruptcy Code in the Chapter 11 Case.

(x)     "Estate Causes of Action" means any challenge right as set forth in the order approving the DIP Credit Agreement, avoidance or recovery action that belongs to or could have been raised by the Sellers or the debtors-in-possession or their respective Estates under chapter 5 of the Bankruptcy Code; and any and all causes of action, defenses, and counterclaims accruing to the Sellers or that is property of their Estates, based upon facts, circumstances and transactions that occurred prior to the Closing Date, except for (i) the foregoing that relate to an Assigned Contract, (ii) causes of action, defenses and counterclaims arising from breaches of warranty relating to the Purchased Assets, and (iii) causes of action, defenses and counterclaims against past and present vendors or customers of the Sellers.

(y)     "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is in full force and effect and (ii) has not been stayed; and (iii)

is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

(z)      "Former Business Employees" shall mean all individuals formerly employed in the Business who are not Current Business Employees.

(aa)     "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(bb)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, any court or arbitrator (public or private) or any contractor (e.g., a Medicare fiscal intermediary) acting on behalf of a Governmental Body.

(cc)     "Hazardous Materials" means radioactive materials, asbestos or asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Laws.

(dd)     "Health Care Laws" means any Laws relating to healthcare regulatory matters, including (a) 42 U.S.C. §§ 1320a-7, 7a and 7b, which are commonly referred to as the "Federal Fraud Statutes", (b) 42 U.S.C. § 1395nn, which is commonly referred to as the "Stark Statute", (c) 31 U.S.C. §§ 3729-3733, which is commonly referred to as the "Federal False Claims Act", (d) 42 U.S.C. §§ 1320d through 1320d-8 and 42 C.F.R. §§ 160, 162 and 164, which is commonly referred to as the "Health Insurance Portability and Accountability Act of 1996," (e) the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., and all regulations promulgated thereunder, (f) the Clinical Laboratory Improvement Amendments, 42 C.F.R. Part 493, and all regulations promulgated thereunder, (g) applicable laws of the United States Drug Enforcement Administration and all regulations promulgated thereunder, (h) applicable state anti-kickback, fee-splitting and patient brokering laws, (i) state information privacy and security laws, and (j) other federal and state laws governing the licensure and operation of clinical laboratories.

(ee)     "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations;

and (vi) all obligations of the type referred to in <u>clauses (i)</u> through <u>(v)</u> of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(ff)    "<u>Intellectual Property</u>" means all intellectual property of any kind including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including any registrations and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, technical data, financial, marketing and business data), proprietary processes, formulae, algorithms, models, and methodologies; (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) similar proprietary rights.

(gg)    "<u>Inventory</u>" means all of the Sellers' inventories, supplies and work in process that are primarily used, or held for use, in connection with the Business.

(hh)    "<u>IT Assets</u>" means all of the Sellers' computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are primarily used in connection with the Business.

(ii)    "<u>Knowledge of the Sellers</u>" or "<u>Sellers' Knowledge</u>" means, with respect to the Sellers, (i) the actual knowledge of Gary Milburn, Thomas Kaylor, Michael Fuller, or any current officer of Sellers and (ii) any information that any of the persons identified in clause (i) would be reasonably expected to know while serving in that capacity.

(jj)    "<u>Laws</u>" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law, including, without limitation, the Bankruptcy Code and any Health Care Laws or related or similar statutes pertaining to any Programs or the regulations or requirements promulgated pursuant to any of such statutes.

(kk)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when

sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(ll)  "Non-Assumed Contracts" means, collectively, (i) any Contracts not listed on Schedule 1.1(a), Schedule 1.1(b), Schedule 1.1(i) or Schedule 1.1(k), (ii) any Deferred Contracts for which Sellers do not receive an Assumption Notice by the Designation Deadline, (iii) any Contract listed on Schedule 1.2(d), (iv) any Deferred Contracts for which a Rejection Notice was delivered, and (v) any Contracts the execution of which required the prior written consent of Purchaser pursuant to Section 8.1, but for which such prior written consent was not given by Purchaser, unless any such Contract is specifically designated as a Purchased Asset by Purchaser pursuant to Section 1.5(a).

(mm)  "Ordinary Course of Business" means the ordinary and usual course of business of Sellers related to the Business subject to the DIP Credit Agreement and/or the Chapter 11 Case.

(nn)  "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body.

(oo)  "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Case; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business and, in the case of the Leased Premises, which do not, individually or in the aggregate, materially adversely affect the use or occupancy of such Leased Premises as it relates to the operation of the Business or materially detract from the value of the Leased Premises, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Laws (but not restrictions arising from a violation of any such Laws), (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Case and that do not result from a breach, default or violation by a Seller of any Contract or Laws, (v) such other Encumbrance, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially adversely affect the value or the intended use of the Purchased Assets taken as a whole and (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(pp)  "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(qq)  "Proceeding" means any litigation, action, suit, mediation, arbitration, assessment, notice of violation, audit or investigation, hearing, charge, complaint, grievance or similar proceeding (in each case, whether civil, criminal, administrative, investigative or

informal) initiated, noticed, commenced, conducted, heard, or pending by or before any Governmental Body, arbitrator or mediator.

(rr)    "Program" means any and all third party payors and third party payor programs, whether private, commercial or governmental, including any federal or state reimbursement program, including any Medicare, Medicaid, Medicaid waiver program, TRICARE program, "Federal Health care programs" as defined in 42 U.S.C. § 1320a-7b(f) and private insurance programs.

(ss)    "Provider Agreement" means a provider or supplier agreement or other Contract with a Program.

(tt)    "Purchaser Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Purchaser is required to execute and/or deliver in connection with this Agreement.

(uu)    "Purchaser Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by Purchaser.

(vv)    "Sale Order" means the order of the Bankruptcy Court, substantially in form attached hereto as Exhibit B, which shall, among other things, (i) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement free and clear of all Encumbrances (other than Permitted Encumbrances), (ii) authorize the assumption of the Assigned Contracts by the Sellers and the assignment of the Assigned Contracts to Purchaser subject to payment of the Cure Costs and (iii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby.

(ww)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver in connection with this Agreement.

(xx)    "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by the Sellers.

(yy)    "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or primarily used, or held for use by, any Seller relating to or in connection with the Business other than the Intellectual Property listed on Schedule 1.2(g).

(zz)    "Successful Bidder" has the meaning ascribed to such term in the Bid Procedures Order.

(aaa)    "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (ii) all interest, penalties, fines, additions to tax or

additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Laws) or otherwise.

(bbb)  "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(ccc)  "Transition Services Agreement" means a Transition Services Agreement in the form attached hereto as Exhibit C, which provides for certain transition services to be performed by the Purchaser for the benefit of the Sellers.

(ddd)  "Undetermined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is not finally determined by court order or by agreement by the parties to such Contract as of the time or date in question.

(eee)  "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar applicable law of any State having jurisdiction over Seller, the Business or the Purchased Assets.

10.2    Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Acquired Customers | Section 1.1(a) |
| Agreement | Preamble |
| Allocation | Section 11.1(b) |
| Assigned Contracts | Section 1.1(k) |
| Assumed Customer Contracts | Section 1.1(a) |
| Assumed IP Contracts | Section 1.1(i) |
| Assumed Liabilities | Section 1.3 |
| Assumed Real Property Leases | Section 1.1(b) |
| Assumption Agreement | Section 1.3(a)(i) |
| Assumption Notice | Section 1.5(f) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | Section 4.2 |
| Benefit Arrangement | Section 1.4(e) |
| Break Up Fee | Section 7.2(a) |
| Chapter 11 Case | Recitals |
| Closing | Section 3.1 |

| Defined Term | Location |
|---|---|
| Closing Date | Section 3.1 |
| COBRA | Section 1.4(o) |
| Debtors | Recitals |
| Deferred Contract | Section 1.5(b) |
| Deposit | Section 2.2(a) |
| Employee Claims | Section 6.1 |
| Equipment | Section 1.1(c) |
| Escrow Account | Section 2.2(a) |
| Escrow Agent | Section 2.2(a) |
| Escrow Agreement | Section 2.2(a) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 1.4 |
| Execution Date | Preamble |
| Existing Leases | Section 4.13(b) |
| Filing Date | Recitals |
| Governmental Payor | Section 1.4 |
| HIPAA | Section 4.14(e) |
| Hired Employees | Section 6.2 |
| HITECH | Section 4.14(e) |
| Insurance Policies | Section 4.17 |
| Interim Arrangement | Section 8.3(b) |
| Lease Assignments | Section 1.3(a)(ii) |
| Leased Premises | Section 4.13(b) |
| License Agreement | Section 3.2(o) |
| LP | Preamble |
| Material Contracts | Section 4.8(a) |
| Material Permits | Section 4.9(a) |
| Nonassignable Assets | Section 8.3(b) |
| OIG | Section 4.14(c) |
| Original Contract and Cure Schedule | Section 1.5(a) |
| Outside Date | Section 3.4(b) |
| Owned Real Property | Section 4.13(a) |
| PATH | Preamble |
| Property Option | Section 1.1(j) |
| Purchase Price | Section 2.1 |
| Purchased Assets | Section 1.1 |
| Purchaser | Preamble |
| Registered IP | Section 4.7(a) |
| Rejection Notice | Section 1.5(b) |
| Representatives | Section 8.2 |

43

| Defined Term | Location |
|---|---|
| Sellers | Preamble |
| Stalking Horse Protections | Section 7.2 |
| Stark Law | Section 4.14(f)(i) |
| THML | Preamble |
| Transfer Taxes | Section 11.1(a) |

# ARTICLE 11

## TAXES

11.1    <u>Additional Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Sellers), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes.

(b)    Purchaser shall, not later than sixty (60) days after the Closing Date, prepare and deliver to the Sellers for each of their consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among the Purchased Assets based on the amount paid to each Seller as provided pursuant to <u>Schedule 11.1(b)</u> (such schedule, the "<u>Allocation</u>"). If the Sellers raise any objection to the Allocation within ten (10) Business days of the receipt thereof, Purchaser and the Sellers shall negotiate in good faith to resolve such objection(s). If the Sellers do not raise any objection to the Allocation within ten (10) Business days of the receipt thereof, the Sellers shall be deemed to have conclusively accepted the Allocation. If, and to the extent the parties are unable to agree on the Allocation, each of the Sellers, on the one hand, and the Purchaser, on the other hand, shall be free to allocate the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among the Purchased Assets based on the amount paid to each Seller pursuant to Section 2.1 without regard to the allocation of any other party. In the event the parties agree to the Allocation, Purchaser and the Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding) without first giving the other party prior written notice; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Purchaser or the Sellers from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser or the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation. In the event the parties agree to the

Allocation, Purchaser and the Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 11.1(b) shall survive the Closing until the later of the final decree closing the Chapter 11 Case and the liquidation and winding up of Sellers' Estates (but in no event later than sixty (60) days after the expiration of the applicable statute of limitations).

(c)     Any real or personal property Taxes or assessments, ad valorem Taxes or similar Taxes with respect to the Purchased Assets for any taxable period beginning on or before and ending after the Closing Date shall be apportioned between the Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days in the taxable period related to such Taxes occurring before and after the Closing Date. Appropriate cash payments by the Sellers or Purchaser, as applicable, shall be made from time to time, as soon as practicable after the facts giving rise to the obligation for such payments are known, to give effect to the foregoing prorations.

(d)     The Sellers and Purchaser shall cooperate in good faith with each other after the Closing in providing any information necessary to permit the filing of Tax Returns or responding to audits or other inquiries of any Governmental Body relating to Taxes; provided, however, that nothing in this Section 11.1(d) shall prohibit, delay or interfere with the ability of any of the Sellers or any of their Affiliates from ceasing operations or winding up their affairs following Closing.

# ARTICLE 12

## MISCELLANEOUS

12.1     Payment of Expenses. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, however, that all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by Purchaser.

12.2     Survival of Representations and Warranties; Survival of Post-Closing Covenants. The parties hereto agree that the representations and warranties contained in this Agreement shall expire automatically and immediately upon the Closing Date and shall have no further force or effect after the Closing Date. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3     Entire Agreement; Amendments and Waivers. This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in

writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.4    <u>Counterparts</u>. For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)    THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE STATE COURTS IN THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    <u>Notices</u>. Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent

by facsimile transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Sellers:

> Laboratory Partners, Inc.
> 671 Ohio Pike
> Suite K
> Cincinnati, OH 45245
> Attn: Chief Executive Officer
> Facsimile No.: (513) 201-1138

> with a copy (which shall not constitute effective notice) to:

> Pillsbury Winthrop Shaw Pittman LLP
> 1540 Broadway
> New York, New York 10036
> Attn: Jonathan J. Russo
> Facsimile No.: (212) 858-1500

If to Purchaser:

> Laboratory Corporation of America Holdings
> 531 South Spring Street
> Burlington, North Carolina 27215
> Facsimile No.: (336) 436-4177
> Attn: General Counsel

> with copies (which shall not constitute effective notice) to:

> K&L Gates LLP
> 4350 Lassiter at North Hills Avenue, Suite 300
> Raleigh, North Carolina 27609
> Facsimile No.: (919) 743-7358
> Attn: John R. Erwin, Esq.

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

     12.8    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to entry of the Bid Procedures Order (with respect to the matters covered thereby) and the Sale Order, the Sellers, and inure to the benefit of the parties and its respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

12.9    <u>Severability</u>. If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.10    <u>Injunctive Relief</u>. The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, each of the Sellers and Purchaser shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this Section 12.10 shall be in addition to any other rights which the Sellers or Purchaser may have at Law or in equity pursuant to this Agreement.

12.11    <u>Time of the Essence</u>. Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.12    <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any chief restructuring officer or similar officer administering the Sellers' assets in their Chapter 11 Case), any legal or equitable rights hereunder.

12.13    <u>Damages</u>.    NOTWITHSTANDING    ANYTHING    HEREIN    TO    THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, DIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

12.14    <u>Certain Interpretations</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii)     All Schedules and Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)     The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)     The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)     Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)     The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)     The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank.]*

49

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS**:

LABORATORY PARTNERS, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and Secretary

TERRE HAUTE MEDICAL LABORATORY, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and Secretary

PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and Secretary

**PURCHASER**:

LABORATORY CORPORATION OF AMERICA HOLDINGS

By: _____
Name: _____
Title: _____

*[Signature page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS**:

LABORATORY PARTNERS, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and
       Secretary

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and
       Secretary

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____
Name: William A. Brandt, Jr.
Title:  Chief Executive Officer, President and
       Secretary

**PURCHASER**:

LABORATORY CORPORATION OF AMERICA
HOLDINGS

By: _____
Name: F. Samuel Eberts III
Title:  Chief Legal Officer, Corporate Secretary and
       Senior Vice President of Corporation



*[Signature page to Asset Purchase Agreement]*

## **EXHIBITS AND SCHEDULES**

Exhibits

| | |
|---|---|
| Exhibit A | Form of Custodian Agreement |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Transition Services Agreement |
| | |
| Exhibit 1.1(j) | Form of Property Option |
| Exhibit 1.3(a)(i) | Form of Assumption Agreement |
| Exhibit 1.3(a)(ii) | Form of Lease Assignments |
| Exhibit 3.2(a) | Form of General Assignment and Bill of Sale |
| Exhibit 3.2(h) | Form of Non-Competition Agreement |

Schedules

| | |
|---|---|
| Schedule A | Seller Disclosure Schedule |
| Schedule 1.1(a) | Assumed Customer Contracts |
| Schedule 1.1(b) | Assumed Real Property Leases |
| Schedule 1.1(c) | Equipment |
| Schedule 1.1(i) | Seller Intellectual Property |
| Schedule 1.1(k) | Assigned Contracts |
| Schedule 1.2(d) | Excluded Contracts |
| Schedule 1.2(g) | Excluded Intangible Rights and Property |
| Schedule 1.2(h) | Other Excluded Assets |
| Schedule 1.5(a) | Original Contract and Cure Schedule |
| Schedule 1.5(b) | Deferred Contracts |
| Schedule 8.1 | Conduct of Business Prior to Closing |
| Schedule 9.1(b) | Governmental Authorizations |
| Schedule 10.1(n) | Current Business Employees |
| Schedule 11.1(b) | Allocation |

## CUSTODIAN OF RECORDS AGREEMENT

THIS CUSTODIAN OF RECORDS AGREEMENT ("Custodian Agreement") is made as of February ●, 2014, by and among [Name of Purchaser], a ● corporation ("Purchaser" or "Custodian"), and Laboratory Partners, Inc., a Delaware corporation ("LP"), Terre Haute Medical Laboratory, Inc., an Indiana corporation ("THML") and Pathology Associates of Terre Haute, Inc., an Indiana corporation ("PATH" and, collectively with LP and THML, the "Sellers"). All capitalized terms used herein without definitions shall have the respective meanings set forth in the Purchase Agreement (defined below).

WHEREAS, Sellers and Purchaser are parties to that certain Asset Purchase Agreement dated as of January ●, 2014 (the "Purchase Agreement"); and

WHEREAS, Purchaser has agreed to serve as custodian for all clinical laboratory records of Sellers for all specimens tested primarily in connection with the Business prior to the Closing Date (the "Laboratory Records").

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Custody of Records.   The each of the Sellers hereby appoints the Purchaser to serve as custodian of all Laboratory Records and Purchaser hereby agrees to serve as the custodian for all Laboratory Records. All such Laboratory Records shall remain in the custody and control of Purchaser, at Purchaser's own expense. After the expiration of any retention periods required by state clinical laboratory licensure, the Clinical Laboratory Improvement Amendments of 1988, or other applicable state or federal law, Purchaser shall destroy or dispose of the Laboratory Records in a method and manner that renders any protected health information (as defined at 45 C.F.R. § 160.103) therein unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the U.S. Secretary of Health & Human Services in applicable guidance issued under section 13402(h)(2) of Public Law 111-5 most recently prior to that destruction or disposition. The Purchaser hereby assumes all of the Sellers' obligations with respect to the maintenance, access and disclosure of the Laboratory Records, as custodian of the Laboratory Records, pursuant to patient authorization or as otherwise permitted or required under applicable state and federal laws. Without limiting the foregoing, Purchaser shall fully comply with the Business Associate Contract entered into by Purchaser and Seller contemporaneously herewith.

2.      Term and Termination.   This Custodian Agreement shall take effect upon execution by the parties hereto and shall remain in effect for as long as Purchaser retains custody of the Laboratory Records, as required by the applicable statute of limitations for the retention of the Laboratory Records.

3.      Access to Records.   All such Laboratory Records shall remain subject to appropriate patient or legal requests for transfer and release, in accordance with all state and

federal laws governing confidentiality, access, use, and disclosure of protected health information. Charges for copies of the Laboratory Records by Purchaser shall be in accordance with applicable state and federal laws. Upon reasonable advance notice, Sellers shall have access to all such Laboratory Records in order to inspect or copy such Laboratory Records or portions thereof at Sellers sole expense and as permitted by and in accordance with all applicable state and federal laws. If Sellers receive written requests or other inquiries regarding the Laboratory Records, those communications shall be directed to Purchaser's attention in writing and on a timely basis.

4.    <u>Further Assurances</u>.  Each Seller, for itself and its successors and assigns, hereby covenants and agrees to execute and deliver such other documents and instruments of sale, conveyance, assignment or transfer, and to take such other actions as may be reasonably requested by Custodian or its successors and assigns to more effectively consummate the transactions contemplated by this Custodian Agreement.

5.    <u>Terms of Purchase Agreement</u>.  Sellers and Purchaser acknowledge and agree that the terms and provisions contained in the Purchase Agreement shall not be superseded by this Custodian Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement. In the event of a conflict or inconsistency between the terms of this Custodian Agreement and the terms of this Purchase Agreement, the terms of the Purchase Agreement shall govern.

6.    <u>Binding Effect</u>.  This Custodian Agreement shall be binding upon the Purchaser and its successors and assigns and shall inure to the benefit of the parties and their respective estates, successors and assigns.

7.    <u>Governing Law; Forum; Waiver of Jury Trial</u>.  This Custodian Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof. Any judicial proceeding brought with respect to this Custodian Agreement must be brought in accordance with the terms of Section 12.6 of the Purchase Agreement. Each party hereto (a) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Custodian Agreement, and (b) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum. Each party hereto waives the right to a jury trial with respect to any dispute related to this Custodian Agreement.

8.    <u>Counterparts</u>.    This Custodian Agreement may be executed in multiple counterparts, (including by means of telecopied, facsimile or pdf signature pages), any of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same, all of which shall be deemed to be original signed versions of this Custodian Agreement.

*[Remainder of page intentionally left blank]*

2

IN WITNESS WHEREOF, the parties have executed this Custodian Agreement to be effective as of the Effective Date.

PURCHASER:                           [NAME OF PURCHASER]

                                     By:  _____
                                     Name:
                                     Title:

SELLERS:                             LABORATORY PARTNERS, INC.

                                     By:  _____
                                     Name:
                                     Title:

                                     TERRE HAUTE MEDICAL LABORATORY, INC.

                                     By:  _____
                                     Name:
                                     Title:

                                     PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.

                                     By:  _____
                                     Name:
                                     Title:

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x

In re                                          :      Chapter 11

                                           :

Laboratory Partners, Inc., *et al.*,[1]              :      Case No. 13-13-12769 (PJW)

                                           :

                     Debtors.              :      (Jointly Administered)

                                           :      **Re: D.I. 46, 100, and ____**

-----------------------------------------------------x

## ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES TO LABORATORY CORPORATION OF AMERICA HOLDINGS PURSUANT TO 11 U.S.C. § 363; (B) THE DEBTORS' ENTRY INTO AND PERFORMANCE OF THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT AND ANCILLARY AGREEMENTS AND (C) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN SPECIFIED EXECUTORY CONTRACTS AND LEASES PURSUANT TO 11 U.S.C. § 365; AND (D) RELATED RELIEF

Upon the motion (the "<u>Motion</u>") of the debtors and debtors-in-possession in the

above-captioned cases (the "<u>Debtors</u>"), pursuant to sections 105(a), 363, 365, 503 and 507 of

title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), as supplemented by Rules 2002,

6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>")

and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), *inter alia*, authorizing and

approving (a) the sale of certain assets relating to the Debtors' businesses (the "<u>Purchased</u>

<u>Assets</u>") described in and pursuant to the terms and conditions of the Asset Purchase Agreement,

dated as of **[●]** a true and accurate copy of which is annexed hereto as **Exhibit A** (collectively

with all exhibits thereto, the "<u>Purchase Agreement</u>") free and clear of all claims, liens, liabilities,

---

[1]      The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485).  Certain of the Debtors do business as MEDLAB.  The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

rights, interests and encumbrances by and between certain of the Debtors, as sellers (the "Sellers"), and Laboratory Corporation of America Holdings ("Purchaser"), (b) the respective Debtors' entry into and performance of their obligations under the Purchase Agreement and each of the ancillary agreements entered into or contemplated as part of the Purchase Agreement (the "Ancillary Agreements"), (c) the Debtors' assumption of and assignment to Purchaser of certain specified executory contracts and leases as specifically set forth in the Purchase Agreement, and (d) related relief; and a hearing on the Motion having been held on February 13, 2014 (the "Sale Hearing"); and the Court having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Sale Hearing and the Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

## I.    **General**

A.    The findings and conclusions set forth in this Order as well as those read into the record at the Sale Hearing (if any) constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 as made applicable to this proceeding by Fed. R. Bankr. P. 9014. All capitalized terms not otherwise defined in this Order have the meanings ascribed to such terms in the Motion or the Purchase Agreement.

B.    The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the transaction that is the subject of the Purchase Agreement and all such matters, including the Motion, constitute a core proceeding under 28

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. Fed. R. Bank. P. 7052.

U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in the Court under 28 U.S.C. §§ 1408 and

1409.

      C.     The statutory predicates for the relief sought in the Motion are sections

105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

      D.     On November 15, 2013, the Court entered the *Order: (I) Approving*

*Bidding Procedures In Connection With Sale(s) Of Substantially All Of The Debtors' Assets;*

*(II) Scheduling Hearing To Consider Sale; (III) Approving Form And  Manner Of Notice*

*Thereof; (IV) Authorizing Entry Into Stalking Horse Agreements Subject To Further Hearing;*

*And (V) Granting Related Relief* (D.I. 100) (the "Bidding Procedures Order"), pursuant to which

the Court, *inter alia,* (i) authorized the Debtors to conduct an auction involving the Purchased

Assets (the "Auction"), (ii) approved the bidding procedures annexed to the Bidding Procedures

Order (the "Bidding Procedures"), (iii) authorized the Debtors to enter into a Stalking Horse

Agreement, subject to higher or better offers at the Auction, with a Stalking Horse Bidder, (iv)

scheduled the Sale Hearing; and (v) established procedures for the assumption, assignment

and/or transfer of the Executory Contracts and Unexpired Leases to any purchaser of the

Purchased Assets and/or to resolve any objections thereto, including procedures to set the Cure

Amounts to be paid under section 365 of the Bankruptcy Code.

      E.     On January 15, 2014, the Debtors filed the *Notice of Adjournment of Dates*

*Related to Auction and Sale Hearing With Respect to Debtors' Talon and Union Hospital*

*Divisions* (D.I. 262) (the "Adjournment Notice"), which, among other things modified certain

deadlines and dates established by the Bidding Procedures Order to permit the Sellers and

Purchaser to complete negotiations over the terms of the Purchase Agreement.

      F.     On [●], 2014, the Court entered the [●] (D.I. [●]) (the "Bid Protections

Order") pursuant to which the Court, *inter alia*, (i) authorized the Debtors and the Purchaser to enter into the Purchase Agreement; (ii) approved certain bid protections, including [●]; and (iii) granted related relief.

        G.    As evidenced by the certificates of service and publication filed with the Court (D.I. [●],[●],[●]), and based on the representations  of counsel, and evidence proffered or adduced, at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the transactions contemplated therein, the Bidding Procedures Order, the Bidding Procedures, the Adjournment Notice, the Bid Protections Order, the Auction and the Sale Hearing, and the assumption and assignment of certain specified executory contracts and leases to the Purchaser at or within 30 days after Closing as provided in the Purchase Agreement has been provided in accordance with sections 102, 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 2001-1; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the transactions contemplated therein, the Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing and the entry of this Order is required.

        H.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) the U.S. Trustee; (ii) counsel for and members of the official committee of unsecured creditors appointed in these cases (the "Committee"); (iii) counsel to the DIP Lender and the Prepetition Lenders; (iv) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (v) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (vi) all Persons known or reasonably believed to have expressed a bona fide

interest in acquiring some or all of any of the Purchased Assets within the last six months; (vii) federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (viii) the Internal Revenue Service; (ix) the Attorneys General in the states where the Purchased Assets are located; and (x) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002.

### II. The Bankruptcy Case

I. On October 25, 2013, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

J. The Debtors have asserted and provided notice to the Court and the United States Trustee that their business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

K. The Debtors assert that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

### III. The Sale Process for the Purchased Assets

L. As demonstrated by testimony and other evidence proffered or adduced at the Sale Hearing, the Debtors have marketed the Purchased Assets diligently, in good faith and in a commercially reasonable manner to secure the highest and best offer or offers therefor by,

among other things, delivering offering materials to potential purchasers and inviting potential purchasers to meet with management and the Debtors' professionals and providing potential purchasers with the opportunity to conduct extensive due diligence.  In addition, the Debtors delivered the Bidding Procedures Order, the Bidding Procedures, the Adjournment Notice, the Bid Protections Order, and the Motion to each of the entities that had previously expressed an interest in the Purchased Assets.

M.      The Debtors conducted the Auction on February 10, 2014 in accordance with the Bidding Procedures.  [●] Qualified Bidders participated in the Auction.  The Purchaser submitted the highest and best offer for the Purchased Assets prior to or at the Auction on terms and conditions set forth in the Purchase Agreement by and between the Debtors and the Purchaser, dated as of January 27, 2014.

N.      The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and no higher or better offer has been made than that of the Purchaser.

O.      The Debtors and the Purchaser have complied with the Bidding Procedures Order and the Bidding Procedures, the Adjournment Notice, and the Bid Protections Order in all respects.

