## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------x
In re                              : Chapter 11
                                   :
Laboratory Partners, Inc., et al.,¹  : Case No. 13-12769 (PJW)
                                   :
                    Debtors.       : (Jointly Administered)
                                   :
                                   : Hearing Date: As set by the Court
                                   : Sale Obj. Due: As set by the Court
------------------------------------------------x
```

## DEBTORS' MOTION FOR ORDER AUTHORIZING (A) SALE OF CERTAIN OF THE DEBTORS' UNION HOSPITAL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) THE DEBTORS TO ENTER INTO RELATED ASSET PURCHASE AGREEMENT; (C) MUTUAL RELEASES; AND (D) RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order approving, among other things, (a) the sale of certain assets relating to the Debtors' nuclear medicine business (the "Purchased Assets") described in and pursuant to the terms and conditions of the Asset Purchase Agreement, dated as of February 21, 2014 and substantially in the form annexed as Exhibit A to

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485). Certain of the Debtors do business as Medlab.  The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

the form of order (the "Sale Order") annexed hereto as **Exhibit 1** (collectively with all exhibits thereto and the Ancillary Agreements, the "Purchase Agreement") by and between certain of the Debtors, as sellers, and Union Hospital, Inc., as purchaser (the "Purchaser" or "Union Hospital"), (b) the Debtors entry into the Purchase Agreement, (c) the mutual releases as set forth in the Purchase Agreement, and (d) related relief.  In support of the Motion, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT[2]**

1.      As set forth in greater detail below, Debtors have engaged in an in-depth marketing process which has resulted in the sale of its Talon Division and part of its Union Hospital Division, as approved by this Court on February 18, 2014.  However, that transaction has left a stub business for which there does not appear to be any available market for a sale providing cash proceeds.  The remaining business is the provision of nuclear medicine services to Union Hospital. Although the Debtors could in theory simply reject the services contract under which they provide such services, doing so would potentially create uncertainty with respect to the Debtors' other continuing businesses, trigger a rejection damage claim, leave employees without jobs, impair continuity of service for the benefit of Union Hospital's patients, and potentially risk the collectability of significant accounts receivable from Union Hospital. Accordingly, the Debtors and Union Hospital have negotiated a transaction to enable Union Hospital itself to take over this operation, which will assure a smooth transition of service and confer significant benefits on the estate.  The Debtors believe this transaction is the best available option for disposition of the UH Nuclear Medicine Business and request that the Court approve the transaction.

---

[2]      Undefined capitalized terms used in the Preliminary Statement shall have the meanings ascribed to them below.

## JURISDICTION

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, and 9014 and Local Rule 6004-1.

## GENERAL BACKGROUND

3.      On October 25, 2013 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.  On November 7, 2013, an Official Committee of Unsecured Creditors (the "Committee") was appointed in these cases. D.I. 80.  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      Laboratory Partners, Inc. ("Laboratory Partners") through its subsidiaries, provides clinical laboratory and anatomic pathology services to (i) skilled nursing facilities in Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Virginia and Washington DC (the "LTC Division"), (ii) physicians, physician offices and medical groups (the "Talon Division"), in Indiana and Illinois, and (iii) Union Hospital, Inc. in Terre Haute and Clinton, Indiana (the "Union Hospital Division").

5.      The events leading up to the Petition Date are set forth in the *Declaration of William A. Brandt, Jr. In Support of First Day Relief* (D.I. 3).

**THE DEBTORS' PREPEITITON AND POSTPETITION SALES EFFORTS**

6.     The Debtors sought the protection of chapter 11 of the Bankruptcy Code to provide breathing room to pursue a sale process and maximize the value of their estates, for the benefit of all estate constituencies.

A.     **Prepetition Strategic and Sales Efforts**

7.     As detailed in prior pleadings filed in these cases, prior to the filing of these cases, the Debtors engaged MTS Health Partners, L.P. ("MTS") as its financial advisor/investment banker to assist in evaluating, formulating and implementing a financial and strategic plan and to provide the Debtors with a range of strategic alternatives.  Following the MTS engagement, from August 2011 through March 2012, the Debtors, with the assistance of MTS, engaged in a detailed examination of their operating performance and reviewed a range of strategic corporate alternatives.

