**<u>EXHIBIT 1</u>**

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

In re                            :      Chapter 11

                                :

Laboratory Partners, Inc., *et al.*,[1]     :      Case No. 13-13-12769 (PJW)

                                :

                 Debtors.       :      (Jointly Administered)

                                :      **Re: D.I. ____**

-------------------------------------------------------x

## ORDER AUTHORIZING AND APPROVING (A) THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT WITH UNION HOSPITAL, INC., (B) THE SALE OF CERTAIN OF THE DEBTORS' ASSETS TO UNION HOSPITAL, INC. PURSUANT TO SUCH ASSET PURCHASE AGREEMENT, AND (C) RELATED RELIEF

Upon the motion (the "<u>Motion</u>") of the debtors and debtors-in-possession in the above-captioned cases (the "<u>Debtors</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), as supplemented by Rules 2002 and 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), *inter alia*, authorizing and approving (a) the sale of certain assets relating to the Debtors' nuclear medicine business (the "<u>Purchased Assets</u>") described in and pursuant to the terms and conditions of the Asset Purchase Agreement, dated as of February 21, 2014 and substantially in the form annexed hereto as **Exhibit A** (collectively with all exhibits thereto and the Ancillary Agreements, the "<u>Purchase Agreement</u>") by and between certain of the Debtors, as sellers (the "<u>Sellers</u>"), and Union Hospital, Inc. **(**the "<u>Purchaser</u>"),  and (b) related relief; and a hearing on the Motion having been held on **[●]** (the

---

[1]    The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485).  Certain of the Debtors do business as MEDLAB.  The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

"Sale Hearing"); and the Court having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Sale Hearing and the Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED:

## I.    **General**

A.    All capitalized terms not otherwise defined in this Order have the meanings ascribed to such terms in the Motion or the Purchase Agreement.

B.    The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334.  The Motion and the transaction that is the subject of the Purchase Agreement are core proceedings under 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

C.    The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.    On November 15, 2013, the Court entered the *Order: (I) Approving Bidding Procedures In Connection With Sale(s) Of Substantially All Of The Debtors' Assets; (II) Scheduling Hearing To Consider Sale; (III) Approving Form And   Manner Of Notice Thereof; (IV) Authorizing Entry Into Stalking Horse Agreements Subject To Further Hearing; And (V) Granting Related Relief* (D.I. 100) (the "Bidding Procedures Order"), pursuant to which the Court, *inter alia,* approved the bidding procedures annexed to the Bidding Procedures Order for sales of the Debtors' assets and established procedures for the assumption, assignment and/or transfer of the executory contracts and unexpired leases to any purchaser of the Debtors' assets and to resolve any objections thereto, including procedures to set the cure amounts to be paid

under section 365 of the Bankruptcy Code.

E.       On _____, 2014, the Debtors filed and served the Motion

seeking approval of the sale of the Purchased Assets to the Purchaser, along with a motion to

shorten notice of the Motion (the "Motion to Shorten") and on _____, 2014, the Court

entered an Order approving the Motion to Shorten, setting corresponding objection deadlines,

and setting the Sale Hearing for _____, 2014.

F.       As evidenced by the certificates of service and publication filed with the

Court (D.I. [●],[●],[●]), and based on the representations and argument of counsel, and evidence

proffered or adduced, at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of

the Motion, the transactions contemplated therein, and the Sale Hearing has been provided in

accordance with sections 102, 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules

2002, 6004, 6006 and 9014 and Local Rule 2001-1; (ii) such notice was good and sufficient and

appropriate under the particular circumstances; and (iii) no other or further notice of the Motion,

the transactions contemplated therein, the Sale Hearing and the entry of this Order is required.

G.       A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including,

but not limited to: (i) the U.S. Trustee; (ii) counsel for and members of the official committee of

unsecured creditors appointed in these cases (the "Committee"); (iii) counsel to the DIP Lender

and the Prepetition Lenders; (iv) all entities (or counsel therefor) known or reasonably believed

to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any

portion of the Purchased Assets; (v) all Persons known or reasonably believed to have expressed

a bona fide interest in acquiring some or all of any of the Purchased Assets within the last six

months; (vi)  federal, state and local regulatory or taxing authorities or recording offices or any

other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (vii) the Internal Revenue Service; (viii) the Attorneys General in the states where the Purchased Assets are located; and (ix) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002.

## II.    The Bankruptcy Cases

H.    On October 25, 2013, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

I.    The Debtors have asserted and provided notice to the Court and the United States Trustee that their business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

J.    The Debtors assert that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

## III.    The Sale Process for the Purchased Assets

K.    Debtors have marketed the Purchased Assets diligently, in good faith and in a commercially reasonable manner to secure the highest and best offer or offers therefor by, among other things, delivering offering materials to potential purchasers and inviting potential purchasers to meet with management and the Debtors' professionals and providing potential purchasers with the opportunity to conduct extensive due diligence.  In addition, the Debtors

delivered the Bidding Procedures Order, the Bidding Procedures, the notices and the Motion to each of the entities that had previously expressed an interest in the Purchased Assets.

L.      Potentially interested parties were afforded a full, fair and reasonable opportunity to make a higher or better offer for the Purchased Assets and no higher or better offer has been made than that of the Purchaser.

IV.      <u>The Sale of the Purchased Assets to the Purchaser</u>

M.      The transactions effectuating, and the terms and conditions governing, the sale of the Purchased Assets to the Purchaser are embodied in the Purchase Agreement, which is in substantially the form attached hereto as **Exhibit A**.

N.      The Purchase Agreement contemplates that the sale of the Purchased Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of section 363(f) of the Bankruptcy Code (collectively, "<u>liens</u>"), except as expressly permitted by the Purchase Agreement; provided, however, that all liens will attach to the proceeds of the Sale with the same priority, validity, force and effect as established under the *Final Order Pursuant to 11 U.S.C. 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying the Automatic Stay* [D.I. 153] (the "<u>Final DIP Order</u>") and applicable nonbankruptcy law.

O.      The Net Asset Sale Proceeds (as defined in the DIP Documents), if any, shall be applied as set forth in the DIP Documents (as defined in the Final DIP Order), unless otherwise agreed to by the Debtors, Prepetition Lenders and DIP Lender.

P.      The Purchaser's obligation to consummate the transactions contemplated

in the Purchase Agreement is subject to the specific conditions outlined in the Purchase Agreement, including Court approval.  As of the date of entry of this Order, there is no known failure of any condition under the Purchase Agreement to the Purchaser's obligation to consummate the Sale that would entitle the Purchaser not to consummate the Sale pursuant to the Purchase Agreement or to terminate the Purchase Agreement.

Q.      The Purchase Agreement was negotiated, proposed, and entered into by and between the Purchaser and the Debtors without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the Sale, including having the Purchase Agreement voided.

R.      The Purchaser is a good faith purchaser in accordance with section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transaction under the Purchase Agreement at any time after the expiration of any stay of this Order, whether pursuant to Bankruptcy Rule 6004(g) or otherwise.

S.      The Purchaser is not an insider of any of the Debtors as that term is defined under section 101 of the Bankruptcy Code.

T.      The terms and conditions of the Purchase Agreement: (i) are fair and reasonable, (ii) valid, binding and enforceable, (iii) constitute the highest and best offer for the Purchased Assets, (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (v) constitute reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code and the

Uniform Fraudulent Transfer Act.

U.      The transactions contemplated by the Purchase Agreement will, upon consummation thereof (the "Closing"), (i) be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser with no further action required on the part of the Debtors or their respective affiliates and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all liens within the meaning of section 363(f) of the Bankruptcy Code, except as expressly permitted by the Purchase Agreement.

V.      The Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions described in the Purchase Agreement (thus adversely affecting the bankruptcy estate and its creditors) if the sale of the Purchased Assets was not free and clear of all liens, except as expressly permitted by the Purchase Agreement.

W.      Neither the Purchaser nor any of its affiliates is a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the Purchase Agreement.

X.      The relief sought in the Motion, including approval of the Purchase Agreement and consummation of the transactions contemplated thereof, is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest.  The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

Y.      Upon entry of this Order, the Debtors have all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Purchase Agreement.

Z.    Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement.

AA.    The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (i) sell the Purchased Assets on the terms and conditions set forth in the Purchase Agreement; and (ii) consummate all transactions contemplated by the Purchase Agreement, and the sale of the Purchased Assets is in the best interests of the Debtors, their estates and their creditors.

BB.    The provisions of section 363 of the Bankruptcy Code have been complied with and are applicable to the sale of the Purchased Assets.

CC.    The Debtors may consummate the transactions and transfer the Purchased Assets free and clear of all liens of any kind or nature whatsoever, except as expressly permitted by the Purchase Agreement, because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.  All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did object to the Motion and the relief requested therein fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their liens attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses,

and objections, if any, of the Debtors and all parties in interest with respect to such liens.

DD.    Except as otherwise provided in the Purchase Agreement, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability.

EE.    To the extent that the Purchased Assets constitute all or substantially all of the assets of any of the Debtors, substantial and sufficient business exigencies exist that permit the Purchased Assets to be sold outside of the context of a plan of reorganization.

FF.    Those of the Debtors' employees that may be hired by the Purchaser may be hired under new employment contracts or other arrangements to be entered into or to become effective at or after the Closing.

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

I.    **General Provisions**

1.    The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.    The Motion is granted and all objections or responses to the Motion are

hereby resolved in accordance with the terms of this Order and as set forth in the record at the Sale Hearing. To the extent that such objections or responses were not otherwise overruled, withdrawn, settled, or resolved, they are hereby overruled and denied.

3.      All parties in interest have had the opportunity to object to the relief requested in the Motion and to the extent that objections to the Motion or the relief requested therein have not been withdrawn, waived or settled, such objections and all reservations of right included therein, are overruled on the merits. The parties who did not object, or who withdrew their objections, to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

4.      The Court finds and concludes that the Debtors' business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

5.      The Court finds that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

## II.      Approval of the Purchase Agreement

6.      The Purchase Agreement and all of the terms and conditions contained therein are approved in their entirety and are binding upon the parties thereto.

7.      The Sale of the Purchased Assets and the terms and conditions contemplated by the Purchase Agreement, including, without limitation, the closing of the transactions contemplated by the Purchase Agreement, are hereby approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.

8.      The Debtors are authorized and directed, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code, to perform all of their obligations pursuant to the Purchase

Agreement and to execute such other documents and take such other actions as are reasonably

necessary to effectuate the transactions contemplated by the Purchase Agreement.

     **III.**    <u>**Transfer of the Purchased Assets to the Purchaser**</u>

     9.    The sale of the Purchased Assets, pursuant to this Order and the Purchase

Agreement, will vest the Purchaser with good title to the Purchased Assets and will be a legal,

valid and effective transfer of the Purchased Assets free and clear of all liens, except as expressly

permitted by the Purchase Agreement.

     10.    Except as expressly provided in the Purchase Agreement, pursuant to

sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall

be sold, transferred or otherwise conveyed to Purchaser free and clear of all liens, with all such

liens to attach to the proceeds of sale of the Purchased Assets in the order of their priority, and

with the same validity, priority, force and effect which they now have as against the Purchased

Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all

parties in interest with respect to such liens.

     11.    All persons or entities holding liens in, to or against the Purchased Assets

shall be, and they hereby are, forever barred from asserting such liens against Purchaser, its

successors and assigns or such Purchased Assets after Closing.

     **VI.**    <u>**Sale Proceeds**</u>

     12.    The Net Asset Sale Proceeds, if any, shall be distributed in accordance

with the terms of the Final DIP Order, unless otherwise agreed to by the Debtors, the Prepetition

Lenders and the DIP Lender.  The allocation of the value by the Buyer to the Purchased Assets

for tax purposes shall not be binding on the Court or any party for purposes of these chapter 11

cases or distributions.

**VII.   Mutual Releases**

13.    Purchaser, on behalf of itself and each of its subsidiaries and affiliates (each, a "Purchaser Party") hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Debtor, any of Debtor's Affiliates, and any of their respective directors, officers, stockholders, employees, advisors, attorneys, representatives and agents and each of their successors and assigns (each a "Debtor Party" and collectively, the "Debtor Parties") a Purchaser Party ever had, now has or may have in the future (including under Bankruptcy Code sections, including but not limited to, 365(d) (3), 365(d)(5), 365(g), 501(a), 502(b)(6), 502(g)(1), 503(b)(1)(A), 507(a)(2)) directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties.  For the avoidance of doubt, no Purchaser Party shall file any proofs of claim (or shall withdraw any previously filed proofs of claim) against any of the Debtors for any amounts owed pre or post-petition (whether as rejection damages, administrative or other claim) related to such matters covered by the release contained herein.

