## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re                                    : Chapter 11
                                         :
Laboratory Partners, Inc., et al.,¹      : Case No. 13-12769 (PJW)
                                         :
                     Debtors.            : (Jointly Administered)
                                         :
                                         : Hearing Date: June 11, 2014 at 9:30 a.m. (ET)
                                         : Obj. Due: June 4, 2014 at 4:00 p.m. (ET)
-------------------------------------------------x
```

**DEBTORS' MOTION FOR ORDER AUTHORIZING (A) SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' LONG-TERM CARE DIVISION ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) THE
DEBTORS TO ENTER INTO RELATED ASSET PURCHASE AGREEMENT;
(C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (D) RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby move (the "Motion"), pursuant to sections 105(a), 363, 365 of title 11 of

the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004,

6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order

approving, among other things, (a) the sale of certain assets relating to the Debtors' Long-Term

Care Division (the "Purchased Assets") described in and pursuant to the terms and conditions of

the Asset Purchase Agreement, dated as of May 20, 2014 and substantially in the form annexed

---

[1]   The Debtors and the last four digits of their taxpayer identification numbers are as
follows: Laboratory Partners, Inc. (3376), Kilbourne Medical Laboratories, Inc. (9849),
MedLab Ohio, Inc. (9072), Suburban Medical Laboratory, Inc. (0859), Biological
Technology Laboratory, Inc. (4370), Terre Haute Medical Laboratory, Inc. (1809), and
Pathology Associates of Terre Haute, Inc. (6485). Certain of the Debtors do business as
Medlab.  The Debtors' mailing address for notice in these cases is: 671 Ohio Pike, Suite
K, Cincinnati, OH 45245.

as <u>Exhibit A</u> to the form of order (the "<u>Sale Order</u>") annexed hereto as **Exhibit 1** (collectively with all exhibits thereto and the Ancillary Agreements, the "<u>Purchase Agreement</u>") by and between certain of the Debtors, as sellers, and Amerathon, LLC, as purchaser (the "<u>Purchaser</u>"), (b) the Debtors' entry into the Purchase Agreement, (c) assumption and assignment of executory contracts and unexpired leases, and (d) related relief.  In support of the Motion, the Debtors respectfully represent as follows:

<u>**PRELIMINARY STATEMENT**</u>[2]

1.　　As set forth in greater detail below, Debtors have engaged in an in-depth marketing process which has resulted in the sales of their Talon and Union Hospital Divisions, including the Union Hospital Division's Nuclear Medicine Business, as approved by this Court on February 18, 2014 and March 6, 2014, respectively.  The Debtors' remaining business consists of their Long-Term Care Division.  After months of marketing such division, the Debtors have negotiated a transaction, subject to approval of this Court, for the sale of certain assets relating to the Long-Term Care Division pursuant to a three-stage closing structure.  The Purchaser is a joint venture between American Health Associates, Inc. and the Debtors' prepetition senior secured lender and is the only entity that has submitted a viable bid for the Purchased Assets.  By the transactions contemplated in the Purchase Agreement, the Debtors' Long-Term Care Division employees, customers and vendors will have jobs, continuity of service and a business partner, respectively.  Without the Purchase Agreement, the Debtors would be required to wind down the Long-Term Care Division in the near term.  The Debtors believe that the Purchase Agreement is the best available option for disposition of assets related to the Long-Term Care Division and request that the Court approve the transaction.

---

[2]　　Undefined capitalized terms used in the Preliminary Statement shall have the meanings ascribed to them below.

**JURISDICTION**

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rule 6004-1.

**GENERAL BACKGROUND**

3.     On October 25, 2013 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.  On November 7, 2013, an Official Committee of Unsecured Creditors (the "Committee") was appointed in these cases. D.I. 80.  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     As of the Petition Date, Laboratory Partners, Inc. ("Laboratory Partners") through its subsidiaries, provided clinical laboratory and anatomic pathology services to (i) skilled nursing facilities in Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Virginia and Washington DC (the "Long-Term Care Division"), (ii) physicians, physician offices and medical groups (the "Talon Division"), in Indiana and Illinois, and (iii) Union Hospital, Inc. in Terre Haute and Clinton, Indiana (the "Union Hospital Division").

5.     The events leading up to the Petition Date are set forth in the *Declaration of William A. Brandt, Jr. In Support of First Day Relief* (D.I. 3).

**THE DEBTORS' PREPEITITON AND POSTPETITION SALES EFFORTS**

6.      The Debtors sought the protection of chapter 11 of the Bankruptcy Code to provide breathing room to pursue a sale process and maximize the value of their estates, for the benefit of all estate constituencies.

A.      **Prepetition Strategic and Sales Efforts**

7.      As detailed in prior pleadings filed in these cases, prior to the filing of these cases, the Debtors engaged MTS Health Partners, L.P. ("MTS") as its financial advisor/investment banker to assist in evaluating, formulating and implementing a financial and strategic plan and to provide the Debtors with a range of strategic alternatives. Following the MTS engagement, from August 2011 through March 2012, the Debtors, with the assistance of MTS, engaged in a detailed examination of their operating performance and reviewed a range of strategic corporate alternatives.

8.      Beginning in March 2012, the Debtors, with the assistance of MTS, began to explore the possible sale of some of their operations, a partial or complete refinancing of their debt and a complete recapitalization. Numerous selected financial and strategic buyers were contacted regarding a potential sale. In addition, numerous selected parties were contacted regarding refinancing alternatives. The Debtors also considered other strategic alternatives.

9.      In May 2013, certain of the Debtors signed a definitive asset purchase agreement to sell a portion of the then-existing Talon Division to Laboratory Corporation of America Holdings ("LabCorp"). In June 2013, such Debtors consummated the sale of selected operating assets of the then-existing Talon Division to LabCorp for an aggregate purchase price of $10,676,000, plus an earn-out payment not to exceed $1,200,000 (the "POB Sale"). In connection with the POB Sale, Laboratory Partners received approximately $9,157,481 in net proceeds (including $1,114,740 of the earn-out), after deducting transaction fees and expenses of

4

approximately $1,457,260.  In addition, $1,000,000 of the purchase price related to the POB Sale is currently held in escrow until December 2014 as security against indemnification claims that may be made by LabCorp.   To date, no indemnification claims have been asserted.   In connection with the POB Sale, the Lenders received $7,392,741 of Debtors' net proceeds and allowed the Debtors to retain $1,764,740 to fund operations.