IV.     **The Sale of the Purchased Assets to the Purchaser**

P.      The transactions effectuating, and the terms and conditions governing, the sale of the Purchased Assets to the Purchaser are embodied in the Purchase Agreement and Ancillary Agreements.  A description of the Purchased Assets is contained in the Purchase Agreement and includes certain executory contracts and unexpired leases that will be assumed and assigned to the Purchaser pursuant to the terms of the Purchase Agreement (the "Assigned

Contracts"). The Assigned Contracts to be assumed and assigned to Purchaser as of the Closing are attached to the Purchase Agreement as Schedules 1.1(a), 1.1(b), 1.1(i) and 1.1(k).  Purchaser may determine to include additional executory contracts and unexpired leases as Assigned Contracts at any time prior to the "Designation Deadline" (defined in the Purchase Agreement to be 30 days from the date of the Closing) and may also determine to not include any executory contract or unexpired lease (an "Excluded Contract") as an Assigned Contract.  If an executory contract and unexpired lease has not been designated as an Assigned Contract as of the Designation Deadline, it shall automatically be an Excluded Asset (as defined in the Purchase Agreement).  As provided in the Purchase Agreement, Purchaser is responsible to promptly pay for the costs associated with continuation of the Sellers of any such contract or lease as such costs become due, including all damages, losses, obligations, liabilities, penalties, and other expenses incurred by the Sellers arising out of or relating to such contract or lease arising after the Closing and until such contract is either assumed or rejected by the Debtors and such assumption or rejection is approved by the Court.

Q.    The Purchase Agreement contemplates that the sale of the Purchased Assets shall be free and clear of all claims, liens, liabilities, rights, interests and encumbrances to the fullest extent permitted by and under sections 363(f) and 105 of the Bankruptcy Code (collectively, "liens"), except as expressly permitted by the Purchase Agreement; provided, however, that all liens will attach to the proceeds of the Sale with the same priority, validity, force and effect as established under the *Final Order Pursuant to 11 U.S.C.  105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying the Automatic Stay* [D.I. 153] (the "Final DIP Order")

and applicable nonbankruptcy law.

R.    The Net Asset Sale Proceeds shall be distributed in accordance with the terms of the Final DIP Order; provided, however, that the Debtors may reserve Net Asset Sale Proceeds for the payment of potential Cure Costs related to Deferred Contracts provided that if such funds are not used to pay Cure Costs, they shall be distributed in accordance with the Final DIP Order.

S.    The Purchaser's obligation to consummate the transactions contemplated in the Purchase Agreement is subject to the specific conditions outlined in the Purchase Agreement, including Court approval.  As of the date of entry of this Order, there is no known failure of any condition under the Purchase Agreement to the Purchaser's obligation to consummate the Sale that would entitle the Purchaser not to consummate the Sale pursuant to the Purchase Agreement or to terminate the Purchase Agreement.

T.    Upon entry of this Order, the Debtors and Sellers have full corporate power and authority necessary to consummate the transactions contemplated by the Purchase Agreement and the Ancillary Agreements and have taken all corporate action necessary to authorize and approve the Purchase Agreement and the Ancillary Agreements and the consummation of the transactions contemplated thereby.

U.    The Debtors and Sellers require no further consents or approvals, other than those expressly provided for in the Purchase Agreement and this Order, to consummate the transactions contemplated in the Purchase Agreement and the Ancillary Agreements.

V.    Approval of the Purchase Agreement and consummation of the Sale of the Purchased Assets at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

W.      The Debtors and Sellers have demonstrated (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for the Sale pursuant to Section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the Sale, the value of the Debtors' assets will be harmed.

X.      The Purchase Agreement was negotiated, proposed, and entered into by and between the Purchaser and the Debtors without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the Sale, including having the Purchase Agreement avoided.

Y.      The Purchaser is a good faith purchaser in accordance with section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transaction under the Purchase Agreement, including the assumption and assignment of the Assigned Contracts, at any time after the expiration of any stay of this Order, whether pursuant to Bankruptcy Rule 6004(g) or otherwise.

Z.      The Purchaser is not an "insider" of any of the Debtors as that term is defined under section 101 of the Bankruptcy Code.

AA.     After the conclusion of the Auction on February 10, 2014, the Debtors determined in a valid and sound exercise of their business judgment that Purchaser delivered the highest and best bid for the Purchased Assets.

BB.     The terms and conditions of the Purchase Agreement and the consideration  to be provided by the Purchaser in accordance with the Purchase Agreement: (i)

9

are fair and reasonable, (ii) valid, binding and enforceable, (iii) constitute the highest and best offer for the Purchased Assets, (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (v) constitute reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code and the Uniform Fraudulent Transfer Act.

CC.     The transactions contemplated by the Purchase Agreement will, upon consummation thereof (the "Closing"), (i) be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser with no further action required on the part of the Debtors or their respective affiliates, except as provided herein, and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all liens within the meaning of and to the fullest extent available under section 363(f) of the Bankruptcy Code, except as expressly permitted by the Purchase Agreement.

DD.     The Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions described in the Purchase Agreement (thus adversely affecting the bankruptcy estate and its creditors) if the sale of the Purchased Assets and the proposed assignment of the Assigned Contracts, which are an integral part of the Purchase Agreement, were not free and clear of all liens, except as expressly permitted by the Purchase Agreement.

EE.     Neither the Purchaser nor any of its affiliates is a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the Purchase Agreement.

FF.     The relief sought in the Motion, including approval of the Purchase Agreement and consummation of the transactions contemplated thereof, is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest.  The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

GG.     The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (i) sell the Purchased Assets on the terms and conditions set forth in the Purchase Agreement; (ii) assume and assign the Assigned Contracts to the Purchaser in accordance with the procedures set forth herein and in the Bidding Procedures Order; and (iii) consummate all transactions contemplated by the Purchase Agreement, and the sale, assumption and assignment of the Purchased Assets, including the Assigned Contracts, is in the best interests of the Debtors, their estates and their creditors.

HH.     The provisions of sections 363 and 365 of the Bankruptcy Code (subject to the additional notice, opportunity to object and hearing, if necessary, with respect to any Assigned Contracts) have been complied with and are applicable to the sale of the Purchased Assets.

II.     The Debtors may consummate the transactions and transfer the Purchased Assets as set forth in the Purchase Agreement free and clear of all liens of any kind or nature whatsoever, except as expressly permitted by the Purchase Agreement, because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented

pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.  All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did object to the Motion and the relief requested therein fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their liens attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such liens.

JJ.    Except as otherwise provided in the Purchase Agreement, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability.

KK.    As provided in the Purchase Agreement and herein, the Debtors hereafter will (i) cure, or provide adequate assurance that they will promptly cure (including as to Assigned Contracts with Undetermined Cure Costs, by reserving the full cure amount asserted by the non-Debtor contract party, subject to a final determination by the Court or agreement by the parties as to the Cure Amount), all defaults under the Assigned Contracts, if any, existing before the date of the assumption and assignment of any Assigned Contracts to the Purchaser, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party

resulting from a default before the date of the assumption and assignment of any Assigned Contracts to the Purchaser under the Assigned Contracts, if any, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser will provide adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by promising to perform the obligations under the Assigned Contracts and providing such other assurance as may be necessary.

LL.    Those of the Debtors' employees that may be hired by the Purchaser are to be hired under new employment contracts or other arrangements to be entered into or to become effective at or after the Closing.

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

I.    **General Provisions**

1.    The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.    The Motion is granted.

3.    All parties in interest have had the opportunity to object to the relief requested in the Motion and to the extent that objections to the Motion or the relief requested therein have not been withdrawn, waived or settled, such objections and all reservations of right included therein, are overruled on the merits.  The parties who did not object, or who withdrew their objections, to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the

Bankruptcy Code.  This Order and the Purchase Agreement shall be binding in all respects upon all creditors, whether known or unknown, of any Debtor, all non-debtor parties to the Assigned Contracts, all successors and assigns of Purchaser, the Debtors, their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' Chapter 11 cases or in any converted case under Chapter 7.  No other order or any Chapter 11 plan of reorganization may conflict or derogate from the provisions of this Order, the Purchase Agreement and the terms of any Assigned Contract.

4.     The Court finds and concludes that the Debtors' business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

5.     The Court finds that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

**II.     <u>Approval of the Purchase Agreement</u>**

6.     The Purchase Agreement and all of the terms and conditions contained therein are approved in their entirety and are binding upon the parties thereto.

7.     The Sale of the Purchased Assets and the terms and conditions contemplated by the Purchase Agreement, including, without limitation, the closing of the transactions contemplated by the Purchase Agreement, are hereby approved pursuant to sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code.

8.     The Debtors are authorized and directed, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to perform all of their obligations pursuant to the Purchase Agreement and to execute such other documents and take such other actions as are reasonably

14

necessary to effectuate the transactions contemplated by the Purchase Agreement.

**III.    Transfer of the Purchased Assets to the Purchaser**

9.      The sale of the Purchased Assets, pursuant to this Order, any Deferred Assignment Order (as defined below), and the Purchase Agreement, will vest the Purchaser with good title to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and clear of all liens, except as expressly permitted by the Purchase Agreement.

10.      Except as expressly provided in the Purchase Agreement, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, upon the Closing, or, with respect to any Deferred Contract, upon the entry of a Deferred Assignment Order, the Purchased Assets shall be sold, transferred or otherwise conveyed to Purchaser free and clear of all liens, with all such liens to attach to the proceeds of sale of the Purchased Assets in the order of their priority, and with the same validity, priority, force and effect which they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such liens.  All non-debtor entities that are presently, or on the Closing Date, in possession of some or all of the Purchased Assets are hereby directed to surrender possession to Purchaser at Closing.

11.      To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any governmental authorization or approval with respect to the Purchased Assets and Assigned Contracts pursuant to the terms of the Purchase Agreement.  To the extent provided by section 525, no governmental unit may revoke or suspend any grant, permit or license related to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 cases

or the consummation of the Sale.

12.    All persons or entities holding liens in, to or against the Purchased Assets shall be, and they hereby are, forever barred, estopped and permanently enjoined from asserting such liens against Purchaser, its successors and assigns or such Purchased Assets after Closing.

**IV.    Assumption and Assignment of Assigned Contracts**

13.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to Purchaser, and Purchaser's assumption on the terms set forth in the Purchase Agreement, of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(l) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

14.    The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Purchaser, effective upon and subject to the occurrence of the Closing (or subject to the Closing and effective upon entry of an Deferred Assignment Order (as defined in paragraph 23 herein) with respect to any Deferred Contract) any or all of the Assigned Contracts free and clear of all interests of any kind or nature whatsoever, which Assigned Contracts by operation of this Order, shall be deemed assumed and assigned in accordance with the Purchase Agreement and this Order, and (b) execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts and Assumed Liabilities to Purchaser.

15.    The Assigned Contracts that shall not be Deferred Contracts or Excluded Contracts to be assumed and assigned to Purchaser as of the Closing are attached to the Purchase Agreement as Schedules 1.1(a), 1.1(b), 1.1(i) and 1.1(k).

16.     Subject to paragraphs 17-24 herein, the Assigned Contracts shall be transferred and assigned to, and following the Closing of the Sale remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such transfer and assignment to Purchaser.   Subject paragraphs 17-24 herein, the Debtors may assume the Assigned Contracts which are executory contracts and unexpired leases of the Debtors in accordance with section 365 of the Bankruptcy Code.   Subject to paragraphs 17-24 herein, the Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the non-Debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, shall constitute unenforceable anti-assignment provisions which are void and of no force and effect.   Subject paragraphs 17-24 herein, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment by the Debtors to Purchaser of each Assigned Contract have been satisfied.   Subject to paragraphs 17-24 herein, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract upon the earlier of Closing or upon entry of a Deferred Assignment Order.   Any portion of any Assigned Contract which purports to permit a landlord thereunder to cancel the remaining term of such Assigned Contract if the Debtors discontinue

their use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against Purchaser, its assignees and sublessees; and the landlords under any such Assigned Contract shall not have the right to cancel or otherwise modify the Assigned Contract or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such Assigned Contract to Purchaser, or the interruption of business activities at any of the leased premises.

17.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing or as of the entry of a Deferred Assignment Order, as applicable, (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code), are deemed satisfied by the Cure Amounts with respect to such Assigned Contracts in those amounts set forth in the notices of assumption and assignment (as may have been amended, the "Notices of Assumption and Assignment"), which were served in accordance with the Bidding Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable, by the Debtors pursuant to the Purchase Agreement.

18.     With the exception of the Cure Amounts set forth in the Notices of Assumption and Assignment, or as otherwise reflected in this Order or a Deferred Assignment Order, each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtors or Purchaser, or the property of any of them, any default existing as of the date of effective date of assumption and assignment; or, against Purchaser any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors.  Except as provided in the Purchase Agreement or this Order, after earlier of the Closing or entry of a Deferred Assignment Order, as applicable, the Debtors and their estates

shall have no further liabilities or obligations with respect to any assumed liabilities under the Assigned Contracts and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, their property or their assets or estates.

19.     All non-Debtor parties to the Assigned Contracts have received sufficient notice of the assumption, assignment and/or transfer and the proposed corresponding Cure Amount as provided under the Bidding Procedures Order.  For each contract selected as an Assigned Contract on or prior to the Designation Deadline, the Debtors shall satisfy the Cure Amounts as set forth in the Notice of Assumption and Assignment or as otherwise agreed by the non-Debtor contract party and the Debtors or as ordered by the Court.  All other defaults or obligations thereunder shall be deemed satisfied by the payment of the Cure Costs.

20.     <u>Excluded Contracts</u>.  As provided in the Purchase Agreement, the Purchaser shall have the right prior to the Designation Deadline to designate any executory contract or unexpired lease not included in Schedules 1.1(a), 1.1(b), 1.1(i) and 1.1(k) to the Purchase Agreement as an Excluded Contract, and such executory contract or unexpired lease will not be deemed Assigned Contracts and will not be assumed and assigned hereunder. For each executory contract or unexpired lease designated as an Excluded Contract on or prior to the Designation Deadline, the Debtors shall promptly provide notice of such exclusion to the non-Debtor contract party (which notice may be included in a rejection notice) and shall promptly reject such executory contract or unexpired lease immediately upon receipt of such notice from Purchaser of its intent to exclude such executory contract or unexpired lease.  If an executory contract and unexpired lease has not been designated as an Assigned Contract as of the Designation Deadline, it shall be an Excluded Contract.

21.    <u>Deferred Contracts</u>.  Purchaser shall promptly pay to the Debtors or as the Debtors direct in a signed writing all Liabilities associated with the continuation by Sellers of any executory contract and unexpired lease not assumed as an Assigned Contract or excluded as an Excluded Asset (a "<u>Deferred Contract</u>") on the Closing from the Closing and through and until either the date on which such Deferred Contract is rejected and such rejection is approved by the Bankruptcy Court or until such Deferred Contract is assumed and such assumption is approved by the Bankruptcy Court.

22.    <u>Assignment of Deferred Contracts</u>.  If at any time during the Designation Period, the Purchaser provides the Debtors with a written request for assumption and assignment of any Deferred Contract, the Debtors shall promptly serve a "<u>Notice of Assumption and Assignment of Deferred Contract</u>" by facsimile, electronic transmission, hand delivery or overnight mail on the counterparty to each Deferred Contract (and its attorney, if known) at the last known address available to the Debtors, counsel to the Committee, the United States Trustee, and counsel to the Debtors' Prepetition Lenders and DIP Lender.  Each Notice of Assumption and Assignment of Deferred Contract shall include the following:  (i) the name and address of the counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors and the Purchaser to withdraw such request), (iii) identification of the Deferred Contract, (iv) the Cure Amount, if any, (v) a description of Purchaser, and a statement as to the ability of Purchaser to perform the Debtors' obligations under the Deferred Contract, and (vi) a proposed form of order approving the assumption and assignment.

23.    Unless the non-Debtor contract counterparty properly files an objection to the Notice of Assumption and Assignment of Deferred Contract within ten (10) calendar days of service of the Notice of Assumption and Assignment of Deferred Contract, the Debtors may

immediately submit a form of order authorizing the assumption and assignment of the Deferred Contract under certification of counsel for entry by the Court (a "Deferred Assignment Order"). If an objection is filed and served within ten (10) calendar days of service of the Notice of Assumption and Assignment of Deferred Contract, and the objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider the objection at the next scheduled omnibus hearing, or as otherwise requested by the Debtors. Any order entered approving the assumption and assignment shall be a Deferred Assignment Order.

24.     Notwithstanding anything in this Order or the Purchase Agreement to the contrary, on the date any Deferred Contract is assumed and assigned to Purchaser pursuant to this Order and the Purchase Agreement, such Deferred Contract shall be deemed an Assigned Contract for all purposes under this Order and the Purchase Agreement.

## VI.     Sale Proceeds

25.     Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors other than set forth under the terms of the Purchase Agreement, Ancillary Agreements, and Assigned Contracts.

26.     The Net Asset Sale Proceeds shall be distributed in accordance with the terms of the Final DIP Order; provided, however, that the Debtors may reserve Net Asset Sale Proceeds for the payment of potential Cure Costs related to Deferred Contracts provided that if such funds are not used to pay Cure Costs, they shall be distributed in accordance with the Final DIP Order.  The allocation of the value by the Purchaser to the Purchased Assets for tax purposes shall not be binding on the Court or any party for purposes of these chapter 11 cases or distributions.

### VII.    **Miscellaneous Provisions**

27.     The Sale of the Purchased Assets is consistent with the Debtors' policy concerning the transfer of personally identifiable information and no consumer privacy ombudsman is necessary as set forth in section 332 or 363(b)(1) of the Bankruptcy Code.  The Purchaser is a "covered entity" within the meaning of the Health Insurance Portability and Accountability Act.

28.     The consideration to be paid by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

29.     This Order (a) is and shall be effective as a determination that, upon the Closing except as expressly provided in the Purchase Agreement, all liens existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee of the Purchased Assets free and clear of all liens.

30.     If any person or entity that has filed financing statement, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing liens or claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements,

22

instruments of satisfactions, releases of all interests or claims that the person or entity has with respect to the Purchased Assets, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens or claims in the Purchased Assets of any kind or nature.

31.     Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

32.     Except with respect to enforcing the terms of the Purchase Agreement, this Order, and/or any subsequent order approving the assumption and assignment of any Assigned Contracts, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Purchase Agreement or this Order.

33.     The Purchase Agreement, Ancillary Agreements, and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement does not change materially the economic outcome of the transactions contemplated hereby for the Debtors' estates.

34.     In the absence of a stay of the effectiveness of this Order, in the event that

the Purchaser and the Debtors consummate the transactions contemplated by the Purchase Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser, as a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

35.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement without charge or tax to the Debtors or Purchaser.

36.     Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements, documents and instruments executed therewith; (b) to compel transfer of the Purchased Assets to the Purchaser; (c) to compel the parties to perform their respective obligations under the Purchase Agreement; (d) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, including without limitation the adjudication of any cure required under Assigned Contracts; and (e) to interpret, implement and enforce the provisions of this Order.

37.     The terms of this Order, any Deferred Assignment Order, and the Purchase Agreement shall be binding on and inure to the benefit of the Debtors, the Purchaser and the Debtors' creditors and all other parties in interest, and any successors of the Debtors, the Purchaser and the Debtors' creditors, including any trustee or examiner appointed in these cases

or any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

38.    The failure to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Purchase Agreement be authorized in its entirety.

39.    Any conflict between the terms and provisions of this Order and the Purchase Agreement shall be resolved in favor of this Order.

40.    The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Purchase Agreement without further order of the Court.

41.    The Debtors and Purchaser are hereby authorized to perform each of their covenants and undertakings as provided in the Transition Services Agreement without further order of the Court.

42.    As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately.  The provisions of Bankruptcy Rules 6004(g) and 6006(d) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Purchase Agreement immediately upon entry of this Order.  Time is of the essence in closing the transaction and parties to the Purchase Agreement shall be authorized to close the sale as soon as possible consistent with the terms of this Purchase Agreement.

43.    This Order shall be served upon the parties listed in Section I (H) of this Order.

Dated: _____, 2014                        _____

                                                THE HONORABLE PETER J. WALSH
                                                UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## Purchase Agreement

<u>**Exhibit C**</u>

**TRANSITION SERVICES AGREEMENT**

      **THIS TRANSITION SERVICES AGREEMENT** (this "**Agreement**") is executed and made effective this _____ day of _____, 2014 (the "**Effective Date**"), by and between **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation ("**Purchaser**"), and **LABORATORY PARTNERS, INC.**, a Delaware corporation ("**LP**"), **TERRE HAUTE MEDICAL LABORATORY, INC.**, an Indiana corporation ("**THML**"), and **PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.**, an Indiana corporation and wholly-owned subsidiary of THML ("**PATH**" and, with LP, and THML, sometimes hereinafter referred to individually as "**Seller**" and collectively, the "**Sellers**").  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

      **WHEREAS**, pursuant to that certain Asset Purchase Agreement dated as of January __, 2014 by and among Purchaser and Sellers (the "**Purchase Agreement**"), Purchaser has agreed to acquire certain assets of Sellers that are used or held for use in connection with the Business;

      **WHEREAS**, the Purchase Agreement provides that Purchaser will provide certain accounts receivable services for the benefit of the Sellers as provided in the Agreement; and

      **WHEREAS**, as a material inducement to the parties to enter into the Purchase Agreement, Sellers and Purchaser have agreed to handle certain matters in the manner stated in this Agreement.

      **NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

      1.    <u>Accounts Receivable and Accounts Payable</u>.

      (a)    Pursuant to the Purchase Agreement, Sellers shall have retained ownership of all accounts receivable related to the Business that arose from services for any periods prior to the Closing Date, and Purchaser shall have the right to retain ownership of all accounts receivable that arise from  services for any periods on or after the Closing Date.  In addition to Purchaser's obligations pursuant to Section 8.10 of the Purchase Agreement, after the Closing Date, Purchaser shall forward Sellers any funds which are received by Purchaser or its Affiliates, but that relate to the accounts receivable owned by Sellers.  In the event that both Sellers and Purchaser (or one of their Affiliates) perform work for a customer during a billing cycle which begins before and ends after the Closing Date, Purchaser shall promptly invoice the customer for Seller's pre-Closing Date services, and the parties agree that Purchaser as agent of the Sellers may, at its option, send a single invoice to such customer.  If a payment received by Purchaser relates to services performed by the Business both prior to and after the Closing Date, Sellers and Purchaser shall cooperate in good faith to determine the portion of such payment belonging to Sellers and Purchaser, respectively, if not readily ascertainable from the documentation accompanying such payment.

(b)    For clarity, neither party is assuming the other party's accounts payable other than with respect to certain defined liabilities specified in the Purchase Agreement assumed by Purchaser.  Sellers shall be responsible for all orders or commitments made by them relative to any period prior to Closing Date unless otherwise set forth in the Purchase Agreement, including without limitation, payment of Cure Costs, and Purchaser shall be responsible for all orders or commitments made by it subsequent to the Closing Date with respect to the Business.

2.    <u>Transition Services</u>.

(a)    <u>Accounts Receivable Processing</u>.  During the period from the Closing Date through May 27, 2014, (or, if the Sellers can establish connectivity to the transferred Misys billing system at the 1945 N. 4th Street, Terre Haute, IN, location or a location within reasonable proximity to such location at Sellers's cost, the date that is one hundred and fifty (150) days following the Closing Date), Purchaser shall cause the personnel identified in Schedule 2(a) (or, if such personnel are not available to Purchaser, personnel with materially similar skills and capabilities) to assist Sellers with billing and accounts receivable collection related to the Business.

(b)    <u>Wind Down Support</u>.  During the ninety (90)-day period following the Closing Date, Purchaser shall make the personnel identified in Schedule 2(b) (or, if such personnel are not available to Purchaser, personnel with materially similar skills and capabilities) available to provide reasonable assistance to Sellers with wind down activities including functions such as cash reconciliations, general ledger posting and financial reporting, processing of invoices relating to the period prior to Closing, reconciliation of pre-petition claims,, accounting of activities relating to the Sellers' nuclear medicine activities, processing payroll, computing and processing paid time off, processing terminations, all to the extent requested by Sellers.

(c)    <u>Compensation</u>.  In consideration for any services performed in accordance with this Section 2, Sellers shall reimburse Purchaser for the applicable hourly wages payable during such period for the time so spent by such personnel (in the case of salaried employees, Purchaser shall pay a pro-rata portion of the base salary for such personnel based on the number of hours dedicated to provision of services to Purchaser divided by the total number of hours worked by such personnel (which shall be no less than 40 hours per week for the purposes of this calculation)).    In addition, Purchaser may request reimbursement, without markup, for reasonable out-of-pocket expenses, including without limitation expenses relating to forms, envelopes, postage, supplies, and telephone that are reasonably directly incurred by Purchaser and are necessary to provide the transition services to be performed hereunder, provided that if the aggregate of any such reimbursable expenses in a single month exceeds one thousand dollars ($1000), such expense must be pre-approved by Sellers.  All fees and reimbursable expenses pursuant to this Section 2 shall be invoiced by Purchaser in arrears.

3.    Additional Transition Services.  The parties may mutually agree additional services to be performed following the Closing Date (any such additional services, collectively with the services described in Section 1, the "Transition Services"), and shall describe any such Transition Services and the associated cost on Schedule 3.  To the extent any additional Transition Services are added, such Transition Services shall be provided for the time periods set

forth in Schedule 1 for such Transition Services.  Purchaser shall use reasonable care in providing the Transition Services, exercising at the minimum that degree of care as Purchaser would use in performing such services for itself.

4.     <u>BAA</u>.  Purchaser and Sellers shall enter into a HIPAA Business Associate Addendum in a form attached hereto as Exhibit A (the "BAA").

5.     <u>Performance Standard</u>.  Purchaser will provide the Transition Services (including provision of access to the personnel identified in Section 2(b)) in a timely manner, and, at a minimum, consistent with the level at which such services were performed by Sellers prior to the Closing Date.

6.     <u>Warranty and Liability</u>.

(a)     Except for the applicable warranties expressly set forth in the Purchase Agreement, neither party makes any warranties, express or implied, with respect to the Transition Services to be provided under this Agreement.

(b)     Neither party shall be liable to the other party for any indirect or consequential damages with respect to the performance of the Transition Services specified in this Agreement.

7.     <u>Force Majeure</u>.  Neither party shall be in default under this Agreement for failure or delay in performance of its obligations under this Agreement, if caused by an act of God or public enemy, war, government acts, regulations or orders, fire, flood, embargo, quarantine, epidemic, accident, unusually severe weather or other cause similar or dissimilar, reasonably beyond the control of such party (a "**Force Majeure Event**").

8.     <u>Term and Termination</u>.

(a)     <u>Term of Agreement</u>.  The term of this Agreement shall commence on the Effective Date and shall continue in effect until the last date on which the obligation to provide any Transition Services hereunder shall cease, unless terminated sooner in accordance with the provisions hereof (the "**Term**").  The provisions of Sections 2 and 6-16 shall survive the termination or expiration of this Agreement.

(b)     <u>Termination</u>.  This Agreement may be terminated by written notice given by either party as follows:

(1)     if the other party shall be in breach of any material obligation hereunder, and has not cured such breach within thirty (30) days after receipt of notice from the non-breaching party requesting the correction of such breach.  Such termination shall be effective upon failure of the breaching party to cure such breach within the specified time period;

(2)     if any failure or delay of the other party in performing any obligation under this Agreement due to a Force Majeure Event shall continue for more than thirty (30) consecutive days; or

(3)      as set forth in the BAA.

(c)      <u>Termination of Services</u>.  Sellers may terminate receipt of particular Transition Services, on ten (10) days' prior written notice.  Such termination shall not affect any of the other Transition Services being provided hereunder.

9.      <u>Mutual Cooperation and Future Assurances</u>.  Prior to the termination of this Agreement, the parties shall reasonably cooperate in good faith to facilitate the performance of this Agreement, and each party shall deliver to the other party copies of such documents, records and information as are reasonably necessary to such performance.

10.      <u>Confidentiality</u>.