8.      Beginning in March 2012, the Debtors, with the assistance of MTS, began to explore the possible sale of some of their operations, a partial or complete refinancing of their debt and a complete recapitalization.  Numerous selected financial and strategic buyers were contacted regarding a potential sale.  In addition, numerous selected parties were contacted regarding refinancing alternatives.  The Debtors also considered other strategic alternatives.

9.     In May 2013, certain of the Debtors signed a definitive asset purchase agreement to sell a portion of the then-existing Talon Division to Laboratory Corporation of America Holdings ("LabCorp").  In June 2013, such Debtors consummated the sale of selected operating assets of the then-existing Talon Division to LabCorp for an aggregate purchase price of $10,676,000, plus an earn-out payment not to exceed $1,200,000 (the "POB Sale").  In connection with the POB Sale, Laboratory Partners received approximately $9,157,481 in net proceeds (including $1,114,740 of the earn-out), after deducting transaction fees and expenses of

approximately $1,457,260.  In addition, $1,000,000 of the purchase price related to the POB Sale is currently held in escrow until December 2014 as security against indemnification claims that may be made by LabCorp.   To date, no indemnification claims have been asserted.   In connection with the POB Sale, the Lenders received $7,392,741 of Debtors' net proceeds and allowed the Debtors to retain $1,764,740 to fund operations.

10.    In August 2013, Debtors retained Development Specialists, Inc. ("DSI") to provide financial restructuring advice.  In connection with DSI's engagement, Laboratory Partners appointed DSI's William A. Brandt, Jr. as chief executive officer.  In addition, on September 5, 2013, the Debtors engaged Pillsbury Winthrop Shaw Pittman LLP and Morris, Nichols, Arsht & Tunnell LLP to provide legal advice to the Debtors in connection with a restructuring.  The Debtors also engaged Duff & Phelps Securities, LLC ("D&P") as their investment banker to assist with postpetition marketing and sale efforts.

**B.**    **Postpetition Sales Efforts**

11.    On October 30, 2013, the Debtors filed the *Debtors' Motion for Orders: (A)(I) Approving Bidding Procedures in Connection with Sales(s) of Substantially all of the Debtors' Assets; (II) Scheduling Hearings to Consider Sales; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Entry into Stalking Horse Agreements Subject to Further Hearing; (B)(I) Authorizing and Approving Sales of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Bid Procedures/Sale Motion") (D.I. 46).  The Bid Procedures/Sale Motion contemplated a staggered sale process with the sale of the LTC Division occurring first, followed by the sale of the Talon Division and possibly the Union Hospital Division.

12.     On November 15, 2013, this Court entered the *Order: (I) Approving Bidding Procedures in Connection with Sale(s) of Substantially All of the Debtors' Assets; (II) Scheduling Hearings to Consider Sales; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Entry into Stalking Horse Agreements Subject to Further Hearing* (the "Bidding Procedures Order") (D.I. 100).[3]  The Bidding Procedures Order approved, among other things, certain procedures for the solicitation of bids for the Debtors' assets, certain noticing procedures related to the sales and the assumption and assignment of executory contracts and unexpired leases.   The Bidding Procedures also set bid deadlines, auction dates and sale hearings, subject to extension by the Debtors in consultation with the Committee, Prepetition Lenders and DIP Lender.

13.     The Bidding Procedures Order, the Notice of Auctions and Sale Hearings, the Notices of Assumption and Assignment, and the Supplemental Notices of Assumption and Assignment were served in accordance with the Bidding Procedures Order.   Further the Notice of Auctions and Sale Hearings was published in the national edition of the *New York Times* on November 20, 2013.

14.     Since their engagement by the Debtors, D&P has worked diligently to create as much interest as possible in the Debtors' assets.   Specifically, D&P prepared marketing materials related to a potential sale of the Debtors' assets and the bid process in these cases. D&P provided these marketing materials to approximately 199 potential strategic and financial buyers that were most likely to express an interest in the Debtors' assets.   In selecting the list of parties to contact, D&P focused on financial buyers that, among other things, have experience with buying distressed companies in bankruptcy proceedings as well as strategic buyers known

---

[3]     Undefined capitalized terms used herein shall have the meanings set forth in the Bidding Procedures Order or Purchase Agreement, as applicable.

to be in the industry by D&P.  Additionally, D&P, with the assistance of the Debtors' senior management, developed a comprehensive list of additional strategic parties that would also potentially have an interest in bidding for the Debtors' assets.