14.    Each Seller, on behalf of itself and each of its subsidiaries and affiliates (each, a "Debtor Releasor"), hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations,

damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Purchaser Party (or any of its officers, directors, stockholders, employees, advisors, attorneys, representatives and agents) a Debtor Releasor ever had, now has or may have in the future directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties; provided, however, that, notwithstanding the foregoing, nothing in this release shall modify or otherwise limit in any manner whatsoever any obligation a Purchaser Party may have to any Debtor Party arising out of or related to the Laboratory Services Agreement, the Service Agreements or the Purchase Agreement.

**VIII.** **Miscellaneous Provisions**

15.     At Closing, Purchaser shall deliver to Sellers, among other things, the Lease Amendments and Termination to the Services Agreements.

16.     The Sale of the Purchased Assets is consistent with the Debtors' policy concerning the transfer of personally identifiable information and no consumer privacy ombudsman is necessary as set forth in sections 332 or 363(b)(1) of the Bankruptcy Code.

17.     The consideration to be paid by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

18.     This Order (a) is and shall be effective as a determination that, upon the Closing, except as expressly provided in the Purchase Agreement, all liens existing as to the

Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee of the Purchased Assets free and clear of all liens.

19.    If any person or entity that has filed financing statement, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing liens or claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all interests or claims that the person or entity has with respect to the Purchased Assets, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens or claims in the Purchased Assets of any kind or nature.

20.    Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

21.     Except with respect to enforcing the terms of the Purchase Agreement, this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Purchase Agreement or this Order.

22.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

23.     In the absence of a stay of the effectiveness of this Order, in the event that the Purchaser and the Debtors consummate the transactions contemplated by the Purchase Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser, as a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

24.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement without charge or tax to the Debtors or Purchaser.

25.     Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements,

documents and instruments executed therewith; (b) to compel transfer of the Purchased Assets to the Purchaser; (c) to compel the Purchaser to perform all of its obligations under the Purchase Agreement; and (d) to interpret, implement and enforce the provisions of this Order.

26.    The terms of this Order and the Purchase Agreement shall be binding on and inure to the benefit of the Debtors, the Purchaser, and the Debtors' creditors (whether known or unknown) and all other parties in interest, and any successors of the Debtors, the Purchaser and the Debtors' creditors, including any trustee or examiner appointed in these cases or any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

27.    The failure to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Purchase Agreement be authorized in its entirety.

28.    Any conflict between the terms and provisions of this Order and the Purchase Agreement shall be resolved in favor of this Order.

29.    The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Purchase Agreement without further order of the Court.

30.     As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately.  The provisions of Bankruptcy Rule 6004(g) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Purchase Agreement immediately upon entry of this Order.  Time is of the essence in closing the transaction and parties to the Purchase Agreement shall be authorized to close the sale as soon as possible consistent with the terms of this Purchase Agreement.

Dated: _____, 2014      _____

                                          THE HONORABLE PETER J. WALSH
                                          UNITED STATES BANKRUPTCY JUDGE

## __EXHIBIT A__

## Purchase Agreement

**Execution Version**

ASSET PURCHASE AGREEMENT

BY AND AMONG

LABORATORY PARTNERS, INC.

TERRE HAUTE MEDICAL LABORATORY, INC., AND

PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,

AS SELLERS

AND

UNION HOSPITAL, INC.,

AS PURCHASER

**Dated as of February 21, 2014**

501291935v5

**TABLE OF CONTENTS**

**Page**

ARTICLE 1
PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.    Purchase and Sale of Assets ................................................................. 2
1.2.    Excluded Assets. ................................................................................. 2
1.3.    Assumption of Liabilities ................................................................... 2
1.4.    Excluded Liabilities ........................................................................... 2
1.5.    "As Is" Transaction ........................................................................... 2
1.6.    Seller Representative ......................................................................... 3

ARTICLE 2
CONSIDERATION

2.1.    Consideration ..................................................................................... 3
2.2.    Seller Representative ......................................................................... 3

ARTICLE 3
CLOSING

3.1.    Closing ............................................................................................... 3
3.2.    Closing Deliveries by Sellers ............................................................ 3
3.3.    Closing Deliveries by Purchaser ....................................................... 4
3.4.    Termination of Agreement ................................................................. 4
3.5.    Procedure Upon Termination ............................................................. 5
3.6.    Effect of Termination. ........................................................................ 6

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

4.1.    Corporate Organization ...................................................................... 6
4.2.    Authority Relative to This Agreement ............................................... 6
4.3.    Conflicts; Consents of Third Parties ................................................. 7
4.4.    Employees .......................................................................................... 7
4.5.    NO OTHER REPRESENTATIONS OR WARRANTIES ................ 7

ARTICLE 5
REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.    Corporate Organization ...................................................................... 8
5.2.    Authority Relative to This Agreement ............................................... 8
5.3.    Consents and Approvals; No Violation .............................................. 8
5.4.    HIPPA Covered Entity ....................................................................... 9

ARTICLE 6
EMPLOYEES

6.1.    Waiver of Certain Restrictions ........................................................... 9

i

6.2.    No Third Party Beneficiaries ...................................................................................9

## ARTICLE 7
## BANKRUPTCY COURT MATTERS

7.1.    Certain Motions and Orders......................................................................................9

## ARTICLE 8
## COVENANTS AND AGREEMENTS

8.1.    Conduct of Business Prior to Closing.....................................................................10
8.2.    Further Agreements ................................................................................................10
8.3.    Publicity .................................................................................................................10
8.4.    Collection of Accounts Receivable........................................................................10
8.5.    Notification of Certain Matters..............................................................................11
8.6.    Further Assurances.................................................................................................12
8.7.    Mutual Releases .....................................................................................................12
8.8.    Accounts Receivable; No Offset............................................................................13
8.9.    Talon Business .......................................................................................................13

## ARTICLE 9
## CONDITIONS TO CLOSING

9.1.    Conditions Precedent to the Obligations of Purchaser and the Sellers.................14
9.2.    Conditions Precedent to the Obligations of the Sellers .........................................14
9.3.    Conditions Precedent to the Obligations of Purchaser ..........................................15

## ARTICLE 10
## DEFINITIONS

10.1.    Certain Definitions.................................................................................................15
10.2.    Additional Defined Terms .....................................................................................19

## ARTICLE 11
## TAXES

11.1.    Additional Tax Matters ..........................................................................................20

## ARTICLE 12
## MISCELLANEOUS

12.1.    Payment of Expenses .............................................................................................21
12.2.    Survival of Representations and Warranties; Survival of Post-Closing Covenants ..........21
12.3.    Entire Agreement; Amendments and Waivers ......................................................21
12.4.    Counterparts...........................................................................................................21
12.5.    Governing Law .......................................................................................................21
12.6.    Jurisdiction, Waiver of Jury Trial ..........................................................................22
12.7.    Notices ...................................................................................................................22
12.8.    Binding Effect; Assignment...................................................................................23
12.9.    Severability ............................................................................................................23
12.10.    Injunctive Relief....................................................................................................23

ii

12.11. Time of the Essence ..................................................................................24
12.12. Third Party Beneficiaries ...........................................................................24
12.13. Damages.....................................................................................................24
12.14. Certain Interpretations ...............................................................................24

## EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit A | Custodian Agreement |
| Exhibit 3.2(d) | Lease Amendments |
| Exhibit 3.2(e) | Termination to the Service Agreements |
| Exhibit 9.3(d) | Result Delivery and Administrative Services Agreement |
| Exhibit 10.1(z) | Sale Order |

Schedules

| | |
|---|---|
| Schedule 1.1(a) | Equipment |
| Schedule 1.2 | Excluded Assets |
| Schedule 3.2(f) | Cash for Closing |
| Schedule 4.3(a) | Conflicts |
| Schedule 4.3(b) | Permits |
| Schedule 4.4 | Current Business Employees |
| Schedule 8.1(a) | Conduct of Business Prior to Closing |
| Schedule 9.1(b) | Required Government Authorizations |
| Schedule 10.1(i) | Current Business Employees |
| Schedule 10.1(q) | Leases |
| Schedule 11.1(b) | Allocation |

501291935v5

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of February 21, 2014 (the "Execution Date"), by and among Laboratory Partners, Inc., a Delaware corporation ("LP"), Terre Haute Medical Laboratory, Inc., an Indiana corporation, ("THML") and Pathology Associates of Terre Haute, Inc., an Indiana corporation and wholly-owned subsidiary of THML ("PATH" and, collectively with LP, and THML, the "Sellers"), each as a Chapter 11 debtor and debtor in possession, and Union Hospital, Inc., an Indiana non-profit corporation ("Purchaser"). Article 10 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

**WHEREAS,** the Sellers own certain assets used in their business of providing nuclear medicine services to hospitals, clinics, surgery centers, physician offices and physicians (the "Business") and Purchaser desires to purchase certain assets and assume certain liabilities related thereto;

**WHEREAS,** the Sellers and certain of their Affiliates are debtors and debtors-in-possession (the "Debtors") in those certain jointly administered bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on October 25, 2013 (the "Filing Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and jointly administered under Case No. 13-12769 (PJW) (such bankruptcy case, the "Chapter 11 Case"); and

**WHEREAS,** the Sellers are providing nuclear medicine services to Purchaser pursuant to the Amended and Restated Pathology Services and Nuclear Medicine Services Agreement between Purchaser and PATH, dated May 18, 2004, and the Amended and Restated Laboratory and Nuclear Medicine Professional and Administrative Services Agreement between Purchaser and THML, dated May 18, 2004 (together, the "Service Agreements").

**WHEREAS,** Purchaser desires to purchase and assume from the Sellers, and the Sellers desire to sell, transfer and assign to Purchaser, the Purchased Assets and the Assumed Liabilities in accordance with this Agreement and in accordance with and subject to the Sale Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code; and

**WHEREAS,** all of the transactions contemplated by this Agreement will be subject to and conditioned upon approval by the Bankruptcy Court and will be consummated only pursuant to the Sale Order entered in the Chapter 11 Case.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and the Sellers hereby agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.    <u>Purchase and Sale of Assets</u>.  Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and each Seller shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances on the Closing Date, all of such Seller's right, title and interest in, to and under all of the following assets, properties, rights and interests primarily used in connection with the Business, but in all cases excluding the Excluded Assets (collectively, the "<u>Purchased Assets</u>"):

(a)    the personal property owned by the Sellers that is identified on Schedule 1.1(a) ("<u>Equipment</u>"); and

(b)    all inventory and supplies maintained by any of the Sellers primarily used in connection with the Business.

1.2.    <u>Excluded Assets.</u>  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller or its Affiliates be deemed to sell, transfer, assign or convey, and such Seller and its Affiliates shall retain all of their right, title and interest to, in and under any assets, properties, rights or interests that are not specifically set forth as Purchased Assets, including all cash and cash equivalents and accounts receivable of any Seller, the Contracts to which any Seller is a party as set forth on Schedule 1.2, and all records that any of the Sellers are required to retain under applicable Laws (collectively, the "<u>Excluded Assets</u>").

1.3.    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume all Liabilities arising out of the ownership of the Purchased Assets or the Business on or after the Closing (the "<u>Assumed Liabilities</u>"):

1.4.    <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities set forth in <u>Section 1.3</u> (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller or any of its Affiliates of any nature whatsoever, whether accrued or unaccrued (collectively, the "<u>Excluded Liabilities</u>").

1.5.    <u>"As Is" Transaction</u>.    PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.  PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES

2

EXPRESSLY PROVIDED IN ARTICLE 4, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

      1.6.   <u>Seller Representative</u>. From and after the date of the entry of the Sale Order, each Seller, by their execution hereof, hereby irrevocably constitutes and appoints LP to act as its exclusive agent and attorney-in-fact to give and receive notices on behalf of such Seller, as the case may be, and in general to do all things and to perform all acts on behalf of such Seller as may be contemplated by this Agreement. From and after the date of the entry of the Sale Order, this power of attorney, and all authority hereby conferred, is irrevocable and will not be terminated by any act of any Seller, by operation of Law or by the occurrence of any other event.