10.   In August 2013, Debtors retained Development Specialists, Inc. ("DSI") to provide financial restructuring advice.   In connection with DSI's engagement, Laboratory Partners appointed DSI's William A. Brandt, Jr. as chief executive officer.   In addition, on September 5, 2013, the Debtors engaged Pillsbury Winthrop Shaw Pittman LLP and Morris, Nichols, Arsht & Tunnell LLP to provide legal advice to the Debtors in connection with a restructuring.   The Debtors also engaged Duff & Phelps Securities, LLC ("D&P") as their investment banker to assist with postpetition marketing and sale efforts.

**B.**     **Postpetition Sales Efforts**

11.   On October 30, 2013, the Debtors filed the *Debtors' Motion for Orders: (A)(I) Approving Bidding Procedures in Connection with Sales(s) of Substantially all of the Debtors' Assets; (II) Scheduling Hearings to Consider Sales; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Entry into Stalking Horse Agreements Subject to Further Hearing; (B)(I) Authorizing and Approving Sales of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Bid Procedures/Sale Motion") (D.I. 46).   The Bid Procedures/Sale Motion contemplated a staggered sale process with the sale of the Long-Term Care Division occurring first, followed by the sale of the Talon Division and possibly the Union Hospital Division.

12.     On November 15, 2013, this Court entered the *Order: (I) Approving Bidding Procedures in Connection with Sale(s) of Substantially All of the Debtors' Assets; (II) Scheduling Hearings to Consider Sales; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Entry into Stalking Horse Agreements Subject to Further Hearing* (the "Bidding Procedures Order") (D.I. 100).[3]  The Bidding Procedures Order approved, among other things, certain procedures for the solicitation of bids for the Debtors' assets, certain noticing procedures related to the sales and the assumption and assignment of executory contracts and unexpired leases.  The Bidding Procedures also set bid deadlines, auction dates and sale hearings, subject to extension by the Debtors in consultation with the Committee, Prepetition Lenders and DIP Lender.

13.     The Bidding Procedures Order, the Notice of Auctions and Sale Hearings, the Notices of Assumption and Assignment, and the Supplemental Notices of Assumption and Assignment were served in accordance with the Bidding Procedures Order.  Further, the Notice of Auctions and Sale Hearings was published in the national edition of the *New York Times* on November 20, 2013.

14.     Since their engagement by the Debtors, D&P has worked diligently to create as much interest as possible in the Debtors' assets.  Specifically, D&P prepared marketing materials related to a potential sale of the Debtors' assets and the bid process in these cases. D&P provided these marketing materials to approximately 199 potential strategic and financial buyers that were most likely to express an interest in the Debtors' assets.  In selecting the list of parties to contact, D&P focused on financial buyers that, among other things, have experience with buying distressed companies in bankruptcy proceedings as well as strategic buyers known

---

[3]     Undefined capitalized terms used herein shall have the meanings set forth in the Bidding Procedures Order or Purchase Agreement, as applicable.

to be in the industry by D&P.  Additionally, D&P, with the assistance of the Debtors' senior management, developed a comprehensive list of additional strategic parties that would also potentially have an interest in bidding for the Debtors' assets.

15.     Following these initial canvassing efforts, D&P received positive responses from approximately forty-four (44) parties who were interested in some segment of the Debtors' businesses.  These parties entered into confidentiality agreements with the Debtors and received a confidential information memorandum and access to an electronic data room.

**(i)     The Combined Talon and Union Hospital Division Sale Process**

16.     The Debtors engaged in negotiations with several interested parties regarding the Debtors' Talon and Union Hospital Divisions.  To facilitate the continuation of such discussions, on January 15, 2014, after consultation with the Committee, DIP Lender and Prepetition Lenders, the Debtors filed a notice extending certain deadlines with respect to the sale of the Talon and Union Hospital Divisions (D.I. 262).  The Debtors filed an additional notice extending certain of such deadlines on January 28, 2014 (D.I. 281).

17.     On January 27, 2014, after receiving consent from the Committee, the DIP Lender, and the Prepetition Lenders, the Debtors entered into a stalking horse asset purchase agreement with LabCorp for substantially all of the Debtors' Talon and Union Hospital Divisions (the "LabCorp Talon APA") and filed and served such agreement in accordance with the Bidding Procedures Order (D.I. 282).

18.     No additional bids for the assets included in the LabCorp Talon APA were received by the Debtors by the applicable Bid Deadline.  As a result, on February 7, 2014, the Debtors filed a notice identifying LabCorp as the Successful Bidder for the assets identified in the LabCorp Talon APA and canceling the Auction for such assets. On February 18, 2014, the

Court held a hearing to consider the sale of certain of the Debtors' assets as contemplated in the LabCorp Talon APA and entered an Order approving such sale (D.I. 348) (the "LabCorp Talon Sale Order").

19.     Notably, the LabCorp Talon APA, as approved by the LabCorp Talon Sale Order excludes certain of the Debtors' assets, including, without limitation, the business of providing nuclear medicine to Union Hospital, Inc. (the "UH Nuclear Medicine Business") and the Long-Term Care Division.

### (ii)     The UH Nuclear Medicine Business Sale Process

20.     The Debtors marketed the UH Nuclear Medicine Business along with all their other assets as described above and provided notice of the sale of such assets as required in the Bidding Procedures Order.  Following such marketing and noticing, the only offer for the UH Nuclear Medicine Business made to the Debtors was the offer by Union Hospital, Inc., set forth in an asset purchase agreement (the "UH APA").  On February 21, 2014, the Debtors filed a motion seeking approval of the UH APA, the Debtors' entry into the UH APA, and related relief (D.I. 358).  On March, 6, 2014, the Court held a hearing to consider the sale of certain of the Debtors' assets as contemplated in the UH APA and entered an Order approving such sale (D.I. 387) (the "UH Sale Order").

### (iii)     The Long-Term Care Sale Process

21.     Despite the extensive marketing for the Long-Term Care Division described above and although the Debtors were in active negotiations with several interested parties, the Debtors did not receive any Qualified Bids for the Long-Term Care Division by the applicable Bid Deadline set forth in the Bid Procedures Order.  As a result, the Debtors adjourned the hearing on the sale of the Long-Term Care Division to a date to be determined.

Since such adjournment, the Debtors have continued negotiations with any interested parties. As a result of such discussions, the Debtors and the Purchaser negotiated the Purchase Agreement. The terms of the Purchase Agreement are beneficial to the Debtors and their estates and provide for the continued employment of the Debtors' Long-Term Care Division employees, continuity of care to the Long-Term Care Division customers, and a business partner for the Long-Term Care Division vendors.