(a)      <u>Confidential Information</u>.  When used herein, the term "Confidential Information" means any and all information concerning the Sellers that the Sellers directly or indirectly provides to the Purchaser and/or its Agents, whether written or oral, whether before or after the date of this Agreement.  Notwithstanding the foregoing, the term "Confidential Information" shall not include information that (i) is or becomes available to the public other than as a result of a disclosure by Purchaser and/or its Agents in breach of this Agreement, (ii) is already in Purchaser's possession or was or becomes known to Purchaser prior to its disclosure to Purchaser and/or its Agents (as defined in Section 10(b), below) by Sellers, (iii) is independently developed or derived by Purchaser without the use of Confidential Information, or (iv) is obtained, after the date hereof, by Purchaser from another party who, to the knowledge of Purchaser, is lawfully in possession of such information and not in violation of any confidentiality agreement with the Sellers in disclosing Confidential Information to Purchaser and/or its Agents.

(b)      <u>Confidentiality and Use of Confidential Information</u>. Purchaser hereby agrees that the Confidential Information will be used by Purchaser solely for the purpose of providing the Transition Services, and for no other purpose whatsoever.  In addition, Purchaser agrees not to disclose the Confidential Information to any person and agrees to keep the Confidential Information confidential; provided, however, that the Confidential Information may be disclosed to Purchaser's and its subsidiaries' directors, officers, employees, agents, advisors or auditors (such entities and persons collectively referred to herein as "Agents") solely to the extent necessary to permit such Agents to advise Purchaser in connection with its provision of the Transition Services to Sellers, it being agreed that such Agents shall be informed by Purchaser of the confidential nature of such information and that before receiving such information have agreed to treat such information as confidential with similar restrictions and other provisions as set forth in this Agreement.  Purchaser agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of the Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those of its Agents authorized by this Agreement to have the Confidential Information.  Purchaser shall be responsible for any breach of this Agreement by Purchaser or any of its Agents.

(c)      <u>Compulsory Disclosure of Confidential Information</u>.  In the event that Purchaser or its Agents are requested in any proceeding to disclose any Confidential Information, Purchaser agrees, to the extent practicable and as permitted under applicable law, to give Sellers

prompt written notice of such request and the documents requested thereby so that the Sellers may seek an appropriate protective order. It is further agreed that, if in the absence of a protective order Purchaser or any of its Agents is nonetheless compelled to disclose Confidential Information to any person or tribunal, such persons may disclose such information (and only that information) to such person or tribunal without liability hereunder.

(d)     Return, Destruction or Erasure of Confidential Information. At any time upon Sellers' request, Purchaser shall promptly return to Sellers or destroy, at Purchaser's discretion, all tangible material of any type containing or reflecting any information, knowledge or data contained in the Confidential Information (whether prepared by the Sellers, Purchaser or any Agent, and to the extent that such information is in the possession of any of its Agents, Purchaser shall cause such Agent to return or destroy such information), and will not retain any copies, extracts or other reproductions, in whole or in part, of such material; provided, however, (a) Purchaser may retain one (1) copy of any Confidential Information (and all documents, notes, summaries, analysis, memoranda and other writings whatsoever (including copies, extracts or other reproductions) prepared by Purchaser or its Agents based on the information, knowledge or data contained in the Confidential Information) in its law department solely for the purpose of determining any continuing obligation hereunder and (b) nothing herein shall require Purchaser to delete electronic copies of Confidential Information or any documents, notes, summaries, analysis, memoranda and other writings whatsoever (including copies, extracts or other reproductions) prepared by Purchaser or its Agents based on the information, knowledge or data contained in the Confidential Information (including emails) that have become embedded in Purchaser's electronic records system through ordinary course automatic back-up procedures. Notwithstanding the redelivery, destruction or retention of any such material, Purchaser will continue to be bound by the obligations of confidentiality as provided under this Agreement.

11.     Indemnification. Purchaser shall be solely responsible for, and shall indemnify, defend and hold harmless each Seller and each of its officers, directors, employees, agents and its successors and assigns (collectively, "Indemnified Persons") from any and all damages, losses, obligations, liabilities, judgments, penalties, claims, causes or action, costs and expenses (including reasonable attorneys' and consultants' fees and expenses) (collectively, "Losses") incurred by such Indemnified Person arising out of or related to third party claims arising from Purchaser's gross negligence or willful misconduct in provision of the Transition Services.

12.     Relationship of Parties. The relationship between Purchaser and Sellers is that of independent contractors and nothing herein shall be deemed to constitute the relationship of partners, joint venturers, nor of principal and agent between Purchaser and Sellers. Notwithstanding the foregoing, following the Closing Date, Sellers shall submit the Form CMS-855B to Medicare and the respective Indiana and Illinois Medicaid Provider Enrollment Applications to the state Medicaid programs designating Purchaser as the Sellers' Billing Agent for the limited purpose of preparing and submitting claims to Medicare and Medicaid and collecting the Medicare and Medicaid accounts receivables on behalf of Sellers. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

13.     Amendment and Waiver. This Agreement may be amended, or any provision of

this Agreement may be waived, provided that any such amendment or waiver will be binding upon Purchaser only if set forth in a writing executed by Purchaser, and any such amendment or waiver will be binding upon Sellers only if set forth in a writing executed by Sellers. No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify, amend, or discharge any part of this Agreement or any rights or obligations of any person under or by reason of this Agreement.

14.     <u>Notices</u>.  The notice provisions of the Purchase Agreement shall govern this Agreement.

15.     <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

16.     <u>Jurisdiction, Waiver of Jury Trial</u>

(a)     .THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE STATE COURTS IN THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

17.     <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, the Sellers, and inure to the benefit of the parties and its respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

18.     <u>Subcontracting</u>. Purchaser may not subcontract any of its responsibilities under this Agreement without Sellers' prior written consent. Purchaser shall ensure that any permitted subcontractors comply with all of Purchaser's obligations under this Agreement, and Purchaser

-6-

shall be responsible for any breach caused by the act or omission of any such subcontractor.

19.    <u>Severability</u>. If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

20.    <u>Miscellaneous</u>.  This Agreement does not create any rights in any person or party who is not a party to this Agreement.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.  This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument.  The exchange of executed copies of this Agreement by facsimile transmission or other electronic transmission shall constitute effective execution and delivery of this Agreement.  Except for matters set forth in the Purchase Agreement or other agreements contemplated therein, this Agreement sets forth the complete agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, that may have related to the subject matter hereof in any way. In the event of any inconsistency between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall prevail.

*(Signatures appear on the following page.)*

RA-3118441 v1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**PURCHASER:**                    **LABORATORY CORPORATION OF AMERICA HOLDINGS**

By:_____
Name:_____
Title:_____


**SELLERS:**                    **LABORATORY PARTNERS, INC.**
By: _____
Name: _____
Title: _____

**TERRE HAUTE MEDICAL LABORATORY, INC.**

By: _____
Name: _____
Title: _____

**PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.**

By: _____
Name: _____
Title: _____

**Schedule 2(a)**

**Transition Service Personnel—Accounts Receivable Personnel**

Deborah Liebermann
Jacqueline Drummy
Debra Kesler
Kimberly Jones
Diana Cheesman
Kelly David
Debra Sturm
Stephanie Chastain
Sharon Stephens
Kristina Akens
Rebecca Padgett
Shanna Sampson

**Schedule 2(b)**

**Transition Service Personnel—Wind Down Support Personnel**

Louise Topolosek
Lori Hutchings
Teri Para
Traci Tucker
Jennifer Watson
Kelly Hartzler
Angie Price

**Schedule 3**

**Transition Services**

**[Intentionally blank]**

**Exhibit A**

## FORM OF
## HIPAA BUSINESS ASSOCIATE ADDENDUM

**THIS HIPAA BUSINESS ASSOCIATE ADDENDUM** (this "<u>Addendum</u>") supplements and is made a part of the Transition Services Agreement dated [_____] (the "<u>Agreement</u>"), and is effective as of [_____] (the "<u>Addendum Effective Date</u>"), by and between **LABORATORY PARTNERS, INC.**, a Delaware corporation ("<u>Covered Entity</u>") and **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation ("<u>Business Associate</u>").

## W I T N E S S E T H

WHEREAS, the parties have entered into the Agreement whereby Business Associate will provide certain services to, for, or on behalf of Covered Entity involving the use or disclosure of Protected Health Information ("<u>PHI</u>") as defined below, and pursuant to such Agreement, Business Associate may be considered a "Business Associate" of Covered Entity as defined below;

WHEREAS, Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate pursuant to the Agreement in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("<u>HIPAA</u>"), the Standards for Privacy of Individually Identifiable Health Information promulgated thereunder by the U.S. Department of Health and Human Services at 45 CFR Part 160 and Part 164 (the "<u>Privacy Rule</u>"), the Standards for the Security of Electronic Protected Health Information promulgated thereunder by the U.S. Department of Health and Human Services at 45 CFR Part 160, Part 162, and Part 164 (the "<u>Security Rule</u>"), the amendments to HIPAA made as a part of the Health Information Technology for Economic and Clinical Health Act ("<u>HITECH</u>") enacted as a part of the American Recovery and Reinvestment Act (ARRA), collectively the "<u>HIPAA Rules</u>" and other applicable laws; and

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA Rules, including, but not limited to, Title 45, Sections 164.504(e) and 164.308(b) of the Code of Federal Regulations ("<u>CFR</u>"), and sections 13400-13424 of HITECH, as the same may be amended from time to time.

NOW, THEREFORE, in consideration of the mutual promises below and the exchange of information pursuant to this Addendum, the parties agree as follows:

1.      <u>Definitions</u>. Except as otherwise defined herein, any and all capitalized terms shall have the definitions set forth in the HIPAA Rules. In the event of inconsistency between the provisions of this Addendum and mandatory provisions of the HIPAA Rules, as amended, the HIPAA Rules shall control. Where provisions of this Addendum are different than those mandated in the HIPAA Rules, but are nonetheless permitted by the HIPAA Rules, the provisions of this Addendum shall control.

a. "Breach" when capitalized shall have the meaning set forth in 45 CFR § 164.402 (including all of its subsections); with respect to all other uses of the word "breach" in this Addendum, the word shall have its ordinary contractual meaning.

b. "<u>Business Associate</u>," in addition to identifying one of the parties to this Addendum as set forth above, shall have the meaning given to such term under 45 CFR § 160.103.

c. "<u>Covered Entity</u>," in addition to identifying one of the parties to this Addendum as set forth above, shall have the meaning given to such term under 45 CFR § 160.103.

d. "<u>Discovered</u>" shall mean the first day upon which a Breach is known to the Business Associate, or, by exercising reasonable diligence should have been known to the Business Associate.

e. "<u>Protected Health Information</u>" or "<u>PHI</u>" means individually identifiable health information including, without limitation, any information, whether oral or recorded in any form or medium, including paper record, audio recording, or electronic format:

(i)     that relates to the past, present or future physical or mental health or condition of an individual; the provision of health care (which includes care, services, or supplies related to the health of an individual) to an individual; or the past, present or future payment for the provision of health care to an individual;

(ii)    that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual; and

(iii)   that shall have the meaning given to such term under 45 CFR § 160.103, and shall specifically include Electronic Protected Health Information (defined below).

PHI under this Addendum shall be limited to the information created or received by Business Associate from or on behalf of Covered Entity.

f. "<u>Electronic Protected Health Information</u>" or "<u>EPHI</u>" means PHI transmitted by, or maintained in, electronic media, as defined in 45 CFR § 160.103.

g. "<u>Individual</u>" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502 (g).

h. "<u>Required by Law</u>" shall have the same meaning as the term "required by law" in 45 CFR § 164.103.

i. "<u>Secretary</u>" shall mean the Secretary of the Department of Health and Human Services or his designee.

j. "<u>Security Incident</u>" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system, as defined in 45 CFR § 164.304.

k. "<u>Unsecured PHI</u>" means "unsecured protected health information" as such term is defined in 45 CFR Section 164.402.  For purposes of this Agreement, Unsecured PHI shall be limited to Unsecured PHI created, acquired, accessed, maintained, used or disclosed by Business Associate, its employees, agents or representatives, from or on behalf of Covered Entity.

2.      <u>Rights and Obligations of Business Associate</u>.

a. <u>Permitted Uses and Disclosures</u>.  Except as otherwise limited in this Addendum or the Agreement, Business Associate may use or disclose PHI to perform functions, activities, or services to, for, or on behalf of, Covered Entity as specified in the Agreement, provided that such use or disclosure

A-2

would not violate the Privacy Rule if made by Covered Entity.  In addition, Business Associate may use PHI to report violations of law to appropriate Federal and State authorities, consistent with 45 CFR § 164.502 (j)(1).

   b. <u>Use for Management and Administration</u>.  Except as otherwise limited in this Addendum or the Agreement, Business Associate may use PHI received by Business Associate in its capacity as a Business Associate of Covered Entity for the proper management and administration of Business Associate, if such use is necessary for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

   c. <u>Disclosure for Management and Administration</u>.  Except as otherwise limited in this Addendum or the Agreement, Business Associate may disclose PHI received by Business Associate in its capacity as a Business Associate of Covered Entity for the proper management and administration of Business Associate if:

    (i) the disclosure is Required By Law;

    (ii) Business Associate obtains reasonable assurances from the person to whom the PHI is disclosed that it will be held confidentially and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person; and

    (iii) the person notifies Business Associate of any instances of which it becomes aware in which the confidentiality of the PHI has been breached.

   d. <u>Nondisclosure</u>.  Business Associate shall not use or further disclose PHI other than as permitted or required by this Addendum or as Required By Law.

   e. <u>Minimum Necessary</u>.  Business Associate shall make all uses and disclosures of PHI subject to the principal of the "minimum necessary use or disclosure," i.e., that only PHI that is the minimum necessary to accomplish the intended purpose of the use, disclosure or request is used or disclosed.

   f. <u>Mitigation</u>.  Business Associate agrees to mitigate, to the extent practical, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate (or by any other agent, person or entity to whom Business Associate has disclosed PHI) in violation of the requirements of this HIPAA Addendum.

   g. <u>Safeguards</u>.  Business Associate shall use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Addendum. Business Associate shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the EPHI that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by Subpart C of 45 CFR § 164, as amended from time to time. Business Associate shall use industry best security practices and shall take all reasonable security measures necessary to protect the security of any computer systems, networks, files, data and software containing such EPHI.  In addition, Business Associate agrees to comply with the requirements of 45 CFR §§ 164.308, 164.312, and 164.316 to the same extent such requirements apply to Covered Entity.

   h. <u>Reporting of Disclosures and Security Incidents</u>.  Business Associate shall report to Covered Entity within two (2) business days any use or disclosure of PHI not provided for by this Addendum of which Business Associate becomes aware. Business Associate shall report to Covered Entity within two (2) business days any Security Incident of which it becomes aware.

i. <u>Business Associate's Agents</u>.  Business Associate shall ensure that any agents, including subcontractors, to whom it provides PHI received from (or created or received by Business Associate on behalf of) Covered Entity agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI. Business Associate shall ensure that any agent, including a subcontractor, to whom it provides EPHI agrees to implement reasonable and appropriate safeguards to protect it.

j. <u>Access to PHI</u>.  Business Associate shall make PHI available in the time and manner that meets the requirements of CFR § 164.524.

k. <u>Amendment of PHI</u>. Business Associate shall make PHI available for amendment and shall incorporate any amendments to PHI in the time and manner that meets the requirements of 45 CFR § 164.526.

l. <u>Access to Documentation for Accounting</u>.  Business Associate shall make available the information required to provide an accounting of disclosures of PHI in the time and manner that meets the requirements of CFR § 164.528.

m. <u>Internal Practices</u>. Subject to any applicable legal privilege, and to the extent consistent with professional ethical obligations, Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from Covered Entity (or created or received by Business Associate on behalf of Covered Entity) available to the Secretary for purposes of the Secretary determining the Covered Entity's compliance with HIPAA and the Privacy Rule.

n. <u>Marketing</u>.  Unless otherwise permitted in the Agreement, Business Associate must obtain or confirm that Covered Entity has obtained an authorization for any use or disclosure of PHI for marketing, unless the marketing communication is made without any form of remuneration (i) to describe medical services or products provided by Covered Entity or Business Associater; (ii) for treatment of the individual; or (iii) for case management or care coordination for the individual or to direct or recommend alternative treatments, therapies, providers or settings.

3. <u>Breach Notification for Unsecured PHI</u>.

a. <u>Obligation to Exercise Reasonable Diligence</u>.  Business Associate shall exercise reasonable diligence to detect any Breach of Unsecured PHI, and provide training and procedures through which its employees, agents and representatives are encouraged to detect and report to Business Associate any Breach of Unsecured PHI.

b. <u>Obligation to Notify Covered Entity</u>.  Business Associate shall notify Covered Entity in writing of any Breach of Unsecured PHI by Business Associate, its employees, agents or representatives within five (5) calendar days from the time such Breach is Discovered.

c. <u>Content of Notification</u>.  Business Associate shall provide Covered Entity the identification of each individual whose Unsecured PHI has been or is reasonably believed to have been accessed, acquired, used, or disclosed, and any other available information Covered Entity requires or reasonably requests in connection with the Breach, including, without limitation, a description of the Breach, the date of the Breach and its discovery, the types of Unsecured Protected Health Information involved and a description of the Business Associate's investigation, mitigation, and prevention efforts.

d. <u>Additional Notification Requirements</u>.  To the extent that Covered Entity determines that the Breach of Unsecured PHI is one which triggers the notification requirements established at 45

CFR Sections 164.404, 164.406 and 164.408, then Business Associate shall cooperate with Covered Entity and bear all costs associated with providing any required notification to affected individuals, the Secretary of the Department of Health and Human Services, and the media.

4. <u>PHI to be Rendered Unusable, Unreadable or Indecipherable to Unauthorized Individuals</u>. Except as otherwise provided herein or in the Agreement, Business Associate shall render PHI unusable, unreadable or indecipherable to unauthorized individuals, such that PHI will not be considered "unsecured" pursuant to guidance issued by the Secretary of the Department of Health and Human Services, in the following manner:

a. Electronic PHI shall be encrypted by the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key and such algorithmic process meets the following requirements:

(i)      Valid encryption processes for data at rest are consistent with the National Institute of Standards and Technology (NIST) Special Publication 800-111, *Guide to Storage Encryption Technologies for End User Devices.*

(ii)      Valid encryption processes for data in motion are those that comply with the requirements of Federal Information Processing Standards (FIPS) 140–2, *Security Requirements for Cryptographic Modules*.  These include, as appropriate, standards described in NIST Special Publication 800-52, *Guidelines for the Selection and Use of Transport Layer Security (TLS) Implementations;*  800-77, *Guide to IPsec VPNs;*  or 800-113, *Guide to SSL VPNs,* and may include others which are FIPS 140-2 validated.

b. The media on which the PHI is stored or recorded shall be destroyed in one of the following ways:

(i)      Paper, film, or other hard copy media shall be shredded or destroyed such that the PHI cannot be read or otherwise cannot be reconstructed.

(ii)      Electronic media shall be cleared, purged or destroyed consistent with NIST Special Publication 800-88, *Guidelines for Media Sanitization,* such that the PHI cannot be retrieved.

5. <u>Obligations of Covered Entity</u>.

a. Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 CFR § 164.520, as well as any changes to such notice.

b. Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by an Individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

c. Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522.  In addition, Covered Entity shall notify Business Associate of any requests it receives for access, amendment or accounting of disclosures which would require action by Business Associate pursuant to <u>Sections 2.h.,</u> <u>2.i.</u>, and <u>2.j.</u> above.

d. Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if made by Covered Entity.

6. <u>Term and Termination</u>.

a. <u>Term</u>.  The Term of this Addendum shall become effective as of the Addendum Effective Date and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions of this Section.  The provisions of this Addendum shall survive termination of this Addendum or the Agreement to the extent necessary for compliance with HIPAA, including both the Privacy Rule and the Security Rule.

b. <u>Material Breach</u>.  A material breach by Business Associate of any provision of this Addendum, as determined by Covered Entity, shall constitute a material breach of the Agreement.

c. <u>Termination for Failure to Comply</u>.  If Covered Entity learns of a pattern of activity or practice of Business Associate that constitutes a material breach or violation of the Business Associate's obligations under the provisions of this Addendum, then Covered Entity may, in its sole discretion, terminate this Addendum and the Agreement immediately upon written notice.  Covered Entity, at its option and within its sole discretion, may elect to keep this Agreement in force and notify Business Associate of the breach and Business Associate shall take reasonable steps to cure such breach or end such violation, as applicable, within the period of time requested by Covered Entity.  If Business Associate's efforts to cure such breach or end such violation are unsuccessful, Covered Entity may terminate this Addendum and the Agreement immediately upon written notice.

d. <u>Effect of Termination</u>.

(i)    Except as provided in paragraph (ii) of this Section 6(d), upon termination of the Agreement and/or this Addendum for any reason, Business Associate shall return or destroy all PHI received from Covered Entity (or created or received by Business Associate on behalf of Covered Entity) that Business Associate still maintains in any form, and shall retain no copies of such PHI. This provision shall also apply to PHI that is in the possession of subcontractors or agents of Business Associate.

(ii)    In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible, and shall extend the protections of this Addendum to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI. The obligations of Business Associate under this Section 6(d)(ii) shall survive the termination of this Addendum and/or the Agreement.

7. <u>Indemnification</u>.

a. Business Associate shall defend, at its expense, Covered Entity and its respective customers, employees, officers, directors and agents (Covered Entity's Indemnified Parties) from and against any third party claims brought against any Covered Entity Indemnified Party (including claims brought by a duly authorized regulatory authority) arising from or based upon a breach of this Addendum or Breach of Unsecured PHI by Business Associate or any of its employees, agents or representatives.  In addition, Business Associate shall pay (a) any judgments finally awarded by a court of competent

jurisdiction to such third parties against any Covered Entity Indemnified Party based on such claims after Business Associate has presented its defenses (or after Business Associate elected not to defend such claims) and any settlements to which Business Associate agrees in writing (or to which Covered Entity agreed after Business Associate elected not to defend such claims); and (b) any final penalties imposed against any Covered Entity Indemnified Party by a duly authorized regulatory authority based on such claims after Business Associate has presented any defenses allowed by applicable law (or after Business Associate elected not to present such defenses) and any settlement amount to which Business Associate agrees in writing (or to which Covered Entity agreed after Business Associate elected not to defend such claims).

b. Covered Entity shall have the option, at its sole discretion, to employ attorneys selected by it to defend any such action at its own expense. Covered Entity shall provide Business Associate with timely notice of the existence of such proceedings and such information, documents, and other cooperation as reasonably necessary to assist Business Associate in establishing any defenses to such action.

c. Covered Entity shall defend, at its expense, Business Associate and its respective customers, employees, officers, directors and agents (Business Associate's Indemnified Parties) from and against any third party claims brought against any Business Associate Indemnified Party (including claims brought by a duly authorized regulatory authority) arising from or based upon a breach of this Addendum or Breach of Unsecured PHI by Covered Entity or any of its employees, agents or representatives. In addition, Covered Entity shall pay (a) any judgments finally awarded by a court of competent jurisdiction to such third parties against any Business Associate Indemnified Party based on such claims after Covered Entity has presented its defenses (or after Covered Entity elected not to defend such claims) and any settlements to which Covered Entity agrees in writing (or to which Business Associate agreed after Covered Entity elected not to defend such claims); and (b) any final penalties imposed against any Business Associate Indemnified Party by a duly authorized regulatory authority based on such claims after Covered Entity has presented any defenses allowed by applicable law (or after Covered Entity elected not to present such defenses) and any settlement amount to which Covered Entity agrees in writing (or to which Business Associate agreed after Covered Entity elected not to defend such claims).

d. Business Associate shall have the option, at its sole discretion, to employ attorneys selected by it to defend any such action, at its own expense. Business Associate shall provide Covered Entity with timely notice of the existence of such proceedings and such information, documents, and other cooperation as reasonably necessary to assist Covered Entity in establishing any defenses to such action.

8. Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of a Covered Entity, available to the U.S. Secretary of Health & Human Services for purposes of determining Covered Entity's or Business Associate's compliance under the HIPAA Rules as required under 45 CFR § 164.504(e)(2)(ii)(I). Without limiting the generality of the foregoing, Business Associate shall disclose PHI when required by the U.S. Secretary of Health & Human Services under Subpart C of 45 CFR Part 160 to investigate or determine Business Associate's compliance with the HIPAA Rules as required under 45 CFR § 164.502(a)(4)(i).

9. Amendment to Comply with Law. The parties acknowledge that amendment of this Addendum may be required to ensure compliance with new standards and requirements of HIPAA, the Privacy Rule, the Security Rule, and other applicable laws relating to the security or confidentiality of PHI. Upon Covered Entity's request, Business Associate agrees to promptly enter into negotiations with

Covered Entity concerning the terms of an amendment to this Addendum embodying written assurances consistent with the standards and requirements of HIPAA, the Privacy Rule, the Security Rule, or other applicable laws relating to security and privacy of PHI. Covered Entity may terminate this Addendum or the Agreement upon thirty (30) days' written notice in the event Business Associate does not promptly enter into negotiations to amend this Addendum when requested by Covered Entity pursuant to this Section, or Business Associate does not enter into an amendment to this Addendum providing assurances regarding the safeguarding of PHI that Covered Entity and Business Associate deem sufficient to satisfy the standards and requirements of HIPAA, the Privacy Rule, the Security Rule, or any other applicable laws relating to security and privacy of PHI.

10. <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than Covered Entity, Business Associate and their respective successors and assigns, any rights, remedies, obligations or liabilities whatsoever.  In addition, none of the provisions of this Addendum are intended to create, nor will they be deemed to create, any relationship between the parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Addendum and the Agreement.

11. <u>Amendment; Assignment</u>.  This Addendum may be amended or modified only in a writing signed by the parties hereto.  No party may assign its respective rights and obligations under this Addendum without the prior written consent of the other party.

12. <u>Effect on Agreement</u>.  Except as specifically required to implement the purposes of this Addendum, or to the extent inconsistent with this Addendum, all other terms of the Agreement shall remain in full force and effect.

13. <u>Interpretation</u>.  This Addendum and the Agreement shall be interpreted as broadly as necessary to implement and comply with the HIPAA Rules, and any other applicable law relating to security and privacy of PHI.  Any ambiguity in this Addendum shall be resolved in favor of a meaning that permits Covered Entity to comply with the HIPAA Rules.  Furthermore, in case of any conflict between the terms and conditions of the Agreement and this Addendum, the terms and conditions of this Addendum shall prevail.

14. <u>Regulatory References</u>.  A reference in this Addendum to a section in the HIPAA Rules means the section as in effect or as amended, and for which compliance is required.

15. <u>Counterparts; Facsimile Signatures</u>.  This Addendum may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.  The exchange of executed copies of this Addendum by facsimile, portable document format (PDF) transmission or other reasonable form of electronic transmission shall constitute effective execution and delivery of this Addendum.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum effective as of the Addendum Effective Date.

*[SIGNATURE PAGE FOLLOWS]*

**COVERED ENTITY:**                          **BUSINESS ASSOCIATE:**

**LABORATORY PARTNERS, INC.**, a          **LABORATORY CORPORATION OF**
Delaware corporation                         **AMERICA HOLDINGS**, a Delaware
                                             corporation


By: _____               By: _____

Print Name: _____             Print Name: _____

Title: _____             Title: _____

**Exhibit 1.1(j)**

# OPTION AGREEMENT

THIS OPTION AGREEMENT (the "Agreement") is made by and between Terre Haute Medical Laboratory, Inc., an Indiana corporation ("Seller"), and Laboratory Corporation of America Holdings, a Delaware corporation ("Buyer") as of the last date set forth next to the signatures of the parties at the end of this Agreement (the "Effective Date"), and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.        Grant of Option; Premises.  In connection with that certain Asset Purchase Agreement dated as of January __, 2014, by and among Seller, Laboratory Partners, Inc. and Pathology Associates of Terre Haute, Inc., as sellers, and Buyer, as purchaser (the "Purchase Agreement"), Seller irrevocably grants to Buyer and its successors and assigns, the sole and exclusive option (the "Option") to purchase, in accordance with the terms and conditions hereinafter contained,  the parcels of land situated in Vigo County, Indiana, described on Exhibit A attached hereto and made a part hereof (the "Land"), together with (a) any buildings, structures, fixtures and improvements erected or located on the Land, or affixed thereto and (b) all tenements, hereditaments, rights, privileges, interests, leases, easements and appurtenances belonging or in any way pertaining to the Land or improvements located thereon, including any right, title or interest of Seller in and to adjacent streets, roads, alleys and rights of way (collectively, the "Real Estate").