15.     Following these initial canvassing efforts, D&P received positive responses from approximately forty-four (44) parties who were interested in some segment of the Debtors' businesses.  These parties entered into confidentiality agreements with the Debtors and received a confidential information memorandum and access to an electronic data room.

### (i)     The LTC Division Sale Process

16.     Although the Debtors were in active negotiations with several interested parties, the Debtors did not receive any Qualified Bids for the LTC Division by the applicable Bid Deadline.  As a result, the Debtors adjourned the hearing on the sale of the LTC Division to a date to be determined.

### (ii)     The Combined Talon and Union Hospital Division Sale Process

17.     The Debtors have also been involved in negotiations with several interested parties regarding the Debtors' Talon and Union Hospital Divisions.  To facilitate the continuation of such discussions, on January 15, 2014, after consultation with the Committee, DIP Lender and Prepetition Lenders, the Debtors filed a notice extending certain deadlines with respect to the sale of the Talon and Union Hospital Divisions (D.I. 262).  The Debtors filed an additional notice extending certain of such deadlines on January 28, 2014 (D.I. 281).

18.     On January 27, 2014, after receiving consent from the Committee, the DIP Lender, and the Prepetition Lenders, the Debtors entered into a stalking horse asset purchase agreement with LabCorp for substantially all of the Debtors' Talon and Union Hospital Divisions (the "LabCorp Talon APA") and filed and served such agreement in accordance with the Bidding Procedures Order (D.I. 282).  Concurrently therewith, the Debtors filed a motion

seeking approval of certain bid protections contained in the LabCorp Talon APA, which protections were approved by Order entered February 4, 2014 (D.I. 310).

19.      No additional bids for the assets included in the LabCorp Talon APA were received by the Debtors by the applicable Bid Deadline.  As a result, on February 7, 2014, the Debtors filed a notice identifying LabCorp as the Successful Bidder for the assets identified in the LabCorp Talon APA and canceling the Auction for such assets. On February 18, 2014, the Court held a hearing to consider the sale of certain of the Debtors' assets as contemplated in the LabCorp Talon APA.  The Court entered an Order approving such sale on February 18, 2014 (D.I. 348) (the "LabCorp Talon Sale Order").

20.      Notably, the LabCorp Talon APA, as approved by the LabCorp Talon Sale Order excludes certain of the Debtors' assets, including, without limitation, the business of providing nuclear medicine to Union Hospital, Inc. (the "UH Nuclear Medicine Business") and the LTC Division.

### (iii)      The UH Nuclear Medicine Business Process

21.      The Debtors marketed the UH Nuclear Medicine Business along with all their other assets as described above and provided notice of the sale of such assets as required in the Bidding Procedures Order.  Following such marketing and noticing, the only offer for the UH Nuclear Medicine Business made to the Debtors is the offer set forth in the Purchase Agreement. The Debtors believe that the Purchase Agreement represents the highest and best available bid for the UH Nuclear Medicine Business.

22.    In general, the Purchase Agreement contains the following material terms.[4]  Notably, the Purchase Agreement does not require the assumption and assignment of any executory contracts or unexpired leases.

| Parties | Laboratory Partners, Inc., Terre Haute Medical Laboratory, Inc., and Pathology Associates of Terre Haute, Inc., as Sellers, and Union Hospital, Inc., as Purchaser. |
|---|---|
| Consideration, Purchase Agreement, § 2.1 | (a) assumption of the Assumed Liabilities, (b) amendment of the Leases and termination of the Services Agreement, (c) waiver of certain claims, and (d) full compliance with the terms and provisions of the Purchase Agreement. |
| Purchased Assets and Excluded Assets, Purchase Agreement, §§ 1.1, 1.2 | (a) The personal property owned by the Sellers that is identified on Schedule 1.1(a) to the Purchase Agreement; and<br><br>(b) All inventory and supplies maintained by any of the Sellers primarily used in connection with the Business.<br><br>All of Seller's assets that are not Purchased Assets are Excluded Assets. |
| Assumed Liabilities and Excluded Liabilities, Purchase Agreement, §§ 1.3, 1.4 | Assumed liabilities are all Liabilities arising out of the ownership of the Purchased Assets or the Business on or after the Closing.<br><br>Other than the Assumed Liabilities, all of Seller's Liabilities are Excluded Liabilities. |
| Closing Conditions, Purchase Agreement, §§ 9.1, 9.2. 9.3. | Subject to the satisfaction or written waiver, on or prior to the Closing Date:<br><br>(a) No temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Body or court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other applicable Law promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by the Purchase Agreement illegal, void or rescinded; |

---

[4]    The summary provided in this Motion is provided for the convenience of the Court and interested parties.  To the extent there is any conflict between this summary and the Purchase Agreement, the latter controls in all respects.