## ARTICLE 2

## CONSIDERATION

      2.1.   <u>Consideration</u>. In consideration for the purchase of the Purchased Assets, on the Closing Date the Purchaser shall (a) assume the Assumed Liabilities, (b) amend the Leases and (c) terminate the Service Agreements, pursuant to <u>Section 3.3</u> hereof, (c) waive certain claims, and (d) fully comply with the terms and provisions of this Agreement.

      2.2.   <u>Seller Representative</u>. All obligations of any Seller pursuant to this Agreement shall be administered by LP pursuant to <u>Section 1.6</u> hereof. Purchaser shall be entitled to deal with and rely on the authority of LP with respect to any such matters.

## ARTICLE 3

## CLOSING

      3.1.   <u>Closing</u>. Subject to (i) the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party entitled to waive the applicable condition and (ii) the provisions of <u>Section 3.4</u>, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Pillsbury Winthrop Shaw Pittman LLP at 1540 Broadway, New York, New York 10036 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing). The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>".

      3.2.   <u>Closing Deliveries by Sellers</u>. At the Closing, the Sellers shall deliver, or cause to be delivered, to Purchaser:

3

(a)    a duly executed bill of sale, in customary form, with respect to conveyances by the Sellers of the Purchased Assets to Purchaser;

(b)    a duly executed assignment and assumption agreement, in customary form, with respect to the assignment by the Sellers and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(c)    a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

(d)    duly executed copies of the Lease Amendments, substantially in the form set forth on Exhibit 3.2(d);

(e)    duly executed copies of the Termination to the Service Agreements, substantially in the form set forth on Exhibit 3.2(e);

(f)    cash in an amount equal to the amount set forth on Schedule 3.2(f); and

(g)    a duly executed Custodian Agreement, duly executed by Sellers.

3.3.    Closing Deliveries by Purchaser.  At the Closing, Purchaser shall deliver, or cause to be delivered, to (or at the direction of) the Sellers:

(a)    a duly executed assignment and assumption agreement, in customary form, with respect to the assignment by the Sellers and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(b)    duly executed copies of the Lease Amendments, substantially in the form set forth on Exhibit 3.2(d);

(c)    duly executed copies of the Termination to the Service Agreements, substantially in the form set forth on Exhibit 3.2(e); and

(d)    a duly executed Custodian Agreement, duly executed by Purchaser.

3.4.    Termination of Agreement.  This Agreement may be terminated as follows:

(a)    By the mutual written consent of the Sellers and Purchaser at any time;

(b)    by Purchaser or the Sellers, if there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)    by Purchaser, if any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(d)    by Purchaser or the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on March 14, 2014, (ii) following entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B)

4

have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days, or (D) have been modified or amended in any manner adverse to Purchaser without the prior written consent of Purchaser;

(e)      by the Sellers, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and Purchaser fails to consummate the transactions contemplated hereby at the Closing;

(f)      by Purchaser, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing;

(g)      by Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to twenty (20) days after written notice of such breach, failure or occurrence is given to the Sellers by Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(g) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(h)      by the Sellers, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to twenty (20) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers; provided, that the right of the Sellers to terminate this Agreement under this Section 3.4(h) shall not be available if any Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

(i)      by the Sellers, if the Sellers accept and consummate the sale of all or substantially all of their assets relating to the Talon Business with a purchaser other than the Stalking Horse Bidder.

3.5.    Procedure Upon Termination.  In the event of a termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) subject to Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto; provided, however, that such termination shall not relieve any

5

party from Liability for its intentional misconduct or material breach of this Agreement prior to such termination. Any termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto.

3.6.   Effect of Termination. In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Purchaser or the Sellers or any of their respective Affiliates, except as expressly set forth in Section 3.5. The provisions of Section 3.4, Section 3.5, this Section 3.6 and Article 12 shall survive any termination of this Agreement and shall remain in full force and effect.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby, jointly and severally, make the representations and warranties in this Article 4 to Purchaser as of the Execution Date and as of the Closing Date. Each Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article 4. Any event, item or matter disclosed in any Section or numbered part of the Seller Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article 4 to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.1.   Corporate Organization. Each Seller is duly organized and validly existing under the Laws of the state of its incorporation. Each Seller has all requisite power and authority to own, lease and operate its properties used to operate the Business as it is now being operated, subject to the provisions of the Bankruptcy Code.

4.2.   Authority Relative to This Agreement. Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite corporate power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver such Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Ancillary Agreements by Sellers, and the consummation of the transactions contemplated hereby and thereby by Sellers, have been duly authorized by all requisite action on the part of each Seller. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Bid Procedures Order and Sale Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally,

6

and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

    4.3.   Conflicts; Consents of Third Parties.

       (a)   Except as set forth in Section 4.3(a) of the Seller Disclosure Schedule or as permitted by the Sale Order, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation by Sellers of the transactions contemplated hereby or thereby, or compliance by such Seller with any of the provisions hereof or thereof will (i) conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (A) any of the organizational documents of such Seller; (B) subject to and assuming entry of the Sale Order, any Contract or permit that is a Purchased Asset; or (C) subject to and assuming entry of the Sale Order, any applicable Law, other than, in the case of clauses (B) and (C), such conflicts, violations, defaults, fees, payments, increases, charges, modifications, terminations, cancellations, accelerations or losses that would not have, individually or in the aggregate, a material adverse effect on the Purchased Assets taken as a whole or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any of the Purchased Assets.

       (b)   Except as set forth in Section 4.3(b) of the Seller Disclosure Schedule, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of any Seller in connection with the execution and delivery of this Agreement or any of the Seller Ancillary Agreements by Sellers, the compliance by such Seller with any of the provisions hereof or thereof, the consummation by any Seller of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and (ii) such other approvals, orders, permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, have a material adverse effect on the Purchased Assets taken as a whole.

    4.4.   Employees.

       (a)   Schedule 4.4 of the Seller Disclosure Schedule sets forth a true and complete list of Current Business Employees, including name, title, date of hire and current base salary.

    4.5.   NO OTHER REPRESENTATIONS OR WARRANTIES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 4, NONE OF THE SELLERS NOR OR ANY OTHER PERSON ON BEHALF OF THE SELLERS MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO ANY OF THE SELLERS OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING AS TO THE PROBABLE SUCCESS OR

7

PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS, AND THE PURCHASED ASSETS FOLLOWING THE CLOSING.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties in this <u>Article 5</u> to the Sellers as of the Execution Date and as of the Closing.

5.1.    <u>Corporate Organization</u>.  Purchaser is a corporation or limited liability company, duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation (as applicable).

5.2.    <u>Authority Relative to This Agreement</u>.  Purchaser has the requisite corporate power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each of the Purchaser Ancillary Agreements have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and at or prior to the Closing the Purchaser Ancillary Agreements shall be, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and entry of the Sale Order) this Agreement constitutes, and of each of the Purchaser Ancillary Agreements when so executed and delivered shall constitute, a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3.    <u>Consents and Approvals; No Violation</u>.

(a)    None of the execution and delivery by Purchaser of this Agreement or the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof shall conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (i) the certificate of formation of Purchaser, (ii) any contract (including any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other arrangement) or permit to which Purchaser is a party or by which Purchaser or its properties, assets or business are bound or subject, (iii) any order of any Governmental Body applicable to Purchaser or by which any of the properties, assets or business of Purchaser are bound, or (iv) any applicable Law.

(b)    No approval, order or permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Ancillary Agreements, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the

501291935v6

taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to operate the Purchased Assets.

     5.4.   <u>HIPPA Covered Entity</u>.  Purchaser is a "covered entity" as defined under the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as codified at 45 C.F.R. §160.103.

## ARTICLE 6

## EMPLOYEES

     6.1.   <u>Waiver of Certain Restrictions</u>.

          (a)   The Sellers hereby waive any provision in any agreement to which they are party that prohibits Purchaser from contacting any Current Business Employee and from soliciting any Current Business Employee for employment by Purchaser.

          (b)   The Sellers shall cause THML PathLab LLC ("<u>PathLab</u>") to waive, effective as of the Closing Date, the noncompetition provision contained in paragraph 11 of the Physician's Employment Contract, dated February 19, 2010, between Betty Jo Mills, M.D. and PathLab (as assignee of PATH pursuant to the Assignment and Assumption of Employment Contracts between PATH and PathLab, dated July 19, 2010).

     6.2.   <u>No Third Party Beneficiaries</u>.  No provision of this Agreement shall (i) create any right in any employee of any Seller or any of its Affiliates to continued employment by any Seller, Purchaser or any of their respective Affiliates or preclude the ability of any Seller, Purchaser or any of their respective Affiliates to terminate the employment of any employee for any reason, (ii) require any Seller, Purchaser or any their respective Affiliates to continue any benefit arrangement or prevent the amendment, modification or termination thereof, (iii) confer upon any employee of any Seller or any of its Affiliates any rights or remedies under or by reason of this Agreement or (iv) be treated as an amendment to any particular employee benefit plan of any Seller, Purchaser or any of their respective Affiliates.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

     7.1.   <u>Certain Motions and Orders</u>.

          (a)   The Sellers shall use their commercially reasonable efforts to:  (i) obtain entry by the Bankruptcy Court of the Sale Order no later than March 14, 2014, and (ii) subject to the satisfaction of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

          (b)   The Sale Order, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance reasonably satisfactory to Purchaser.

9

# ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1.    <u>Conduct of Business Prior to Closing.</u>  During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code or the DIP Credit Agreement, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement or as otherwise approved by the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 8.1(a) or (4) with the prior written consent of Purchaser (which consent shall not to be unreasonably withheld, conditioned or delayed), each Seller shall use commercially reasonable efforts to operate the Purchased Assets in the Ordinary Course of Business and maintain the goodwill associated with the Purchased Assets and the relationships with the employees, customers and suppliers primarily related to the Purchased Assets.

8.2.    <u>Further Agreements.</u>  After the Closing, each Seller shall promptly deliver to Purchaser any mail or other communication received by such Seller and primarily relating to the Purchased Assets or the Assumed Liabilities.  After the Closing, Purchaser shall (x) promptly deliver to such Seller any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by Purchaser to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to the Sellers any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Excluded Assets.  From and after the Closing Date, the Sellers shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Sellers.

8.3.    <u>Publicity.</u>  Prior to the Closing, the Sellers and Purchaser agree to communicate with each other and cooperate with each other prior to any public disclosure of this Agreement or the transactions contemplated hereby.  Prior to the Closing, each of the Sellers and Purchaser agrees that it shall not issue, and it shall cause its respective Affiliates and representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed), except as such release or announcement may be required by applicable Law or by the Bankruptcy Court (which shall include the filings to be made with the Bankruptcy Court in connection with this Agreement), in which case the party required to make the release or announcement shall use reasonable efforts to allow the other party reasonable time to comment on such release or announcement in advance of such issuance. Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without disclosure schedules.  Notwithstanding the foregoing, for purposes of this <u>Section 8.3</u>, each Seller may freely communicate with its employees regarding this Agreement and the sale of the Purchased Assets.

8.4.    <u>Collection of Accounts Receivable.</u>  Sellers and Purchaser covenant and agree that

10

(a)     Following the Closing, Sellers may continue to collect accounts receivable related to the Business that arose from services provided by Sellers or any of their Affiliates prior to the Closing Date. Subject to the terms of this Section 8.4(a), Purchaser shall (i) not intentionally take, or fail to take, any action that could reasonably be expected to interfere, or cause any other person to interfere with Sellers' billing and collection activities related to services provided Sellers or any of their Affiliates prior to the Closing Date, and (ii) shall not intentionally take, or fail to take, any action that could reasonably be expected to cause any customer of Seller or any of their Affiliates to withhold payment of any invoice due from such customer to Sellers or any of their Affiliates, including demanding, suggesting or otherwise requiring such customer to pay post-Closing claims due to Purchaser prior to paying pre-Closing claims due to Sellers.