22.    The Debtors believe that the Purchase Agreement represents the highest and best available bid for the Purchased Assets.

23.    In general, the Purchase Agreement contains the following material terms:[4]

| Parties | Laboratory Partners, Inc., Kilbourne Medical Laboratories, Inc., MedLab Ohio, Inc., Suburban Medical Laboratory, Inc., and Biological Technology Laboratory, Inc. as Sellers, and Amerathon, LLC, as Purchaser. |
|---|---|
| Consideration, Purchase Agreement, § 2.1. | (a)  On the Stage 1 Closing Date, assumption of the Assumed Liabilities set forth in Section 1.3 of the Purchase Agreement (subject to Section 1.5(a) of the Purchase Agreement) and cancellation of a portion of the Credit Bid Debt equal to $500,000; (b) On the Stage 2 Closing Date, assumption of the Assumed Liabilities set forth in Section 1.3 of the Purchase Agreement (subject to Section 1.5(b) of the Purchase Agreement) and cancellation of a portion of the Credit Bid Debt equal to $4,000,000; and (c)  On the Stage 3 Closing Date, assumption of the Assumed Liabilities set forth in Section 1.3 of the Purchase Agreement (subject to Section 1.5(c) of the Purchase Agreement) and cancellation of a portion of the Credit Bid Debt equal to $1,000,000. |

---

[4]    The summary provided in this Motion is provided for the convenience of the Court and interested parties.  To the extent there is any conflict between this summary and the Purchase Agreement, the latter controls in all respects.

| | |
|---|---|
| Purchased Assets. Purchase Agreement, §§ 1.1. | The Purchaser is acquiring, on the relevant Closing Date, all of the Sellers' assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, solely or primarily related to or used, or held for use, in connection with the Business, now existing or hereafter acquired on or prior to the relevant Closing Date, as the same shall exist on the relevant Closing Date, including the following assets, properties, rights and interests: (a) the Assumed Customer Contracts; (b) the Assumed Real Property Leases; (c) the Equipment; (d) that portion of the total cash proceeds derived from the Accounts Receivable as of the applicable Closing Date as set forth on Schedule 1.1(d) to the Purchase Agreement; (e) the Inventory and Supplies; (f) the Customer and Equipment Records; (g) the Third Party Claims; (h) the Deposit Rights; (i) the Warranties; (j) the Assumed Permits; (k) the IP / IT Property; (l) the Assigned Contracts; (m) with respect to all Assigned Contracts, any Estate Causes of Action against the counterparty thereto based upon facts, circumstances and transactions that occurred prior to the relevant Closing Date; and (n) all patient clinical laboratory test results and such other records that are required by applicable Laws to be retained by Purchaser. |
| Excluded Assets, Purchase Agreement, §§ 1.2. | (a) all cash and cash equivalents of the Sellers (except as set forth in Section 1.1(d) of the Purchase Agreement); (b) all bank accounts of the Sellers; (c) the Commercial Accounts Receivable; (d) the Accounts Receivable; (e) each Seller's minute books, stock books and Tax records and such other corporate records having to do with the organization and capitalization of the Sellers; (f) each Seller's rights under any Contract that is not an Assigned Contract; (g) all Non-Assumed Contracts; (h) the Excluded Permits; (i) all of the intangible rights and property of any of the Sellers and any of their Affiliates not primarily related to the Business (including, specifically, all trade names and marks, together with the goodwill associated with the names and marks), all websites and domain names of any Seller or its Affiliates and all Intellectual Property listed on Schedule 1.2(i) to the Purchase Agreement; of the Seller Disclosure Schedule attached hereto; (j) the assets, properties and businesses of any of the Sellers that are not Purchased Assets or that are not primarily related to the Business and the Purchased Assets; (k) all refunds, credits or deposits of Taxes with respect to the period prior to the relevant Closing Date, including any refunds, credits or deposits of Taxes arising as a result of any Seller's operation of the Business or ownership, operation, utilization or maintenance of the Purchased Assets prior to the relevant Closing Date; (l) all of each Seller's rights under this Agreement and the Ancillary Agreements; (m) all Estate Causes of Action that are not Purchased Assets (as set forth in Section 1.1(m) to the Purchase Agreement); (n) all of each Seller's Provider Agreements under any |

| | |
|---|---|
| | Program not otherwise expressly assumed as Other Contracts and set forth on Schedule 1.1(l) to the Purchase Agreement; (o) all insurance policies and the rights and proceeds thereunder relating to any Seller or its Affiliates; (p) all assets set aside in a trust for the payment of benefits under any funded Benefit Arrangement; (q) all equity securities of any Person; and (r) all assets listed on Schedule 1.2(r) of the Purchase Agreement. |
| Assumed Liabilities and Excluded Liabilities, Purchase Agreement, §§ 1.3, 1.4. | Assumed Liabilities are (a) all Liabilities under each Assigned Contract solely to the extent accruing, arising or relating to the conduct or operation of the Purchaser's business by Purchaser after the relevant Closing; (b) all Purchaser Cure Costs with respect to any Assigned Contract; (c) any Liabilities of any Seller related to (i) compliance with the WARN Act and similar state and local laws to the extent such Liability arises out of Purchaser's failure to comply with any of the covenants contained in the first, second and fifth sentences of Section 6.1 of the Purchase Agreement and (ii) compliance with the covenant contained in Section 6.2 of the Purchase Agreement; and (d) all Liabilities arising out of ownership of the Purchased Assets solely to the extent accruing, arising or relating to the conduct or operation of the Purchaser's business by Purchaser after the relevant Closing, including any liabilities owing to Transferred Employees solely in respect of their employment by Purchaser after the relevant Closing.<br><br>Excluded Liabilities are all Liabilities that are not Assumed Liabilities, including those specifically set forth in section 1.4 of the Purchase Agreement. |
| Staged Closings, Purchase Agreement § 1.5. | (a)  Subject to amendment or modification in accordance with Section 1.6 of the Purchase Agreement, on the Stage 1 Closing Date, in accordance with Section 1.1 of the Purchase Agreement and subject to the exclusions set forth in Section 1.2 of the Purchase Agreement, Purchaser shall acquire (i) all Assumed Real Property Leases identified on Schedule 1.1(b) of the Seller Disclosure Schedule for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 1 Closing Date, (ii) all Equipment identified on Schedule 1.1(c) of the of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 1 Closing Date, (iii) all Other Contracts identified on Schedule 1.1(l) of the of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 1 Closing Date, (iv) that portion of the total cash proceeds to be collected by the Sellers from the Accounts Receivable as of the Stage 1 Closing Date related to services rendered at any Stage 1 Real Property Site prior to the Stage 1 Closing Date as set forth in Schedule 1.1(d) of the Purchase Agreement, (v) all Inventory and Supplies, |

Third Party Claims, Warranties and Assumed Permits located at the Stage 1 Real Property Sites or relating to the Stage 1 Purchased Assets,  (vi) all Estate Causes of Action against the counterparty to any Assigned Contract acquired in accordance with Section 1.5(a) of the Purchase Agreement and (vii) all patient clinical laboratory test results and such other records that are required by applicable Laws to be retained by Purchaser with respect to the Sellers' operation of the Business at any Stage 1 Real Property Site prior to the Stage 1 Closing Date.  On the Stage 1 Closing Date, in accordance with Section 1.3 of the Purchase Agreement, and in each case subject to the exclusions set forth in Section 1.4 of the Purchase Agreement, Purchaser shall assume and thereafter discharge solely those Assumed Liabilities related to the Stage 1 Closing Date.