2.        Purchase Price.  The purchase price for the Real Estate is as set forth in the Purchase Agreement ("Purchase Price").

3.        Option Consideration.  Buyer has paid to Seller the sum of Ten and 00/100 Dollars ($10.00) as consideration for the Option granted hereby (the "Option Consideration").  Except as otherwise provided herein, the Option Consideration shall be retained by Seller as consideration for the Option granted hereby.  If the Option is exercised and the sale is consummated, then the Option Consideration shall be credited against the Purchase Price at the Closing.

4.        Term.  Buyer's right to exercise the Option shall commence on the Effective Date hereof and shall, unless extended as hereinafter provided, expire on the 60th day following the Effective Date ("Expiration Date").

5.        Exercise.  The Option shall be deemed exercised if, on or before the Expiration Date, Buyer has given Seller written notice of its exercise of the Option in accordance with notice provisions of Section 21 hereof.  The provisions of Sections 19 and 21 shall govern when notice is received, and the date the notice exercising the Option is deemed received by Seller shall be the "Commencement Date".  Upon Buyer's exercise of the Option, Buyer shall be deemed to have agreed to purchase and Seller shall have agreed to sell the Real Estate for the Purchase Price upon and subject to the terms and conditions hereinafter set forth.

6.        Closing.  If the Option is exercised, the closing of the purchase and sale of the Real Estate (the "Closing") shall occur at the Indianapolis office of First American Title Insurance Company ("Title Insurer") on a date (the "Closing Date") selected by Buyer which is not later than ten (10) business days following the date Seller is deemed to have received Buyer's notice exercising the Option, provided that such Closing Date will not be later than ten (10) business days from the Expiration Date.  At the Closing, Buyer shall pay the Purchase Price to Seller by wire transfer.  Seller and Buyer agree that each party shall execute and deliver on or before Closing all such papers and documents as may be reasonably

required to carry out the terms and provisions of this Agreement, including the documents referenced in Section 13(a).

7.     <u>Seller's Title</u>.  Seller agrees to sell and convey the Real Estate to Buyer free and clear of all Encumbrances (as defined in the Purchase Agreement) other than Permitted Encumbrances (as defined in the Purchase Agreement).  As evidence of such title, Buyer shall obtain within fifteen (15) days of the Commencement Date, at Seller's sole cost and expense, a commitment for an ALTA owner's policy of title insurance (the "<u>Commitment</u>") issued by Title Insurer, which shall have attached thereto copies of all instruments noted therein as exceptions to title (the "<u>Exception Documents</u>"), in which Title Insurer shall agree to insure good and marketable title to the fee simple estate in the Real Estate, for the amount of the Purchase Price, subject only to Permitted Encumbrances.

8.     <u>Conveyance of Title</u>.  Seller shall convey the Real Estate to Buyer by general warranty deed subject only to Permitted Encumbrances.  In addition, Seller shall execute and deliver to Buyer a vendor's affidavit in the form most recently published by the Indianapolis Bar Association, a duly executed certificate pursuant to Section 1445 of the Internal Revenue Code, a Disclosure of Sales Information Form as required by Ind. Code § 6-1.1-5.5, all necessary organizational documents, resolutions, court approvals, authorizations of Seller authorizing the sale, and such other documents as reasonably may be required to complete the sale of the Real Estate to Buyer.  Seller shall discharge at Closing all monetary liens on the Real Estate other than the lien of current real estate taxes not delinquent.

9.     <u>Real Property Taxes and Assessments</u>.  At the Closing, Seller and Buyer shall prorate all real property taxes relating to the Real Estate as of the day of Closing.  If Buyer exercises the Option, then Buyer shall assume and agree to pay all assessments for municipal improvements and other public improvements relating to the Real Estate becoming due and payable after the Closing Date and so much of the real property taxes assessed for and becoming a lien during the calendar year in which the Real Estate is conveyed to Buyer as shall be allocable to Buyer after the Closing, and Seller shall pay the balance of such taxes, using, for closing purposes, the present tax rate if the applicable tax rate has not been set, and providing that both installments of real property taxes payable during the calendar year in which the Closing occurs shall be paid by Seller.

10.     <u>Possession, Rents, Risk of Loss and Insurance</u>.  Seller shall deliver full, complete and exclusive possession of the Real Estate to Buyer on the Closing Date and the risk of loss incident to the ownership thereof shall pass to Buyer at the time of delivery of possession.  Seller shall not during the Option Period enter into any lease or occupancy agreement pursuant to which any person other than Buyer, pursuant to the terms of this Agreement shall have any right to the use or possession of the Real Estate after the Closing Date.

11.     <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer that on the date hereof and as of the date of the Closing:

(a)     Seller owns the fee simple title to the Land described in <u>Exhibit A</u>, and, subject to the Bankruptcy Court (as defined in the Purchase Agreement), has the right, power and authority to execute and deliver this Agreement and to observe and perform its obligations hereunder; to sell and convey the Real Estate to Buyer; and there are no legal, contractual or other restrictions upon Sellers' right, power or authority to sell and convey the Real Estate to Buyer.

(b)     As of the Closing Date, there will be no parties in possession (other than Buyer pursuant to the provisions of this Agreement) of all or a portion of the Real Estate, including any crop or agricultural leases;

(c)      No part of the Real Estate is subject to any pending or, to the knowledge of Seller, threatened condemnation proceedings;

(d)      The execution and delivery hereof, and consummation of the transaction, have been duly authorized by all necessary organizational action of Seller, specifically including, but not limited to, approval and authorization thereof by Seller's Board of Directors;

(e)      The Seller is not in violation of any zoning, public health, building code or other similar laws applicable thereto or to the ownership, occupancy and/or operation thereof, nor does there exist any waivers or exemptions relating to such Real Estate with respect to any non-conforming use or other zoning or building code matters;

(f)      To Seller's knowledge, the Real Estate is not subject to any unrecorded document, instrument or Encumbrance (other than Permitted Encumbrances);

(g)      There is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (except as filed as part of the Bankruptcy Case (as defined in the Purchase Agreement)) arising out of or related to the Real Estate, pending or, to the knowledge of the Seller, threatened that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated hereby;

(h)      To Seller's knowledge, have not at any time generated, used, treated or stored Hazardous Materials (as defined in the Purchase Agreement) on, or transported Hazardous Materials to or from, the Real Estate;

(i)      To Seller's knowledge, the Real Estate (A) contains no facilities that are subject to reporting under Section 312 of the federal Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11022); (B) is not the site of any underground storage tanks; (C) is not listed on the Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) in accordance Section 116 of the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9616); and (D) contains no environmental defects, as that term is defined in IND. CODE § 13-11-2-70;

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 11, THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE REAL ESTATE. BUYER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL REAL ESTATE AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE REAL ESTATE AS BUYER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE REAL ESTATE, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN SECTION 11, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE REAL ESTATE. ACCORDINGLY, BUYER WILL ACCEPT THE REAL ESTATE AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

12.    <u>Closing Costs</u>.  Closing Costs shall be paid as follows:

(a)    <u>Seller's Expenses</u>.  Seller agrees to pay all costs of releasing existing loans and recording the releases; ½ of any insured closing fee and other expenses stipulated to be paid by Seller under other provisions of this Agreement.

(b)    <u>Buyer's Expenses</u>.  Buyer agrees to pay ½ of any insured closing fee; recording fees; and other expenses stipulated to be paid by Buyer under other provisions of this Agreement.

13.    <u>Conditions Precedent to Buyer's Obligations</u>.    In addition to any other conditions precedent to Buyer's obligations hereunder, Buyer's obligation to consummate the purchase contemplated hereby shall be conditioned upon the occurrence or fulfillment of each of the following conditions or events, unless waived by Buyer in writing:

(a)    The delivery to Buyer of each of the documents, instruments or things herein specified to be delivered to Buyer on or before the time provided in this Agreement and Buyer's determination that the same are acceptable to Buyer and Buyer's counsel as to substance and form; and

(b)    The representations and warranties of Seller under Section 11 shall be true and correct in all material respects on and as of the date of Closing with the same force and effect as if made on the date of Closing and Seller shall have performed in all material respects its covenants and obligations set forth herein; and

In the event that any one or more of the conditions precedent set forth herein is not waived, satisfied or fulfilled or deemed waived, satisfied or fulfilled as set forth therein, then, and in any such event, Buyer shall have the right, at its election, to terminate this Agreement, in which event, the parties shall be released from all further obligations and liabilities hereunder and this Agreement shall be of no further force or effect.

14.    <u>Default</u>.  If subsequent to the exercise of this Option, the sale contemplated by this Agreement is not consummated (a) through the default by Seller, then Buyer shall have and retain all legal and equitable remedies including, but not limited to, the right to damages including attorneys' and paralegals' fees and other costs of enforcement and the right to seek and obtain specific performance of this Agreement, or (b) through default by Buyer, then Seller shall have and retain all legal and equitable remedies including, but not limited to, the right to damages including attorneys' and paralegals' fees and other costs of enforcement and the right to seek and obtain specific performance of this Agreement.

15.    <u>Entire Agreement; Written Modifications; Survival of  Representations, Warranties And Agreements</u>.  This Agreement contains the entire agreement between Seller and Buyer with respect to the subject matter hereof.   All representations, promises and prior or contemporaneous understandings between the parties are merged into and expressed in this instrument, and any and all prior agreements between the parties are hereby canceled.   This Agreement shall not be amended, modified or supplemented without the written agreement of Seller and Buyer at the time of such amendment, modification or supplement.  The representations, warranties and agreements of Seller made herein shall not survive the acceptance of this Agreement, the Closing and the consummation of the transaction contemplated hereunder, and shall be merged by the delivery of the deed by Seller to Buyer.  The terms and conditions hereof represent the results of bargaining and negotiations between the parties, and neither of which has acted under duress or compulsion, whether legal, economic or otherwise.  Consequently, the terms and conditions hereof shall be interpreted and construed in accordance with their usual and

customary meanings, and the parties hereby expressly waive and disclaim, in connection with interpretation and construction hereof, any rule of law or procedure requiring otherwise, specifically including, but not limited to, any rule of law to the effect that ambiguous or conflicting terms or conditions contained herein shall be interpreted or construed against the drafting party.

16.      Expenses; Brokerage.  Except as otherwise specifically provided in this Agreement, Seller and Buyer shall each bear its own expenses incurred in connection herewith, and neither shall be liable to other for any of such expenses, whether or not the transaction contemplated hereby is consummated.  Each of the parties covenants that it has not employed or used any broker, finder or agent in connection herewith or with the transaction contemplated hereby pursuant to any agreement under which the other may be or become liable to such broker, finder or agent for any fee or commission.

17.      No Waiver.  No failure on the part of either party at any time to require performance by the other party of any term hereof shall be taken or held to be a waiver of such term or in any way affect such party's right to enforce such term, and no waiver on the part of either party of any term hereof shall be taken or held to be a waiver of any other term hereof or the breach thereof.

18.      Severability.  The invalidity or unenforceability of any particular provision hereof shall not affect the other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had not been contained herein.

19.      Expiration of Time Periods.  If any date specified herein is, or any period specified herein expires on, a Saturday, Sunday or holiday, then such date or the expiration date of such period, as the case may be, shall be extended to the next succeeding business day.

20.      Attorneys' Fees.  If any party institutes any action in connection with any controversy arising out of this Agreement, such party, if successful in its claim, shall be entitled to recover, in addition to costs, such sum as the court may adjudge reasonable as attorneys' fees in such action, and on any appeal from any judgment or decree entered therein.

21.      Notices.  Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) business day after being sent by overnight courier or when sent by facsimile transmission, and (iii) three (3) business days after being sent by registered or certified mail, postage prepaid, as follows:

To Seller:      Laboratory Partners, Inc.
               671 Ohio Pike
               Suite K
               Cincinnati, OH 45245
               Attn: Chief Executive Officer
               Facsimile No.: (513) 201-1138

               with a copy (which shall not constitute effective notice) to:

               Pillsbury Winthrop Shaw Pittman LLP
               1540 Broadway
               New York, New York 10036
               Attn: Jonathan J. Russo
               Facsimile No.: (212) 858-1500

To Buyer:      Laboratory Corporation of America Holdings
             531 South Spring Street
             Burlington, North Carolina 27215
             Facsimile No.: (336) 436-4177
             Attn: General Counsel
             with copies (which shall not constitute effective notice) to:

             K&L Gates LLP
             4350 Lassiter at North Hills Avenue, Suite 300
             Raleigh, North Carolina 27609
             Facsimile No.: (919) 743-7358
             Attn: John R. Erwin, Esq.

or to such other person, address or facsimile numbers as shall be furnished in writing by either party to the other.

22.    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which when so executed shall be an original, but all of such counterparts shall together constitute but one and the same instrument.

23.    <u>Governing Law</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

24.    <u>Binding Effect</u>.  This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of both Seller and Buyer, their respective heirs, successors, assigns and legal representatives.

25.    <u>Successors and Assigns</u>.  The terms, provisions, covenants, agreements and conditions contained in this Agreement shall apply to, inure to the benefit of, and be binding upon, the parties hereto and upon their respective heirs, legal representatives, successors and assigns, and Buyer shall have the right to assign this Agreement without Seller's consent.

26.    <u>License</u>.

(a)    Subject to and upon the covenants, agreements and conditions provided in this Section 26, Seller does hereby grant to Buyer a temporary license and business concession to use the Real Estate (the Real Estate being hereinafter referred to in this Section as the "<u>Licensed Premises</u>"), together with Seller's equipment, furniture and other personal property located in the Licensed Premises.  Buyer accepts the Licensed Premises in its "as-is" condition.  The license granted to Buyer pursuant this Section 26 (the "<u>License</u>") creates only a license terminable as set forth herein and not a lease or other estate in land.

(b)        Subject to and upon the covenants, agreements and conditions provided in this Section 26, the term of the License shall commence on the Effective Date and expire on the Expiration Date (provided, however, that if Buyer exercises the Option in accordance herewith, the term of the License shall be automatically extended, without the need for any further or additional documentation, to the Closing Date), unless sooner terminated by Seller pursuant to the terms and conditions set forth herein. Unless the Closing occurs, if Buyer fails to vacate and terminate its use of the Licensed Premises upon the expiration or earlier termination of the term of the License, then:  (i) Buyer shall be deemed a trespasser; (ii) Buyer shall remain liable for the payment of the License Fee pursuant to Section 26(e) hereof until Buyer vacates and terminates its use of the Licensed Premises; and (iii) Seller may immediately remove Buyer and Buyer's property from the Licensed Premises.

(c)        Buyer shall use the Licensed Premises solely for the operation of the Business (as defined in the Purchase Agreement) and for no other use or purpose.

(d)        Buyer shall comply with all applicable laws, rules, orders, ordinances and regulations at any time issued or in force with respect to the Licensed Premises or Buyer's use thereof.

(e)        Buyer is granted the License to use the Licensed Premises during the term of the License in consideration of a license fee (the "License Fee") in the amount of Fourteen Thousand Seven Hundred Seventy-One and 52/100 Dollars ($14,771.52) per month, payable in advance on the first day of each calendar month during the term hereof.  The first installment of the License Fee shall be due and payable by Buyer simultaneously with Buyer's execution and delivery to Seller of this Agreement.   License Fees for any partial month shall be properly prorated on a daily rate basis, computed with reference to a presumed thirty (30) day month.  Payment of the License Fee shall be made by check payable to Seller in legal tender of the United States, at the address to which notices to Seller are to be given or to such other address as Seller may designate in writing.  If Buyer shall fail to pay any installment of the License Fee or other charge pursuant to this Section 26 within five (5) business days after the same becomes due and payable, then Buyer shall be obligated to pay a late charge equal to five percent (5%) of any License Fee or other charge not so paid when due.  In addition, any installments of License Fee or other charges to be paid by Buyer pursuant to this Section 26 which are not paid by Buyer within five (5) business days after the same becomes due and payable shall bear interest at a rate equal to two (2) percentage points above the then applicable Wall Street Journal Prime Rate (U.S. money center commercial banks) or its successor (or in the absence thereof such similar rate reasonably designated by Seller), accruing from the date such installment or payment became due and payable to the date of payment thereof by Buyer.  Such interest shall constitute additional License Fees due and payable to Seller by Buyer upon the date of payment of the delinquent payment referenced above.

(f)        Buyer shall not assign or otherwise transfer the License, nor permit occupancy or use by another party of the Licensed Premises or any part thereof.

(g)        Buyer shall make no alterations, installations, additions or improvements in or to the Licensed Premises without Seller's prior written consent.

(h)        Buyer shall keep the Licensed Premises in clean, safe and sanitary condition and take good care of the Licensed Premises.  If the Closing does not occur, then: (i) upon the expiration or earlier termination of the term of the License, Buyer shall surrender the Licensed Premises in the same order and condition in which the Licensed Premises existed on the Effective Date, ordinary wear and tear and damage by the elements, fire and other casualty excepted; and (ii) if any of Buyer's property remains in the Licensed Premises at the expiration or earlier termination of the term of the License, then it shall be deemed Seller's property and Buyer shall be liable to Seller for all costs and expenses incurred by Seller for the storage and/or removal of such property.

(i)      No sign, advertisement or notice shall be inscribed, painted, affixed or displayed on any part of the Licensed Premises without Seller's prior written approval.

(j)      (i) Buyer shall indemnify, defend and save harmless Seller and Seller's affiliates, together with the respective partners, trustees, beneficiaries, shareholders, members, managers, directors, officers, employees, agents and representatives of Seller and Seller's affiliates, from and against any and all liabilities, damages, causes of action, suits, claims, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising from injury to person or damage to personal property in or to the Licensed Premises which arise out of: (x) the act, failure to act or negligence of Buyer, its agents, contractors, servants employees or invitees; or (y) Buyer's use or occupancy of the Licensed Premises.  The foregoing indemnity shall survive the expiration or earlier termination of the License.

(ii) In order to assure such indemnity, Buyer agrees, at its sole cost and expense, to carry and keep in full force and effect at all times during the term of the License, a commercial general liability policy with a single limit of no less than One Million Dollars ($1,000,000.00) including coverage for bodily injury, property damage and personal injury liability.

(k)      The company or companies writing the insurance which Buyer is required to carry and maintain or cause to be carried or maintained pursuant to this Section 26 shall be licensed to do business in the jurisdiction in which the Licensed Premises are located.  Buyer's public liability insurance policies and certificates evidencing such insurance shall: (i) name as additional insureds Seller and such other parties as Seller shall designate; and (ii) contain a provision by which the insurer agrees that such policies shall not be canceled except after thirty (30) days' written notice to Seller.  Prior to the Effective Date, Buyer shall provide Seller with the certificates evidencing such insurance.

(l)      All personal property of Buyer and its employees, contractors, agents and invitees in or on the Licensed Premises shall be and remain therein under any and all circumstances at the sole risk of such parties, and Seller shall in no event be liable to any such person or party for any damage to, or loss of, such property.

(m)      Seller shall not be liable for any personal injury to Buyer or any of its employees, contractors, agents or invitees arising from the use and condition of the Licensed Premises unless such party establishes that there has been gross negligence or a willful act or failure to act on the part of Seller.

(n)      The License shall, at the option of Seller, cease and terminate if Buyer shall violate or fail to perform any of the conditions, covenants or agreements contained herein made by Buyer, and any violation or failure to perform any of those conditions, covenants or agreements shall continue for a period of five (5) business days after written notice thereof has been delivered by Seller to Buyer.  In such event, Buyer shall remain liable to Seller for all money and other damages arising from such default.

(o)      BUYER AND SELLER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON OR IN RESPECT OF ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LICENSE, THE RELATIONSHIP OF BUYER AND SELLER UNDER THIS SECTION 26, BUYER'S USE OF THE LICENSED PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE.

(p)      Buyer's sole recourse for satisfaction of any judgment against Seller shall be against Seller's estate, interest and title in and to the Licensed Premises.

(q)    Nothing contained herein shall be deemed or construed as creating a partnership, joint venture, or a relationship of landlord and tenant between Seller and Buyer.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date indicated below.

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____
Name: _____
Title: _____

Dated:_____

LABORATORY CORPORATION OF AMERICA
HOLDINGS

By: _____
Name: _____
Title: _____

Dated: _____

## EXHIBIT A

Parcel Numbers & Short Legal Descriptions:

84-06-16-210-001.000-002; Peyton Park 14.8' N-79 D-441/2641 16-12-9 Lots 79-80

84-06-16-210-002.000-002; Peyton Park 22'6" S Side D-383/761 16-12-9 Lot 79

84-06-16-210-003.000-002; Peyton Park D-441/2640 16-12-9 Lot 78

84-06-16-210-004.000-002; Peyton Park (1927 N 4th St) D-441/2640 16-12-9 Lots 76-77

84-06-16-210-005.000-002; Peyton Park D-441/2640 16-12-9 Lots 71-75

**Exhibit 1.3(a)(i)**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Agreement</u>") is made as of this _____ day of February, 2014, by and among **LABORATORY PARTNERS, INC.,** a Delaware corporation ("<u>LP</u>"), **TERRE HAUTE MEDICAL LABORATORY, INC.**, an Indiana corporation ("<u>THML</u>"), **PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.**, an Indiana corporation and wholly-owned subsidiary of THML ("<u>PATH</u>" and, with LP and THML, the "<u>Sellers</u>") and **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation ("<u>Purchaser</u>").

## W I T N E S S E T H:

**WHEREAS**, Purchaser and Sellers have entered into that certain Asset Purchase Agreement dated as of January ___, 2014 (the "<u>Purchase Agreement</u>"). Each capitalized term used herein but not defined herein shall have the respective meaning ascribed to such term in the Purchase Agreement.

**WHEREAS**, Section 1.3 of the Purchase Agreement provides that Purchaser, at the Closing, will assume the Assumed Liabilities.

**NOW, THEREFORE,** in consideration for the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Effective as of the date hereof and in accordance with and subject to the Purchase Agreement, Sellers hereby assign to Purchaser, and Purchaser hereby assumes and agrees to perform and discharge the Assumed Liabilities.

2.      Nothing in this Agreement  shall be deemed to supersede, alter or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided in, and subject to the limitations set forth in, the Purchase Agreement. If any conflict exists between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

3.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its principles of conflicts of law.

4.      This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.  The exchange of executed copies of this Agreement by facsimile, portable document format (PDF) transmission or other reasonable form of electronic transmission shall constitute effective execution and delivery of this Agreement.

*(Signatures appear on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption Agreement as of the date and year set forth above.

**<u>SELLERS</u>:**

LABORATORY PARTNERS, INC.

By: _____

Name: _____

Title: _____

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____

Name: _____

Title: _____

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____

Name: _____

Title: _____

**<u>PURCHASER</u>:**

LABORATORY CORPORATION OF AMERICA
HOLDINGS

By: _____

Name: _____

Title: _____

Exhibit 1.3(a)(ii)

## ASSIGNMENT AND ASSUMPTION OF LEASE

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Agreement**") is made as of this _____ day of _____, 2014, by and among **TERRE HAUTE MEDICAL LABORATORY, INC.**, an Indiana corporation (the "**Assignor**"), and **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation (together with its successors and permitted assigns, the "**Assignee**").

## W I T N E S S E T H :

**WHEREAS**, as contemplated by that certain Asset Purchase Agreement dated January __, 2014 by and among Assignor, Assignee, and certain other parties thereto (the "**Purchase Agreement**"), Assignor desires to assign the Existing Leases (as defined in the Purchase Agreement), upon the closing of the transactions contemplated thereby, to Assignee; and

**WHEREAS**, the parties desire to cause the Existing Leases to be assigned to Assignee.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Effective as of the date of the closing of the transactions contemplated by the Purchase Agreement (the "**Closing Date**"), Assignor hereby assigns and sets over unto Assignee all of Assignor's right, title and interest in and to the Existing Leases, to have and to hold unto Assignee, its successors and assigns for the remainder of the term of such Existing Leases.

2.      Effective as of the Closing Date, Assignee hereby assumes and agrees to perform and observe all of the terms, covenants and conditions of each Existing Lease on the part of Assignor thereunder to be performed and observed, including, without limitation, the payment of rent thereunder.

3.      Assignor hereby agrees that, with respect to matters arising prior to the Closing Date, Assignee shall have no liability.  Assignee hereby agrees that, with respect to matters arising on or after the Closing Date, Assignor shall have no liability.

4.      Nothing in this Agreement  shall be deemed to supersede, alter or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided in, and subject to the limitations set forth in, the Purchase Agreement. If any conflict exists between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

5.      The provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, personal representatives, successors and assigns.

6.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its principles of conflicts of law.

7.      This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument.  The exchange of executed copies of this Agreement by facsimile, portable document format (PDF) transmission or other reasonable form of electronic transmission shall constitute effective execution and delivery of this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**ASSIGNOR:**                                          **TERRE HAUTE MEDICAL LABORATORY, INC.,**
an Indiana corporation

By: _____
Name: _____
Title: _____


**ASSIGNEE:**                                           **LABORATORY CORPORATION OF AMERICA HOLDINGS,**
a Delaware corporation

By: _____
Name: _____
Title: _____

**[Signature Page to Assignment and Assumption of Lease]**

**Exhibit 3.2(a)**

## GENERAL ASSIGNMENT AND BILL OF SALE

**THIS GENERAL ASSIGNMENT AND BILL OF SALE** is made this ___ day of February, 2014, by **LABORATORY PARTNERS, INC.,** a Delaware corporation ("LP"), **TERRE HAUTE MEDICAL LABORATORY, INC.**, an Indiana corporation ("THML"), and **PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.**, an Indiana corporation and wholly-owned subsidiary of THML ("PATH" and, with LP and THML, the "Sellers"), for the benefit of **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into an Asset Purchase Agreement dated as of January ___, 2014 (the "Purchase Agreement") providing, among other things, that Sellers shall transfer to Purchaser certain of the properties and assets, tangible and intangible, of Sellers upon the terms and conditions set forth in the Purchase Agreement (each capitalized term used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Purchase Agreement).

NOW, THEREFORE, Sellers, for and in consideration of the purchase price set forth in the Purchase Agreement, do hereby grant, bargain, sell, assign, alienate, remise, release, convey, transfer, set over and confirm unto Purchaser and its successors and assigns free and clear of all Encumbrances other than Permitted Encumbrances, all right, title and interest of Sellers in and to the Purchased Assets, including, any Deferred Contracts that become Purchased Assets after the Closing Date in accordance with the Purchase Agreement.

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, to and for its and their use and benefit forever.

Sellers covenant and agree that, at any time and from time to time, they will, upon the written request of Purchaser, do, execute, acknowledge and deliver all such further acts, deeds, instruments, transfers, powers of attorney or assurances as may be reasonably requested by Purchaser from time to time for the purpose of confirming the sale, transfer and assignment of the Purchased Assets to Purchaser.

Nothing in this General Assignment and Bill of Sale shall be deemed to supersede, alter or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this General Assignment  and Bill of Sale as provided in, and subject to the limitations set forth in, the Purchase Agreement. If any conflict exists between the terms of this General Assignment and Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of Sellers and Purchaser.

This General Assignment and Bill of Sale shall be governed and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.  The execution and delivery of this General Assignment and Bill of Sale by facsimile, portable document format (PDF) transmission, or other reasonable form of electronic transmission shall constitute effective execution and delivery of this General Assignment and Bill of Sale.

*(Signatures appear on the following page)*

**IN WITNESS WHEREOF**, Sellers have caused this instrument to be duly executed and its corporate seal to be hereunto affixed the date first above written.

<u>**SELLERS**</u>**:**

LABORATORY PARTNERS, INC.