(b) all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body set forth on Schedule 0 to the Purchase Agreement, shall have been filed, occurred or been obtained;

(c) the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order; provided, however, if the Sale Order as entered contains a waiver of the requirements under Federal Rule of Bankruptcy Procedure 6004(h) then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed;

(d) the Sellers shall have consummated the sale of the Talon Business with LabCorp on or prior to the Closing Date;

(e) each of (i) the representations and warranties of Purchaser and Seller in the Purchase Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations and warranties of Purchaser and Sellers in the Purchase Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (i) and (ii), at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Sellers and Purchasers shall have received a certificate signed by an authorized person of Purchaser and Sellers, respectively, dated the Closing Date, to the foregoing effect;

(f) Purchaser and Sellers shall have performed and complied in all material respects with all obligations and agreements required by the Purchase Agreement to be performed or complied with by Purchaser and Sellers, respectively, on or prior to the Closing Date, and the Sellers and Purchasers shall have received a certificate signed by an authorized officer of Purchaser and Seller, respectively, dated the Closing Date, to the foregoing effect;

(g) Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) all of the items set forth in Section 3.3 of the Purchase Agreement and Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2 of the Purchase Agreement;

| | (h)  Purchaser and Laboratory Corporation of America Holdings shall have entered into the Result Delivery and Administrative Services Agreement, substantially in the form of Exhibit 9.3(d) to the Purchase Agreement. |
|---|---|
| Releases, Purchase Agreement, § 8.7. | Purchaser, on behalf of itself and each of its subsidiaries and affiliates (each, a "Purchaser Party") irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Debtor, any of Debtor's Affiliates, and any of their respective directors, officers, stockholders, employees, advisors, attorneys, representatives and agents and each of their successors and assigns (each a "Debtor Party" and collectively, the "Debtor Parties") a Purchaser Party ever had, now has or may have in the future (including under Bankruptcy Code sections, including but not limited to, 365(d) (3), 365(d)(5), 365(g), 501(a), 502(b)(6), 502(g)(1), 503(b)(1)(A), 507(a)(2)) directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties.  For the avoidance of doubt, no Purchaser Party shall file any proofs of claim (or shall withdraw any previously filed proofs of claim) against any of the Debtors for any amounts owed pre or post-petition (whether as rejection damages, administrative or other claim) related to such matters covered by the release contained herein.<br><br>Each Seller, on behalf of itself and each of its subsidiaries and affiliates (each, a "Debtor Releasor"), irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Purchaser Party (or any of its officers, directors, stockholders, employees, advisors, attorneys, representatives and agents) a Debtor Releasor ever had, now has or may have in the future directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties; provided, however, that, notwithstanding the foregoing, nothing in this |

| | release shall modify or otherwise limit in any manner whatsoever any obligation a Purchaser Party may have to any Debtor Party arising out of or related to the Laboratory Services Agreement, the Service Agreements or the Purchase Agreement. |
|---|---|

The terms of the Purchase Agreement are beneficial to the Debtors and their estates and provide the possibility for continued employment for the Debtors' employees in the UH Nuclear Medicine Business.