(b)     Purchaser agrees that any payments for services received by the Purchaser from any payor or customer that are attributable to dates of service pre-Closing shall be separated from any payments for services attributable to dates of service post-Closing and shall be promptly forwarded to Sellers at the notice address identified in Section 12.7 hereof. In the event that reimbursements from any payor or customer cover time periods occurring both pre-Closing and post-Closing and Purchaser is unable to identify to which dates of service the reimbursement should be allocated, Purchaser shall promptly and in good faith query the payor or customer as to what period the payment relates. Should the payor or customer fail to designate the dates of service to which the payment relates, Purchaser shall promptly notify the Sellers and the parties shall promptly jointly determine an appropriate allocation. In the event that Purchaser and Sellers are unable to mutually agree to an allocation, the payment shall be allocated between the Sellers and the Purchaser pro rata based upon the ratio of the unpaid billed amounts for services rendered to that payor or customer by the Sellers prior to or on the Closing Date and the unpaid billed amounts for services rendered by the Purchaser to the same payor or customer after the Closing Date. In the event of a pro rata determination, Purchaser agrees to promptly pay such amounts to the Sellers by check or wire transfer to accounts designated by the Sellers.

(c)     To the extent the Purchaser receives any proceeds from the accounts receivable of the Sellers, the Purchaser acknowledges that the payment belongs to the Sellers and the Purchaser shall hold the payment in trust for the benefit of the Sellers. Purchaser shall not have any right of offset with respect to such accounts receivable, and shall not have any right, title or interest whatsoever in the payment and shall remit the same to Sellers within five (5) Business Days of receipt.

8.5.    Notification of Certain Matters.    The Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to the Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or Action that challenges the transactions contemplated hereby or the entry of any Bankruptcy Court Order.

8.6.    <u>Further Assurances.</u>

(a)    Subject to the terms and conditions of this Agreement and applicable Law, each Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent set forth in this Agreement are satisfied and to consummate the transactions contemplated by this Agreement as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, neither the Sellers nor Purchaser shall take any action or refrain from taking any action the effect of which would materially delay or materially impede the ability of the Sellers or Purchaser to consummate the transactions contemplated by this Agreement unless taking such action is permitted or required by this Agreement or refraining from taking such action is required by applicable Law, the Bankruptcy Court or the Bankruptcy Code.

(c)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby. Nothing in this <u>Section 8.6</u> shall obligate any party hereto to waive any right or condition under this Agreement and nothing in this <u>Section 8.6</u> shall (i) require the Sellers or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of Purchaser (unless funds in the full amount thereof are prepaid in advance to the Sellers in cash) or (ii) prohibit, delay or interfere with the ability of Sellers or any of their Affiliates from ceasing operations or winding up their affairs following the Closing.

(d)    The obligations of the Sellers pursuant to this <u>Section 8.6</u> shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Case), and each Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Bid Procedures Order), and the Sellers' duty to the estate and their creditors including the duty to seek and obtain the highest or otherwise best price for the Purchased Assets in compliance with, and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

8.7.    <u>Mutual Releases.</u>

(a)    Purchaser, on behalf of itself and each of its subsidiaries and affiliates (each, a "<u>Purchaser Party</u>") hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or

12

otherwise which against any Debtor, any of Debtor's Affiliates, and any of their respective directors, officers, stockholders, employees, advisors, attorneys, representatives and agents and each of their successors and assigns (each a "Debtor Party" and collectively, the "Debtor Parties") a Purchaser Party ever had, now has or may have in the future (including under Bankruptcy Code sections, including but not limited to, 365(d) (3), 365(d)(5), 365(g), 501(a), 502(b)(6), 502(g)(1), 503(b)(1)(A), 507(a)(2)) directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties. For the avoidance of doubt, no Purchaser Party shall file any proofs of claim (or shall withdraw any previously filed proofs of claim) against any of the Debtors for any amounts owed pre or post-petition (whether as rejection damages, administrative or other claim) related to such matters covered by the release contained herein.

(b)    Each Seller, on behalf of itself and each of its subsidiaries and affiliates (each, a "Debtor Releasor"), hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Purchaser Party (or any of its officers, directors, stockholders, employees, advisors, attorneys, representatives and agents) a Debtor Releasor ever had, now has or may have in the future directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties; provided, however, that, notwithstanding the foregoing, nothing in this release shall modify or otherwise limit in any manner whatsoever any obligation a Purchaser Party may have to any Debtor Party arising out of or related to the Laboratory Services Agreement, the Service Agreements or this Agreement.

8.8.    Accounts Receivable; No Offset.  Purchaser herby agrees to promptly pay, when due, any and all amounts due to any Debtor for services rendered under the Laboratory Services Agreement or either Nuclear Medicine Services Agreement.  Purchaser hereby agrees that it shall not offset or otherwise contest in any manner whatsoever any amounts due to any Debtor for services rendered under the Laboratory Services Agreement or either Nuclear Medicine Services Agreement on account of any obligations or liabilities of any Debtor Party to any Purchaser Party.

8.9.    Talon Business.  Purchaser hereby agrees that it has no objection to (and shall not assert or make any claim related to): (a) Sellers' assignment of the Purchased Assets (as such term is defined in the Talon APA) to the Stalking Horse Bidder pursuant to the Talon APA or (b) the separation of Sellers' nuclear medicine and laboratory services businesses as contemplated by this Agreement and the Talon APA.

13

## ARTICLE 9

## CONDITIONS TO CLOSING

9.1.    <u>Conditions Precedent to the Obligations of Purchaser and the Sellers</u>.    The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers and Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    no temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Body or court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other applicable Law promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body set forth on <u>Schedule 9.1(b)</u>, shall have been filed, occurred or been obtained;

(c)    the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order; <u>provided</u>, <u>however</u>, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed; and

(d)    the Sellers shall have consummated the sale of the Talon Business with the Stalking Horse Bidder on or prior to the Closing Date.

9.2.    <u>Conditions Precedent to the Obligations of the Sellers</u>.    The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law):

(a)    each of (i) the representations and warranties of Purchaser in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations and warranties of Purchaser in this Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of <u>clauses (i)</u> and <u>(ii)</u>, at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Sellers shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

14

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)    Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) all of the items set forth in Section 3.3.

9.3.    Conditions Precedent to the Obligations of Purchaser.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    each of the representations and warranties of the Sellers shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein), except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, have a material adverse effect on the Purchased Assets taken as a whole, at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)    each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by such Seller on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of such Seller, dated the Closing Date, to the foregoing effect; and

(c)    the Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2.

(d)    Purchaser and Laboratory Corporation of America Holdings shall have entered into the Result Delivery and Administrative Services Agreement, substantially in the form set forth on Exhibit 9.3(d).

# ARTICLE 10

## DEFINITIONS

10.1.    Certain Definitions.  As used herein:

(a)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is

15

under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(b)     "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(c)     "Bid Procedures" has the meaning ascribed to such term in the Bid Procedures Order.

(d)     "Bid Procedures Order" means the Order: (I) Approving Bidding Procedures In Connection with Sale(s) Of Substantially All Of The Debtors' Assets; (II) Scheduling Hearing To Consider Sale; (III) Approving Form And Manner Of Notice Thereof; (IV) Authorizing Entry Into Stalking Horse Agreements Subject To Further Hearing; and (V) Granting Related Relief, entered by the Bankruptcy Court on November 15, 2013 [Docket No. 100.]

(e)     "Business" has the meaning set forth in the Recitals.

(f)     "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(g)     "Code" means the Internal Revenue Code of 1986, as amended.

(h)     "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement of any Seller primarily related to the Business.

(i)     "Current Business Employees" shall mean all individuals employed by the Sellers primarily in connection with the operation of the Business immediately prior to the Closing as set forth on Schedule 10.1(i) (which Schedule shall be updated at the Closing), including in each case all such individuals on leave of absence, furlough, maternity or paternity leave, vacation, sick leave, short term disability, military leave, jury duty or bereavement leave.

(j)     "Custodian Agreement" means a Custodian of Records Agreement in the form attached hereto as Exhibit A, which shall appoint Purchaser as custodian of certain medical records retained by Sellers.

(k)     "DIP Credit Agreement" means that certain $5,000,000 Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 30, 2013, by and among the Debtors, The Bank of New York Mellon, as the administrative and collateral agent, Marathon Special Opportunity Fund, as lead arranger, and the other lenders party thereto from time to time, as the same may be amended, supplemented or otherwise modified from time to time.

16

(l)    "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(m)    "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is in full force and effect and (ii) has not been stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

(n)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, any court or arbitrator (public or private) or any contractor (e.g., a Medicare fiscal intermediary) acting on behalf of a Governmental Body.

(o)    "Laboratory Services Agreement" means that certain Laboratory Professional and Administrative Services Agreement effective September 1, 2011 by and between Purchaser and THML, as the same may be amended from time to time.

(p)    "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(q)    "Leases" shall mean the leases between THML and Purchaser as set forth on Schedule 10.1(q).

(r)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(s)    "Ordinary Course of Business" means the ordinary and usual course of business of Sellers related to the Business subject to the DIP Credit Agreement and/or the Chapter 11 Case.

(t)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the

17

commencement of the Chapter 11 Case; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Purchased Assets, taken as a whole, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Case and that do not result from a breach, default or violation by a Seller of any Contract or Law, (v) such other Encumbrance, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially adversely affect the value or the intended use of the Purchased Assets taken as a whole and (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(u)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(v)    "Purchaser Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Purchaser is required to execute and/or deliver in connection with this Agreement.

(w)    "Sale Order" means the order of the Bankruptcy Court, substantially in form attached hereto as Exhibit 10.1(w), which shall, among other things, (i) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement free and clear of all Encumbrances and (ii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby.

(x)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver in connection with this Agreement.

(y)    "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by the Sellers.

(z)    "Stalking Horse Bidder" means Laboratory Corporation of America Holdings pursuant to the Talon APA.

(aa)    "Talon APA" means that certain Asset Purchase Agreement dated January 27, 2014 between the Sellers and the Stalking Horse Bidder as the same may be amended from time to time.

(bb)    "Talon Business" means the Sellers' business of providing clinical and anatomic laboratory and associated pathology-related services, which includes reference business, to hospitals, clinics, surgery centers, physician offices, physicians and other

18

applicable sources. For the avoidance of doubt, the Talon Business does not include the Business or the LTC Division (as such term is used in the Bid Procedures Order).

(cc) "<u>Tax</u>" and "<u>Taxes</u>" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in <u>clause (i)</u>; and (iii) any Liability in respect of any items described in <u>clauses (i)</u> and/or <u>(ii)</u> payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

(dd) "<u>Tax Return</u>" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

10.2.  <u>Additional Defined Terms</u>. The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
|---|---|
| Agreement | Preamble |
| Allocation | Section 11.1(b) |
| Assumed Liabilities | Section 1.3 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | Section 4.2 |
| Chapter 11 Case | Recitals |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| Debtors | Preamble |
| Debtor Party or Debtor Parties | Section 8.7(a) |
| Equipment | Section 1.1(a) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 1.4 |
| Execution Date | Preamble |
| Filing Date | Recitals |
| Purchased Assets | Section 1.1 |
| PathLab | Section 6.1(b) |
| Purchaser | Preamble |
| Purchaser Party | Section 8.7(a) |
| Sellers | Preamble |
| Service Agreements | Recitals |
| Transfer Taxes | Section 11.1(a) |

19

## ARTICLE 11

### TAXES

11.1.  Additional Tax Matters.

(a)     Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Sellers), protect, and save and hold the Sellers harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes.

(b)     Prior to the Closing, Purchaser and Sellers shall agree on a schedule allocating the Purchase Price (as calculated for federal income tax purposes) among the Purchased Assets and other relevant items (such schedule, the "Allocation").  If, and to the extent, the parties are unable to agree on the Allocation, each of the Sellers, on the one hand, and the Purchaser, on the other hand, shall be free to allocate the Purchase Price (as calculated by each such party for federal income tax purposes) among the Purchased Assets and other relevant items, without regard to the allocation of any other party.  In the event the parties agree to the Allocation, Purchaser and the Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall not voluntarily take any position contrary thereto or inconsistent therewith. Notwithstanding any other provision of the Agreement, the terms and provisions of the Section 11.1(b) shall survive the Closing until the later of the final decree closing the Chapter 11 Case and the liquidation and winding up of Sellers' estates (but in no event later than sixty (60) days after the expiration of the applicable statute of limitations).