(b)  Subject to amendment or modification in accordance with Section 1.6 of the Purchase Agreement, on the Stage 2 Closing Date, in accordance with Section 1.1 of the Purchase Agreement and subject to the exclusions set forth in Section 1.2 of the Purchase Agreement, Purchaser shall acquire (i) all Assumed Customer Contracts, (ii) all Assumed Real Property Leases identified on Schedule 1.1(b) of the of the Purchase Agreement hereto for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 2 Closing Date, (iii) all Equipment identified on Schedule 1.1(c) of the of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 2 Closing Date, (iv) that portion of the total cash proceeds to be collected by the Sellers from the Accounts Receivable as of the Stage 2 Closing Date related to services rendered at any Stage 2 Real Property Site prior to the Stage 2 Closing Date as set forth on Schedule 1.1(d) of the Purchase Agreement, (v) all Other Contracts identified on Schedule 1.1(l) of the of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 2 Closing Date, (vi) all Inventory and Supplies, Customer and Equipment Records, Third Party Claims, Deposit Rights, Warranties, Assumed Permits, and IP / IT Property located at the Stage 2 Real Property Sites or relating to the Stage 2 Purchased Assets, (vii) all Estate Causes of Action against the counterparty to any Assigned Contract acquired in accordance with Section 1.5(b) of the Purchase Agreement and (viii) all patient clinical laboratory test results and such other records that are required by applicable Laws to be retained by Purchaser with respect to the Sellers' operation of the Business at any Stage 2 Real Property Site prior to the Stage 2 Closing Date.  On the Stage 2 Closing Date, in accordance with Section 1.3 of the Purchase Agreement, and in each case subject to the exclusions set forth in Section 1.4 of the Purchase Agreement, Purchaser shall assume and discharge solely those Assumed Liabilities related to the Stage 2

| | |
|---|---|
| | Closing Date.<br><br>(c) Subject to amendment or modification in accordance with Section 1.6 of the Purchase Agreement, on the Stage 3 Closing Date, in accordance with Section 1.1 of the Purchase Agreement and subject to the exclusions set forth in Section 1.2 of the Purchase Agreement, Purchaser shall acquire (i) all Assumed Customer Contracts, (ii) Assumed Real Property Leases identified on Schedule 1.1(b) of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 3 Closing Date, (iii) all Equipment identified on Schedule 1.1(c) of the of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 3 Closing Date, (iv) that portion of the total cash proceeds to be collected by the Sellers from the Accounts Receivable as of the Stage 3 Closing Date related to services rendered at any Stage 3 Real Property Site prior to the Stage 3 Closing Date as set forth on Schedule 1.1(d) of the Purchase Agreement, (v) all Other Contracts identified on Schedule 1.1(l) of the Purchase Agreement for which the column "Closing Stage" in such Schedule indicates acquisition at the Stage 3 Closing Date, (vi) all Inventory and Supplies, Customer and Equipment Records, Third Party Claims, Deposit Rights, Warranties, Assumed Permits, and IP / IT Property located at the Stage 3 Real Property Sites or relating to the Stage 3 Purchased Assets, (vii) all Estate Causes of Action against the counterparty to any Assigned Contract acquired in accordance with this Section 1.5(c) and (viii) all patient clinical laboratory test results and such other records that are required by applicable Laws to be retained by Purchaser with respect to the Sellers' operation of the Business at any Stage 3 Real Property Site prior to the Stage 3 Closing Date.  On the Stage 3 Closing Date, in accordance with Section 1.3 of the Purchase Agreement, and in each case subject to the exclusions set forth in Section 1.4 of the Purchase Agreement, Purchaser shall assume and discharge solely those Assumed Liabilities related to the Stage 3 Closing Date. |
| Closing Conditions, Purchase Agreement, §§ 9.1, 9.2, 9.3. | <u>Conditions Precedent to Obligations of Sellers and Purchaser</u>. (a) as of each Closing Date, no temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Body or court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other Laws promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded and no Governmental Body shall have instituted any Action (which remains pending at what would otherwise be the relevant Closing Date) before any court or Governmental Body of competent jurisdiction seeking to enjoin, |

restrain or otherwise prohibit consummation of the transactions contemplated by the Purchase Agreement;(b) as of each Closing Date, all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body as set forth on Schedule 9.1(b) of the Purchase Agreement shall have been filed, occurred or been obtained; and (c) the Bankruptcy Court shall have entered the Sale Order on proper notice to all parties in interest, and such order shall be a Final Order that remains in full force and effect at the date of each Closing; provided, however, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed.

Conditions Precedent to the Obligations of the Sellers. (a) (i) each of the representations and warranties of Purchaser set forth in Sections 5.1 and 5.2 of the Purchase Agreement shall be true and correct in all respects and (ii) each other representation and warranty of Purchaser set forth in the Purchase Agreement shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions contemplated hereby, in each case of clauses (i) and (ii), at and as of the Execution Date and at and as of the relevant Closing Date as if made at and as of the relevant Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Sellers shall have received a certificate signed by an authorized person of Purchaser, dated the relevant Closing Date, to the foregoing effect; (b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the relevant Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the relevant Closing Date, to the foregoing effect; and (c) Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) all of the items set forth in Section 3.3.