By: _____

Name: _____

Title: _____

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____

Name: _____

Title: _____

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____

Name: _____

Title: _____

<u>**Exhibit 3.2(h)**</u>

**NON-COMPETITION AGREEMENT**

**THIS NON-COMPETITION AGREEMENT** (this "<u>Agreement</u>") is made this [____] day of _____, 2014 by and among **LABORATORY PARTNERS, INC.,** a Delaware corporation ("<u>LP</u>"), **TERRE HAUTE MEDICAL LABORATORY, INC.,** an Indiana corporation ("<u>THML</u>"), **PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,** an Indiana corporation and wholly-owned subsidiary of THML ("<u>PATH</u>" and, with LP and THML, the "<u>Sellers</u>"), and **LABORATORY CORPORATION OF AMERICA HOLDINGS**, a Delaware corporation ("<u>Purchaser</u>").  Sellers are sometimes hereinafter referred to individually as a "<u>Seller Party</u>" and collectively as the "<u>Seller Parties</u>."

This Agreement is delivered to Purchaser pursuant to that certain Asset Purchase Agreement dated as of January __, 2014 (the "<u>Purchase Agreement</u>"), among Purchaser and the Seller Parties pursuant to which, Purchaser purchased selected assets of Sellers that were used or held for use in connection with the Business.  Each Seller Party acknowledges that Purchaser would not enter into, or consummate, the Purchase Agreement and the transactions contemplated thereby without the execution and delivery of this Agreement by the Seller Parties.  Each capitalized term used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration including that set forth in the Purchase Agreement, the sufficiency of which is hereby acknowledged, for the purpose of inducing Purchaser to enter into the Purchase Agreement and intending to be legally bound hereby, the undersigned parties covenant and agree as follows:

1.   **Definitions.**

(a)   "<u>Restricted Period</u>" means a period of five (5) years from and after the Closing Date.

(b)   "<u>Competing Business</u>" means the business of providing clinical and anatomic laboratory and associated pathology-related services, which includes reference business, to hospitals, clinics, surgery centers, physician offices, physicians, skilled nursing facilities and long-term care facilities. For the avoidance of doubt, Competing Business does not include the business of providing nuclear medicine services.

(c)   "<u>Territory</u>" means (i)(A) with respect to providing services to hospitals, clinics, surgery centers, physician offices and physicians, the counties of Clay, Crawford, Fountain, Greene, Hamilton, Hendricks, Marion, Monroe, Parke, Putnam, Sullivan, Vermillion and Vigo in the State of Indiana, and (B) with respect to providing services to skilled nursing and long-term care facilities, the counties of Greene, Parke, Vermillion and Vigo in the State of Indiana, and (ii)(A) with respect to providing services to hospitals, clinics, surgery centers, physician offices and physicians, the counties of Clark, Edgar and Vermillion in the State of Illinois, and (B) with respect to providing services to skilled nursing and long-term care facilities, the counties of Clark, Edgar and Vermillion in the State of Illinois.

(d)    "Confidential Information" means all non-public information regarding the Purchased Assets or the Business, including but not limited to lists of patients and referring physicians, information regarding pricing, costs and details of services, and personnel and compensation information.  Notwithstanding the foregoing, the term "Confidential Information" shall not include any information that is or becomes generally available to the public (through no fault of any Seller Party or any of their Affiliates) by the act of one who has the right to disclose such information without violating any right or privilege of Purchaser or any other Person.

(e)    "Controlled Affiliate" means, as applied to any Person, an Affiliate of that Person over whom such Person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities or other equity interests (having ordinary voting power) of such Affiliate or (ii) to direct or cause the direction of the management policies of such Affiliate, whether through the ownership of voting securities or by contract or otherwise.  For the avoidance of doubt, an Affiliate shall be deemed a "Controlled Affiliate" of another Person only during the period in which such Person holds the power described above.

2.    **Non-Competition.**    During the Restricted Period, except in furtherance of Purchaser's business, or otherwise on behalf of Purchaser, or with the prior written consent of Purchaser, none of the Seller Parties shall, or shall permit any of Seller Parties' Controlled Affiliates to, directly or indirectly, for their own account or together with or on behalf of any other Person, (a) engage, directly or indirectly, in a Competing Business within the Territory; or (b) provide Confidential Information to, solicit or sell for, organize or own any interest in, or become employed by or engaged by, or act as agent for, any person, corporation, or other entity that is directly or indirectly engaged in a Competing Business in the Territory; provided, however, that nothing herein shall preclude the Seller Parties or any of their respective Affiliates from holding (solely as a passive investment) not more than three percent (3%) of the outstanding shares of any publicly held company which may be so engaged in a Competing Business within the Territory.

3.    **Non-Solicitation.**    During the Restricted Period, except in furtherance of Purchaser's business, or otherwise on behalf of Purchaser, or with the prior written consent of Purchaser, none of the Seller Parties shall, or shall permit any of Seller Parties' Controlled Affiliates to, directly or indirectly, for their own account or together with or on behalf of any other Person, influence or attempt to influence any:

(a)    Acquired Customer, either directly or indirectly, to divert the purchases by such customer of products or services of the Business to any person, firm, corporation, institution, or other entity then in a Competing Business; or

(b)    Hired Employees, either directly or indirectly, to terminate his or her employment with Purchaser or such subsidiary or Affiliate; provided, however, that the foregoing shall not prohibit any Seller Party from (i) engaging in general solicitations, public advertising or the use of hiring or recruiting services for employment that are not specifically targeted at such Hired Employees, (ii)  hiring  such  Hired Employees as part of, or following their response to, generalized searches for employment, or (iii) hiring, engaging or  soliciting any such Hired Employee whose employment with Purchaser or its Affiliate has been terminated by Purchaser or its Affiliate without cause.

2

4.    **Exceptions.**  Notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement shall limit the right of

(a)    any of the equity owners of LP (including their respective portfolio companies, if any) or any buyer of the equity interests or assets of LP or any of its Affiliates or any officer or director of any Seller Party, to directly or indirectly undertake the restricted activities described in this Agreement; or

(b)    any Seller Party or any of their Controlled Affiliates to provide clinical laboratory or anatomic pathology services to long-term care and skilled nursing facilities and corporate accounts, whether within the Territory or otherwise (which, for the avoidance of doubt, shall not include any Acquired Customer), including routine and STAT lab tests, chart auditing services, and utilization and infection control reports.

5.    **Specific Enforcement: Extension of Period.**

(a)    Each Seller Party acknowledges that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate interests of Purchaser and that Purchaser would not have entered into the Purchase Agreement in the absence of such restrictions.  Each Seller Party also acknowledges that any breach by any Seller Party or such Seller Party's Controlled Affiliates of this Agreement will cause continuing and irreparable injury to Purchaser for which monetary damages would not be an adequate remedy.  Each Seller Party agrees that such Seller Party shall not, and shall not permit any of such Seller Party's Controlled Affiliates to, in any action or proceeding to enforce any of the provisions of this Agreement, assert the claim or defense that an adequate remedy at law exists.  In the event of such breach by any Seller Party, or any of Seller Party's Controlled Affiliates, Purchaser shall have the right to enforce the provisions of this Agreement by seeking injunctive or other relief in any court, without a requirement that a bond be posted, and this Agreement shall not in any way limit remedies of law or in equity otherwise available to Purchaser.

(b)    If any provision of this Agreement is held to be in any respect an unreasonable restriction upon any Seller Party, or any of such Seller Party's Affiliates, then such provision shall be deemed to extend only over the maximum period of time, geographic area, or range of activities as to which it may be enforceable with respect to such party.  In the event that any Seller Party, or any of such Seller Party's Controlled Affiliates, shall be in violation of the restrictive covenants in this Agreement, then the Restricted Period shall be extended for a period of time equal to the period of time during which such breach shall occur, and, in the event that Purchaser should be required to seek relief from such breach in any court, board of arbitration or other tribunal, then the Restricted Period shall be extended for the period of time required for the pendency of such proceedings, including all appeals.

6.    **Notice.**  Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

3

| | |
|---|---|
| To Sellers: | Laboratory Partners, Inc. |
| | 671 Ohio Pike, Suite K |
| | Cincinnati, OH 45245 |
| | Telecopy No.: (513) 201-1138 |
| | Attn: Chief Executive Officer |
| | |
| With a copy to: | |
| | |
| | Pillsbury Winthrop Shaw Pittman LLP |
| | 1540 Broadway |
| | New York, New York 10036 |
| | Telecopy No.: (212) 858-1500 |
| | Attn: Jonathan J. Russo |
| | |
| To Purchaser: | Laboratory Corporation of America Holdings |
| | 531 South Spring Street |
| | Burlington, North Carolina 27215 |
| | Telecopy No.: (336) 226-3835 |
| | Attention: General Counsel |
| | |
| With a copy to: | K&L Gates LLP |
| | 4350 Lassiter at North Hills, Suite 300 |
| | Raleigh, North Carolina 27619 |
| | Telecopy No.: (919) 743-7358 |
| | Attention: John R. Erwin, Esq. |

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

      7.    **Miscellaneous.**

      (a)    **Successors and Assigns.**  This Agreement shall inure to the benefit of Purchaser and its successors and assigns.

      (b)    **Waiver.**  The waiver by Purchaser of the breach of any term or provision of this Agreement shall not operate as or be construed to be a waiver of any other or subsequent breach of this Agreement.

      (c)    **Governing Law; Consent to Jurisdiction.**  This Agreement shall be construed and enforced in accordance with the substantive laws of the State of Delaware, without regard to the principles of conflicts of laws of any jurisdiction.  Each party hereto agrees that any proceeding in connection with or relating to this Agreement shall be brought in a court of competent jurisdiction located in Delaware, whether a state or federal court.

      (d)    **Invalidity.**  If any provision of this Agreement shall be determined to be void, invalid, unenforceable or illegal for any reason, the validity and enforceability of all of the remaining provisions hereof shall not be affected thereby.  If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such

amendment to apply only to the operation of such provision in the particular jurisdiction in which such adjudication is made; <u>provided</u>, that if any provision contained in this Agreement shall be adjudicated to be invalid or unenforceable because such provision is held to be excessively broad as to duration, geographic scope, activity or subject, such provision shall be deemed amended by limiting and reducing it so as to be valid and enforceable to the maximum extent compatible with the applicable laws of such jurisdiction, such amendment only to apply with respect to the operation of such provision in the applicable jurisdiction in which the adjudication is made.

(e)    **Section Headings.**    The section headings in this Agreement are for convenience only. They form no part of this Agreement and shall not affect interpretation.

(f)    **Counterparts; Facsimile Signatures.**    This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument.  The exchange of executed copies of this Agreement by facsimile, portable document format (PDF) transmission or other reasonable form of electronic transmission shall constitute effective execution and delivery of this Agreement.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the undersigned have executed this Non-Competition Agreement on the day first above written.

**SELLERS:**

LABORATORY PARTNERS, INC.

By: _____
Name: _____
Title: _____

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____
Name: _____
Title: _____

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____
Name: _____
Title: _____

**PURCHASER:**

LABORATORY CORPORATION OF AMERICA
HOLDINGS

By: _____
Name: _____
Title: _____

## **Seller Disclosure Schedule**

Section 4.

EXECUTION VERSION

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

## BY AND AMONG

## LABORATORY PARTNERS, INC.,

## TERRE HAUTE MEDICAL LABORATORY, INC., AND

## PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,

## AS SELLERS

## AND

## LABORATORY CORPORATION OF AMERICA HOLDINGS,

## AS PURCHASER

### Dated as of January 27, 2014

These Disclosure Schedules (the "Disclosure Schedules") have been prepared in connection with the Asset Purchase Agreement (the "Agreement"), dated as of January 27, 2014, by and among Laboratory Partners, Inc. ("LP"), Terre Haute Medical Laboratory, Inc. ("THML") and Pathology Associates of Terre Haute, Inc. ("PATH" and, collectively with LP and THML, the "Sellers"), and Laboratory Corporation of America Holdings (the "Purchaser").

1.      Capitalized terms used in these Disclosure Schedules but not defined herein shall have the meaning ascribed to such terms in the Agreement.

2.      Headings and captions in these Disclosure Schedules are for convenience of reference only and shall in no way affect or be considered in construing or interpreting any information provided herein.

3.      Any event, item or matter disclosed in any Section or numbered part of these Disclosure Schedules that qualifies any representation or warranty contained in Article 4 of the Agreement shall be deemed to be disclosed with respect to every other representation and warranty in Article 4 of the Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.      These Disclosure Schedules are qualified in their entirety by reference to specific provisions of the Agreement and are not intended to constitute, and shall not be construed as constituting representations and warranties of any of the Sellers or agreements by any of the Sellers except as and to the extent expressly provided in the Agreement. Inclusion of information herein shall not be construed as an admission that such information is material to the business, financial condition or results of operations of any of the Sellers, that any of the Sellers have violated any Law or that any of the Sellers breached any of their agreements or obligations.

5.      Any description or summary set forth in these Disclosure Schedules of any contracts, agreements, permits, licenses or other documents of any Seller is qualified in its entirety by reference to such contracts, agreements, permits, licenses or other documents of any Seller.

## SCHEDULE 1.1(a)

## Assumed Customer Contracts

Customer Agreements:

1.    Laboratory Services Agreement dated May 6, 2005 by and between Burnside Nursing Home and Terre Haute Medical Laboratory, Inc.

2.    Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Cobblestone Crossing and Addendum dated July 1, 2009.

3.    Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Davis Gardens and Addendum dated July 13, 2009.

4.    Laboratory Services Agreement dated September 22, 2005 by and between Glenburn Nursing Home and Terre Haute Medical Laboratory, Inc.

5.    Laboratory Services Agreement dated May 3, 2005 by and between Heritage House of Clinton and Terre Haute Medical Laboratory, Inc.

6.    Laboratory Services Agreement dated May 6, 2005 by and between Linton Nursing and Rehab and Terre Haute Medical Laboratory, Inc.

7.    Laboratory Services Agreement dated January 2, 2009 by and between Lyons Health & Living and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

8.    Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Meadows Manor and Addendum dated July 13, 2009.

9.    Laboratory Services Agreement dated August 25, 2004 by and between Meadows Manor North, Inc. and Terre Haute Medical Laboratory, Inc.

10.    Nursing Facility Laboratory Agreement between North Logan Health Care Center and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated September 1, 2009.

11.    Laboratory Services Agreement dated February 19, 2004 by and between Pleasant Meadows Christian Village and Terre Haute Medical Laboratory, Inc.

12.    Laboratory Services Agreement dated May 3, 2005 by and between Rockville Nursing Center and Terre Haute Medical Laboratory, Inc.

13.    Nursing Facility Laboratory Services Agreement dated January 1, 2014 by and between LP Terre Haute Management LLC managing operations of a facility known as Signature HealthCARE of Terre Haute and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

14.    Laboratory Services Agreement dated May 5, 2005 by and between Shakamak Good Samaritan and Terre Haute Medical Laboratory, Inc.

15.    Laboratory Services Agreement dated May 3, 2005 by and between Southwood (Kindred Transitional Care) and Terre Haute Medical Laboratory, Inc.

16.    Laboratory Services Agreement dated June 30, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Springhill Villages of American Senior Communities.

17.    Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Providence/St. Mary's Health Care.

18.     Laboratory Services Agreement dated May 4, 2005 by and between Terre Haute Nursing & Rehabilitation and Terre Haute Medical Laboratory, Inc.

19.     Nursing Facility Laboratory Agreement between The Waters of Covington and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated November 30, 2004.

20.     Laboratory Services Agreement dated January 8, 2004 by and between Westridge Health Care and Terre Haute Medical Laboratory, Inc.

21.     Laboratory Services Agreement dated July 23, 2010 by and between VistaCare USA, Inc. d/b/a VistaCare Hospice and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

22.     Laboratory Services Agreement dated September 13, 2013 by and between Union Associated Physicians Clinic, LLC and Terre Haute Medical Laboratory, Inc. and Business Associate Agreement dated September 16, 2013.

23.     Laboratory Services Agreement dated September 5, 2006 by and between Horizon Hospice and Terre Haute Medical Laboratory, Inc., Addendum dated September 7, 2006 and Business Associate Agreement Addendums dated September 5, 2006 and February 1, 2007.

24.     Laboratory Professional and Administrative Services Agreement, effective as of September 1, 2011, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and First Addendum to Laboratory Professional and Administrative Services Agreement.

25.     Amended and Restated Medical Director Agreement by and between Union Hospital Terre Haute, a division of Union Hospital, Inc., and Pathology Associates of Terre Haute, Inc. effective as of December 1, 2012 and HIPAA Business Associate Agreement effective as of December 10, 2012.

26.     Amended and Restated Medical Director Agreement by and between Union Hospital Clinton, a division of Union Hospital, Inc., and Pathology Associates of Terre Haute, Inc. effective as of December 1, 2012 and HIPAA Business Associate Agreement effective as of December 5, 2012.

27.     Pathology Services Agreement by and between Greene County General Hospital and Pathology Associates of Terre Haute, Inc. dated May 1, 2011, Business Associate Agreement dated May 1, 2011 and HIPAA Business Associate Agreement by and between Terre Haute MedLab and Greene County General Hospital dated September 1, 2013.

28.     Medical Director/Arterial Blood Gas Laboratory Agreement by and between Greene County General Hospital and Pathology Associates of Terre Haute, Inc. dated May 1, 2011.

29.     Laboratory Services Agreement dated March 6, 2008 by and between Harsha Behavioral Center and Terre Haute Medical Laboratory, Inc.

30.     Laboratory Service Agreement dated August 3, 2007 by and between Terre Haute Medical Laboratory, Inc. and St. Vincent Surgery Center of Terre Haute.

31.     Laboratory Service Agreement dated August 3, 2007 by and between Pathology Associates of Terre Haute, Inc. and St. Vincent Surgery Center of Terre Haute.

32.     Letter Agreement regarding courier services between Terre Haute Medical Laboratory, Inc. and Clara Fairbanks Center for Women dated April 16, 1998.

33.     Letter Agreement regarding courier services between Terre Haute Medical Laboratory, Inc. and Crawford Memorial Hospital dated January 16, 2008.

34.     Phlebotomy Services Agreement effective as of August 27, 2012 by and between Sequenom Center for Molecular Medicine, LLC and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

4

35.    Letter Agreement regarding courier services between Terre Haute Medical Laboratory, Inc. and Greene County General Hospital dated October 31, 2000.

36.    Hamilton Center Use Agreement dated August 12, 2012 by and between Terre Haute Medical Lab and Hamilton Center, Inc. and Laboratory Services Agreement dated August 1, 1994.

37.    Letter Agreement regarding courier services between Terre Haute Medical Laboratory, Inc. and Midwest Center for Rural Health dated July 8, 1997.

38.    Courier and Delivery Services Agreement dated December 4, 1995 by and between Terre Haute Medical Laboratory, Inc. and Phoenix Healthcare f/k/a Wabash Valley Practice Management and Letter Amendment dated January 8, 2002.

39.    Pathology Services Agreement by and between Sullivan County Community Hospital and Pathology Associates of Terre Haute, Inc. dated July 1, 2012 and Business Associate Agreement effective September 1, 2013.

40.    Laboratory and Pathology Services Agreement by and between Hospital & Medical Foundation of Paris, Inc. and Terre Haute Medical Laboratory, Inc. dated September 21, 2012 and Business Associate Agreement dated October 22, 2012.

41.    End-Stage Renal Dialysis Laboratory Services Agreement dated March 1, 2006 by and between RenaLab, Inc. and Terre Haute Medical Lab.

42.    Laboratory Services Agreement dated July 1, 2007 by and between Ambulatory Surgery Management Services LLC and Terre Haute Medical Laboratory, Inc.

43.    Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Westminster Village.

44.    Pathology Services Agreement by and between West Central Community Hospital, a division of Union Hospital, Inc., and Pathology Associates of Terre Haute, P.C. dated September 1, 1996.

45.    Laboratory Services Agreement dated December 27, 2006 by and between Vermillion Convalescent Center and Terre Haute Medical Laboratory, Inc.

46.    Collector/Clinic Agreement between Phlebotomy Services International and Terre Haute Medical Laboratory, Inc. d/b/a MedLab dated September 2, 2010.

47.    Business Associate Agreement between Clark County Family Medicine and MedLab of Terre Haute dated September 23, 2013.

48.    Courier and Delivery Services Agreement dated November 6, 1995 by and between Terre Haute Medical Laboratory, Inc. and Union Hospital, Inc.

49.    Letter Agreement regarding reference laboratory services between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Federal Penitentiary Laboratory dated January 18, 2011.

50.    Nursing Facility Laboratory Agreement by and between Heart to Heart Hospice and Laboratory Partners d/b/a MEDLAB effective as of July 24, 2013.

## SCHEDULE 1.1(b)

### Assumed Real Property Leases

| | Location | Lease |
|---|---|---|
| 1. | 315 Lankford Street Clay City, IN 47841 | Lease Agreement, dated October 12, 1996, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease Agreement dated July 25, 2003. |
| 2. | 408 North 2nd Street Marshall, IL 62441 | Lease Agreement, commencing July 9, 2012, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB. |
| 3. | 890 North Ridgelawn Road Martinsville, IL 62442 | Lease Agreement, effective as of July 15, 2009, by and between Medlab Terre Haute and David P. Davis, LLC and Addendum to Lease effective as of July 1, 2013. |
| 4. | 1332 North 7th Street Terre Haute, IN 47807 | Lease Agreement, commencing June 1, 2003, by and between Mayuri Estates, L.L.C. and Terre Haute Medical Laboratory, Inc. d/b/a Terre Haute Med Lab and Assignment of Lease from Mayuri Estates, L.L.C. to Union Hospital, Inc., effective as of January 1, 2012. |
| 5. | 4001 E. Wabash Avenue Terre Haute, IN 47803 | Lease Agreement, dated September 7, 1992, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease effective as of May 20, 1993. |
| 6. | 2723 South 7th Street Terre Haute, IN 27802 | Lease Agreement, dated March 1, 2007, by and between BMA Real Estate, LLC and Providence Medical Group, LLC and Sublease Agreement by and between Providence Medical Group, LLC and Terre Haute Medical Laboratory, Inc. dated October 1, 2008. |
| 7. | 601 Surgery Center Drive Terre Haute, IN 47802 | Lease Agreement, dated January 31, 2007, by and between R&S Medical Enterprises, L.L.C. and Terre Haute Medical Lab, Inc. and Assignment of Lease from R&S Medical Enterprises, L.L.C. to Union Hospital, Inc., effective as of January 1, 2012. |
| 8. | 5500 U.S. Highway 41 South Terre Haute, IN 47802 | Lease Agreement, dated April 30, 1997, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease Agreement dated July 25, 2003 and First Addendum to Lease effective as of May 1, 1997. |
| 9. | 1207 East National Avenue Brazil, IN 47834 | Amended and Restated Lease Agreement, commencing April 1, 2004, by and between Union Hospital, Inc. and Providence Medical Group, LLC and Assumption of Lease from Providence Medical Group by Terre Haute Medical Laboratory, Inc. effective as of October 1, 2008. |

501287382v5

|  | Location | Lease |
|---|---|---|
| 10. | 1606 North 7th Street Terre Haute, IN 47804 | Lease Agreement, dated October 11, 1999, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc., Amendment to Lease dated May 18, 2004 and Second Addendum effective as of September 1, 2004. |
| 11. | 801 South Main Street Clinton, IN 47842 | Sublease Agreement, dated September 1, 1996, by and between West Central Community Hospital and Terre Haute Medical Laboratory, Inc., First Addendum to Sublease dated September 1, 1997, Second Addendum to Sublease dated September 1, 1998, Third Addendum to Sublease dated July 25, 2003 and Fourth Addendum to Sublease effective as of January 1, 2008. |
| 12. | 1530 North 7th Street Terre Haute, IN 47807 | Lease Agreement, commencing August 1, 2004, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. |

501287382v5

## SCHEDULE 1.1(c)

### Equipment

<u>Medical Laboratory Equipment</u>:

1.   TP 2000 Processor, plus 2 loaner's
2.   TP 5000 Processor
3.   Qiagen HPV
4.   BD Viper
5.   Hologic Imager, 3 scopes
6.   LH750 -Beckman Coulter
7.   LH500-Beckman Coulter
8.   LH500-Beckman Coulter
9.   CA-1500 - Siemens
10.  CA-1500 - Siemens
11.  PFA-100 - Dade
12.  Hemochron Response - ITC
13.  Hemochron Response - ITC
14.  Adeza Tliq- Hologic
15.  Iris iQ200 - Beckman Coulter
16.  Iris Velocity- Beckman Coulter
17.  iChem 100 - Beckman Coulter
18.  eXcyte 20 - Vital Diagnostics
19.  Roche Modular PE
20.  Roche Modular PE
21.  Roche Cobas 6000
22.  Biorad Variant Turbo
23.  Siemens Centaur XP
24.  Siemens Stratus CS
25.  Siemens Stratus CS
26.  Nova CCX
27.  Nova CCX
28.  Nova CCX
29.  Alere Triage Meter
30.  Alere Triage Meter
31.  Advance Instruments Osmometer
32.  Helena Sample Handler
33.  Helena Spife 3000
34.  AtheNa
35.  Affirm BD
36.  Vitek II XL
37.  BacT-Alert 3D
38.  Geneohm SmartCycler BD
39.  Previ Isola
40.  Previ Color
41.  Eppendorf AG Mastercycler Pro

8

42.     Provue
43.     Helmer Platelet Incubator
44.     Urisys 1800
45.     Advia Centaur CP
46.     NOVA CCX-2
47.     Stratus CS
48.     Cobas 311
49.     Beckman Coulter LH500
50.     Beckman Coulter ActDiff2
51.     Sysmex CA-500
52.     Biosite Triage Meter - (2)
53.     Leica Cryostat CM 1800
54.     Excyte 20
55.     Tissue Tek VIP6
56.     Sakura Prisma Stainer
57.     Tissue Tek 4740 Coverslipper
58.     Dako Link 48 IHC Stainer
59.     VIP3000
60.     DRS 2000 Stainer
61.     Leica CM1800 Cryostat (backup)
62.     Leica CM1850UV Cryostat
63.     Thermo Shandon Histocentre 3
64.     Tissue-Tek/Microm Embedding Center
65.     Leica RM2035 Microtome
66.     Leica RM2030 Microtome
67.     Microm HM355S Automated Microtome
68.     Microwave-EBS Sciences H2850
69.     Thin Prep Processor-TP2000 Hologic
70.     ACIS x 2
71.     Beckman Coulter AcT Diff II
72.     Roche Urisys 1800
73.     DT 60 II Vitro Clinical Diagnostics
74.     Beckman Coulter LH500
75.     Beckman Coulter AcT Diff II
76.     Excyte 20 (Vital Diagnostics)
77.     Sysmex CA 540
78.     Siemens Dimension RXL
79.     Coagusense PT (Abbott)
80.     Triage BNP
81.     Clinitek

9

<u>Motor Vehicles</u>:

| <u>Vehicle</u> | <u>VIN #</u> |
|---|---|
| 1.  1995 Ford Van | 1FTEE14NXSHC25405 |
| 2.  1997 Pontiac | 1G2J 852 49V75 65 779 |
| 3.  2005 Toyota Matrix | 2T1KR32E65C333065 |
| 4.  2006 Toyota Matrix | 2T1KR32E96C589024 |
| 5.  2006 Toyota Matrix | 2T1KR32E36C591318 |
| 6.  2005 Dodge Caravan | 1 D4GP24R058396363 |
| 7.  2007 Toyota Matrix | 2T1KR32E57C664707 |
| 8.  2008 Toyota Matrix | 2T1KR32E28C716103 |
| 9.  2007 Toyota Matrix | 2TKR32E97C661227 |
| 10. 2007 Toyota Matrix | 2T1KR32E57C648166 |
| 11. 1997 Chevrolet Utility Van | 1GCHG35R2V1005046 |
| 12. 2009 Toyota Corolla | JTDBL40E29J041496 |
| 13. 2009 Toyota Matrix | 2T1KU40E39C172185 |
| 14. 2009 Toyota Matrix | 2T1KU40E89C155690 |

10

## SCHEDULE 1.1(i)

## Seller Intellectual Property

(ii)    Assumed IP Contracts

1.    Application Services Provider Agreement by and between Atlas Database Software Corp. d/b/a Atlas Development Corporation and Terre Haute Medical Laboratory, Inc. dated July 31, 2007.