       23.     Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of the Sale Order and Purchase Agreement, including:

| | |
|---|---|
| Sale to Insider | N/A |
| Agreements with Management | N/A |
| Releases | The Sale Order and Purchase Agreement contain mutual releases. Purchase Agreement at § 8.7; Sale Order at ¶¶ 13-14. |
| Private Sale/ No Competitive Bidding | The Debtors performed a thorough marketing process for their assets (including the Purchased Assets) in accordance with the Bidding Procedures Order. No auction was held because the Debtors did not receive any bids for the Purchased Assets other than the Purchase Agreement. The Debtors will continue to consider offers for any of their assets that have not been sold pursuant to Court order. |
| Closing Deadlines | N/A |
| Good-Faith Deposit and Conditions for Forfeiture | N/A |
| Interim Arrangements with Proposed Buyer | N/A |
| Use of Proceeds | The Net Asset Sale Proceeds (as defined in the DIP Documents), if any, shall be applied as set forth in the DIP Documents (as defined in the Final DIP Order), unless otherwise agreed to by the Debtors, Prepetition Lenders and DIP Lender. Sale Order at ¶¶ O, 12. |
| Tax Exemption | N/A |

| Record Retention | N/A |
|---|---|
| Sale of Avoidance Actions | N/A |
| Requested Findings as to Successor Liability | The Sale Order contains provisions limiting the Purchaser's successor liability.  Sale Order at ¶¶ W, DD. |
| Sale Free and Clear | The Sale Order and Purchase Agreement contain provisions seeking to sell the Purchased Assets free and clear of all Claims, Liens, liabilities, rights, interests, and encumbrances.  Purchase Agreement at 1.1; Sale Order at ¶¶ N, CC, 10. |
| Credit Bid | N/A |
| Relief from Bankruptcy Rule 6004(h) | The Sale Order seeks relief from the stay imposed by Bankruptcy Rule 6004(h).  Sale Order at ¶ 30. |

## RELIEF REQUESTED

24.    The Debtors seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit 1** approving, among other things, (a) the sale of the Purchased Assets pursuant to the Purchase Agreement to the Purchaser, (b) the Debtors entry into the Purchase Agreement, (c) the mutual releases set forth in the Purchase Agreement, and (d) related relief. The Debtors expressly reserve the right to modify the relief requested in this Motion prior to or at the applicable hearing.

## BASIS FOR RELIEF REQUESTED

**A.    The Sale of the Purchased Assets is Within the Sound
Business Judgment of the Debtors and Should be Approved**

25.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

26.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with Sale of the Purchased Assets is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance

program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

27.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

28.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Purchaser.  The prompt sale of the Purchased Assets presents the best opportunity to minimize liability and risk and thereby maximize value for the estates. Although there is no cash consideration in the Purchase Agreement, the Debtors believe that the liabilities avoided by executing the Sale make it very worthwhile.  Specifically, the Debtors will

avoid any risk of rejection damages or other claims by Union Hospital and the potential for related litigation. Additionally, the very limited equipment and inventory being sold by the Debtors does not have discernible market value. In fact, the UH Nuclear Medicine Business only accounts for 8% of revenues for the Talon Division and 3% of the Debtors' aggregate revenues. Further, the ability to provide a smooth transition of the UH Nuclear Medicine Business (rather than an abrupt halt with layoffs), will assist the Debtors in relations with their hundreds of current employees, customers and other business partners.

29.     The Debtors believe the sale of the UH Nuclear Medicine Business must occur quickly in order to maximize the value of their estates and that further time marketing and operating such assets will not be beneficial to these estates and would in fact, be detrimental to the estates. *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y.2010) ("[I]f the Debtors were to abandon the Sale Transaction ... there [would be] a material risk that, although the Debtors may not 'die,' their condition would significantly deteriorate."). The UH Nuclear Medicine Business was previously operated in connection with the Debtors' Talon Division. Following consummation of the LabCorp Talon APA, the UH Nuclear Medicine Business will retain little value for these estates. Cash and liquidity for the Debtors' businesses are limited. The sale relieves the Debtors of their obligations to provide nuclear medicine services in the future. Given all these circumstances, the Debtors perceive no benefit in continuing to operate or market the UH Nuclear Medicine Business.

30.     The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders, and that a sound business justification exists to pursue the proposed sales utilizing the expedited process of a section 363 sale rather than through a plan of

reorganization. Further, the sale pursuant to the Purchase Agreement and on the time table requested in connection with this Motion is supported by the DIP Lender, Prepetition Lenders and the Committee and is not opposed by the U.S. Trustee.  As a result, the first prong of the *Abbotts Dairies* standard has been met.

31.    The Debtors propose to serve this Motion upon : (a) the U.S. Trustee; (b) counsel for and members of any Committee; (c) counsel to the DIP Lender and the Prepetition Lenders; (d) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (e) all Persons known or reasonably believed to have expressed a bona fide interest in acquiring some or all of any of the Purchased Assets within the last six months; (f) federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (g) the Internal Revenue Service; (h) the Attorneys General in the state where the Purchased Assets are located; and (i) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002.