(c)     Any real or personal property Taxes or assessments, ad valorem Taxes or similar Taxes with respect to the Purchased Assets for any taxable period beginning on or before and ending after the Closing Date shall be apportioned between the Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days in the taxable period related to such Taxes occurring before and after the Closing Date.  Appropriate cash payments by the Sellers or Purchaser, as applicable, shall be made from time to time, as soon as practicable after the facts giving rise to the obligation for such payments are known, to give effect to the foregoing prorations.

(d)     The Sellers and Purchaser shall cooperate in good faith with each other after the Closing in providing any information necessary to permit the filing of Tax Returns or responding to audits or other inquiries of any Governmental Body relating to Taxes; provided, however, that nothing in this Section 11.1(d) shall prohibit, delay or interfere with the ability of any of the Sellers or any of their Affiliates from ceasing operations or winding up their affairs following Closing.

20

## ARTICLE 12

## MISCELLANEOUS

12.1.    <u>Payment of Expenses</u>.    Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, however, that all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by Purchaser.

12.2.    <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. The parties hereto agree that the representations and warranties contained in this Agreement shall expire automatically and immediately upon the Closing Date and shall have no further force or effect after the Closing Date.    The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3.    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement (including the Schedules hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.    No action taken pursuant to this Agreement, including any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.4.    <u>Counterparts</u>.    For the convenience of the parties hereto, this Agreement and any Ancillary Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5.    <u>Governing Law</u>.    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

21

12.6.   <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)   THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED, HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE STATE COURTS IN THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7.   <u>Notices</u>.  Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Sellers:

> Laboratory Partners, Inc.
> 671 Ohio Pike
> Suite K
> Cincinnati, OH 45245
> Attn:  Chief Executive Officer
> Facsimile No.:  (513) 753-1103

> with a copy (which shall not constitute effective notice) to:

> Pillsbury Winthrop Shaw Pittman LLP
> 1540 Broadway
> New York, New York 10036
> Attn:  Jonathan J. Russo, Esq.
> Facsimile No.:  (212) 858-1500

If to Purchaser:

> Union Hospital, Inc.
> 1606 North 7th Street
> Terre Haute, Indiana 47804

22

Attn: Kym A. Pfrank
Facsimile No.:

with copies (which shall not constitute effective notice) to:

Wilkinson, Goeller, Modesitt, Wilkinson
& Drummy
333 Ohio Street, P.O. Box 800
Terre Haute, Indiana 47808
Attn: Kelvin L. Roots, Esq.
Facsimile No.: (812) 235-5107

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

   12.8.   Binding Effect; Assignment.  This Agreement shall be binding upon Purchaser and, subject to Bankruptcy Court approval of this Agreement and the Sale Order, the Sellers, and inure to the benefit of the parties and its respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case.  No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

   12.9.   Severability.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

   12.10.   Injunctive Relief.  The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, each of the Sellers and Purchaser shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.  The rights set forth in this Section 12.10 shall be in addition to any other rights which the Sellers or Purchaser may have at Law or in equity pursuant to this Agreement.

23

501291935v6

12.11. <u>Time of the Essence</u>.  Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.12. <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any chief restructuring officer or similar officer administering the Sellers' assets in their Chapter 11 Case), any legal or equitable rights hereunder.

12.13. <u>Damages</u>.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, DIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

12.14. <u>Certain Interpretations</u>.  (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii)    All Schedules and Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

24

        (vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

        (viii)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

        (b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank.]*

501291935v6

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>SELLERS</u>:

LABORATORY PARTNERS, INC.

By: _William A. Brandt, Jr._

Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
      President and Secretary

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _William A. Brandt, Jr._

Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
      President and Secretary

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _William A. Brandt, Jr._

Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
      President and Secretary

<u>PURCHASER</u>:

UNION HOSPITAL, INC.

By: _____
Name: Kym A. Pfrank
Title:  Interim President and Chief
      Executive Officer

*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS**:

LABORATORY PARTNERS, INC.

By: _____
Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
       President and Secretary

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____
Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
       President and Secretary

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____
Name: William A. Brandt, Jr.
Title: Chief Executive Officer,
       President and Secretary

**PURCHASER**:

UNION HOSPITAL, INC.

By: _____
Name: Kym A. Pfrank
Title: Interim President and Chief
       Executive Officer

*[Signature page to Asset Purchase Agreement]*

EXHIBIT A

## CUSTODIAN OF RECORDS AGREEMENT

THIS CUSTODIAN OF RECORDS AGREEMENT ("Custodian Agreement") is made as of February •, 2014, by and among Union Hospital, Inc., an Indiana non-profit corporation ("Purchaser" or "Custodian"), and Laboratory Partners, Inc., a Delaware corporation ("LP"), Terre Haute Medical Laboratory, Inc., an Indiana corporation ("THML") and Pathology Associates of Terre Haute, Inc., an Indiana corporation ("PATH" and, collectively with LP and THML, the "Sellers"). All capitalized terms used herein without definitions shall have the respective meanings set forth in the Purchase Agreement (defined below).

WHEREAS, Sellers and Purchaser are parties to that certain Asset Purchase Agreement dated as of February 21, 2014 (the "Purchase Agreement"); and

WHEREAS, Purchaser has agreed to serve as custodian for all medical records of Sellers pertaining to the nuclear medicine services performed in connection with the Business prior to the Closing Date (the "Medical Records").

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Custody of Records.  The each of the Sellers hereby appoints the Purchaser to serve as custodian of all Medical Records and Purchaser hereby agrees to serve as the custodian for all Medical Records. All such Medical Records shall remain in the custody and control of Purchaser, at Purchaser's own expense. After the expiration of any retention periods required by state law for the maintenance of medical records, the Health Information Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), the amendments to HIPAA made as a part of the Health Information Technology for Economic and Clinical Health Act ("HITECH") enacted as a part of the American Recovery and Reinvestment Act ("ARRA"), (collectively the "HIPAA Rules"), the Clinical Laboratory Improvement Amendments of 1988 or other applicable state or federal law, Purchaser shall destroy or dispose of the Medical Records in a method and manner that renders any protected health information (as defined at 45 C.F.R. § 160.103) therein unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the U.S. Secretary of Health & Human Services in applicable guidance issued under section 13402(h)(2) of Public Law 111-5 most recently prior to that destruction or disposition. The Purchaser hereby assumes all of the Sellers' obligations with respect to the maintenance, access and disclosure of the Medical Records, as custodian of the Medical Records, pursuant to patient authorization or as otherwise permitted or required under applicable state and federal laws. Without limiting the foregoing, Purchaser shall fully comply with the Business Associate Agreement entered into by Purchaser and Sellers contemporaneously herewith.

2.    Term and Termination.  This Custodian Agreement shall take effect upon execution by the parties hereto and shall remain in effect for as long as Purchaser retains custody

501294392v4

of the Medical Records, as required by the applicable statute of limitations for the retention of the Medical Records.

       3.     <u>Access to Records.</u>  All such Medical Records shall remain subject to appropriate patient or legal requests for transfer and release, in accordance with all state and federal laws governing confidentiality, access, use, and disclosure of protected health information. Charges for copies of the Medical Records by Purchaser shall be in accordance with applicable state and federal laws.  Upon reasonable advance notice, Sellers shall have access to all such Medical Records in order to inspect or copy such Medical Records or portions thereof at Sellers' sole expense and as permitted by and in accordance with all applicable state and federal laws. If Sellers receive written requests or other inquiries regarding the Medical Records, those communications shall be directed to Purchaser's attention in writing and on a timely basis.

       4.     <u>Further Assurances.</u>  Each Seller, for itself and its successors and assigns, hereby covenants and agrees to execute and deliver such other documents and instruments of sale, conveyance, assignment or transfer, and to take such other actions as may be reasonably requested by Custodian or its successors and assigns to more effectively consummate the transactions contemplated by this Custodian Agreement.

       5.     <u>Terms of Purchase Agreement.</u>  Sellers and Purchaser acknowledge and agree that the terms and provisions contained in the Purchase Agreement shall not be superseded by this Custodian Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement. In the event of a conflict or inconsistency between the terms of this Custodian Agreement and the terms of this Purchase Agreement, the terms of the Purchase Agreement shall govern.

       6.     <u>Binding Effect.</u>  This Custodian Agreement shall be binding upon the Purchaser and its successors and assigns and shall inure to the benefit of the parties and their respective estates, successors and assigns.

       7.     <u>Governing Law; Forum; Waiver of Jury Trial.</u>  This Custodian Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof. Any judicial proceeding brought with respect to this Custodian Agreement must be brought in accordance with the terms of Section 12.6 of the Purchase Agreement. Each party hereto (a) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Custodian Agreement, and (b) irrevocably waives any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum. Each party hereto waives the right to a jury trial with respect to any dispute related to this Custodian Agreement.

       8.     <u>Counterparts.</u>  This Custodian Agreement may be executed in multiple counterparts, (including by means of telecopied, facsimile or pdf signature pages), any of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same, all of which shall be deemed to be original signed versions of this Custodian Agreement.

501294392v4

IN WITNESS WHEREOF, the parties have executed this Custodian Agreement to be effective as of the Effective Date.

PURCHASER:                        UNION HOSPITAL, INC.

                                  By: _____
                                  Name:
                                  Title:

SELLERS:                          LABORATORY PARTNERS, INC.

                                  By: _____
                                  Name:
                                  Title:

                                  TERRE HAUTE MEDICAL LABORATORY, INC.

                                  By: _____
                                  Name:
                                  Title:

                                  PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.

                                  By: _____
                                  Name:
                                  Title:

<u>**Exhibit 3.2(d)**</u>

**FIRST AMENDMENT TO LEASE**

**THIS FIRST AMENDMENT TO LEASE** (this "<u>Amendment</u>") is dated as of February __, 2014 by and between **UNION HOSPITAL, INC.**, an Indiana nonprofit corporation ("<u>Landlord</u>"), and **TERRE HAUTE MEDICAL LABORATORY, INC.**, an Indiana corporation ("<u>Tenant</u>").

R E C I T A L S:

**WHEREAS**, Landlord and Tenant are parties to that certain Lease effective as of January 24, 2005 (the "<u>Lease</u>") pursuant to which Tenant leases from Landlord certain premises on the first (1st) floor of the building located at 1530 North 7th Street, Terre Haute, Indiana, as more particularly described in the Lease; and

**WHEREAS**, Landlord and Tenant desire to amend the Lease in accordance with and subject to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.      <u>Capitalized Terms</u>.  All capitalized terms used and not otherwise defined in this Amendment shall have the respective meanings ascribed to them in the Lease.

2.      <u>Leased Premises</u>.

(a)     Section 1.2 of the Lease is hereby amended in its entirety to read as follows:

> "'Leased Premises': All space occupied by Tenant on the portion of the first floor of the Office Complex as shown by the cross-checked area on the attached '**Exhibit B**', containing seven hundred thirty-nine (739) square feet of Rentable Area in the building (hereinafter referred to as the 'Building') located at 1530 North 7th Street, Terre Haute, Vigo County, Indiana."

(b)     The floor plan attached as "Exhibit B" to the Lease is hereby replaced with the floor plan attached as "Exhibit B" to this Amendment.

3.      <u>Tenant's Percentage Allocation</u>.  The second sentence in Section 1.3 of the Lease is hereby amended in its entirety to read as follows:

> "For purposes of calculating Tenant's prorated share of expenses for maintenance and upkeep of the Office Complex, including the expenses as set forth in Section 7, or other services provided by Landlord to or on behalf of Tenant, Tenant's percentage of the Office Complex or Total Building shall be 0.005%."

404340830v2

4.    Initial Term. Section 3.1 of the Lease is hereby amended in its entirety to read as follows:

> "**Initial Term/Commencement Date**.    The Initial Term or Primary Term of this Lease commenced on August 1, 2004 ('Commencement Date') and will end at 11:59 p.m. on December 31, 2020, unless otherwise terminated or extended as provided herein."