Conditions Precedent to the Obligations of Purchaser. (a) as of the Stage 1 Closing Date, each of the representations and warranties of the Sellers set forth in this Agreement shall be true and correct in all respects (without regard for any "materiality" or "material adverse effect" qualifiers set forth therein), except where the failure of such representations and warranties to be so true and correct would not,

| | |
|---|---|
| | individually or in the aggregate, have a Material Adverse Effect at and as of the Execution Date and at and as of the Stage 1 Closing Date as if made at and as of such Stage 1 Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Stage 1 Closing Date, to the foregoing effect; (b) as of each Closing Date, each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by such Seller on or prior to the relevant Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of such Seller, dated the relevant Closing Date, to the foregoing effect; (c) with respect to each of the Stage 2 Closing Date and Stage 3 Closing Date, as of such Closing Date Purchaser shall have received, with respect to the certain facilities conveyed at the immediately prior staged Closing Date as set forth on Schedule 9.3(c) of the Purchase Agreement (the "<u>Facilities</u>"), confirmation from the Centers for Medicare and Medicaid Services ("<u>CMS</u>") and state Medicaid Programs that Purchaser shall have received Provider Agreements with respect to such Facilities, or such Facilities have been added as additional practice locations to Purchaser's Provider Agreements, to enable such Facilities to participate in the Medicare Program and respective state Medicaid Programs, provided that, notwithstanding the foregoing, the Purchase Agreement may only be terminated in accordance with Section 3.4 of the Purchase Agreement; and (d) as of each Closing Date, the Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2 of the Purchase Agreement. |
| Assumption and Assignment of Executory Contracts and Unexpired Leases, Purchase Agreement, § 1.6. | (a) Schedule 1.6(a) of the Purchase Agreement (the "Original Contract & Cure Schedule") contains a list of each Executory Contract and each other Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each Executory Contract.  Except as otherwise expressly provided herein or  agreed to in a signed writing by Sellers, Purchaser and the counterparty to such Contract, Seller shall pay all Cure Costs for the Assigned Contracts that are assumed or designated to be assumed by Purchaser as of the earlier of (i) the applicable Closing Date, and (ii) the Effective Date; <u>provided</u>, <u>however</u>, that with respect to any Cure Costs that are Undetermined Cure Costs as of such date, upon such Cure Costs becoming finally determined by court order or by agreement of the parties, Sellers shall promptly pay such final determined Cure Costs; <u>provided</u>, <u>further</u>, <u>however</u>, that in the event that any Cure Cost becomes a Purchaser Cure Cost pursuant to Section 1.6(c) of the Purchase Agreement, then Purchaser shall assume and fulfill the payment obligations in respect of such Purchaser Cure Cost. |

(b) Purchaser may, at any time and from time to time through (and including) the Designation Deadline, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets any Contract of the Sellers or their Affiliates not otherwise included in the definition of Purchased Assets and the Sellers shall give notice to the non-debtor parties to any such Contract of the Sellers' assumption and assignment thereof to Purchaser and the amount of Cure Costs associated with such Contract; provided that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Consideration. Purchaser may, at any time and from time to time through (and including) the Designation Deadline, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any Contract otherwise included in the definition of Purchased Assets and require the Sellers to give notice to the non-debtor parties to any such Contract that such Contract will not be assigned to Purchaser and at the Sellers' option, the rejection of such Contract; provided that no such change to the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Consideration. To exercise its rights under Section 1.6(b) of the Purchase Agreement to include Contracts in, or exclude Contracts from, the Purchased Assets and the Excluded Assets, as applicable, Purchaser shall deliver one or more written notices to the Sellers specifying the Contract(s) to be so included or excluded and specifying the requisite additions, deletions or other changes to any applicable Schedule to reflect such inclusion or exclusion.  At any time after the Designation Deadline but prior to the assumption or rejection of the applicable Contract, with the prior written consent of the counterparty to such Contract, Purchaser and Sellers may jointly agree to include Contracts in, or exclude Contracts from, the Purchased Assets and the Excluded Assets, as applicable; provided that no such change to the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Consideration.  If any Contract is added to (or excluded from) the Purchased Assets and the Excluded Assets as permitted by Section 1.6(b) of the Purchase Agreement, then Purchaser and Sellers agree to make appropriate additions, deletions or other changes to any applicable Schedule to reflect such addition or exclusion.  In addition, if any Contract is added to (or excluded from) the Purchased Assets and the Excluded Assets as permitted by Section 1.6(b) of the Purchase Agreement, the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-debtor counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to Purchaser, pursuant to the terms hereof (or excluded under the Sale Order and this Agreement).  Notwithstanding anything in Section

| | |
|---|---|
| | 1.6(b) of the Purchase Agreement to the contrary, Purchaser shall not be entitled to make any changes to the Assumed Real Property Leases identified on Schedule 1.1(b) of the Purchase Agreement following the Designation Deadline without the prior written consent of the applicable Seller and the counterparty to such Assumed Real Property Lease.<br><br>(c) In the event that any counterparty to an Assigned Contract agrees to accept treatment of its Cure Costs in a manner acceptable to Purchaser in its sole and absolute discretion, or if after the date hereof pursuant to Section 1.6 of the Purchase Agreement, Purchaser includes any Contract in the definition of Purchased Assets that is not otherwise included in the definition of Purchased Assets on the date hereof, then such Cure Costs shall be deemed "Purchaser Cure Costs".<br><br>(d) The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the relevant Closing Date.<br><br>(e) Subject to the provisions of Section 1.6 of the Purchase Agreement, Purchaser may, at any time and from time to time through (and including) the Designation Deadline, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any assets identified as Purchased Assets prior to the relevant Closing Date; provided that no such change to the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Consideration. |
| Transferred Employees, Purchase Agreement, § 6.1. | Subject to the occurrence of each of the respective Closing Dates, Purchaser acknowledges and agrees that it will offer employment, on an at will basis, effective on the applicable Closing Date, to at least the minimum number of employees of Sellers at each specified location who are primarily related to the applicable Purchased Assets being acquired on such Closing Date as specified on Schedule 6.1 of the Purchase Agreement.  Purchaser agrees that each such offer of employment (i) will be made at least five (5) Business Days prior to, and effective as of (and subject to the occurrence of), the applicable Closing Date and (ii) will be for a position at such rate of pay and with such employee benefits as are reasonably comparable in the aggregate to each such employee's current level of compensation and benefits. The employees of Sellers who accept Purchaser's offer of employment and who commence employment with Purchaser from and after the Closing Date shall be referred to herein as the "Transferred Employees."  In no event shall (i) Purchaser be obligated to hire or retain any employee of Sellers for any period following the applicable Closing Date and (ii) any individual employed or formerly employed |