2.    Cloverleaf Master License Agreement and Software Maintenance Agreement by and between Healthcare.com and Terre Haute Medical Laboratory, Inc. dated November 27, 2000.

3.    Transcription Platform Agreement by and between InfraWare and Terre Haute Medical Laboratory, Inc. dated August 1, 2009.

4.    Software License and Maintenance Agreement by and between Medic Computer Systems (Allscripts Healthcare LLC as successor in interest) and Terre Haute Medical Laboratory, Inc. dated December 23, 1998.

5.    Software License Agreement and Software Application Support and Maintenance Agreement by and between Soft Computer Consultants, Inc. and Terre Haute Medical Laboratory, Inc. dated January 14, 2002.

(iii)    Assumed Domain Names and Websites

1.    The following registered domain names of Terre Haute Medical Laboratory, Inc.:
   a.    http://www.terrehautemedlab.com.
   b.    http://www.thml.net.
   c.    http://www.thml.org.

501287382v5

**SCHEDULE 1.1(k)**

**Other Assigned Contracts**

Capital Leases:

1.      Lease Agreement dated December 14, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9830000).

2.      Lease Agreement dated January 9, 2012 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9838000).

3.      Lease Agreement dated May 29, 2012 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 10047000).

4.      Agreement dated March 5, 2012 between Terre Haute Medical Laboratory, Inc. and U.S. Bank Equipment Finance and Addendum dated April 20, 2012 (#1565427).

5.      Lease with Maintenance Agreement between Toshiba Business Solutions and Terre Haute Medical Laboratory, Inc. dated May 6, 2011 with Purchase Option Addendum dated May 6, 2011.

6.      Lease Agreement dated May 4, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9295000).

7.      Lease Agreement dated May 11, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9306000).

8.      Lease Agreement between bioMerieux, Inc. and MedLab – Terre Haute dated June 17, 2011 (Reference Number 19539v2).

9.      Lease Agreement dated November 11, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9710000).

10.     Lease Agreement dated November 21, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9725000).

11.     Lease Agreement dated January 26, 2012 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9867000).

12.     Agreement dated December 11, 2009 between Terre Haute Medical Laboratory, Inc. d/b/a MedLab and U.S. Bank Equipment Finance.

12

Reagent and Equipment Agreements:

1.      Product and Equipment Agreement between Qiagen Inc. and Terre Haute Medical Center dated April 13, 2009 and Products and Equipment Addendum dated June 1, 2012.

2.      Reagent Rental Agreement dated July, 18, 2011 by and between Becton, Dickinson and Company and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and Addendum dated August 1, 2011.

3.      Equipment lease between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042310) and Amendment effective as of August 4, 2011 (#41043199).

4.      Reagent and Supply Agreement between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042310) and Amendment effective as of August 4, 2011 (#41043199).

5.      Equipment lease between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

6.      Reagent and Supply Agreement between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

7.      Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab effective June 12, 2012.[1]

8.      Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab and Amendment dated February 8, 2013.

9.      IHN Master Agreement dated December 12, 2012 between Laboratory Partners, Inc. d/b/a MEDLAB and Beckman Coulter, Inc. and Amendments dated March 4, 2013.

10.      Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Kilbourne Medical Laboratory, Inc. and Supplement to the Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Terre Haute Medical Laboratory, Inc. dated July 11, 2011 and Amendment dated July 11, 2011.

11.      Equipment Agreement by and between Siemens Healthcare Diagnostics Inc. and Terre Haute Medical Laboratory, Inc. dated June 1, 2010.

12.      Work Station Agreement by and between Siemens Medical Solutions USA and Terre Haute Medical Laboratory, Inc.

13.      Quality Control Solutions and Hemoglobin A1c Instrumentation, Reagents and Service Agreement for the MEDLAB Group between Bio-Rad Laboratories and Terre Haute Medical Lab and MedLab Ohio, Inc. dated August 1, 2011.

14.      Letter Agreement between Fisher Scientific Company LLC and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB effective as of September 1, 2011.

15.      Product Agreement by and between Dako North America, Inc. and Terre Haute Medical Laboratory, Inc. effective May 31, 2012 and Addendum.

16.      Product Agreement by and between Dako North America, Inc. and Terre Haute Medical Laboratory, Inc. effective June 15, 2012.

17.      Reagent Agreement/Reagent Rental Agreement by and between Biosite Incorporated and Terre Haute Med Lab dated March 4, 2008 and Amendment #1 dated June 27, 2011.

18.      SmartCycler Service Contract between BD GeneOhm and Terre Haute Medical Lab dated June 2, 2008.

501287382v5

19.     ThinPrep Imaging System Agreement between Hologic, L.P. (f/k/a Cytyc, LP) and Terre Haute Medical Laboratory dated June 14, 2007 and Amendment No. 1 dated August 27, 2008, Amendment No. 2 dated August 27, 2009, Amendment No. 3 dated April 13, 2010, Amendment No. 4 dated December 13, 2010 and Amendment No. 5 dated March 7, 2012.

<u>Software/IT Agreements</u>:

1.      Application Services Provider Agreement by and between Atlas Database Software Corp. d/b/a Atlas Development Corporation and Terre Haute Medical Laboratory, Inc. dated July 31, 2007.

2.      Maintenance Agreement by and between Emerson Network Power and Terre Haute Medical Laboratory, Inc. dated March 14, 2013.

3.      Services Agreement by and between Frontier Communications of Indiana LLC and Terre Haute Medical Laboratory, Inc. dated October 19, 2011.

4.      Cloverleaf Master License Agreement and Software Maintenance Agreement by and between Healthcare.com and Terre Haute Medical Laboratory, Inc. dated November 27, 2000.

5.      Transcription Platform Agreement by and between InfraWare and Terre Haute Medical Laboratory, Inc. dated August 1, 2009.

6.      Wireless Service Agreement by and between Joink LLC and Terre Haute Medical Laboratory, Inc. dated January 6, 2012.

7.      Dedicated Internet Access Agreement by and between Joink LLC and Terre Haute Medical Laboratory, Inc. dated November 7, 2006.

8.      Hardware Equipment and Maintenance Agreement and Software License and Maintenance Agreement by and between Medic Computer Systems (Allscripts Healthcare LLC as successor in interest) and Terre Haute Medical Laboratory, Inc. dated December 23, 1998.

9.      Hardware Purchase Agreement by and between Soft Computer Consultants, Inc. and Terre Haute Medical Laboratory, Inc. dated January 14, 2002, and Hardware Support and Service Agreement and Addendum dated January 14, 2002.

10.     Software License Agreement by and between Soft Computer Consultants, Inc. and Terre Haute Medical Laboratory, Inc. dated January 14, 2002 and Software Application Support and Maintenance Agreement dated January 14, 2002.

11.     Master Agreement by and between Licensed Wireless Services and Terre Haute Medical Laboratory, Inc. undated.

12.     VMWare Maintenance Agreement by and between VMWare and Terre Haute Medical Laboratory, Inc. dated December 12, 2011.

13.     WebSense Software Maintenance Agreement by and between WebSense Express and Terre Haute Medical Laboratory, Inc. dated February 8, 2012.

15

<u>Strategic Relationship Agreements</u>:

1.      Assignment and Assumption of Employment Contracts dated July 19, 2010 by and between Pathology Associates of Terre Haute, Inc. and THML PathLab LLC.

2.      Administrative Services Agreement dated July 19, 2010 by and between Terre Haute Medical Laboratory, Inc., Pathology Associates of Terre Haute, Inc. and THML PathLab LLC.

3.      Professional Services Agreement dated July 19, 2010 by and between Terre Haute Medical Laboratory, Inc., Pathology Associates of Terre Haute, Inc. and THML PathLab LLC.

4.      Agreement to Comply with Professional Services Agreement and to Assign Billing and Collection Rights dated July 21, 2010 by and between Terre Haute Medical Laboratory and Ramona Jora, MD.

5.      Agreement to Comply with Professional Services Agreement and to Assign Billing and Collection Rights dated July 21, 2010 by and between Terre Haute Medical Laboratory and A. Limjoco-Antonio, MD.

16

## SCHEDULE 1.2(g)

## Excluded Intellectual Property

Domain names:

1.      Biological Technology Laboratory, Inc. has a registered domain name: http://www.biotechlab.com.

2.      Kilbourne Medical Laboratories, Inc. has a registered domain name: http://www.kilbournelabs.com.

3.      Laboratory Partners, Inc. has a registered domain name: http://www.laboratorypartners.com.

4.      Laboratory Partners, Inc. has a registered domain name: http://www.labpartners.com.

5.      Laboratory Partners, Inc. has a registered domain name: http://www.labpart.com.

6.      MedLab Ohio, Inc. has a registered domain name:  http://www.medilabinc.com.

7.      MedLab Ohio, Inc. has a registered domain name: http://clinicalhealthlabs.com.

8.      Suburban Medical Laboratory, Inc. has a registered domain name: http://www.smlab.com.

9.      The domain name: http://www.theMedLab.com.

10.      Terre Haute Medical Laboratory, Inc. has a registered domain name: http://www.thml.com.


Service marks:

1.      Biological Technology Laboratory, Inc. has a "MEDLAB" service mark registered in the State of Illinois.

2.      Kilbourne Medical Laboratories, Inc. has the service mark of the word "MedLab" in blue lettering with a hexagonal design with an embedded DNA double helix on the left side of the text registered in Kentucky.

3.      Laboratory Partners, Inc. has a "MEDLAB" work mark registered with the US Patent and Trademark Office on the Supplemental Register.

4.      Laboratory Partners, Inc. has a "MEDLAB" design mark registered with the US Patent and Trademark Office on the Principal Register.

5.      Laboratory Partners, Inc. has a "MEDLAB" service mark registered in the State of Illinois.

6.      MedLab Ohio, Inc. has a "MEDLAB" service mark registered in the State of Illinois.

7.      Suburban Medical Laboratory, Inc. has a "MEDLAB" service mark registered in the State of Illinois.

8.      Terre Haute Medical Laboratory, Inc. has a service mark of MedLab—with logo—word appears in blue stylized print in conjunction with custom blue and white design registered in Ohio.

18

<u>Trade names</u>:

    1.    Biological Technology Laboratory, Inc. has the following trade names: Biological Technology Laboratory, Inc., Biotech Lab, Biotech MedLab, MedLab Illinois, MEDLAB St. Louis and MedLab.

    2.    Kilbourne Medical Laboratories, Inc. has the following trade names: MedLab, Kilbourne Medical Laboratory, Dayton Medical Laboratories, Total Med Lab and TOTALMED LAB.

    3.    Laboratory Partners, Inc. has the following trade names: MedLab, MEDLAB – Springfield, and MEDLAB – Mt. Vernon.

    4.    MedLab Ohio, Inc. has the following trade names: MedLab, Clinical Health Laboratories, Inc., CHL, Medi-Lab, and MedLab of Ohio, Inc.

    5.    Suburban Medical Laboratory, Inc. has the following trade names: Suburban Medical Laboratory, Inc. and MedLab.

19

**SCHEDULE 1.2(h)**

**Excluded Assets**

      1.      Capital stock of Sellers, Kilbourne Medical Laboratories, Inc., MedLab Ohio, Inc., Suburban Medical Laboratory, Inc. and Biological Technology Laboratory, Inc.

      2.      All of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, held by Kilbourne Medical Laboratories, Inc., MedLab Ohio, Inc., Suburban Medical Laboratory, Inc. and Biological Technology Laboratory, Inc.

      3.      2012 Ford Fusion (VIN# 3FAHP0GA7CR445455).

      4.      2012 Nissan Versa (VIN# 3N1BC1CP4CK811265).

      5.      2009 Toyota Matrix (VIN# 2T1KU40E19C085790).

20

**SCHEDULE 1.5(a)**

**Original Contract & Cure Schedule[1]**

Capital Leases:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1. THML | bioMeriux, Inc. | 1,938.78 | BioMerieux #29552 Color Gram |
| 2. THML | Leasing Associates of Barrington, Inc. | 8,673.42 | LAB - Immunoassay Systems; Lease #9295000 |
| 3. THML | Leasing Associates of Barrington, Inc. | 37,702.80 | LAB - Coagulation Analyzers; Lease #9306000 |
| 4. THML | Leasing Associates of Barrington, Inc. | 16,929.54 | LAB - ProVue Blood Bank System; Lease #9710000 |
| 5. THML | Leasing Associates of Barrington, Inc. | 14,939.34 | LAB - Previ Isola Micro Instrument; Lease #9725000 |
| 6. THML | Leasing Associates of Barrington, Inc. | 11,032.77 | LAB - Sakura Tissue Tek VIP 6 Processor; Lease #9867000 |
| 7. THML | Leasing Associates of Barrington, Inc. | 18,717.51 | LAB - Sakura Tissue Tek Prisma Stainer; Lease #9830000 |
| 8. THML | Leasing Associates of Barrington, Inc. | 6,041.22 | LAB - QuickScan 2000 Electrophoresis; Lease #9838000 |
| 9. THML | Leasing Associates of Barrington, Inc. | 13,937.82 | LAB - Autostainer System; Lease #10047000 |
| 10. THML | Toshiba Business Solutions | 2,456.94 | Toshiba copier; Lease #90136100709; Includes Maintenance Agreement |
| 11. THML | U.S. Bank Equipment | 6,903.00 | COPY CO; Lease #1058164 |
| 12. THML | U.S. Bank Equipment | 880.32 | New Xerox CopyCo; Lease #1058164 |
| | **TOTAL:** | **$ 140,153.46** | |

Reference Laboratory Services Agreement:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1. THML d/b/a MEDLAB | Quest Diagnostics Nichols Institute, Inc. | 248,319.50 | Reference Laboratory Services Agreement |

---

[1] Cure amounts through January 24, 2014.

21

Software/IT Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.   THML | Atlas Database Software Corp. dba Atlas Development Corporation | 15,657.35 | Application Services Provider Agreement |
| 2.   THML | Emerson Network Power | 0.00 | Maintenance Agreement |
| 3.   THML | Frontier Communications of Indiana LLC | 746.43 | Services Agreement |
| 4.   THML | Healthcare.com /Infor Inc. | 0.00 | Cloverleaf Master License Agreement and Software Maintenance Agreement |
| 5.   THML | InfraWare | 316.00 | Transcription Platform Agreement |
| 6.   THML | Joink LLC | 64.48 | Wireless Service Agreement |
| 7.   THML | Joink LLC | 313.50 | Dedicated Internet Access Agreement |
| 8.   THML | Medic Computer Systems (Mysis / Allscripts) | 27,121.60 | Hardware Equipment and Maintenance Agreement; Software License and Maintenance Agreement |
| 9.   THML | Soft Computer Consultants, Inc. | 743.72 | Hardware Purchase Agreement; Hardware Support and Service Agreement and Addendum |
| 10.  THML | Soft Computer Consultants, Inc. | 29,618.27 | Software License Agreement; Software Application Support and Maintenance Agreement |
| 11.  THML | St. Francisville Properties Inc d/b/a Licenses Wireless Services | 966.94 | Master Agreement |
| 12.  THML | VM Ware | 0.00 | VM Ware Maintenance Agreement |
| 13.  THML | WebSense Express | 0.00 | WebSense Software Maintenance Agreement |
| | **TOTAL:** | **$ 75,548.29** | |

501287382v5

Reagent and Equipment Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.  THML | Alere North America, Inc. | 23,213.65 | Reagent Rental Agreement - AtheNA Multi-Lyte Test System |
| 2.  THML | Alere North America, Inc. | 81,938.78 | Reagent Rental Agreement - Biosite Triage |
| 3.  Laboratory Partners, Inc. | Beckman Coulter, Inc. | 36,027.65 | IHN Master Agreement |
| 4.  THML | Becton, Dickinson and Company (dba BD Diagnostics) | 0.00 | Reagent Rental Agreement - BD ProbeTec System |
| 5.  THML | Bio-Rad Laboratories, Inc. | 21,346.18 | Quality Control Solutions and Hemoglobin A1c Instrumentation, Reagents and Service |
| 6.  THML | Qiagen Inc. | 14,361.31 | Products and Equipment Agreement |
| 7.  THML | Roche Diagnostics Corporation | 231,251.94 | Equipment Lease #41043197 |
| 8.  THML | Roche Diagnostics Corporation | 144,017.78[2] | Reagent and Supply Agreement - Lease #41043197 |
| 9.  THML | Roche Diagnostics Corporation | 25,692.63 | Equipment Lease #41043199 |
| 10. THML | Roche Diagnostics Corporation | 144,017.78[2] | Reagent and Supply Agreement - Lease #41043199 |
| 11. THML | Siemens Healthcare Diagnostics, Inc. | 82,842.29 | Master Products Agreement |
| 12. THML | Siemens Healthcare Diagnostics, Inc. | 2,288.19 | Equipment Agreement - RxL Max Equipment and Millipore System |
| 13. THML | Siemens Medical Solutions USA | 18,733.97 | Work Station Agreement |
| 14. THML d/b/a MEDLAB | Fisher Scientific | 249,680.26 | Letter Agreement |
| 15. THML | Biosite Incorporated (Carter Wallace) | 0.00 | Reagent Rental Agreement - Biosite Triage |
| 16. THML | BD Diagnostics, Geneohn | 0.00 | Reagent Rental Agreement - Smart Cycler Desktop System |
| 17. THML | Hologic LP (fka Cytyc Limited Partnership) | 38,542.21 | ThinPrep2000 Imaging System Agreement |
| 18. THML | Dako North America, Inc. | 0.00 | Product Agreement (5/31/12) |
| 19. THML | Dako North America, Inc. | 22,978.25 | Product Agreement (6/15/12) |
| | **TOTAL:** | **$ 992,915.09** | |

---

[2] Cure amounts for Reagent and Supply Agreements Leases #41043197 and #41043199 with Roche Diagnostics Corporation are aggregated in Sellers' accounting records and presented in aggregate in the table above.

23

Provider Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.  THML | Advantage Health Solutions | 0.00 | Provider Agreement |
| 2.  THML | Aetna Health, Inc. | 0.00 | Ancillary Services Agreement |
| 3.  PATH | Aetna Workers' Comp Access LLC | 0.00 | Physician Group Participation Agreement |
| 4.  THML | AmeriHealth Mercy of Indiana, LLC dba MDWise Hoosier Alliance | 0.00 | Participating Provider Agreement |
| 5.  PATH | AmeriHealth Mercy of Indiana, LLC dba MDWise Hoosier Alliance | 0.00 | MDWise Plan Participating Provider Agreement |
| 6.  THML | Anthem Insurance Companies dba Anthem Blue Cross and Blue Shield | 0.00 | Ancillary Provider Agreement |
| 7.  PATH | Anthem Insurance Companies dba Anthem Blue Cross and Blue Shield | 0.00 | Professional Provider Agreement |
| 8.  PATH | BCE Emergis Corporation | 0.00 | Healthcare Provider Network Agreement, Provider Group |
| 9.  PATH | Beyond Benefits, Inc. dba ppoNEXT | 0.00 | Participating Provider Agreement |
| 10. THML | CareSource Indiana, Inc. | 0.00 | Group Practices Service Agreement |
| 11. PATH, P.C. | CCN Managed Care, Inc. | 0.00 | CCN Professional Care Provider Agreement |
| 12. THML | Clarian Health Partners, Inc. | 0.00 | Participating Provider Agreement |
| 13. THML | Community Health Alliance | 0.00 | Ancillary Services Provider Agreement |
| 14. THML | Connecticut General Life Insurance Company and HealthSource Indiana Managed Care Plan, Inc. (CIGNA) | 0.00 | Ancillary Provider Managed Care Agreement |
| 15. PATH | CIGNA HealthCare of Indiana, Inc. | 0.00 | Group Practice Managed Care Agreement |
| 16. PATH | Consumers Life Insurance Company | 0.00 | Supermed Network Participation Agreement |
| 17. THML | CorVel Corporation | 0.00 | Ancillary Agreement |
| 18. THML | Coventry Health Life Insurance Company | 0.00 | Participating Ancillary Services Agreement |
| 19. THML | Encore Health Network | 0.00 | Provider Services Agreement |
| 20. PATH | Encore Health Network | 0.00 | Provider Services Agreement |
| 21. THML | First Health Network | 0.00 | Participating Provider Agreement |
| 22. THML | Harmony Health Plan of Illinois, Inc. dba Harmony Health Plan of Indiana | 0.00 | Ancillary Services Agreement |

24

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 23. PATH | Harmony Health Plan of Illinois, Inc. dba Harmony Health Plan of Indiana | 0.00 | Consulting Physician Agreement |
| 24. THML | Health Alliance Medical Plans, Inc. | 0.00 | Participating Provider Agreement |
| 25. PATH | Health Alliance Medical Plans, Inc. | 0.00 | Provider Service Agreement |
| 26. PATH | Health Indiana, LLC | 0.00 | Payor Agreement |
| 27. THML | HealthLink HMO, Inc. | 0.00 | Healthlink HMO Allied/Ancillary Provider Agreement |
| 28. PATH | HealthLink HMO, Inc. | 0.00 | Healthlink HMO Group Agreement |
| 29. THML | HealthLink, Inc. | 618.66 | Ancillary Participating Provider Agreement |
| 30. PATH | HealthLink, Inc. | 101.50 | Participating Provider Agreement |
| 31. THML | Humana dba ChoiceCare Network | 0.00 | ChoiceCare Network Ancillary Provider Participation Agreement |
| 32. PATH | Humana dba ChoiceCare Network | 0.00 | Group Participation Agreement |
| 33. PATH | IHN, Inc. | 0.00 | Group Provider Agreement |
| 34. THML | Illinois Department of Public Aid | 0.00 | IL Medical Assistance Program Participation Agreement |
| 35. THML | Indiana State Department of Health | 0.00 | BCCP Provider Agreements |
| 36. PATH | Indiana State Department of Health | 0.00 | BCCP Provider Agreements |
| 37. THML | Indiana State Department of Health | 0.00 | Children's Special Healthcare Services Provider Agreement |
| 38. PATH | Indiana State Department of Health | 0.00 | Children's' Special Healthcare Services Provider Agreement |
| 39. THML | Integrated Health Plan, Inc. | 0.00 | Provider Network Ancillary Agreement |
| 40. THML | Managed Care Services LLC dba Parkview Health Plan Services | 0.00 | Participating Provider Agreement |
| 41. THML | Medical Mutual of Ohio | 0.00 | Provider Agreement |
| 42. THML | Molina Healthcare of Indiana, Inc. | 0.00 | Provider Services Agreement |
| 43. THML | MultiPlan, Inc. | 0.00 | Participating Ancillary Services Provider Agreement |
| 44. PATH | MultiPlan, Inc. (formerly with Private Healthcare Systems, Inc.) | 0.00 | Preferred Physician Group Agreement |
| 45. THML | NaphCare, Inc. | 0.00 | Inpatient & Outpatient Subcontract Agreement |
| 46. PATH | NaphCare, Inc. | 0.00 | Inpatient & Outpatient Subcontract Agreement |

25

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 47. THML | PPO of Indiana | 0.00 | PPO Participating Provider Agreement |
| 48. PATH | PPO of Indiana | 0.00 | PPO Participating Provider Agreement |
| 49. THML | PPOM LLC | 0.00 | HCP Agreement |
| 50. PATH | PPOM LLC | 0.00 | HCP Agreement |
| 51. PATH | Preferred Plan Administrative Services, Inc. | 0.00 | Participating Facility Agreement |
| 52. THML | Preferred Plan, Inc. | 0.00 | Agreement |
| 53. THML | Private Healthcare Systems, Inc. | 0.00 | PCHS Participating Vendor Agreement |
| 54. PATH | Provider Select, Inc. | 0.00 | Physician Group Agreement |
| 55. THML | Prudential Health Care Plan, Inc. | 0.00 | Professional Services Agreement |
| 56. THML | Sagamore Health Network, Inc. | 120.97 | PPO Provider Agreement |
| 57. PATH | Sagamore Health Network, Inc. | 0.00 | PPO Provider Group Agreement |
| 58. THML | Senate Health Plan Solutions LLC | 0.00 | Provider Services Agreement |
| 59. PATH | SIHO Network, LLC; Southeastern Indiana Health Operations, Inc; Southeastern Indiana Health Organization | 0.00 | Participating Ancillary Provider Agreement |
| 60. THML | UMWA Combined Benefit Fund, 1992 Plan & 1993 Plan | 0.00 | Provider Agreement |
| 61. PATH | UMWA Combined Benefit Fund, 1992 Plan & 1993 Plan | 0.00 | Provider Agreement |
| 62. THML | United Healthcare Insurance Company | 0.00 | Facility Participation Agreement |
| 63. PATH | United Healthcare Insurance Company | 0.00 | Medical Group Participation Agreement |
| | **TOTAL:** | **$ 841.13** | |

Customer Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.  THML | Union Associated Physicians & Surgeons Clinic, LLC | 0.00 | Laboratory Services Agreement |
| 2.  THML | Burnside | 0.00 | Laboratory Services Agreement & Addendum for Phlebotomy Services |
| 3.  THML d/b/a MEDLAB | Cobblestone Crossings | 0.00 | Laboratory Services Agreement |
| 4.  THML d/b/a MEDLAB | Davis Gardens | 0.00 | Laboratory Services Agreement & Addendum for Phlebotomy Services |
| 5.  THML | Glenburn Nursing Home | 0.00 | Laboratory Services Agreement & Addendum for Phlebotomy Services |
| 6.  THML | Heritage House of Clinton (Clinton Gardens) | 0.00 | Laboratory Services Agreement |
| 7.  THML | Horizon Hospice Care, Inc. | 0.00 | Laboratory Services Agreement & Addendum |
| 8.  THML | Linton Nursing and Rehab | 0.00 | Laboratory Services Agreement |
| 9.  THML | Lyons Health and Living | 0.00 | Laboratory Services Agreement |
| 10. THML | Meadows Manor North, Inc. | 0.00 | Laboratory Services Agreement |
| 11. THML d/b/a MEDLAB | Meadows Manor, Inc. | 0.00 | Laboratory Services Agreement & Addendum for Phlebotomy Services |
| 12. THML d/b/a MEDLAB | North Logan Health Care Center | 0.00 | Nursing Facility Laboratory Agreement |
| 13. THML | Pleasant Meadows Christian Village | 0.00 | Laboratory Services Agreement |
| 14. THML d/b/a MEDLAB | Providence/St. Mary's Health Care | 0.00 | Laboratory Services Agreement |
| 15. THML | Rockville Nursing Center | 0.00 | Laboratory Services Agreement |
| 16. THML | LP Terre Haute Management LLC | 0.00 | Nursing Facility Laboratory Agreement |
| 17. THML | Shakamak Good Samaritan | 0.00 | Laboratory Services Agreement |
| 18. THML | Southwood (Kindred Transitional Care) | 0.00 | Laboratory Services Agreement |
| 19. THML d/b/a MEDLAB | Springhill Villages of American Senior Communities | 0.00 | Laboratory Services Agreement |
| 20. THML | Terre Haute Nursing & Rehabilitation | 0.00 | Laboratory Services Agreement |
| 21. THML d/b/a MEDLAB | The Board of Trustees of the Flavius J. Witham Memorial Hospital dba Westridge Health Care Center | 0.00 | Nursing Facility Laboratory Agreement |
| 22. THML d/b/a MEDLAB | The Waters of Covington | 0.00 | Nursing Facility Laboratory Agreement |