32.    Such notice and the notice provided in connection with the Bidding Procedures Order provides adequate notice to all potentially interested parties, including both creditors of the Debtors' estates and also those parties who have previously expressed an interest in purchasing the Purchased Assets in the past six months.  Accordingly, the proposed sale satisfies the second prong of the *Abbotts Dairies* standard.

33.     The marketing process in these cases was also designed to maximize the value received for the Purchased Assets, therefore satisfying the requirement that the Debtors are adhering to their fiduciary duties owed to all creditors and interest holders.  The Debtors have subjected the value of the Purchased Assets to market testing and will continue to entertain offers for the Purchased Assets in accordance with their fiduciary duties.  Accordingly, the Debtors and all parties in interest should be assured that the consideration received for the Purchased Assets is fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of *Abbotts Dairies* is also satisfied here.

**B.     The Proposed Sale is Proposed in "Good Faith"
Under Section 363(m) of the Bankruptcy Code**

34.     The Debtors request that the Court find that the Purchaser is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

35.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

36.     As required by section 363(m) of the Bankruptcy Code, the Purchase Agreement has been proposed in good faith and the Debtors and the Purchaser have acted in good faith in negotiating the sale of the Purchased Assets.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *Abbotts Dairies*, 788 F.2d at 147.  To constitute lack of good faith, a party's

18

conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

37.    Here, the Debtors marketed the Purchased Assets prior to the commencement of these cases and in accordance with the Bidding Procedures Order.  As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Purchase Agreement is the culmination of an extensive, arm's length solicitation and negotiation process in which the Debtors and the Purchaser were represented by counsel.  All negotiations have been and will continue to be conducted on an arm's length, good faith basis.  Moreover, there has been no fraud or collusion in terms of the proposed sale.  Under the circumstances, the Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

38.    All parties in interest as described herein will receive notice of the sale proposed herein and will be provided with an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code.

C.    **The Proposed Sale Satisfies the Requirements**
      **of Section 363(f) of the Bankruptcy Code**

         39.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

         40.     All entities known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets were notified of a proposed sale of the Purchased Assets in connection with the Bidding Procedures Order, and the Debtors are unaware of any objections thereto.  See 11 U.S.C. § 363(f)(2).  The DIP Lender holds super-priority liens in the Purchased Assets and the Prepetition Lenders are entitled to super-priority liens as adequate protection to the extent of any diminution in their collateral.  Both the DIP Lender and Prepetition Lenders have consented to the Sale

Order and the sale contemplated by the Purchaser Agreement.  In addition, to the extent that any party with a lien, claim, or interest in, or encumbrance on, the Purchased Assets has not consented to such sale, the Debtors assert that such party could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interests, if any, in the relevant assets. See 11 U.S.C. § 363(f)(5).  Accordingly, the Debtors believe that one or more of the other requirements of section 363(f) of the Bankruptcy Code are satisfied with respect to the proposed sale of the Purchased Assets.  Thus, subject to the limitations described above, the Debtors seek authority to sell the Purchased Assets free and clear of all liens, claims, interests and encumbrances, with such liens, claims, interests and encumbrances, if any, to attach to the proceeds of such sale, subject to any rights and defenses that the Debtors may have with respect thereto.

**D.**     **Relief from the Fourteen-Day Waiting Periods**
        **Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

41.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) are waived.

42.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce

the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

43.    Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

44.    Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel for and members of any Committee; (c) counsel to the DIP Lender and the Prepetition Lenders; (d) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (e) all Persons known or reasonably believed to have expressed a bona fide interest in acquiring some or all of any of the Purchased Assets within the last six months; (f) federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (g) the Internal Revenue Service; (h) the Attorneys General in the state where the Purchased Assets are located; and (i) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed sale Order, substantially in the form attached hereto as **Exhibit 1**; and (b) such other and further relief as the Court deems just and proper.

Dated: February 21, 2014
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Erin R. Fay
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Erin R. Fay (No. 5268)
1201 N. Market St., 16th Flr.
PO Box 1347
Wilmington, DE  19899-1347
Telephone:  302-658-9200
Facsimile:  302-658-3989

-and-

PILLSBURY WINTHROP SHAW PITTMAN LLP
Leo T. Crowley
Jonathan J. Russo
Margot Erlich
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500

7982992

*Counsel to Debtors and Debtors in Possession*

23