5.    Base Rent. Section 4.1(a) of the Lease is hereby amended in its entirety to read as follows:

> "For the period commencing on March 1, 2014 (the 'Rent Adjustment Date') and ending on July 31, 2015, Tenant shall pay to Landlord Basic Annual Rent in the amount of **One Thousand Sixty-Seven and 29/100 Dollars ($1,067.29)** per month.  On the Rent Adjustment Date, Tenant shall be entitled to a credit against the Basic Annual Rent in an amount equal to the difference between: (a) the per diem amount (based on the actual number of days in the applicable calendar month) of (i) Basic Annual Rent and (ii) additional rent calculated on the basis of the square footage of the Leased Premises, in each case paid by Tenant for the number of days in the immediately preceding calendar month attributable to the period prior to February 23, 2014 (the 'Effective Date'); and (b) the per diem amount (based on the actual number of days in the applicable calendar month) of (i) Basic Annual Rent and (ii) additional rent calculated on the basis of the square footage of the Leased Premises, in each case paid by Tenant for the number of days in the immediately preceding calendar month attributable to the period from and after the Effective Date through the end of such calendar month (taking into account the modifications made to the Lease as of the Effective Date, including, without limitation, this Section 4.1(a) and the second sentence in Section 1.3)."

6.    Tenant's Default. Section 16.6 of the Lease is hereby deleted in its entirety.

7.    Notices.  Tenant's address in Section 22 of the Lease is hereby amended in its entirety to read as follows:

> "To Tenant:    Terre Haute Medical Laboratory, Inc.
> c/o Laboratory Partners, Inc.
> 671 Ohio Pike
> Suite K
> Cincinnati, OH 45245
> Attn: Chief Executive Officer"

8.    <u>Miscellaneous</u>.

(a)    Except to the extent modified herein, all of the terms and provisions of the Lease shall remain in full force and effect, and, as modified hereby, all of the terms and provisions of the Lease are hereby ratified and confirmed in all respects.

(b)    This Amendment and the rights and obligations of the parties hereunder shall be governed by the laws of the State of Indiana.

(c)    In the event of any inconsistencies or conflicts between the terms and provisions of this Amendment and the terms and provisions of the Lease as originally executed, the terms and provisions of this Amendment shall govern.

(d)    This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(e)    For the convenience of the parties hereto, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed as of the day and year first above written.

<u>**LANDLORD**</u>:

UNION HOSPITAL, INC.,
an Indiana nonprofit corporation

By:_____
      Name: Kym A. Pfrank
      Title:  Interim President and Chief
            Executive Officer

<u>**TENANT**</u>:

TERRE HAUTE MEDICAL LABORATORY, INC.,
an Indiana corporation

By:_____
      Name: William A. Brandt, Jr.
      Title: Chief Executive Officer,
           President and Secretary

**"EXHIBIT B"**

**Exhibit 3.2(d)**

### THIRD AMENDMENT TO LEASE

**THIS THIRD AMENDMENT TO LEASE** (this "Amendment") is dated as of February __, 2014 by and between **UNION HOSPITAL, INC.,** an Indiana nonprofit corporation ("Landlord"), and **TERRE HAUTE MEDICAL LABORATORY, INC.,** an Indiana corporation ("Tenant").

### R E C I T A L S:

**WHEREAS,** Landlord and Tenant are parties to that certain Lease dated October 11, 1999, as amended by that certain Amendment to Lease dated as of May 18, 2004 and further amended by that certain Second Addendum to Lease effective as of September 1, 2004 (collectively, the "Lease") pursuant to which Tenant leases from Landlord certain premises in the building located at 1606 North 7th Street, Terre Haute, Indiana, as more particularly described in the Lease; and

**WHEREAS,** Landlord and Tenant desire to further amend the Lease in accordance with and subject to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    Capitalized Terms.  All capitalized terms used and not otherwise defined in this Amendment shall have the respective meanings ascribed to them in the Lease.

2.    Leased Premises.

(a)    Section 1.1 of the Lease is hereby amended in its entirety to read as follows:

> "**Leased Premises**.  Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, space in the Facility building commonly known as Union Hospital, Inc. and located at 1606 North 7th Street, Terre Haute, Indiana, consisting of approximately Fourteen Thousand Ninety-Three (14,093) square feet in said building (hereinafter, the 'Leased Premises').  The Leased Premises are shown as the cross-hatched area on the attached 'Exhibit A'.  This Lease shall be for the term, upon the rentals and subject to the terms and conditions set forth in this Lease Agreement."

(b)    The floor plan attached as "Exhibit A" to the Lease is hereby replaced with the floor plan attached as "Exhibit A" to this Amendment.

3.    Initial Term. Section 2.1 of the Lease is hereby amended in its entirety to read as follows:

> "**Initial Term**. The Initial Term of this Lease commenced on September 1, 1999 and will end at 11:59 p.m. on December 31, 2020, unless otherwise terminated or extended as provided herein."

4.    Extended or Renewal Term. Section 2.2 of the Lease is hereby amended in its entirety to read as follows:

> "**Extended or Renewal Term**. Tenant shall, so long as Tenant is not in default hereunder, have an option to extend/renew the term of this Lease for a period of sixty (60) months (hereinafter referred to as the 'Extended Term' or 'Renewal Term'). If Tenant exercises such option to extend/renew, the Extended Term or Renewal Term will begin upon the expiration of the Initial Term. The Extended Term or Renewal Term shall be governed by the same provisions and conditions of this Lease as then in force and effect.
>
> Tenant shall, prior to the termination of the Initial Term of this Lease, give 'Sufficient Notice' of its intention either to exercise its option to extend this Lease or not exercise its option to extend this Lease. If Tenant fails to exercise its option to extend this Lease, Tenant shall vacate the Leased Premises in accordance with the terms of this Lease. For purposes of this Section 2.2, 'Sufficient Notice' shall mean a notice in writing given by Tenant and delivered to Landlord which is at least one hundred eighty (180) days prior to the expiration of the Initial Term or prior Extended Term or Renewal Term of this Lease, as the case may be."

5.    Termination. Section 2.3 of the Lease is hereby amended in its entirety to read as follows:

> "**Termination**. In addition to the other provisions of this Agreement, the parties agree that the Lease may be terminated by mutual agreement of the parties."

6.    Mechanic's Lien. The second and third sentences in Section 3.6 of the Lease are hereby deleted in their entirety and replaced as follows:

> "If any Mechanic's Lien shall at any time be filed against the Leased Premises, Tenant shall, as soon as is reasonably possible thereafter, post a bond in the amount thereof and cause the same to be discharged of record within sixty (60) days after the date of filing the same. If Tenant shall fail to discharge such Mechanic's Lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due without inquiry into the validity of the same and Tenant shall, immediately upon notice from Landlord, reimburse Landlord for all such amounts.

Tenant, however, shall have the right to contest any such Mechanic's Lien provided that, within sixty (60) days after any such Mechanic's Lien attaches to the Leased Premises, it shall post a bond in the amount thereof and give notice to Landlord of its intention to contest the same and provided further that Tenant shall proceed to contest the validity or amount of such Mechanic's Lien by appropriate legal proceedings. Tenant hereby indemnifies Landlord from any cost, damage, loss or expense (including reasonable attorneys' fees) incurred by Landlord as a result of any Mechanic's Lien placed upon the Leased Premises or contested by Tenant."

7.    <u>Base Rent</u>.  Section 4.1 of the Lease is hereby amended in its entirety to read as follows:

"**Basic Fixed Rent**. For each month of the Initial Term during the period commencing on March 1, 2014 (the 'Rent Adjustment Date') and ending on August 31, 2015, Tenant shall pay a Basic Fixed Rent in the amount of Three Hundred Eighty-Eight Thousand Four Hundred Fifty-Eight and 12/100 Dollars ($388,458.12) per lease year, yielding a monthly rent in the amount of Thirty-Two Thousand Three Hundred Seventy-One and 51/100 Dollars ($32,371.51) payable in advance on the first day of each and every month, with the first Basic Fixed Rent payment being due on the Rent Adjustment Date. On the Rent Adjustment Date, Tenant shall be entitled to a credit against the Basic Fixed Rent in an amount equal to the difference between: (a) the per diem amount (based on the actual number of days in the applicable calendar month) of (i) Basic Fixed Rent and (ii) additional rent (if any) calculated on the basis of the square footage of the Leased Premises, in each case paid by Tenant for the number of days in the immediately preceding calendar month attributable to the period prior to February 23, 2014 (the 'Effective Date'); and (b) the per diem amount (based on the actual number of days in the applicable calendar month) of (i) Basic Fixed Rent and (ii) additional rent (if any) calculated on the basis of the square footage of the Leased Premises, in each case paid by Tenant for the number of days in the immediately preceding calendar month attributable to the period from and after the Effective Date through the end of such calendar month (taking into account the modifications made to the Lease as of the Effective Date, including, without limitation, this Section 4.1)."

8.    <u>Default</u>.  The first sentence in Section 9.1 of the Lease is hereby amended to add the following parenthetical after the words "on the due date" in the second line of such Section 9.1:

> "(if the failure continues for ten (10) days after the receipt of Landlord's written notice thereof)"

9.    <u>Notices</u>.  Tenant's address in Section 10.1 of the Lease is hereby amended in its entirety to read as follows:

> "To Tenant:    Terre Haute Medical Laboratory, Inc.
> c/o Laboratory Partners, Inc.
> 671 Ohio Pike
> Suite K
> Cincinnati, OH 45245
> Attn: Chief Executive Officer"

10.    <u>Miscellaneous</u>.

(a)    Except to the extent modified herein, all of the terms and provisions of the Lease shall remain in full force and effect, and, as modified hereby, all of the terms and provisions of the Lease are hereby ratified and confirmed in all respects.

(b)    This Amendment and the rights and obligations of the parties hereunder shall be governed by the laws of the State of Indiana.

(c)    In the event of any inconsistencies or conflicts between the terms and provisions of this Amendment and the terms and provisions of the Lease as originally executed, the terms and provisions of this Amendment shall govern.

(d)    This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(e)    For the convenience of the parties hereto, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed as of the day and year first above written.

<u>**LANDLORD:**</u>

UNION HOSPITAL, INC.,
an Indiana nonprofit corporation


By:_____
       Name: Kym A. Pfrank
       Title: Interim President and Chief
            Executive Officer


<u>**TENANT:**</u>

TERRE HAUTE MEDICAL LABORATORY, INC.,
an Indiana corporation


By:_____
       Name: William A. Brandt, Jr.
       Title: Chief Executive Officer,
            President and Secretary

"EXHIBIT A"

**Exhibit 3.2(e)**

## TERMINATION AGREEMENT

**THIS TERMINATION AGREEMENT** (this "Agreement") is made as of this ____ day of February, 2014, by and among **LABORATORY PARTNERS, INC.,** a Delaware corporation ("LP"), **TERRE HAUTE MEDICAL LABORATORY, INC.,** an Indiana corporation ("THML"), **PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,** an Indiana corporation and wholly-owned subsidiary of THML ("PATH" and, with LP and THML, the "Sellers") and **UNION HOSPITAL, INC.,** an Indiana non-profit corporation ("Purchaser" and, collectively, with Sellers, the "Parties" and each, individually, a "Party").

### W I T N E S S E T H :

**WHEREAS,** Purchaser and THML are parties to that certain Amended and Restated Laboratory and Nuclear Medicine Professional and Administrative Services Agreement dated as of May 18, 2004 (the "THML Nuclear Medicine Agreement"), whereby THML agreed to provide Purchaser with certain clinical laboratory services and nuclear medicine services to meet the inpatient and outpatient needs of Purchaser;

**WHEREAS,** Purchaser and PATH are parties to that certain Amended and Restated Pathology Services and Nuclear Medicine Services Agreement dated as of May 18, 2004 (the "PATH Nuclear Medicine Agreement" and, collectively with the THML Nuclear Medicine Agreement, the "Nuclear Medicine Agreements"), whereby PATH agreed to provide Purchaser with certain clinical and administrative pathology services and nuclear medicine services to meet the inpatient and outpatient needs of Purchaser;

**WHEREAS,** Purchaser and THML entered into that certain Laboratory Professional and Administrative Services Agreement effective September 1, 2011 (the "2011 Laboratory Agreement"), which amended and superseded the Nuclear Medicine Agreements with respect to clinical laboratory, anatomic pathology and administrative laboratory services provided to Purchaser, as provided therein;

**WHEREAS,** each of THML and PATH continue to provide nuclear medicine services to Purchaser pursuant to the Nuclear Medicine Agreements;

**WHEREAS,** Purchaser and Sellers have entered into that certain Asset Purchase Agreement dated as of February 21, 2014 (the "Purchase Agreement") (each capitalized term used herein but not defined herein shall have the respective meaning ascribed to such term in the Purchase Agreement); and

**WHEREAS,** pursuant to Sections 3.2(e) and 3.3(c) of the Purchase Agreement, the Parties desire to enter into this Agreement subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I

TERMINATION OF AGREEMENTS

Section 1.1 Termination. Effective as of the date of this Agreement, each of the Nuclear Medicine Agreements is hereby terminated and shall have no further force or effect from and after the date hereof; provided, however, that notwithstanding the foregoing, the Parties hereby agree that such termination shall not affect in any manner whatsoever the Parties' obligations set forth in Articles III and IV (other than Section 4.4) of the THML Nuclear Medicine Agreement and Article VI (other than Section 6.8) of the PATH Nuclear Medicine Agreement relating to periods prior to the date hereof, which obligations shall survive termination and continue to be valid and binding obligations of the Parties, enforceable in accordance with their terms.