| | by Sellers become an employee of Purchaser unless such individual becomes a Transferred Employee. Notwithstanding the preceding sentence, Purchaser shall not, for a period of 90 days after the applicable Closing Date, at any location specified in Schedule 6.1 of the Purchase Agreement (provided that, in the case of any combined location identified on Schedule 6.1 of the Seller Disclosure Schedule, such period shall run from the Closing Date at which the first of the individual sites included in such combined location is transferred to the Purchaser through the date that is 90 days after the Closing Date at which the last of the individual sites included in such combined location is transferred to Purchaser), terminate, layoff, transfer or take other employment action resulting in a loss of employment under the WARN Act or similar state or local law of any Transferred Employee to the extent such action would result in the number of Transferred Employees at any such site to be reduced below the minimum numbers of employees specified on Schedule 6.1 of the Purchase Agreement. Except to the extent prohibited by legal requirements, the Sellers shall (i) make available to Purchaser all personnel records relating to active Transferred Employees and (ii) cooperate with Purchaser and use reasonable best efforts to facilitate the transition of the Transferred Employees to employment with Purchaser. |
|---|---|

24.     Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of the Sale Order and Purchase Agreement, including:

| Sale to Insider | N/A |
|---|---|
| Agreements with Management | N/A |
| Releases | N/A |
| Private Sale/ No Competitive Bidding | The Debtors performed a thorough marketing process for their assets (including the Purchased Assets) in accordance with the Bidding Procedures Order. No auction was held because the Debtors did not receive any bids for the Purchased Assets other than the Purchase Agreement. The Debtors will continue to consider offers for any of their assets that have not been sold pursuant to Court order. |
| Closing Deadlines | The Purchase Agreement provides at Section 3.1 that, subject to (i) the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 of the Purchase Agreement, or the waiver thereof by the party entitled to waive the applicable condition and (ii) the provisions of Section 3.4 of the Purchase Agreement, the Stage 1 Closing shall |

| | take place on or prior to July 3, 2014, the Stage 2 Closing shall take place on or prior to August 29, 2014 and the Stage 3 Closing shall take place on or prior to October 3, 2014.  Purchase Agreement, § 3.1. |
|---|---|
| Good-Faith Deposit and Conditions for Forfeiture | N/A |
| Interim Arrangements with Proposed Buyer | N/A |
| Use of Proceeds | N/A |
| Tax Exemption | N/A |
| Record Retention | The Purchase Agreement provides that (a) each Seller's minute books, stock books and Tax records and such other corporate records having to do with the organization and capitalization of the Sellers and (b) all records that any of the Sellers are required by applicable Laws to retain; are Excluded Assets. Purchase Agreement §1.2.  The Purchase Agreement further provides that the Sellers and Purchaser shall preserve and keep records relating to the Business, the Purchased Assets and the Assumed Liabilities for the Retention Period.  Purchase Agreement, § 8.6. |
| Sale of Avoidance Actions | The Purchase Agreement provides that with respect to all Assigned Contracts, any Estate Causes of Action against the counterparty thereto based upon facts, circumstances and transactions that occurred prior to the relevant Closing Date are Purchased Assets. Purchase Agreement, § 1.1(m). |
| Requested Findings as to Successor Liability | The Sale Order contains provisions limiting the Purchaser's successor liability.  Sale Order at ¶¶ GG, 17. |
| Sale Free and Clear | The Sale Order and Purchase Agreement contain provisions seeking to sell the Purchased Assets free and clear of all Claims, Liens, liabilities, rights, interests, and encumbrances.  Purchase Agreement, § 1.1; Sale Order at ¶¶ O, Z, FF, 12, 13, 20. |
| Credit Bid | The Sale Order and Purchase Agreement provide for consideration including cancellation of the Credit Bid Debt.  Purchase Agreement, §§ 2.1, 5.5; Sale Order at ¶¶ JJ-LL, 2, 36, 37. |
| Relief from Bankruptcy Rule 6004(h) | The Sale Order seeks relief from the stay imposed by Bankruptcy Rule 6004(h).  Sale Order, ¶ 56. |

**C.**    **Sale Notice and Cure Notices**

25.    Objections to this Motion shall: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the United States Bankruptcy Court for the District of Delaware; (d) state with specificity the nature of such objection; and (e) be served so as to be received no later than 4:00 p.m. (ET) on June 4, 2014:

> (i) the Debtors, 671 Ohio Pike, Suite K, Cincinnati, OH 45245; (ii) co-counsel to the Debtors, (a) Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036 (Attn: Leo T. Crowley, Jonathan Russo and Margot Erlich) and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P. O. Box 1347, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney and Derek C. Abbott); (iii) investment bankers to the Debtors, Duff & Phelps Securities, LLC, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067 (Attn: Mark Catania); (iv) Development Specialists, Inc., Three First National Plaza, 70 West Madison Street, Suite 2300, Chicago, IL 60602-4250 (Attn: William A. Brandt, Jr.); (v) counsel to DIP Lender and Prepetition Lenders, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn: Mark Deveno and Erin K. Mautner) and Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801 (Attn: Mark Collins); (vi) counsel to the Committee; and (vii) the United States Trustee for the District of Delaware (the "Notice Parties").

26.    As soon as practicable after the filing of this Motion, the Debtors will cause the notice attached hereto as **Exhibit 2** (the "Sale Notice") to be sent by first-class mail postage prepaid, to the following: (a) the Notice Parties; (b) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (c) all non-Debtor parties to the Assigned Contracts; (d) all Persons known or reasonably believed to have expressed a *bona fide* interest in acquiring some or all of any of the Purchased Assets within the last six months; (e) federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims,

contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (f) the Internal Revenue Service; (g) the Attorneys General in the states where the Purchased Assets are located; and (h) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

27.    In addition to the foregoing, electronic copies of this Motion, the Purchase Agreement, and the Sale Notice will be posted on the case website maintained by the Debtors' claims and noticing agent, BMC Group, Inc., www.bmcgroup.com/laboratorypartners.

28.    Further, to facilitate the sale of the Purchased Assets and the assumption, assignment and/or transfer of the Assigned Contracts, the Debtors propose to serve the notice attached hereto as **Exhibit 3** (the "Notice of Assumption and Assignment") on all non-Debtor parties to the Assigned Contracts, as soon as practicable after the filing of the Motion by first-class mail or hand delivery.  If the Debtors identify additional executory contracts or unexpired leases that may be assumed by the Debtors and assigned to Purchaser not set forth in an original Notice of Assumption and Assignment, the Debtors will promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional Assigned Contract.

29.    In the proposed Notice of Assumption and Assignment or Supplemental - Notice of Assumption and Assignment, the Debtors will identify that an Assigned Contract is potentially to be assumed and assigned and the amount that the Debtors believe must be paid to cure all defaults required to be cured pursuant to section 365(b) of the Bankruptcy Code with respect to such Assigned Contract (the "Cure Amounts").  If no amount (or $0.00) is listed on the

Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Debtors believe that there is no Cure Amount.