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 23. THML | Vermillion Convalescent Center | 0.00 | Laboratory Services Agreement |
| 24. THML | VistaCare USA, Inc. dba VistaCare Hospice | 0.00 | Laboratory Services Agreement |
| 25. THML | Clara Fairbanks Center for Women | 0.00 | Courier Services Agreement |
| 26. THML | Crawford Memorial Hospital | 0.00 | Courier Services Agreement |
| 27. THML | Greene County Hospital | 0.00 | Specimen Transport Agreement |
| 28. PATH | Greene County Hospital | 0.00 | Pathology Services Agreement and HIPAA Business Associate Agreement |
| 29. PATH | Greene County Hospital | 0.00 | Medical Director / Arterial Blood Gas Laboratory Agreement |
| 30. THML | Hamilton Center, Inc. | 0.00 | Laboratory Services Agreement & Hamilton Center Use Agreement |
| 31. THML | Midwest Center for Rural Health | 0.00 | Clay City Rural Health Clinic Courier Services Agreement |
| 32. THML d/b/a MEDLAB | Phlebotomy Services International (Hux Center) | 0.00 | Collector / Clinic Agreement |
| 33. THML | Phoenix Healthcare (UH Medical Group) | 0.00 | Courier Services Agreement |
| 34. PATH | Sullivan County Community Hospital | 0.00 | Pathology Services Agreement & Business Associate Agreement |
| 35. PATH | Union Hospital, Inc. | 0.00 | Amended & Restated Medical Director Agreement (Union Hospital Clinton) |
| 36. PATH | Union Hospital, Inc. | 0.00 | Amended & Restated Medical Director Agreement (Union Hospital Terre Haute) |
| 37. THML | Union Hospital, Inc. | 0.00 | Laboratory Professional and Administrative Services Agreement |
| 38. THML | Harsha Behavioral Center | 0.00 | Laboratory Services Agreement & Specimen Pick-Up Addendum |
| 39. THML | Medical Foundation of Paris, Inc. | 0.00 | Laboratory and Pathology Services Agreement |
| 40. THML | RenaLab, Inc. | 0.00 | End-Stage Renal Dialysis Laboratory Services Agreement |
| 41. THML d/b/a MEDLAB | Sequenom Center for Molecular Medicine, LLC | 0.00 | Phlebotomy Services Agreement |
| 42. PATH | St. Vincent Surgery Center of Terre Haute | 0.00 | Pathology Service Agreement |
| 43. THML | St. Vincent Surgery Center of Terre Haute | 0.00 | Laboratory Services Agreement |
| 44. THML | Ambulatory Surgery Management Services LLC | 0.00 | Laboratory Services Agreement |
| 45. THML | Westminster Village | 0.00 | Laboratory Services Agreement |

28

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---:|---|
| 46. PATH | West Central Community Hospital (Union Hospital) | 0.00 | Pathology Services Agreement |
| 47. THML d/b/a MEDLAB | Clark County Family Medicine | 0.00 | Business Associate Agreement |
| 48. THML | Union Hospital, Inc. | 0.00 | Courier and Delivery Services Agreement |
| 49. THML d/b/a MEDLAB | Federal Penitentiary Laboratory | 0.00 | Reference laboratory |
| 50. LP d/b/a MEDLAB | Heart to Heart Hospice | 0.00 | Nursing Facility Laboratory Agreement |
| | TOTAL: | **$ 0.00** | |

29

Real Property Leases:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.  THML | David P Davis LLC | 0.00 | 890 Ridgelawn Road, Martinsville IL 62442 |
| 2.  THML | Providence Medical Group LLC | 0.00 | 2723 South 7th Street, Terre Haute IN 47802 |
| 3.  THML | Union Hospital, Inc. | 0.00 | 315 Lankford Street, Clay City IN 47841 |
| 4.  THML | Union Hospital, Inc. | 0.00 | 408 North 2nd Street, Marshall IL  62441 |
| 5.  THML | Union Hospital, Inc. | 0.00 | 601 Surgery Center Drive, Terre Haute IN 47802 |
| 6.  THML | Union Hospital, Inc. | 0.00 | 801 South Main Street, Clinton IN 47842 |
| 7.  THML | Union Hospital, Inc. | 0.00 | 1207 E. National Avenue, Brazil IN 47834 |
| 8.  THML | Union Hospital, Inc. | 0.00 | 1332 North 7th Street, Terre Haute IN 47807 |
| 9.  THML | Union Hospital, Inc. | 0.00 | 1530 North 7th Street #100, Terre Haute IN 47807 |
| 10. THML | Union Hospital, Inc. | 0.00 | 1606 North 7th Street, Terre Haute IN 47801 |
| 11. THML | Union Hospital, Inc. | 0.00 | 4001 E. Wabash Avenue, Terre Haute IN 47803 |
| 12. THML | Union Hospital, Inc. | 0.00 | 5500 South US Highway 41, Terre Haute IN 47802 |
| | | **TOTAL:**  **$ 0.00** | |

Strategic Relationship Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.  PATH | THML PathLab LLC | 0.00 | Assignment and Assumption of Employment Contracts |
| 2.  THML and PATH | THML PathLab LLC | 0.00 | Administrative Services Agreement |
| 3.  THML and PATH | THML PathLab LLC | 0.00 | Professional Services Agreement |
| 4.  THML | Ramona Jora, MD | 0.00 | Agreement to Comply with Professional Services Agreement and to Assign Billing and Collection Rights |
| 5.  THML | A. Limjoco-Antonio, MD | 0.00 | Agreement to Comply with Professional Services Agreement and to Assign Billing and Collection Rights |
| | TOTAL: | $ 0.00 | |

31

**SCHEDULE 1.5(b)**

**Deferred Contracts**

Provider Agreements:

1.      Provider Agreement dated July 1, 2011 by and between Advantage Health Solutions, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

2.      Participating Provider Agreement by and between Clarian Health Partners, Inc. and Terre Haute Medical Laboratory, Inc. effective as of September 1, 2010.

3.      Ancillary Agreement between CorVel Corporation and Terre Haute Medical Laboratory, Inc. dated January 1, 1999.

4.      Provider Services Agreement by and between The HealthCare Group, LLC, Encore PPO, Encircle EPO and Terre Haute Medical Laboratory, Inc. effective as of February 21, 2006.

5.      Provider Services Agreement by and between The HealthCare Group, LLC, Encore PPO, Encircle EPO and Pathology Associates of Terre Haute, Inc. effective as of February 21, 2006 and Exhibit A-3 dated October 28, 2011.

6.      Ancillary Provider Participation Agreement by and between Terre Haute Medical Laboratory, Inc. and Health Value Management, Inc. d/b/a ChoiceCare Network commencing March 1, 2004 and Letter Amendment dated December 14, 2007.

7.      Group Participation Agreement by and between Pathology Associates of Terre Haute and Health Value Management, Inc. d/b/a ChoiceCare Network commencing January 1, 2005, Amendment Letter dated December 14, 2007, Provider Addendum for William D. DePond dated April 20, 2009 and Provider Addendum for Chitra Kohli dated July 1, 2011.

8.      Provider Services Agreement by and between Senate Health Plans Solutions, LLC and Terre Haute Medical Laboratory, Inc. effective as of 2011.

9.      Inpatient and Outpatient Subcontract Agreement effective as of June 15, 2011 between NaphCare, Inc. and Terre Haute Medical Lab, Inc.

10.     Inpatient and Outpatient Subcontract Agreement effective as of June 15, 2011 between NaphCare, Inc. and Pathology Associates of Terre Haute, Inc.

11.     Participating Provider Agreement by and between Managed Care Services LLC d/b/a Parkview Health Plan Services and Terre Haute Medical Laboratory, Inc. effective as of February 15, 2007

12.     PPO Participating Provider Agreement by and between PPO of Indiana and Terre Haute Medical Laboratory, Inc. dated January 6, 1998.

13.     PPO Participating Provider Agreement by and between PPO of Indiana and Pathology Associates of Terre Haute, P.C. dated October 15, 1997

14.     Group Practice Services Agreement dated March 9, 2005 by and between CareSource Indiana, Inc. and Terre Haute Medical Laboratory, Inc.

15.     Participating Provider Agreement dated August 30, 2005 by and between Health Alliance Medical Plans, Inc. and Terre Haute Medical Laboratory, Inc. and First Amendment dated November 16, 2007

16.     Participating Provider Agreement dated August 30, 2006 by and between Health Alliance Medical Plans, Inc. and Pathology Associates of Terre Haute, P.C.

17.     Health Care Provider Network Agreement undated between BCE Emergis Corporation and Pathology Associates of Terre Haute, P.C.

32

18.     Participating Provider Agreement dated September 10, 2001 by and between Beyond Benefits, Inc. and Pathology Associates of Terre Haute, P.C.

19.     Ancillary Services Agreement dated January 1, 2005 by and between Harmony Health Plan of Illinois, Inc. d/b/a Harmony Health Plan of Indiana and Terre Haute Medical Laboratory, Inc.

20.     Consulting Physician Agreement dated January 1, 2005 by and between Harmony Health Plan of Illinois, Inc. d/b/a Harmony Health Plan of Indiana and Pathology Associates of Terre Haute.

21.     Agreement effective as of January 1, 1997 by and between Health Indiana, LLC and Pathology Associates of Terre Haute, PC


Reference Laboratory Services Agreement:

1.     Reference Laboratory Services Agreement by and between Quest Diagnostics Nichols Institute, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated September 29, 2009 and Amendment dated November 20, 2009.

501287382v5

**SCHEDULE 3.2(o)**

**License Agreements**

      1.      License Agreement by and between Terre Haute Medical Laboratory, Inc. and Laboratory Corporation of America Holdings.

      2.      License Agreement by and between Kilbourne Medical Laboratories, Inc. and Laboratory Corporation of America Holdings.

34

**SECTION 4.3(b)**

**Permits**

None.

# SECTION 4.4

# Collections Statements

[on file]

501287382v5

**SECTION 4.5(e)**

**Nonqualified Deferred Compensation Plan**

     1.     First Amended and Restated Incentive Compensation Plan adopted by Terre Haute Medical Laboratory, Inc. July 1, 1997 and amended as of September 20, 2006.

**SECTION 4.6**

**Litigation**

1.      Clay Sheffer and Chelsi Sheffer v. Antonietta Limjoco-Antonio, M.D., Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB, Rasiklal Ganatra, M.D., Nabil Mnayarji, M.D., Suresh Kunapareddy, M.D., Associated Physicians & Surgeons Clinic, LLC d/b/a UAP Clinic and Union Hospital (Claim No. 1012177).[3]

---

[3] Medical malpractice claim filed with Indiana Department of Insurance on August 24, 2011.  The Parties are in the process of selecting a three doctor medical review panel.  As of the date hereof, there is no submission schedule and no depositions have been taken or requested.  This claim has been automatically stayed as to Sellers pursuant to law.

45

**SECTION 4.7(a)**

**Registered IP**

<u>Service marks</u>:

     1.     Terre Haute Medical Laboratory, Inc. has a service mark of MedLab—with logo—word appears in blue stylized print in conjunction with custom blue and white design registered in Ohio.

<u>Domain names</u>:

     1.     Terre Haute Medical Laboratory, Inc. has a registered domain name: http://www.terrehautemedlab.com.
     2.     Terre Haute Medical Laboratory, Inc. has a registered domain name: http://www.thml.com.
     3.     Terre Haute Medical Laboratory, Inc. has a registered domain name: http://www.thml.net.
     4.     Terre Haute Medical Laboratory, Inc. has a registered domain name: http://www.thml.org.

501287382v5

**SECTION 4.7(b)**

**Encumbered Owned Intellectual Property**

1.       Liens in favor of The Bank of New York Mellon, as collateral agent, under that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 30, 2013, by and among the Sellers, as borrower, debtors and debtors-in-possession, Marathon Special Opportunity Fund, L.P. and the other lenders signatory thereto from time to time, The Bank of New York Mellon, as administrative agent and as collateral agent.

2.       Liens in favor of The Bank of New York Mellon, as collateral agent, under that certain Amended and Restated Credit and Guaranty Agreement, dated as of August 5, 2008, by and among the lenders named therein, The Bank of New York Mellon, as administrative agent and as collateral agent, and the Sellers as borrowers, as amended from time to time.

## SECTION 4.8(a)

## Material Contracts

(i)

Reagent and Supply Agreements:

     1.     Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab effective June 12, 2012.

     2.     Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab and Amendment dated February 8, 2013.

     3.     IHN Master Agreement dated December 12, 2012 between Laboratory Partners, Inc. d/b/a MEDLAB and Beckman Coulter, Inc. and Amendments dated March 4, 2013.

     4.     Reagent Rental Agreement dated July, 18, 2011 by and between Becton, Dickinson and Company and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and Addendum dated August 1, 2011.

     5.     Quality Control Solutions and Hemoglobin A1c Instrumentation, Reagents and Service Agreement for the MEDLAB Group between Bio-Rad Laboratories and Terre Haute Medical Lab and MedLab Ohio, Inc. dated August 1, 2011.

     6.     Reagent Agreement/Reagent Rental Agreement by and between Biosite Incorporated and Terre Haute Med Lab dated March 4, 2008 and Amendment #1 dated June 27, 2011.

     7.     ThinPrep Imaging System Agreement between Hologic, L.P. (f/k/a Cytyc, LP) and Terre Haute Medical Laboratory dated June 14, 2007 and Amendment No. 1 dated August 27, 2008, Amendment No. 2 dated August 27, 2009, Amendment No. 3 dated April 13, 2010, Amendment No. 4 dated December 13, 2010 and Amendment No. 5 dated March 7, 2012.

     8.     Equipment lease between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

     9.     Reagent and Supply Agreement between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

     10.     Product and Equipment Agreement between Qiagen Inc. and Terre Haute Medical Center dated April 13, 2009 and Products and Equipment Addendum dated June 1, 2012.

     11.     Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Kilbourne Medical Laboratory, Inc. and Supplement to the Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Terre Haute Medical Laboratory, Inc. dated July 11, 2011 and Amendment dated July 11, 2011.

     12.     Equipment Agreement by and between Siemens Healthcare Diagnostics Inc. and Terre Haute Medical Laboratory, Inc. dated June 1, 2010.

     13.     Work Station Agreement by and between Siemens Medical Solutions USA and Terre Haute Medical Laboratory, Inc.

     14.     Letter Agreement between Fisher Scientific Company LLC and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB effective as of September 1, 2011.

     15.     SmartCycler Service Contract between BD GeneOhm and Terre Haute Medical Lab dated June 2, 2008.

16.     Product Agreement by and between Dako North America, Inc. and Terre Haute Medical Laboratory, Inc. effective June 15, 2012.

Capital Leases:

1.     Lease Agreement dated May 11, 2011 between Leasing Associates of Barrington, Inc. and Terre Haute Medical Laboratory, Inc. and Laboratory Partners, Inc. (Lease No. 9306000).

Reference Laboratory Services Agreement:

1.     Reference Laboratory Services Agreement by and between Quest Diagnostics Nichols Institute, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated September 29, 2009 and Amendment dated November 20, 2009.

Software/IT Agreements:

1.     Software License and Maintenance Agreement by and between Medic Computer Systems (Allscripts Healthcare LLC as successor in interest) and Terre Haute Medical Laboratory, Inc. dated December 23, 1998.

2.     Hardware Purchase Agreement by and between Soft Computer Consultants, Inc. and Terre Haute Medical Laboratory, Inc. dated January 14, 2002, and Hardware Support and Service Agreement and Addendum dated January 14, 2002.

3.     Software License Agreement by and between Soft Computer Consultants, Inc. and Terre Haute Medical Laboratory, Inc. dated January 14, 2002 and Software Application Support and Maintenance Agreement dated January 14, 2002.

4.     Application Services Provider Agreement by and between Atlas Database Software Corp. d/b/a Atlas Development Corporation and Terre Haute Medical Laboratory, Inc. dated July 31, 2007.

501287382v5

Provider Agreements:

     1.     Ancillary Provider Agreement by and between Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB, Amendment effective September 10, 2001, Amendment effective as of January 1, 2008, Participation Attachment dated January 1, 2008 and Medicaid Amendment effective January 1, 2011.

     2.     Professional Provider Agreement by and between Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield and Pathology Associates of Terre Haute, P.C. dated April 1, 2001, Amendment effective November 1, 2005, Amendment effective January 1, 2008 and Amendment dated January 1, 2011.

     3.     Ancillary Services Agreement dated October 1, 2009 by and between Aetna Health of Illinois, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

     4.     MDwise Plan Participating Provider Agreement by and between AmeriHealth Mercy of Indiana, LLC d/b/a MDWise Hoosier Alliance and Terre Haute Medical Laboratory, Inc. dated June 13, 2011.

     5.     Ancillary Provider Managed Care Agreement by and between Connecticut General Life Insurance Company, Healthsource Indiana Managed Care Plan, Inc. and Terre Haute Medical Laboratory, Inc. effective as of July 1, 1999 and Amendment dated January 1, 2000.

     6.     Ancillary Provider Participation Agreement by and between Terre Haute Medical Laboratory, Inc. and Health Value Management, Inc. d/b/a ChoiceCare Network commencing March 1, 2004 and Letter Amendment dated December 14, 2007.

     7.     PPO Provider Agreement Ancillary Laboratory Services by and between Sagamore Health Network, Inc. and Terre Haute Medical Laboratory, Inc. effective September, 20, 2001.

     8.     PPO Provider Group Agreement by and between Sagamore Health Network, Inc. and Pathology Associates of Terre Haute, Inc. effective January 1, 2012.

     9.     Facility Participation Agreement by and between United HealthCare Insurance Company and Terre Haute Medical Lab effective January 1, 2012, Ancillary Provider Participation Agreement by and between United HealthCare Insurance Company and Terre Haute Medical Lab effective October 1, 2003 and Amendment effective October 1, 2008.

     10.     Medical Group, Participation Agreement by and between United HealthCare Insurance Company and Pathology Associates of Terre Haute, P.C. effective October 1, 2003.

     11.     Ancillary Participating Provider Agreement between HealthLink, Inc. and Terre Haute Medical Laboratory, Inc. dated March 12, 2001.

     12.     Participating Group Agreement between HealthLink, Inc. and Pathology Associates of Terre Haute, P.C. dated March 12, 2001.

Customer Agreements:

      1.      Nursing Facility Laboratory Agreement between The Waters of Covington and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated November 30, 2004.

      2.      Laboratory Services Agreement dated December 27, 2006 by and between Vermillion Convalescent Center and Terre Haute Medical Laboratory, Inc.

      3.      Pathology Services Agreement by and between Greene County General Hospital and Pathology Associates of Terre Haute, Inc. dated May 1, 2011.

      4.      Medical Director/Arterial Blood Gas Laboratory Agreement by and between Greene County General Hospital and Pathology Associates of Terre Haute, Inc. dated May 1, 2011.

      5.      Pathology Services Agreement by and between Sullivan County Community Hospital and Pathology Associates of Terre Haute, Inc. dated July 1, 2012.

      6.      Laboratory Professional and Administrative Services Agreement, effective as of September 1, 2011, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and First Addendum to Laboratory Professional and Administrative Services Agreement.

      7.      Laboratory Services Agreement dated September 13, 2013 by and between Union Associated Physicians Clinic, LLC and Terre Haute Medical Laboratory, Inc. and Business Associate Agreement dated September 16, 2013.

      8.      Pathology Services Agreement by and between West Central Community Hospital, a division of Union Hospital, Inc., and Pathology Associates of Terre Haute, P.C. dated September 1, 1996.

      9.      Laboratory Services Agreement dated July 1, 2007 by and between Ambulatory Surgery Management Services LLC and Terre Haute Medical Laboratory, Inc.

      10.     Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Cobblestone Crossing and Addendum dated July 1, 2009.

      11.     Laboratory Services Agreement dated September 22, 2005 by and between Glenburn Nursing Home and Terre Haute Medical Laboratory, Inc.

      12.     Laboratory Services Agreement dated May 3, 2005 by and between Heritage House of Clinton and Terre Haute Medical Laboratory, Inc.

      13.     Laboratory Services Agreement dated August 25, 2004 by and between Meadows Manor North, Inc. and Terre Haute Medical Laboratory, Inc.

      14.     Nursing Facility Laboratory Agreement between North Logan Health Care Center and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB dated September 1, 2009.

      15.     Laboratory Services Agreement dated February 19, 2004 by and between Pleasant Meadows Christian Village and Terre Haute Medical Laboratory, Inc.

      16.     Nursing Facility Laboratory Agreement dated January 1, 2014 by and between LP Terre Haute Management LLC managing operating of facility known as Signature HealthCARE of Terre Haute and Terre Haute Medical Laboratory, Inc. Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

      17.     Laboratory Services Agreement dated May 3, 2005 by and between Southwood (Kindred Transitional Care) and Terre Haute Medical Laboratory, Inc.

18.     Laboratory Services Agreement dated June 30, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Springhill Villages of American Senior Communities.

19.     Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Providence/St. Mary's Health Care.

20.     Business Associate Agreement between Clark County Family Medicine and MedLab of Terre Haute dated September 23, 2013.

21.     Laboratory Services Agreement dated May 4, 2005 by and between Terre Haute Nursing & Rehabilitation and Terre Haute Medical Laboratory, Inc.

22.     Letter Agreement regarding reference laboratory services between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Federal Penitentiary Laboratory dated January 18, 2011.

23.     Hamilton Center Use Agreement dated August 12, 2012 by and between Terre Haute Medical Lab and Hamilton Center, Inc. and Laboratory Services Agreement dated August 1, 1994.


Real Property Leases:

1.     Lease Agreement, dated October 11, 1999, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc., Amendment to Lease dated May 18, 2004 and Second Addendum effective as of September 1, 2004.

2.     Lease Agreement, dated June 20, 2007, between Kashlan Partnership, L.P. and the Longa Partnership, L.P. and Terre Haute Medical Laboratory, Inc. and Amendment No. 1 to Lease dated March 28, 2012.

501287382v5

(ii)

1.      Laboratory Services Agreement dated September 13, 2013 by and between Union Associated Physicians Clinic, LLC and Terre Haute Medical Laboratory, Inc. and Business Associate Agreement dated September 16, 2013.

2.      Laboratory Services Agreement dated September 5, 2006 by and between Horizon Hospice and Terre Haute Medical Laboratory, Inc., Addendum dated September 7, 2006 and Business Associate Agreement Addendums dated September 5, 2006 and February 1, 2007.

3.      Laboratory Professional and Administrative Services Agreement, effective as of September 1, 2011, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and First Addendum to Laboratory Professional and Administrative Services Agreement.

4.      Courier and Delivery Services Agreement dated November 6, 1995 by and between Terre Haute Medical Laboratory, Inc. and Union Hospital, Inc.

5.      Laboratory Services Agreement dated September 13, 2013 by and between Union Associated Physicians Clinic, LLC and Terre Haute Medical Laboratory, Inc. and Business Associate Agreement dated September 16, 2013.

6.      Laboratory Services Agreement dated July 1, 2009 by and between Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Providence/St. Mary's Health Care.

7.      Laboratory Services Agreement dated December 27, 2006 by and between Vermillion Convalescent Center and Terre Haute Medical Laboratory, Inc.

8.      Business Associate Agreement between Clark County Family Medicine and MedLab of Terre Haute dated September 23, 2013.

9.      Laboratory Services Agreement dated May 4, 2005 by and between Terre Haute Nursing & Rehabilitation and Terre Haute Medical Laboratory, Inc.

(iii)

1.      Physician's Employment Contract by and between Ramona Jora, MD and Pathology Associates of Terre Haute, Inc. dated December 21, 2009.

2.      Physician's Employment Contract by and between Antonietta Limjoco-Antonio, MD and Pathology Associates of Terre Haute, Inc. dated December 30, 2009.

3.      Physician's Employment Contract by and between Frank J. Pikul, MD and THML PathLab, LLC dated May 28, 2012.

(iv)

1.      First Amended and Restated Incentive Compensation Plan adopted by Terre Haute Medical Laboratory, Inc. July 1, 1997 and amended as of September 20, 2006.

(v)

None.

501287382v5

(vi)

None.

(vii)

None.

(viii)

    1.     Indemnification Agreement by and between Laboratory Partners, Inc. and David Jones, Jr. dated July 27, 2005, as amended.

    2.     Indemnification Agreement by and between Laboratory Partners, Inc. and John J. Fleming dated March 28, 2007.

    3.     Indemnification Agreement by and between Laboratory Partners, Inc. and Scott Harper dated March 7, 2012.

    4.     Side Letter by and between Laboratory Partners, Inc. and Jonathan J. Fleming, Scott Harper, David A. Jones, Jr. dated September 16, 2013 regarding Indemnification Agreements.

(ix)

1.      Provider Agreement dated July 1, 2011 by and between Advantage Health Solutions, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB.

2.      Ancillary Services Agreement dated October 1, 2009 by and between Aetna Health of Illinois, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB and Aetna Workers' Compensation Access Addendum effective as of October 1, 2009.

3.      Ancillary Provider Agreement by and between Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB, Amendment effective September 10, 2001, Amendment effective as of January 1, 2008, Participation Attachment dated January 1, 2008 and Medicaid Amendment effective January 1, 2011.

4.      Group Practice Services Agreement dated March 9, 2005 by and between CareSource Indiana, Inc. and Terre Haute Medical Laboratory, Inc.

5.      Ancillary Provider Managed Care Agreement by and between Connecticut General Life Insurance Company, Healthsource Indiana Managed Care Plan, Inc. (collectively "CIGNA") and Terre Haute Medical Laboratory, Inc. effective as of July 1, 1999 and Amendment dated January 1, 2000.

6.      Participating Provider Agreement by and between Clarian Health Partners, Inc. and Terre Haute Medical Laboratory, Inc. effective as of September 1, 2010.

7.      Ancillary Services Provider Agreement by and between Community Health Alliance and Terre Haute Medical Laboratory, Inc.

8.      Ancillary Agreement between CorVel Corporation and Terre Haute Medical Laboratory, Inc. dated January 1, 1999.

9.      Participating Ancillary Agreement by and between Personal Care of Illinois, Inc. and Coventry Health Life Insurance Company and Terre Haute Medical Laboratory, Inc. dated February 4, 1999, Amendments effective May 20, 2002, Amendment effective January 1, 2010 and Amendment II effective January 1, 2010.

10.     Provider Services Agreement by and between The HealthCare Group, LLC, Encore PPO, Encircle EPO and Terre Haute Medical Laboratory, Inc. effective as of February 21, 2006.

11.     Participating Provider Agreement between First Health Group Corp. and Terre Haute Medical Laboratory, Inc. dated September 1, 2004 and Letter Amendment effective April 1, 2005.

12.     Ancillary Services Agreement dated January 1, 2005 by and between Harmony Health Plan of Illinois, Inc. d/b/a Harmony Health Plan of Indiana and Terre Haute Medical Laboratory, Inc.

13.     Participating Provider Agreement dated August 30, 2005 by and between Health Alliance Medical Plans, Inc. and Terre Haute Medical Laboratory, Inc. and First Amendment dated November 16, 2007.

14.     Allied/Ancillary Provider Agreement between HealthLink HMO, Inc. and Terre Haute Medical Laboratory, Inc. dated March 12, 2001, Addendum dated March 12, 2001 and Rider dated March 12, 2001.

15.     Ancillary Participating Provider Agreement between HealthLink, Inc. and Terre Haute Medical Laboratory, Inc. dated March 12, 2001.

16.     Ancillary Provider Participation Agreement by and between Terre Haute Medical Laboratory, Inc. and Health Value Management, Inc. d/b/a ChoiceCare Network commencing March 1, 2004 and Letter Amendment dated December 14, 2007.

17.     BCCP Provider Agreement between Indiana State Department of Health Breast and Cervical Cancer Early Detection Program and Terre Haute Medical Laboratory, Inc. dated August 15, 2004 and Letter of Intent for Cytology Laboratory Participant dated August 16, 2010.

18.     Provider Agreement between Terre Haute Medical Laboratory, Inc. and The Children's Special Health Care Services Program for Indiana State Department of Health dated October 26, 2006.

19.     Provider Network Ancillary Agreement dated August 21, 2000 between Terre Haute Medical Laboratory, Inc. and Integrated Health Plan, Inc. and Amendment dated September 26, 2006.

20.     Agreement for Participation in the Illinois Medical Assistance Program between Terre Haute Medical Laboratory, Inc. and the Illinois Department of Public Aid dated March 9, 2005.

21.     Provider Services Agreement by and between Senate Health Plans Solutions, LLC and Terre Haute Medical Laboratory, Inc. effective as of 2011.

22.     MDwise Plan Participating Provider Agreement by and between AmeriHealth Mercy of Indiana, LLC d/b/a MDWise Hoosier Alliance and Terre Haute Medical Laboratory, Inc. dated June 13, 2011.