Section 1.2 No Termination of 2011 Laboratory Agreement. For the avoidance of doubt, nothing in this Agreement shall terminate or otherwise modify in any manner whatsoever any term or provision contained in the 2011 Laboratory Agreement and the Parties hereby agree that such 2011 Laboratory Agreement is in full force and effect following the date of this Agreement.

ARTICLE II

REPRESENTATIONS AND WARRANTIES

Section 2.1 Representations and Warranties of Each Party. Each Party hereto represents and warrants to the other Party that:

(a) the execution of this Agreement is fully authorized by it;

(b) the person or persons executing this Agreement on its behalf have the necessary and appropriate authority to do so;

(c) it has obtained all authorizations, consents, or approvals, including any governmental entity, required to make this Agreement valid and binding as to such Party; and

(d) this Agreement constitutes the legal, valid and binding agreement of such Party, enforceable against such Party in accordance with its terms.

ARTICLE III

MISCELLANEOUS

Section 3.1 Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and the Sellers, and inure to the benefit of the parties and its respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

US_NE_501294311_6.DOC

Section 3.2  Entire Agreement.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof; provided however, nothing in this Agreement shall be deemed to supersede, alter or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided in, and subject to the limitations set forth in, the Purchase Agreement. If any conflict exists between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

Section 3.3  Amendments.  This Agreement may not be changed, altered or modified unless the same shall be in writing executed by all of the Parties.

Section 3.4  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its principles of conflicts of law.

Section 3.5  Fees and Expenses.  Each Party shall bear its own costs and expenses (including advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 3.6  Severability.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 3.7  Notices.  Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Sellers:

        Laboratory Partners, Inc.
        671 Ohio Pike
        Suite K
        Cincinnati, OH 45245
        Attn:  Chief Executive Officer
        Facsimile No.:  (513) 753-1103

3

with a copy (which shall not constitute effective notice) to:

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036
Attn: Jonathan J. Russo, Esq.
Facsimile No.: (212) 858-1500

If to Purchaser:

Union Hospital, Inc.
1606 North 7th Street
Terre Haute, Indiana 47804
Attn: President
Facsimile No.:

with copies (which shall not constitute effective notice) to:

Wilkinson, Goeller, Modesitt, Wilkinson
& Drummy
333 Ohio Street, P.O. Box 800
Terre Haute, Indiana 47808
Attn: Kelvin L. Roots, Esq.
Facsimile No.: (812) 235-5107

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

Section 3.8 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. The exchange of executed copies of this Agreement by facsimile, portable document format (PDF) transmission or other reasonable form of electronic transmission shall constitute effective execution and delivery of this Agreement.

***(Signatures appear on following page)***

**IN WITNESS WHEREOF**, the parties hereto have executed this Termination Agreement as of the date and year set forth above.

<u>**SELLERS**</u>:

LABORATORY PARTNERS, INC.

By: _____
Name: _____
Title: _____

TERRE HAUTE MEDICAL
LABORATORY, INC.

By: _____
Name: _____
Title: _____

PATHOLOGY ASSOCIATES OF
TERRE HAUTE, INC.

By: _____
Name: _____
Title: _____

<u>**PURCHASER**</u>:

UNION HOSPITAL, INC.

By: _____
Name: _____
Title: _____

**Exhibit 10.1(z)**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Laboratory Partners, Inc., *et al.*,[1] | : | Case No. 13-13-12769 (PJW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | **Re: D.I. ____** |

-----------------------------------------------------x

**ORDER AUTHORIZING AND APPROVING (A) THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT WITH UNION HOSPITAL, INC., (B) THE SALE OF CERTAIN OF THE DEBTORS' ASSETS TO UNION HOSPITAL, INC. PURSUANT TO SUCH ASSET PURCHASE AGREEMENT, AND (C) RELATED RELIEF**

Upon the motion (the "Motion") of the debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 2002 and 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*, authorizing and approving (a) the sale of certain assets relating to the Debtors' nuclear medicine business (the "Purchased Assets") described in and pursuant to the terms and conditions of the Asset Purchase Agreement, dated as of [●] and substantially in the form annexed hereto as **Exhibit A** (collectively with all exhibits thereto and the Ancillary Agreements, the "Purchase Agreement") by and between certain of the Debtors, as sellers (the "Sellers"), and Union Hospital, Inc. (the "Purchaser"),  and (b) related relief; and a hearing on the Motion having been held on [●] (the "Sale Hearing"); and the Court

---

[1]     The Debtors and the last four digits of their taxpayer identification numbers are as follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849), MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and Pathology Associates of Terre Haute, Inc. (6485).  Certain of the Debtors do business as MEDLAB.  The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite K, Cincinnati, OH 45245.

having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Sale Hearing and the Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED:

I.    **General**

A.    All capitalized terms not otherwise defined in this Order have the meanings ascribed to such terms in the Motion or the Purchase Agreement.

B.    The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334. The Motion and the transaction that is the subject of the Purchase Agreement are core proceedings under 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

C.    The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.    On November 15, 2013, the Court entered the *Order: (I) Approving Bidding Procedures In Connection With Sale(s) Of Substantially All Of The Debtors' Assets; (II) Scheduling Hearing To Consider Sale; (III) Approving Form And   Manner Of Notice Thereof; (IV) Authorizing Entry Into Stalking Horse Agreements Subject To Further Hearing; And (V) Granting Related Relief* (D.I. 100) (the "Bidding Procedures Order"), pursuant to which the Court, *inter alia*, approved the bidding procedures annexed to the Bidding Procedures Order for sales of the Debtors' assets and established procedures for the assumption, assignment and/or transfer of the executory contracts and unexpired leases to any purchaser of the Debtors' assets and to resolve any objections thereto, including procedures to set the cure amounts to be paid

under section 365 of the Bankruptcy Code.

        E.      On _____, 2014, the Debtors filed and served the Motion seeking approval of the sale of the Purchased Assets to the Purchaser, along with a motion to shorten notice of the Motion (the "Motion to Shorten") and on _____, 2014, the Court entered an Order approving the Motion to Shorten, setting corresponding objection deadlines, and setting the Sale Hearing for _____, 2014.

        F.      As evidenced by the certificates of service and publication filed with the Court (D.I. [●],[●],[●]), and based on the representations and argument of counsel, and evidence proffered or adduced, at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the transactions contemplated therein, and the Sale Hearing has been provided in accordance with sections 102, 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rule 2001-1; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the transactions contemplated therein, the Sale Hearing and the entry of this Order is required.

        G.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) the U.S. Trustee; (ii) counsel for and members of the official committee of unsecured creditors appointed in these cases (the "Committee"); (iii) counsel to the DIP Lender and the Prepetition Lenders; (iv) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (v) all Persons known or reasonably believed to have expressed a bona fide interest in acquiring some or all of any of the Purchased Assets within the last six months; (vi) federal, state and local regulatory or taxing authorities or recording offices or any

other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (vii) the Internal Revenue Service; (viii) the Attorneys General in the states where the Purchased Assets are located; and (ix) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002.

## II.    The Bankruptcy Cases

H.    On October 25, 2013, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

I.    The Debtors have asserted and provided notice to the Court and the United States Trustee that their business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

J.    The Debtors assert that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

## III.    The Sale Process for the Purchased Assets

K.    Debtors have marketed the Purchased Assets diligently, in good faith and in a commercially reasonable manner to secure the highest and best offer or offers therefor by, among other things, delivering offering materials to potential purchasers and inviting potential purchasers to meet with management and the Debtors' professionals and providing potential purchasers with the opportunity to conduct extensive due diligence.  In addition, the Debtors

delivered the Bidding Procedures Order, the Bidding Procedures, the notices and the Motion to each of the entities that had previously expressed an interest in the Purchased Assets.

        L.      Potentially interested parties were afforded a full, fair and reasonable opportunity to make a higher or better offer for the Purchased Assets and no higher or better offer has been made than that of the Purchaser.

        **IV.**    **The Sale of the Purchased Assets to the Purchaser**

        M.      The transactions effectuating, and the terms and conditions governing, the sale of the Purchased Assets to the Purchaser are embodied in the Purchase Agreement, which is in substantially the form attached hereto as **Exhibit A.**

        N.      The Purchase Agreement contemplates that the sale of the Purchased Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of section 363(f) of the Bankruptcy Code (collectively, "liens"), except as expressly permitted by the Purchase Agreement; provided, however, that all liens will attach to the proceeds of the Sale with the same priority, validity, force and effect as established under the *Final Order Pursuant to 11 U.S.C. 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying the Automatic Stay* [D.I. 153] (the "Final DIP Order") and applicable nonbankruptcy law.

        O.      The Net Asset Sale Proceeds (as defined in the DIP Documents), if any, shall be applied as set forth in the DIP Documents (as defined in the Final DIP Order), unless otherwise agreed to by the Debtors, Prepetition Lenders and DIP Lender.

        P.      The Purchaser's obligation to consummate the transactions contemplated

in the Purchase Agreement is subject to the specific conditions outlined in the Purchase Agreement, including Court approval. As of the date of entry of this Order, there is no known failure of any condition under the Purchase Agreement to the Purchaser's obligation to consummate the Sale that would entitle the Purchaser not to consummate the Sale pursuant to the Purchase Agreement or to terminate the Purchase Agreement.

Q.     The Purchase Agreement was negotiated, proposed, and entered into by and between the Purchaser and the Debtors without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the Sale, including having the Purchase Agreement voided.

R.     The Purchaser is a good faith purchaser in accordance with section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transaction under the Purchase Agreement at any time after the expiration of any stay of this Order, whether pursuant to Bankruptcy Rule 6004(g) or otherwise.

S.     The Purchaser is not an insider of any of the Debtors as that term is defined under section 101 of the Bankruptcy Code.

T.     The terms and conditions of the Purchase Agreement: (i) are fair and reasonable, (ii) valid, binding and enforceable, (iii) constitute the highest and best offer for the Purchased Assets, (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (v) constitute reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code and the

Uniform Fraudulent Transfer Act.

U.    The transactions contemplated by the Purchase Agreement will, upon consummation thereof (the "Closing"), (i) be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser with no further action required on the part of the Debtors or their respective affiliates and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all liens within the meaning of section 363(f) of the Bankruptcy Code, except as expressly permitted by the Purchase Agreement.

V.    The Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions described in the Purchase Agreement (thus adversely affecting the bankruptcy estate and its creditors) if the sale of the Purchased Assets was not free and clear of all liens, except as expressly permitted by the Purchase Agreement.

W.    Neither the Purchaser nor any of its affiliates is a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the Purchase Agreement.

X.    The relief sought in the Motion, including approval of the Purchase Agreement and consummation of the transactions contemplated thereof, is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest.  The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

Y.    Upon entry of this Order, the Debtors have all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Purchase Agreement.

Z.     Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement.

AA.     The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment, to (i) sell the Purchased Assets on the terms and conditions set forth in the Purchase Agreement; and (ii) consummate all transactions contemplated by the Purchase Agreement, and the sale of the Purchased Assets is in the best interests of the Debtors, their estates and their creditors.

BB.     The provisions of section 363 of the Bankruptcy Code have been complied with and are applicable to the sale of the Purchased Assets.

CC.     The Debtors may consummate the transactions and transfer the Purchased Assets free and clear of all liens of any kind or nature whatsoever, except as expressly permitted by the Purchase Agreement, because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.   All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.   All parties with liens of any kind or nature whatsoever in the Purchased Assets, except as expressly permitted by the Purchase Agreement, who did object to the Motion and the relief requested therein fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their liens attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses,

and objections, if any, of the Debtors and all parties in interest with respect to such liens.