30.     Parties to Assigned Contracts shall file any objections (each a "Cure/Assignment Objection") to (a) scheduled Cure Amounts, and/or (b) to the proposed assumption, assignment and/or transfer of such Assigned Contracts, by 4:00 p.m. (ET) on June 4, 2014 (the "Cure/Assignment Objection Deadline") and to serve a copy of the Cure/Assignment Objection on the Notice Parties so as to be actually received by the Cure/Assignment Objection Deadline.  If a Cure/Assignment Objection challenges a Cure Amount, such objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof.  Upon receipt of an objection to a Cure Amount, subject to the Purchase Agreement, the Debtors or the Purchaser, as the case may be, may, in their sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between the Debtors, the Purchaser, and the objecting party.  So long as the Claimed Cure Amount (or such other amount as the Court may order) is held in reserve, the Debtors will seek authority to assume, assign and/or transfer the applicable Assigned Contract without further delay. Upon assumption and assignment of such an Assigned Contract, the objecting party's recourse with respect to the Cure Amounts will be limited to the funds held in reserve.

31.     By this Motion, the Debtors request that the Court determine that any non-Debtor party to an Assigned Contract that does not file and serve a Cure/Assignment Objection as set forth above (i) is forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Assigned Contract and the Debtors shall be entitled to rely solely upon the Cure Amount, and (ii) be deemed to consent to

the assumption, assignment and/or transfer of such Assigned Contract and shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional pre-assignment amounts are due or pre-assignment defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, under such Assigned Contract.

## RELIEF REQUESTED

32.    The Debtors seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit 1** approving, among other things, (a) the sale of the Purchased Assets pursuant to the Purchase Agreement to the Purchaser, (b) the Debtors entry into the Purchase Agreement, (c) assumption and assignment of executory contracts and unexpired leases, and (d) related relief.  The Debtors expressly reserve the right to modify the relief requested in this Motion prior to or at the applicable hearing.

## BASIS FOR RELIEF REQUESTED

**A.     The Sale of the Purchased Assets is Within the Sound
         Business Judgment of the Debtors and Should be Approved**

33.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery*

*Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

34.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with Sale of the Purchased Assets is based upon sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

35.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C.

§ 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

36.    The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Purchaser.  The sale of the Purchased Assets presents the best opportunity to maximize value for the estates.  Although the consideration for the Purchased Assets is a credit bid, the Purchase Agreement is beneficial to the Debtors, their estates and creditors because it reduces the Debtors' secured indebtedness, preserves hundreds of jobs, ensures a continuity of service to customers and provides an on-going business partners for vendors.   The ability to smoothly transition the Long-Term Care Division business (rather than an abrupt halt with layoffs) is critical to value of such business and numerous parties in interest in these cases.

37.    The Debtors believe the sale of the Purchased Assets should be approved quickly to maximize the value of their estates and that further time marketing and operating such

assets will not be beneficial to these estates and would in fact, be detrimental to the estates.  *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y.2010) ("[I]f the Debtors were to abandon the Sale Transaction ... there [would be] a material risk that, although the Debtors may not 'die,' their condition would significantly deteriorate.").  Operating the Long-Term Care Division is cash intensive and liquidity for the Debtors' businesses is limited.  The sale will transition the business from the Debtors and relieve the Debtors of their obligations to pay costs attendant to such business.

38.    The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders, and that a sound business justification exists to pursue the proposed sale utilizing the expedited process of a section 363 sale rather than through a plan of reorganization. Further, the sale pursuant to the Purchase Agreement and on the time table contemplated by this Motion is supported by the Prepetition Lenders.  As a result, the first prong of the *Abbotts Dairies* standard has been met.

39.    As set forth above, the Debtors intend to service the Sale Notice on the Sale Notice Parties.  In addition, the Debtors will serve a Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment upon all non-Debtor parties to the Assigned Contracts.  In addition, the Debtors previously served a sale and auction notice, the Bidding Procedures Order and notices of assumption and assignment as set forth in the Bidding Procedures Order upon numerous parties, including the Sale Notice Parties.  The Debtors further published the prior sale and auction notice as required by the Bidding Procedures Order.  The notice contemplated herein and provided in connection with the Bidding Procedures Order provides adequate notice to all potentially interested parties, including both creditors of the

Debtors' estates and also those parties who have previously expressed an interest in purchasing the Purchased Assets in the past six months. Accordingly, the proposed sale satisfies the second prong of the *Abbotts Dairies* standard.

         40.     The marketing process in these cases was also designed to maximize the value received for the Purchased Assets, therefore satisfying the requirement that the Debtors are adhering to their fiduciary duties owed to all creditors and interest holders. The Debtors have subjected the value of the Purchased Assets to market testing and will continue to entertain offers for the Purchased Assets in accordance with their fiduciary duties. Accordingly, the Debtors and all parties in interest should be assured that the consideration received for the Purchased Assets is fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of *Abbotts Dairies* is also satisfied here.

**B.**     **The Proposed Sale is Proposed in "Good Faith"**
         **Under Section 363(m) of the Bankruptcy Code**

         41.     The Debtors request that the Court find that the Purchaser is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

         42.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

         43.     Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section

363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3d Cir. 1998). In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Assigned Contracts are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. Therefore, the Debtors respectfully submit that section 363(m) applies to protect the Purchaser with respect to the purchase of the Purchased Assets and the assumption of Assigned Contracts.

44. As required by section 363(m) of the Bankruptcy Code, the sale has been proposed in good faith and the Debtors and Purchaser have acted in good faith in negotiating the sale of the Purchased Assets and the assignment of the Assigned Contracts related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

1198 (7th Cir. 1978)).  *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

45.     Here, the sale of the Purchased Assets and the assignment of the Assigned Contracts is in good faith.  The Debtors marketed the Purchased Assets both prior to and after the commencement of these cases.  As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Purchase Agreement is the culmination of an extensive, arm's length, and good faith negotiation process in which all parties were represented by counsel.  Moreover, there is no evidence of fraud or collusion in terms of the proposed Sale. Under the circumstances, the Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

46.     All parties in interest as described herein will receive notice of the Sale proposed herein and will be provided with an opportunity to be heard.  Additionally, all counterparties to Assigned Contracts will be provided notice of assumption, assignment, and/or transfer and an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**C.      The Proposed Sale Satisfies the Requirements
of Section 363(f) of the Bankruptcy Code**

47.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such

property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in

the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met).  Furthermore, courts have held that they have the equitable power to

authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See,

e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27,

2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit

Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

      48.    All entities known or reasonably believed to have asserted any lien, claim,

encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets

were notified of a proposed sale of the Purchased Assets in connection with the Bidding

Procedures Order and will be served with the Sale Notice.  See 11 U.S.C. § 363(f)(2).  The

Prepetition Lenders are entitled to super-priority liens as adequate protection to the extent of any

diminution in their collateral and the Prepetition Lenders have consented to the Sale Order and

the sale contemplated by the Purchase Agreement.  In addition, to the extent that any party with a

lien, claim, or interest in, or encumbrance on, the Purchased Assets has not consented to such

sale, the Debtors assert that such party could be compelled, in a legal or equitable proceeding, to

accept a money satisfaction of its interests, if any, in the relevant assets.  See 11 U.S.C.