23.     Provider Agreement by and between Medical Mutual of Ohio and Terre Haute Medical Laboratory, Inc. dated March 7, 2011.

24.     Provider Services Agreement by and between Molina Healthcare of Indiana, Inc. and Terre Haute Medical Laboratory, Inc. dated March 1, 2005.

25.     Participating Ancillary Services Provider Agreement effective July 1, 2006 by and between Multiplan, Inc. and Terre Haute Medical Laboratory, Inc.

26.     PHCS Participating Vendor Agreements dated October 1, 2007 and October 1, 2002 by and between Private Healthcare Systems, Inc. and Terre Haute Medical Laboratory, Inc.

27.     Inpatient and Outpatient Subcontract Agreement effective as of June 15, 2011 between NaphCare, Inc. and Terre Haute Medical Lab, Inc.

28.     Participating Provider Agreement by and between Managed Care Services LLC d/b/a Parkview Health Plan Services and Terre Haute Medical Laboratory, Inc. effective as of February 15, 2007.

29.     PPO Participating Provider Agreement by and between PPO of Indiana and Terre Haute Medical Laboratory, Inc. dated January 6, 1998.

30.     HCP Agreement dated June 19, 2001 by and between PPOM, L.L.C. and Terre Haute Medical Lab, Inc.

31.     Amendment to Contract between Terre Haute Medical Laboratory and Preferred Plan, Inc. dated October 16, 2000.

32.     PPO Provider Agreement Ancillary Laboratory Services by and between Sagamore Health Network, Inc. and Terre Haute Medical Laboratory, Inc. effective September, 20, 2001.

33.     Agreement by and between Trustees of the United Mine Workers of America Combined Benefit Fund, Trustees of the United Mine Workers of America 1992 Benefit Fund and Trustees of the United Mine Workers of America 1993 Benefit Fund and Terre Haute Medical Lab dated March 17, 2000.

34. Facility Participation Agreement by and between United HealthCare Insurance Company and Terre Haute Medical Lab effective January 1, 2012, Ancillary Provider Participation Agreement by and between United HealthCare Insurance Company and Terre Haute Medical Lab effective October 1, 2003 and Amendment effective October 1, 2008.

35. Physician Group Participation Agreement dated January 21, 2010 by and between Aetna Workers' Compensation Access, LLC and Pathology Associates of Terre Haute, Inc.

36. Professional Provider Agreement by and between Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield and Pathology Associates of Terre Haute, P.C. dated April 1, 2001, Amendment effective November 1, 2005, Amendment effective January 1, 2008 and Amendment dated January 1, 2011.

37. Group Practice Managed Care Agreement by and between CIGNA HealthCare of Indiana, Inc. and Pathology Associates of Terre Haute, Inc. effective as of April 3, 2001.

38. Professional Care Provider Agreement by and between CCN Managed Care, Inc. d/b/a CCN and Pathology Associates of Terre Haute, P.C. effective as of September 1, 2000.

39. Supermed Network Participation Agreement between Consumers Life Insurance Company and Pathology Associates of Terre Haute dated May 19, 2009.

40. Provider Agreement between Pathology Associates of Terre Haute, Inc. and The Children's Special Health Care Services Program for Indiana State Department of Health dated October 14, 2003.

41. Provider Services Agreement by and between The HealthCare Group, LLC, Encore PPO, Encircle EPO and Pathology Associates of Terre Haute, Inc. effective as of February 21, 2006 and Exhibit A-3 dated October 28, 2011.

42. Participating Provider Agreement dated August 30, 2006 by and between Health Alliance Medical Plans, Inc. and Pathology Associates of Terre Haute, P.C.

43. Healthlink HMO – Group Agreement between Healthlink HMO, Inc. and Pathology Associates of Terre Haute, P.C. dated March 12, 2001, Addendum dated March 12, 2001, Rider dated March 12, 2001 and Business Associate Addendum effective as of January 1, 2003.

44. Participating Group Agreement between HealthLink, Inc. and Pathology Associates of Terre Haute, P.C. dated March 12, 2001.

45. Group Participation Agreement by and between Pathology Associates of Terre Haute and Health Value Management, Inc. d/b/a ChoiceCare Network commencing January 1, 2005, Amendment Letter dated December 14, 2007, Provider Addendum for William D. DePond dated April 20, 2009 and Provider Addendum for Chitra Kohli dated July 1, 2011.

46. Provider Agreement by and between IHN, Inc. and Pathology Associates of Terre Haute, P.C. dated October 23, 2001 and Group Provider Agreement dated December 11, 2003.

47. BCCP Provider Agreement between Indiana State Department of Health Breast and Cervical Cancer Early Detection Program and Pathology Associates of Terre Haute, Inc. dated September 20, 2010 and BCCP Provider Agreement dated August 5, 2004.

48. Participating Provider Agreement between AmeriHealth Mercy of Indiana, LLC d/b/a Hoosier Alliance and Pathology Associates of Terre Haute, P.C. effective December 15, 2011.

49. Health Care Provider Network Agreement undated between BCE Emergis Corporation and Pathology Associates of Terre Haute, P.C.

50. Preferred Physician Group Agreement between Pathology Associates of Terre Haute, P.C. and Private Healthcare Systems, Inc. effective September 1, 1998.

501287382v5

51.     Inpatient and Outpatient Subcontract Agreement effective as of June 15, 2011 between NaphCare, Inc. and Pathology Associates of Terre Haute, Inc.

52.     PPO Participating Provider Agreement by and between PPO of Indiana and Pathology Associates of Terre Haute, P.C. dated October 15, 1997.

53.     HCP Agreement dated September 12, 2001 by and between PPOM, L.L.C. and Pathology Associates of Terre Haute.

54.     Participating Provider Agreement dated September 10, 2001 by and between Beyond Benefits, Inc. and Pathology Associates of Terre Haute, P.C.

55.     Participating Facility Agreement effective July 1, 2010 between Preferred Plan Administrative Services, Inc. and Pathology Associates of Terre Haute.

56.     PPO Provider Group Agreement by and between Sagamore Health Network, Inc. and Pathology Associates of Terre Haute, Inc. effective January 1, 2012.

57.     Participating Ancillary Provider Agreement dated July 1, 2011 by and between SIHO Network, LLC, Southeastern Indiana Health Operations, Inc., Southeastern Indiana Health Organization and Pathology Associates of Terre Haute, Inc.

58.     Agreement by and between Trustees of the United Mine Workers of America Combined Benefit Fund, Trustees of the United Mine Workers of America 1992 Benefit Fund and Trustees of the United Mine Workers of America 1993 Benefit Fund and Pathology Associates of Terre Haute dated March 17, 2000.

59.     Medical Group, Participation Agreement by and between United HealthCare Insurance Company and Pathology Associates of Terre Haute, P.C. effective October 1, 2003.

60.     Consulting Physician Agreement dated January 1, 2005 by and between Harmony Health Plan of Illinois, Inc. d/b/a Harmony Health Plan of Indiana and Pathology Associates of Terre Haute.

61.     Professional Services Agreement dated December 1, 1995 by and between Terre Haute Medical Laboratory and Prudential Health Care Plan, Inc.

62.     Agreement effective as of January 1, 1997 by and between Health Indiana, LLC and Pathology Associates of Terre Haute, PC.

63.     Physician Group Agreement effective April 22, 2013 between Pathology Associates of Terre Haute, Inc. and Provider Select, Inc.

(x)

None.

(xi)

None.

(xii)

58

None.


(xiii)

      1.      Non-Competition Agreement dated June 3, 2013 by and among Kilbourne Medical Laboratories, Inc., MedLab Ohio, Inc., Suburban Medical Laboratory, Inc., Biological Technology Laboratory, Inc., Laboratory Partners, Inc. and Laboratory Corporation of America Holdings.

501287382v5

## SECTION 4.8(b)

## Material Contracts Disclosures

Reagent and Supply Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1. THML | Alere North America, Inc. | 23,213.65 | Reagent Rental Agreement - AtheNA Multi-Lyte Test System |
| 2. THML | Alere North America, Inc. | 81,938.78 | Reagent Rental Agreement - Biosite Triage |
| 3. Laboratory Partners, Inc. | Beckman Coulter, Inc. | 36,027.65 | IHN Master Agreement |
| 4. THML | Bio-Rad Laboratories, Inc. | 21,346.18 | Quality Control Solutions and Hemoglobin A1c Instrumentation, Reagents and Service for the MedLab Group |
| 5. THML | Qiagen Inc. | 14,361.31 | Products and Equipment Agreement |
| 6. THML | Roche Diagnostics Corporation | 231,251.94 | Equipment Lease #41043197 |
| 7. THML | Roche Diagnostics Corporation | 144,017.78[4] | Reagent and Supply Agreement - Lease #41043197 |
| 8. THML | Siemens Healthcare Diagnostics, Inc. | 82,842.29 | Master Products Agreement |
| 9. THML | Siemens Healthcare Diagnostics, Inc. | 2,288.19 | Equipment Agreement - RxL Max Equipment and Millipore System |
| 10. THML | Siemens Medical Solutions USA | 18,733.97 | Work Station Agreement |
| 11. THML d/b/a MEDLAB | Fisher Scientific | 249,680.26 | Letter Agreement |
| 12. THML | Hologic LP (fka Cytyc Limited Partnership) | 38,542.21 | ThinPrep2000 Imaging System Agreement |
| 13. THML | Dako North America, Inc. | 22,978.25 | Product Agreement (6/15/12) |
| | **TOTAL:** | **$967,222.46**[5] | |

---

[4] The $144,017.78 cure amount for Reagent and Supply Agreement – Lease #41043197 is aggregated in Sellers' accounting records with Reagent and Supply Agreement – Lease #41043199, which is not a Material Contract.

[5] The total cure amount present above includes the $144,017.78 aggregated cure amount above so the actual cure amount will be lower.

Capital Leases:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.   THML | Leasing Associates of Barrington, Inc. | 37,702.80 | LAB - Coagulation Analyzers; Lease #9306000 |

Reference Laboratory Services Agreement:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.   THML d/b/a MEDLAB | Quest Diagnostics Nichols Institute, Inc. | 248,319.50 | Reference Laboratory Services Agreement |

Software/IT Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.        THML | Medic Computer Systems (Mysis / Allscripts) | 27,121.60 | Hardware Equipment and Maintenance Agreement; Software License and Maintenance Agreement |
| 2.        THML | Soft Computer Consultants, Inc. | 743.72 | Hardware Purchase Agreement; Hardware Support and Service Agreement and Addendum |
| 3.        THML | Soft Computer Consultants, Inc. | 29,618.27 | Software License Agreement; Software Application Support and Maintenance Agreement |
| 4.        THML | Atlas Database Software Corp. dba Atlas Development Corporation | 15,657.35 | Application Services Provider Agreement |
| | **TOTAL:** | **$ 73,140.94** | |

Provider Agreements:

| Seller Party | Counter Party | Cure Amount ($) | Description |
|---|---|---|---|
| 1.   THML | HealthLink, Inc. | 618.66 | Ancillary Participating Provider Agreement |
| 2.   PATH | HealthLink, Inc. | 101.50 | Participating Provider Agreement |
| 3.   THML | Sagamore Health Network, Inc. | 120.97 | PPO Provider Agreement |
| | **TOTAL:** | **$ 841.13** | |

61

## SECTION 4.9(a)(i)

## Material Permits

Certificates and Accreditations:

1.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Accreditation, #15D0647842 issued to MedLab located at 1606 N 7th St., Terre Haute, IN 47804-2706, effective February 28, 2013 through February 27, 2015.

2.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Accreditation, #15D0035673 issued to MedLab located at 801 S Main St., Clinton, IN 47842-2261, effective November 12, 2013 through November 11, 2015.

3.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Accreditation, #15D0949601 issued to MedLab located at 521 E County Line Rd., Suite B, Greenwood, IN 46143, effective November 17, 2013 through November 16, 2015.

4.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Accreditation, #15D0974447 issued to Pathology Associates of Terre Haute IN located at Union Hospital/Lower Level 1606 N 7th St., Terre Haute, IN 47804, effective July 3, 2012 through July 2, 2014.

5.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Compliance, #15D1035669 issued to MedLab located at 1207 E National Ave., Brazil, IN 47834, effective December 10, 2012 through December 9, 2014.

6.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Compliance, #15D0926334 issued to MedLab located at 5500 S US Hwy 41, Terre Haute, IN 47802, effective December 2, 2012 through December 1, 2014.

7.      Clinical Laboratory Improvements Amendments (CLIA) Certificate of Compliance, #15D0361963 issued to MedLab located at 2723 S 7th St., Providence Medical Group (side entrance), 2nd Floor, Terre Haute, IN 47802, effective September 7, 2011 through September 6, 2015.

8.      The College of American Pathologists Accreditation, LAP No. 1701101, AU-ID: 1182952, CLIA No. 15D0035673 issued to MedLab Laboratory in Clinton, Indiana through November 10, 2014.

9.      The College of American Pathologists Accreditation, LAP No. 1700601, AU-ID: 1182942, CLIA No. 15D0647842 issued to MedLab Laboratory in Terre Haute, Indiana through November 10, 2014.

10.     The College of American Pathologists Accreditation, LAP No. 1700610, AU-ID: 1198082, CLIA No. 15D0949601 issued to MedLab Laboratory in Greenwood, Indiana through June 11, 2015.

11.     The College of American Pathologists Accreditation, LAP No. 7102201, AU-ID: 1344696, CLIA No. 15D0974447 issued to Path Associates of Terre Haute, Inc. located in Terre Haute, Indiana through November 10, 2014.

State Licenses:

1.       Indiana Medical Corporation License, License No. 50000920A, issued to Terre Haute Medical Laboratory, Inc. at P.O. Box 1468, Terre Haute, IN 47808. Expiration Date – January 31, 2016.


Drug Enforcement Administration (DEA) Registrations:

1.       Controlled Substance Registration Certificate, DEA Registration No. PT0082494, issued to Terre Haute Medical Lab located at 1606 N. 7th Street, Terre Haute, IN 47808-9359. Expiration Date – November 30, 2014.


Tax and Business Licenses (other than foreign qualifications to do business and assumed name certificates with respect to any Sellers):

1.       Indiana Department of Revenue Registered Retail Merchant Certificate, TID: 0002125382 issued to Terre Haute Medical Lab Incorporated at P.O. Box 9359, Terre Haute, IN 47808-9359. Expiration Date – April 30, 2014.

**SECTION 4.9(a)(ii)**

**Material Permits Disclosures**

None.

## SECTION 4.9(b)

## Breach or Threatened Proceedings Related to Material Permits

None.

**SECTION 4.11(b)**

**Location of Purchased Assets**

| Location | Address | Equipment | Vendor Serial/Model |
|---|---|---|---|
| 1. Waltz Family Practice | 727 N Lincoln Rd Rockville, IN 47872 | Drucker 614 B Centrifuge | Labsco 161008104 |
| 2. Waltz Family Practice | 727 N Lincoln Rd Rockville, IN 47872 | Refrigerator - Dorm size w/freezer | |
| 3. Waltz | 727 N Lincoln Rd Rockville, IN 47872 | Phlebotomy chair x 1 | |
| 4. Vermillion-Park Community Health Center | 777 S. Main Street, Suite 100 Clinton, IN 47842 | Fisher Model 614 B centrifuge | Fisher 160208-254 |
| 5. Vermillion-Park Community Health Center | 777 S. Main Street, Suite 100 Clinton, IN 47842 | Fisher Model 614 B centrifuge | Fisher 160707-377 |
| 6. Vermillion-Park Community Health Center | 777 S. Main Street, Suite 100 Clinton, IN 47842 | Refrigerator - Dorm size w/freezer | |
| 7. Vermillion-Park Community Health Center | 777 S. Main Street, Suite 100 Clinton, IN 47842 | Phlebotomy chair x 1 | |
| 8. Gary Fitzgerald (Union Hospital) | 1530 N. 7th St. Terre Haute, IN 47807 | Printer | Lexmark 360DN |
| 9. Rebecca B Brewer, MD | 2925 Hagan St. #104 Bloomington, IN 47401 | PC Label Printer Printer | Lenovo Zebra 420DN Lexmark 360DN |
| 10. Harsha Behavioral Center | 4733 S, 7th St. Terre Haute, IN 47802 | Label Printer | Zebra 420DN |
| 11. Shakamak Medical Center | 714 W. Main St. Jasonville, IN 47438 | Fax machine | Brother 2811 |
| 12. Glenburn Nursing Home | 618 W. Glenburn Road Linton, IN 47441 | Fax machine | |

Various office furniture, computers and printers are located at the N. 4th Street, Terre Haute IN facility owned by Sellers.

66

## SECTION 4.12

## Tangible Personal Property; Equipment

1.    Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab effective June 12, 2012.

2.    Reagent Agreement/Reagent Rental Agreement between Alere North America, Inc. and Terre Haute Medical Lab and Amendment dated February 8, 2013.

3.    IHN Master Agreement dated December 12, 2012 between Laboratory Partners, Inc. d/b/a MEDLAB and Beckman Coulter, Inc. and Amendments dated March 4, 2013.

4.    Reagent Rental Agreement dated July, 18, 2011 by and between Becton, Dickinson and Company and Terre Haute Medical Laboratory, Inc. d/b/a MedLab and Addendum dated August 1, 2011.

5.    Quality Control Solutions and Hemoglobin A1c Instrumentation, Reagents and Service Agreement for the MEDLAB Group between Bio-Rad Laboratories and Terre Haute Medical Lab and MedLab Ohio, Inc. dated August 1, 2011.

6.    Reagent Agreement/Reagent Rental Agreement by and between Biosite Incorporated and Terre Haute Med Lab dated March 4, 2008 and Amendment #1 dated June 27, 2011.

7.    ThinPrep Imaging System Agreement between Hologic, L.P. (f/k/a Cytyc, LP) and Terre Haute Medical Laboratory dated June 14, 2007 and Amendment No. 1 dated August 27, 2008, Amendment No. 2 dated August 27, 2009, Amendment No. 3 dated April 13, 2010, Amendment No. 4 dated December 13, 2010 and Amendment No. 5 dated March 7, 2012.

8.    Equipment lease between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

9.    Reagent and Supply Agreement between Roche Diagnostics Corporation and Terre Haute Medical Laboratory, Inc. effective as of July 5, 2011 (Customer Number 0055042308) and Amendment effective as of August 4, 2011 (#41043197).

10.    Product and Equipment Agreement between Qiagen Inc. and Terre Haute Medical Center dated April 13, 2009 and Products and Equipment Addendum dated June 1, 2012.

11.    Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Kilbourne Medical Laboratory, Inc. and Supplement to the Master Products Agreement by and between Siemens Healthcare Diagnostics Inc. and Terre Haute Medical Laboratory, Inc. dated July 11, 2011 and Amendment dated July 11, 2011.

12.    Work Station Agreement by and between Siemens Medical Solutions USA and Terre Haute Medical Laboratory, Inc.

13.    Letter Agreement between Fisher Scientific Company LLC and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB effective as of September 1, 2011.

67

## SECTION 4.13(a)

### Owned Real Property

1. 1941 N. 4th Street, Terre Haute, Indiana (Parcel ID: 84-06-16-210-001.000-002).
2. 1937 N. 4th Street, Terre Haute, Indiana (Parcel ID: 84-06-16-210-002.000-002).
3. 1935 N. 4th Street, Terre Haute, Indiana (Parcel ID: 84-06-16-210-003.000-002).
4. 1927 N. 4th Street, Terre Haute, Indiana (Parcel ID: 84-06-16-210-004.000-002).
5. 472 Buckeye Street, Terre Haute, Indiana (Parcel ID: 84-06-16-210-005.000-002).
6. 1830 N. 5th Street, Terre Haute, Indiana (Parcel ID: 84-06-16-254-010.000-002).

501287382v5

**SECTION 4.13(b)**

**Leased Premises**

(i)

| | Location | Lease |
|---|---|---|
| 1. | 634 Beech Street<br>Terre Haute, IN 47804 | Lease Agreement, dated June 20, 2007, between Kashlan Partnership, L.P. and the Longa Partnership, L.P. and Terre Haute Medical Laboratory, Inc. and Amendment No. 1 to Lease dated March 28, 2012. |
| 2. | 315 Lankford Street<br>Clay City, IN 47841 | Lease Agreement, dated October 12, 1996, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease Agreement dated July 25, 2003. |
| 3. | 408 North 2nd Street<br>Marshall, IL 62441 | Lease Agreement, commencing July 9, 2012, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. d/b/a MEDLAB. |
| 4. | 890 North Ridgelawn Road<br>Martinsville, IL 62442 | Lease Agreement, effective as of July 15, 2009, by and between Medlab Terre Haute and David P. Davis, LLC and Addendum to Lease effective as of July 1, 2013. |
| 5. | 1332 North 7th Street<br>Terre Haute, IN 47807 | Lease Agreement, commencing June 1, 2003, by and between Mayuri Estates, L.L.C. and Terre Haute Medical Laboratory, Inc. d/b/a Terre Haute Med Lab and Assignment of Lease from Mayuri Estates, L.L.C. to Union Hospital, Inc., effective as of January 1, 2012. |
| 6. | 4001 E. Wabash Avenue<br>Terre Haute, IN 47803 | Lease Agreement, dated September 7, 1992, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease effective as of May 20, 1993. |
| 7. | 2723 South 7th Street<br>Terre Haute, IN 27802 | Lease Agreement, dated March 1, 2007, by and between BMA Real Estate, LLC and Providence Medical Group, LLC and Sublease Agreement by and between Providence Medical Group, LLC and Terre Haute Medical Laboratory, Inc. dated October 1, 2008. |
| 8. | 601 Surgery Center Drive<br>Terre Haute, IN 47802 | Lease Agreement, dated January 31, 2007, by and between R&S Medical Enterprises, L.L.C. and Terre Haute Medical Lab, Inc. and Assignment of Lease from R&S Medical Enterprises, L.L.C. to Union Hospital, Inc., effective as of January 1, 2012. |

|     | Location | Lease |
| --- | --- | --- |
| 9. | 5500 U.S. Highway 41 South Terre Haute, IN 47802 | Lease Agreement, dated April 30, 1997, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. and First Addendum to Lease Agreement dated July 25, 2003 and First Addendum to Lease effective as of May 1, 1997. |
| 10. | 1207 East National Avenue Brazil, IN 47834 | Amended and Restated Lease Agreement, commencing April 1, 2004, by and between Union Hospital, Inc. and Providence Medical Group, LLC and Assumption of Lease from Providence Medical Group by Terre Haute Medical Laboratory, Inc. effective as of October 1, 2008. |
| 11. | 1606 North 7th Street Terre Haute, IN 47804 | Lease Agreement, dated October 11, 1999, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc., Amendment to Lease dated May 18, 2004 and Second Addendum effective as of September 1, 2004. |
| 12. | 801 South Main Street Clinton, IN 47842 | Sublease Agreement, dated September 1, 1996, by and between West Central Community Hospital and Terre Haute Medical Laboratory, Inc., First Addendum to Sublease dated September 1, 1997, Second Addendum to Sublease dated September 1, 1998, Third Addendum to Sublease dated July 25, 2003 and Fourth Addendum to Sublease effective as of January 1, 2008. |
| 13. | 1530 North 7th Street Terre Haute, IN 47807 | Lease Agreement, commencing August 1, 2004, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. |

(ii)

None.

See note on Schedule 1.2(d) regarding 521 East County Line Road, Greenwood IN lease which is not used in connection with the Business.

## SECTION 4.15(c)

## Employment Law Disclosures

None.

501287382v5

# SECTION 4.17

## Insurance Policies

| Type | Insurer | Insured Parties | Expiration | Policy Number(s) |
|---|---|---|---|---|
| Healthcare Facilities Professional Liability/General Liability | ProAssurance Indemnity Company, Inc. | Terre Haute Medical Laboratory, Inc. | 12/10/2014 | HP533 |
| Healthcare Facilities Professional Liability/General Liability | ProAssurance Indemnity Company, Inc. | Pathology Associates of Terre Haute, Inc. | 9/9/2014 | HP1776 |
| Umbrella | ProAssurance Indemnity Company, Inc. | Pathology Associates of Terre Haute, Inc. | 9/9/2014 | HP1778 |
| Umbrella | ProAssurance Indemnity Company, Inc. | Terre Haute Medical Laboratory, Inc. | 12/10/2014 | HP534 |
| Property | Hartford Insurance Company of the Midwest | Terre Haute Medical Laboratory, Inc. | 4/4/2014 | 36UUMLP0556 |
| Automobile | State Auto Insurance Companies | Terre Haute Medical Laboratory, Inc. | 12/10/2014 | BAP 2335834 |
| Primary D&O/EPL/ Fiduciary | AmTrust International Underwriters Limited | Laboratory Partners, Inc., Biological Technology Laboratory, Inc., Kilbourne Medical Laboratories Inc., Medlab Ohio, Inc., Pathology Associates of Terre Haute, Inc., Suburban Medical Laboratory, Inc. and Terre Haute Medical Laboratory, Inc. | 9/1/2014 | EUC 1001350-0 |
| Fiduciary | Chubb Group of Insurance Companies | Terre Haute Medical Laboratory, Inc. | 5/9/2014 | 81809747 |

501287382v5

| Type | Insurer | Insured Parties | Expiration | Policy Number(s) |
|---|---|---|---|---|
| Excess D&O – 1st Layer | Liberty Insurance Underwriters, Inc. | Laboratory Partners, Inc., Biological Technology Laboratory, Inc., Kilbourne Medical Laboratories Inc., Medlab Ohio, Inc., Pathology Associates of Terre Haute, Inc., Suburban Medical Laboratory, Inc. and Terre Haute Medical Laboratory, Inc. | 9/1/2014 | DOCH217361-213 |
| Excess D&O – 2nd Layer | Illinois National Insurance Co. | Laboratory Partners, Inc., Biological Technology Laboratory, Inc., Kilbourne Medical Laboratories Inc., Medlab Ohio, Inc., Pathology Associates of Terre Haute, Inc., Suburban Medical Laboratory, Inc. and Terre Haute Medical Laboratory, Inc. | 9/1/2014 | 01-349-02-43 |

501287382v5

| Type | Insurer | Insured Parties | Expiration | Policy Number(s) |
|---|---|---|---|---|
| Crime | National Union Fire Insurance Company of Pittsburgh, PA | Laboratory Partners, Inc., Biological Technology Laboratory, Inc., Kilbourne Medical Laboratories Inc., Medlab Ohio, Inc., Pathology Associates of Terre Haute, Inc., Suburban Medical Laboratory, Inc. and Terre Haute Medical Laboratory, Inc. | 9/1/2014 | 01-347-84-35 |
| Crime | Travelers Casualty and Surety Company of America | Terre Haute Medical Laboratory, Inc. | 3/27/2016 | 105904400 |
| Management Liability Tail Coverage  (36 months) | Westchester Fire Insurance Company | Laboratory Partners, Inc., Biological Technology Laboratory, Inc., Kilbourne Medical Laboratories Inc., Medlab Ohio, Inc., Pathology Associates of Terre Haute, Inc., Suburban Medical Laboratory, Inc. and Terre Haute Medical Laboratory, Inc. | 9/1/2016 | G25024345003 |

501287382v5

## SECTION 4.18

### Environmental Matters

1.      On February 27, 2012, Terre Haute Medical Laboratory, Inc. entered into a settlement with the Indiana Department of Environmental Management for a civil penalty in the amount of $7,000.00 relating to a notice of violation regarding inappropriate waste management of the chemical Xylene.

501287382v5

**SCHEDULE 8.1**

**Conduct of Business Prior to Closing**

The Sellers' operations are limited by the DIP Budget, the terms and provisions of the DIP Credit Agreement, any orders from the Bankruptcy Court, and the limitations imposed upon the Sellers by the Bankruptcy Code and applicable law.

501287382v5

**SCHEDULE 9.1(b)**

**Required Government Authorizations**

None.

**SCHEDULE 10.1(n)**

**Current Business Employees**

1.      All the individuals listed on Schedule 4.15(a).

**SCHEDULE 11.1(b)**

**Allocation**

[To be provided by Purchaser no later than sixty (60) days after Closing.]