DD.     Except as otherwise provided in the Purchase Agreement, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability.

EE.     To the extent that the Purchased Assets constitute all or substantially all of the assets of any of the Debtors, substantial and sufficient business exigencies exist that permit the Purchased Assets to be sold outside of the context of a plan of reorganization.

FF.     Those of the Debtors' employees that may be hired by the Purchaser may be hired under new employment contracts or other arrangements to be entered into or to become effective at or after the Closing.

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

I.      **General Provisions**

1.      The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.      The Motion is granted and all objections or responses to the Motion are

9

hereby resolved in accordance with the terms of this Order and as set forth in the record at the Sale Hearing. To the extent that such objections or responses were not otherwise overruled, withdrawn, settled, or resolved, they are hereby overruled and denied.

3. All parties in interest have had the opportunity to object to the relief requested in the Motion and to the extent that objections to the Motion or the relief requested therein have not been withdrawn, waived or settled, such objections and all reservations of right included therein, are overruled on the merits. The parties who did not object, or who withdrew their objections, to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

4. The Court finds and concludes that the Debtors' business is not a health care business as defined under section 101(27A), and therefore, a patient care ombudsman is not required as provided in section 333 of the Bankruptcy Code.

5. The Court finds that the proposed sale of assets does not require the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code as the Debtors have no privacy policies in place of the type described in section 363(b)(1)(B).

## II.    Approval of the Purchase Agreement

6. The Purchase Agreement and all of the terms and conditions contained therein are approved in their entirety and are binding upon the parties thereto.

7. The Sale of the Purchased Assets and the terms and conditions contemplated by the Purchase Agreement, including, without limitation, the closing of the transactions contemplated by the Purchase Agreement, are hereby approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.

8. The Debtors are authorized and directed, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code, to perform all of their obligations pursuant to the Purchase Agreement and to execute such other documents and take such other actions as are reasonably necessary to effectuate the transactions contemplated by the Purchase Agreement.

**III.    Transfer of the Purchased Assets to the Purchaser**

9.    The sale of the Purchased Assets, pursuant to this Order and the Purchase Agreement, will vest the Purchaser with good title to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and clear of all liens, except as expressly permitted by the Purchase Agreement.

10.    Except as expressly provided in the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be sold, transferred or otherwise conveyed to Purchaser free and clear of all liens, with all such liens to attach to the proceeds of sale of the Purchased Assets in the order of their priority, and with the same validity, priority, force and effect which they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such liens.

11.    All persons or entities holding liens in, to or against the Purchased Assets shall be, and they hereby are, forever barred from asserting such liens against Purchaser, its successors and assigns or such Purchased Assets after Closing.

**VI.    Sale Proceeds**

12.    The Net Asset Sale Proceeds, if any, shall be distributed in accordance with the terms of the Final DIP Order, unless otherwise agreed to by the Debtors, the Prepetition Lenders and the DIP Lender.  The allocation of the value by the Buyer to the Purchased Assets for tax purposes shall not be binding on the Court or any party for purposes of these chapter 11

cases or distributions.

### VII.    **Mutual Releases**

13.    Purchaser, on behalf of itself and each of its subsidiaries and affiliates (each, a "Purchaser Party") hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations, damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Debtor, any of Debtor's Affiliates, and any of their respective directors, officers, stockholders, employees, advisors, attorneys, representatives and agents and each of their successors and assigns (each a "Debtor Party" and collectively, the "Debtor Parties") a Purchaser Party ever had, now has or may have in the future (including under Bankruptcy Code sections, including but not limited to, 365(d) (3), 365(d)(5), 365(g), 501(a), 502(b)(6), 502(g)(1), 503(b)(1)(A), 507(a)(2)) directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties.  For the avoidance of doubt, no Purchaser Party shall file any proofs of claim (or shall withdraw any previously filed proofs of claim) against any of the Debtors for any amounts owed pre or post-petition (whether as rejection damages, administrative or other claim) related to such matters covered by the release contained herein.

14.    Each Seller, on behalf of itself and each of its subsidiaries and affiliates (each, a "Debtor Releasor"), hereby irrevocably and unconditionally fully releases, discharges and waives any and all claims, demands, suits, causes of actions, liabilities, obligations,

damages, judgments, rights to payment, costs and expenses whatsoever, whether known or unknown, matured or unmatured, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, priority or unsecured, pre-petition or post-petition in law, equity or otherwise which against any Purchaser Party (or any of its officers, directors, stockholders, employees, advisors, attorneys, representatives and agents) a Debtor Releasor ever had, now has or may have in the future directly or indirectly arising out of or in connection with, in whole or in part, any facts, events, occurrences, acts, omissions or any other matter taking place on or prior to the Closing Date directly or indirectly relating to any agreement, understanding or relationship between the parties; provided, however, that, notwithstanding the foregoing, nothing in this release shall modify or otherwise limit in any manner whatsoever any obligation a Purchaser Party may have to any Debtor Party arising out of or related to the Laboratory Services Agreement, the Service Agreements or the Purchase Agreement.

## VIII.   **Miscellaneous Provisions**

15.    At Closing, Purchaser shall deliver to Sellers, among other things, the Lease Amendments and Termination to the Services Agreements.

16.    The Sale of the Purchased Assets is consistent with the Debtors' policy concerning the transfer of personally identifiable information and no consumer privacy ombudsman is necessary as set forth in sections 332 or 363(b)(1) of the Bankruptcy Code.

17.    The consideration to be paid by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

18.    This Order (a) is and shall be effective as a determination that, upon the Closing, except as expressly provided in the Purchase Agreement, all liens existing as to the

13

Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee of the Purchased Assets free and clear of all liens.

19.     If any person or entity that has filed financing statement, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing liens or claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all interests or claims that the person or entity has with respect to the Purchased Assets, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens or claims in the Purchased Assets of any kind or nature.

20.     Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

14

21.    Except with respect to enforcing the terms of the Purchase Agreement, this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Purchase Agreement or this Order.

22.    The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

23.    In the absence of a stay of the effectiveness of this Order, in the event that the Purchaser and the Debtors consummate the transactions contemplated by the Purchase Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser, as a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

24.    Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement without charge or tax to the Debtors or Purchaser.

25.    Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements,

documents and instruments executed therewith; (b) to compel transfer of the Purchased Assets to the Purchaser; (c) to compel the Purchaser to perform all of its obligations under the Purchase Agreement; and (d) to interpret, implement and enforce the provisions of this Order.

26. The terms of this Order and the Purchase Agreement shall be binding on and inure to the benefit of the Debtors, the Purchaser, and the Debtors' creditors (whether known or unknown) and all other parties in interest, and any successors of the Debtors, the Purchaser and the Debtors' creditors, including any trustee or examiner appointed in these cases or any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

27. The failure to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Purchase Agreement be authorized in its entirety.

28. Any conflict between the terms and provisions of this Order and the Purchase Agreement shall be resolved in favor of this Order.

29. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Purchase Agreement without further order of the Court.

30. As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately. The provisions of Bankruptcy Rule 6004(g) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Purchase Agreement immediately upon entry of this Order. Time is of the essence in closing the transaction and parties to the Purchase Agreement shall be authorized to close the sale as soon as possible consistent with the terms of this Purchase Agreement.

Dated: _____, 2014     _____

                                        THE HONORABLE PETER J. WALSH
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Purchase Agreement**

**EXECUTION VERSION**

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**LABORATORY PARTNERS, INC.,**

**TERRE HAUTE MEDICAL LABORATORY, INC., AND**

**PATHOLOGY ASSOCIATES OF TERRE HAUTE, INC.,**

**AS SELLERS**

**AND**

**UNION HOSPITAL, INC.,**

**AS PURCHASER**

**Dated as of February 21, 2014**

501292836v4

These Disclosure Schedules (the "Disclosure Schedules") have been prepared in connection with the Asset Purchase Agreement (the "Agreement"), dated as of February 21, 2014, by and among Laboratory Partners, Inc. ("LP"), Terre Haute Medical Laboratory, Inc. ("THML") and Pathology Associates of Terre Haute, Inc. ("PATH" and, collectively with LP and THML, the "Sellers"), and Union Hospital, Inc. (the "Purchaser").

1.      Capitalized terms used in these Disclosure Schedules but not defined herein shall have the meaning ascribed to such terms in the Agreement.

2.      Headings and captions in these Disclosure Schedules are for convenience of reference only and shall in no way affect or be considered in construing or interpreting any information provided herein.

3.      Any event, item or matter disclosed in any Section or numbered part of these Disclosure Schedules that qualifies any representation or warranty contained in Article 4 of the Agreement shall be deemed to be disclosed with respect to every other representation and warranty in Article 4 of the Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.      These Disclosure Schedules are qualified in their entirety by reference to specific provisions of the Agreement and are not intended to constitute, and shall not be construed as constituting representations and warranties of any of the Sellers or agreements by any of the Sellers except as and to the extent expressly provided in the Agreement. Inclusion of information herein shall not be construed as an admission that such information is material to the business, financial condition or results of operations of any of the Sellers, that any of the Sellers have violated any Law or that any of the Sellers breached any of their agreements or obligations.

5.      Any description or summary set forth in these Disclosure Schedules of any contracts, agreements, permits, licenses or other documents of any Seller is qualified in its entirety by reference to such contracts, agreements, permits, licenses or other documents of any Seller.

**SCHEDULE 1.1(a)**

**Equipment**

1.  ELSCINT SP6HR GAMMA CAMERA
2.  ELSCINT SP6HR GAMMA CAMERA
3.  ELSCINT SP6 GAMMA CAMERA
4.  GE MILLENNIUM GAMMA CAMERA
5.  SIEMENS ECAT ACCEL PET SCANNER
6.  ELSCINT XPERT COMPUTER (X4)
7.  SIEMENS ESOFT COMPUTER (X4)
8.  CAPINTEC CRC-35R DOSE CALIBRATOR
9.  CAPINTEC CAPRAC WELL COUNTER(X2)
10. LUDLUM SCALER/THYROID UPTAKER
11. LUDLUM 14C SURVEY METER (X3)
12. CAPINTEC XENON TRAP
13. Agfa DRYSTAR 5302
14. AccuSync 42 R Wa
15. Featherlite CO- 57

3

**SCHEDULE 1.2**

**Excluded Assets**

<u>Vendor Agreements</u>:

     1.    Technology Service Maintenance Agreement (SMA) Terms and Conditions between Agfa Healthcare Corporation and Terre Haute Medical Laboratory, Inc. effective as of April 2009.

     2.    SYNtrac Agreement between Cardinal Health 414, Inc. and Terre Haute Medical Laboratory, Inc. dated April 4, 2005.

     3.    Service Agreement between Siemens Medical Solutions USA, Inc. and Terre Haute Medical Laboratory, Inc. dated August 29, 2003.

4

**SCHEDULE 3.2(f)**

**Cash for Closing**

$9,897.46

## SECTION 4.3(a)

### Conflicts

None.

501292836v4

## SECTION 4.3(b)

### Permits

None.

501292836v4

## SCHEDULE 8.1(a)

### Conduct of Business Prior to Closing

The Sellers' operations are limited by the DIP Budget, the terms and provisions of the DIP Credit Agreement, any orders from the Bankruptcy Court, and the limitations imposed upon the Sellers by the Bankruptcy Code and applicable law.

9

**SCHEDULE 9.1(b)**

**Required Government Authorizations**

None.

## SCHEDULE 10.1(i)

### Current Business Employees

1.      All the individuals listed on Schedule 4.4.

501292836v4

## SCHEDULE 10.1(q)

### Leases

| | Location | Lease |
|---|---|---|
| 1. | 1606 North 7th Street Terre Haute, IN 47804 | Lease Agreement, dated October 11, 1999, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc., Amendment to Lease dated May 18, 2004 and Second Addendum effective as of September 1, 2004. |
| 2. | 1530 North 7th Street Terre Haute, IN 47807 | Lease Agreement, effective as of January 24, 2005, by and between Union Hospital, Inc. and Terre Haute Medical Laboratory, Inc. |

12

**SCHEDULE 11.1(b)**

**Allocation**

To be determined prior to Closing.

501292836v4