§ 363(f)(5).  Accordingly, the Debtors believe that one or more of the other requirements of section 363(f) of the Bankruptcy Code are satisfied with respect to the proposed sale of the Purchased Assets.  Thus, subject to the limitations described above, the Debtors seek authority to sell the Purchased Assets free and clear of all liens, claims, interests and encumbrances, with such liens, claims, interests and encumbrances, if any, to attach to the proceeds of such sale, subject to any rights and defenses that the Debtors may have with respect thereto.

**D.      Assumption and Assignment of Executory Contracts
           and Unexpired Leases Should be Approved**

49.      To facilitate and effectuate the Sale of the Purchased Assets, the Debtors seek authority to assume, assign, and/or transfer the Assigned Contracts to the Purchaser as set forth in the Purchase Agreement.  Section 365 of the Bankruptcy Code authorizes a debtor to assume, assign and/or transfer its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc*., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

50.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

51.     The Purchaser desires to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets.  Pursuant to the terms of the Purchase Agreement, the Closings of the Purchased Assets will occur in three stages.. The Debtors will assume the Assigned Contracts either (i) on the earlier of (a) the relevant LTC Closing Date or (b) the Effective Date of the Debtors' Chapter 11 plan and then assign the Assigned Contracts at the time of the Stage 1 Closing Date, the Stage 2 Closing Date or the Stage 3 Closing Date, as applicable, or (ii) if the Debtors, LTC Purchaser and applicable counterparty agrees, assume and assign the Assigned Contracts upon the relevant LTC Closing Date.  Further, the Debtors or Reorganized Debtors and the counterparty to any contract shall have the right to agree to defer the date for assumption or rejection, as the case may be, until after the Effective Date, subject to such conditions as shall be mutually agreeable.  Pursuant to the Purchase Agreement, at any time prior to the Designation Deadline, the Purchaser may determine to include additional executory contracts and unexpired leases as Assigned Contracts and may also determine to not include any executory contract or unexpired lease as an Assigned Contract.  The proposed sale order further provides that at any time after the Designation Deadline, Purchaser, the Debtors and the non-

Debtor contract counterparty may jointly agree to include Contracts in, or exclude Contracts from, the Purchased Assets and the Excluded Assets without further order of this Court.

52.    The Debtors intend to demonstrate that all requirements for assumption, assignment, and/or transfer of the Assigned Contracts have been satisfied at the Sale Hearing. For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling their assets and assuming, assigning, and/or transferring the Assigned Contracts to the Purchaser is in the best interests of their estates.    Moreover, the Debtors will provide all parties to the Assigned Contracts an opportunity to be heard.    Thus, the Debtors request that the assumption, assignment, and/or transfer of the Assigned Contracts should be approved.

53.    Specifically, the Debtors will serve the Notice of Assumption and Assignment as soon as practicable after the filing of this Motion on the non-Debtor parties to the Assigned Contracts.    The Purchase Agreement identifies the Assigned Contracts that Purchaser wishes to assume, and the respective Cure Amounts, if any.    The Debtors request that unless the non-Debtor party to an Assigned Contracts files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment, and/or transfer to the Purchaser on or before the Cure/Assignment Objection Deadline, such non-Debtor party will (i) be forever barred from objecting to assumption, assignment and/or transfer to the Purchaser of such Assigned Contract, including, any objection to the Cure Amount, and from asserting any additional cure or other amounts with respect to such Assigned Contract, and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) be deemed to have consented to the assumption, assignment, and/or transfer of such Assigned Contract and shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser of

the relevant Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, under such Assigned Contract.

**E.    Relief from Bankruptcy Rules 6004(h) and 6006(d)-(f) is Appropriate**

54.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) are waived.

55.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

56.    The Debtors further request relief from Bankruptcy Rule 6006(e)-(f) regarding the filing of omnibus motions to assume and assign executory contracts and unexpired leases.  Although the Sale Order and Purchase Agreement provide for the potential assumption

and assignment of numerous Assigned Contracts, the counterparties to the Assigned Contracts will receive a Notice of Assumption and Assignment that clearly specifies the Assigned Contracts and Cure Amounts. The Debtors submit that the counterparties to the Assigned Contracts will receive the targeted notice that Bankruptcy Rule 6006(e)-(f) is intended to provide through such notice despite the number of Assigned Contracts.

57.     Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h) and 6006(d) and the omnibus motion restriction in Bankruptcy Rule 6006(e)-(f).

## **NOTICE**

58.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel for and members of the Committee; (c) counsel to the Prepetition Lenders; (d) all entities (or counsel therefor) known or reasonably believed to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon any portion of the Purchased Assets; (e) all Persons known or reasonably believed to have expressed a bona fide interest in acquiring some or all of any of the Purchased Assets within the last six months; (f)  federal, state and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any reasonably known interest in the relief requested by the Motion; (g) the Internal Revenue Service; (h) the Attorneys General in the state where the Purchased Assets are located; and (i) all parties that have requested, prior to the date of service of the notice, or that are required to receive notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed sale Order, substantially in the form attached hereto as **Exhibit 1**; and (b) such other and further relief as the Court deems just and proper.

Dated: May 21, 2014                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
        Wilmington, Delaware

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Erin R. Fay (No. 5268)
1201 N. Market St., 16th Flr.
PO Box 1347
Wilmington, DE  19899-1347
Telephone:  302-658-9200
Facsimile:  302-658-3989

-and-

PILLSBURY WINTHROP SHAW PITTMAN LLP
Leo T. Crowley
Jonathan J. Russo
Margot Erlich
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500

8071252

*Counsel to Debtors and Debtors in Possession*